**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOHN DOE,

               *Petitioner*,

               v.

GEN. JAMES N. MATTIS,
  in his official capacity as SECRETARY OF
  DEFENSE,

               *Respondent*.

No. 17-cv-2069 (TSC)

**PETITIONER'S RESPONSE TO RESPONDENT'S FACTUAL RETURN**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

SUMMARY OF ARGUMENT .......................................................................................... 2

ARGUMENT ........................................................................................................................ 5

I.   The indefinite military detention of an American citizen requires clear statutory
     authorization. ............................................................................................................... 5

     A.   Under the Constitution, Congress must clearly authorize the indefinite military
          detention of an American citizen. ................................................................... 5

     B.   The Non-Detention Act reinforces the clear-statement requirement. ............. 6

II.  The 2001 AUMF does not provide the clear and unmistakable authorization
     necessary to detain indefinitely an American citizen for alleged membership in ISIS. ..... 9

     A.   Congress did not authorize detention of U.S. citizens under the 2001 AUMF
          except as to individuals and groups directly connected to the September 11,
          2001 attacks. ................................................................................................... 10

     B.   The 2001 AUMF does not authorize Petitioner's detention as an alleged
          member of ISIS under the government's theory that ISIS is "part of" or an
          "associated force" of al Qaeda. ..................................................................... 13

          1.   ISIS is not a "part of" al Qaeda under the 2001 AUMF. ...................... 13

          2.   The 2001 AUMF does not authorize the detention of American citizens as
               members of "associated forces" of al Qaeda, and in any event ISIS is not
               such an "associated force." ................................................................... 18

               a.   Congress has not clearly and unmistakably authorized the detention of
                    U.S. citizens as members of "associated forces." .......................... 18

               b.   There is no legal support for the government's self-created definition of
                    "associated force." .......................................................................... 20

               c.   The government's allegations fail to establish that ISIS was an
                    "associated force" of al Qaeda at the time of Petitioner's detention in
                    September 2017. ............................................................................... 24

III. The 2002 AUMF specifically targeted the Saddam Hussein regime in Iraq and does
     not authorize Petitioner's indefinite military detention. .................................................. 29

IV.  The National Defense Appropriations Act of 2012 and other appropriations acts do
     not support the government's claims of detention authority. ........................................... 33

V.  The president has no inherent authority to detain indefinitely an American citizen. ....... 36

CONCLUSION ....................................................................................................................... 41

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Clapper*,
    785 F.3d 787 (2d Cir. 2015)................................................................. 29

*Al Ginco v. Obama*,
    626 F. Supp. 2d 123 (D.D.C. 2009)................................................. 16, 25

*al Odah v. United States*,
    62 F. Supp. 3d 101 (D.D.C. 2014).......................................................... 16

*Al-Adahi v. Obama*,
    698 F. Supp. 2d 48 (D.D.C. 2010)........................................................... 16

*\*Al-Bihani v. Obama*,
    590 F.3d 866 (D.C. Cir. 2010)..................................................... 20, 21, 25

*\*Ali v. Obama*,
    736 F.3d 542 (D.C. Cir. 2013)........................................................ 22, 25

*Almerfedi v. Obama*,
    654 F.3d 1 (D.C. Cir. 2011)................................................................... 22

*Alsabri v. Obama*,
    764 F. Supp. 2d 60 (D.D.C. 2011)........................................................ 16

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003)............................................................................... 40

*Ass'n of Am. Railroads v. Costle*,
    562 F.2d 1310 (D.C. Cir. 1977)............................................................. 30

*Barhoumi v. Obama*,
    609 F.3d 416 (D.C. Cir. 2010)................................................... 21, 22, 25

*Boumediene v. Bush*,
    553 U.S. 723 (2008)............................................................................... 40

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)............................................................................... 30

*Duncan v. Walker*,
    533 U.S. 167 (2001)............................................................................... 27

*Ex parte Bollman*,
    8 U.S. (4 Cranch) 75 (1807).................................................................. 39

*Ex parte Endo,*
    323 U.S. 283 (1944) ............................................................................................ 5, 6

*Ex parte Milligan,*
    71 U.S. (4 Wall.) 2 (1866) ..................................................................................... 39

*Foucha v. Louisiana,*
    504 U.S. 71 (1992) .................................................................................................. 5

*Gherebi v. Obama,*
    609 F. Supp. 2d 43 (D.D.C. 2009) ......................................................................... 16

*Greene v. McElroy,*
    360 U.S. 474 (1959) ................................................................................................ 6

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ................................................................................................ 5

*Gutknecht v. United States,*
    396 U.S. 295 (1970) ................................................................................................ 6

*Hamdan v. Rumsfeld,*
    548 U.S. 557 (2006) .............................................................................................. 37

*\*Hamdi v. Rumsfeld,*
    542 U.S. 507 (2004) ....................................................................................... passim

*Hamlily v. Obama,*
    616 F. Supp. 2d 63 (D.D.C. 2009) .................................................................. 24, 27

*Hedges v. Obama,*
    724 F.3d 170 (2d Cir. 2013) ............................................................................ 19, 34

*Howe v. Smith,*
    452 U.S. 473 (1981) ................................................................................................ 7

*Hussain v. Obama,*
    134 S. Ct. 1621 (2014) .......................................................................................... 12

*\*Hussain v. Obama,*
    718 F.3d 964 (D.C. Cir. 2013) .............................................................................. 22

*INS v. St. Cyr,*
    533 U.S. 289 (2001) ........................................................................................... 5, 37

*Khalifh v. Obama,*
    No. 05-CV-1189, 2010 WL 2382925 (D.D.C. May 28, 2010) .............................. 16

*Khan v. Obama,
  655 F.3d 20 (D.C. Cir. 2011) ................................................... 21, 22, 24, 25

Padilla v. Rumsfeld,
  352 F.3d 695 (2d Cir. 2003) ................................................................... 8

*Parhat v. Gates,
  532 F.3d 834 (D.C. Cir. 2008) ........................................................ 21, 22

Rasul v. Bush,
  542 U.S. 466 (2004) ............................................................................. 37

Salahi v. Obama,
  625 F.3d 745 (D.C. Cir. 2010) ............................................................. 16

Shaughnessy v. United States ex rel. Mezei,
  345 U.S. 206 (1953) ............................................................................. 38

United States v. Salerno,
  481 U.S. 739 (1987) ............................................................................... 5

Whitman v. Am. Trucking Ass'ns,
  531 U.S. 457 (2001) ............................................................................. 29

Yazoo & M.V.R. Co. v. Thomas,
  132 U.S. 174 (1889) ............................................................................. 30

*Youngstown Sheet & Tube Co. v. Sawyer,
  343 U.S. 579 (1952) ............................................................... 13, 37, 38

## Statutes

8 U.S.C. § 1189 ...................................................................................... 29

18 U.S.C. § 4001(a) ..................................................................... 2, 6, 7, 8

18 U.S.C. § 4001(b) ................................................................................. 8

28 U.S.C. § 2241 .................................................................................... 40

2001 Authorization for Use of Military Force, Pub. L. 107-40, 115 Stat. 224 (2001)
  ("2001 AUMF") .......................................................................... passim

Authorization for Use of Military Force against Iraq Resolution of 2002, Pub. L. No. 107-243,
  116 Stat. 1498 (2002) ("2002 AUMF") ......................................... passim

Consolidated and Further Continuing Appropriations Act of 2015, Pub. L. No. 113-235,
  128 Stat. 2130 (2014) ........................................................................... 34

Consolidation Appropriations Act, 2016, Pub. L. No. 114-13, 129 Stat. 2242 (2015) ............... 34

Emergency Detention Act of 1950, Pub. L. No. 81-831, 64 Stat. 1019 (1950).............................. 6

Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (2006)
    ("2006 MCA") ............................................................................... 20

Military Commissions Act of 2009, Pub. L. No. 111-84, tit. XVIII, 123 Stat. 2190
    (2009) ("2009 MCA")................................................................... 20

National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81,
    125 Stat. 1298 (2012) ("2012 NDAA").......................................... passim

National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92,
    129 Stat. 726 (2015)..................................................................... 34

## Legislative History

117 Cong. Rec. 31542 (daily ed. Sept. 13, 1971) ......................................... 8

147 Cong. Rec. H5654 (daily ed. Sept. 14, 2001) ...................................... 11

147 Cong. Rec. S9417 (daily ed. Sept. 14, 2001) ....................................... 11

157 Cong. Rec. S8094 (daily ed. Dec. 1, 2011)........................................... 33

## Other Authorities

Amanda L. Tyler, *The Forgotten Core Meaning of the Suspension Clause*, 125 Harv. L.
    Rev. 901 (2012) ............................................................................... 39

Charlie Savage, Eric Schmitt & Mark Mazzetti, *Obama Expands War with Al Qaeda to
    Include Shabab in Somalia*, N.Y. Times, Nov. 27, 2016........................... 14

Cristina Silva, *Iran is the 'Greatest Long-Term Threat to Stability,' Army General Warns*,
    Newsweek, Mar. 29, 2017 .............................................................. 31

David Abramowitz, *The President, the Congress, and Use of Force: Legal and Political
    Considerations in Authorizing Use of Force Against International Terrorism*, 43 Harv.
    Int'l L.J. 71 (2002)........................................................................ 10

David J. Barron & Martin S. Lederman, *The Commander-in-Chief at the Lowest Ebb—
    Framing the Problem, Doctrine, and Original Understanding*, 121 Harv. L. Rev.
    689 (2008)..................................................................................... 38

Int'l Comm. of Red Cross, *Commentary IV: Geneva Convention Relative to the Protection
    of Civilian Persons in Time of War* (Jean S. Pictet ed. 1958)................................. 26

Jack Goldsmith, *Obama's Breathtaking Expansion of a President's Power to Make War*, Time, Sept. 11, 2014 ............................................................................... 17, 25

Jake Miller, *David Petraeus: Biggest Threat to Iraq's Future is Iran, Not ISIS*, CBS News, Mar. 20, 2015 ......................................................................................... 32

Jennifer Daskal, *Democracy's Failure*, Just Security, Sept. 11, 2014 ........................ 18

Joseph Story, 3 *Commentaries on the Constitution* (1833) ........................................ 39

Karen DeYoung & Greg Miller, *Al-Qaeda's Expulsion of Islamist Group in Syria Prompts U.S. Debate*, Wash. Post, Feb. 10, 2014 .................................................. 26

Letter from Susan E. Rice, Assistant to the President for Nat'l Security Aff., to John A. Boehner, Speaker of the House of Representatives (July 25, 2014)......................... 33

M. Alex Johnson, *Obama Formally Ends Iraq Combat Mission*, NBC News, Aug. 31, 2010............................................................................................................... 32

Marko Milanovic, *The End of Application of International Humanitarian Law, in* 96 Int'l Rev. of Red Cross: Scope of the Law in Armed Conflict 163 (2014) ...................... 23

Nathalie Weizmann, *The End of Armed Conflict, the End of Participation in Armed Conflict, and the End of Hostilities: Implications for Detention Operations Under the 2001 AUMF*, 47 Colum. Hum. Rts. L. Rev. 204 (2016)......................................... 26

Press Release, U.S. Dep't of Justice, American Citizen Convicted of Conspiring to Murder U.S. Nationals in Bombing Attack Against Military Base in Afghanistan (Sept. 29, 2017) ............................................................................................................... 35

Press Release, U.S. Dep't of Justice, American Sentenced to 20 Years for Joining ISIS (Oct. 27, 2017) ................................................................................................. 35

Press Release, U.S. Dep't of Justice, New Jersey Man Admits Conspiring to Provide Material Support to ISIS (Oct. 29, 2015)............................................................... 35

Press Release, U.S. Dep't of Justice, Queens Man Charged with Attempting to Provide Material Support to ISIS (Aug. 29, 2017)............................................................. 35

Press Release, U.S. Dep't of Justice, United States Citizen Pleads Guilty to Providing Material Support to Al Shabaab (Sept. 8, 2017).................................................... 35

Press Release, U.S. Dep't of Justice, Wisconsin Man Sentenced to 10 Years in Prison for Attempting to Provide Material Support to ISIS (Feb. 17, 2017)....................... 35

Rebecca Ingber, *Co-Belligerency*, 42 Yale J. Int'l L. 67 (2017) ................................. 23

Remarks of John O. Brennan, Director, CIA, Remarks at Harvard Law School, *Strengthening Our Security by Adhering to Our Values and Laws* (Sept. 16, 2011) .............. 36

Report of the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions, Gen. Assembly, U.N. Doc. A/68/382 (Sept. 13, 2013) ........................................................... 27

Richard F. Grimmett, Cong. Research Serv., RS22357, Authorization for Use of Military Force in Response to the 9/11 Attacks (Pub. L. 107-40): Legislative History (Jan. 16, 2007) ..................................................................................................................................... 10, 28

Robert Chesney, *The 2001 AUMF: From Associated Forces to (Disassociated) Successor Forces*, Lawfare, Sept. 10, 2014 ............................................................................................ 17

Ryan Goodman, *The President Has No Congressional Authorization to Use Force Against ISIS in Iraq*, Just Security, June 19, 2014 .............................................................................. 17

*The Federalist No. 69* (Alexander Hamilton) (Clinton Rossiter ed., 1961) ................................ 38

U.S. Dep't of Defense, Report on Associated Forces (July 2014) ............................................. 28

**INTRODUCTION**

For nearly five months, the government has been detaining an American citizen without charge or trial, based on legal theories that no court has ever endorsed. The government asserts that it may rely on either a sixteen-year-old Congressional authorization targeting those responsible for the September 11, 2001 attacks, a fifteen-year-old Congressional authorization targeting the Saddam Hussein regime in Iraq, or the president's inherent authority to imprison American citizens indefinitely. But on the government's own allegations, Petitioner has no connection to the September 11 attacks, or to any organization that even existed at the time of those attacks. Likewise, Petitioner has no connection to the U.S. war against the Saddam Hussein regime or to that war's statutory authorization, which the government itself previously abandoned as obsolete. Finally, the president has no unilateral authority to detain indefinitely an American citizen absent congressional suspension of habeas corpus.

Because the executive lacks the legal authority to detain Petitioner even on the facts it alleges about him, *see* Respondent's Factual Return ("Return"), Petitioner seeks an expeditious ruling on that question.[1] Petitioner therefore accepts the government's allegations about him as true for the limited purpose of this threshold challenge, and has reserved his right to challenge those allegations at a later stage. However, Petitioner notes that those allegations are riddled with inaccuracies, fundamentally misleading, and replete with irrelevant information. Contrary to the thrust of the government's contentions that Petitioner is an ISIS fighter, and as Petitioner told the government, he sought to understand firsthand and report about the conflict in Syria, Return ¶ 86; was kidnapped and imprisoned by ISIS, Return ¶ 71; and tried numerous times to escape,

---

[1] The government will be filing a redacted version of its Return on the public docket.

Return TIR 03 at 3—and not even the government alleges that he ever took up arms against the United States or anyone else.

Petitioner has now been detained without charge for nearly five months. A lengthy adjudication over the government's factual allegations, which would necessarily require investigation of evidence, production of corroborating witnesses and materials, and testimony by experts, would not only further prolong Petitioner's unlawful detention by the executive—it would also be manifestly unfair. The government's unlawful use of "enemy combatant" detention would force Petitioner to present a defense at a hearing where he is denied bedrock criminal procedural safeguards to which he, as an American citizen, is constitutionally entitled. *See* Return ¶ 6 (enemy-combatant habeas hearing "need not resemble a criminal trial" (citation omitted)).

If the government wishes to continue to detain Petitioner, it must immediately charge him with a crime in federal court. Otherwise, it must release him from unlawful executive imprisonment. The Constitution and laws of the United States require no less.

## SUMMARY OF ARGUMENT

The executive's indefinite detention of Petitioner without charge is unlawful, even assuming the facts alleged about him are true.

First, the Constitution and federal law mandate that Congress clearly and unmistakably authorize the detention of an American citizen, whether in time of war or peace. This clear-statement rule is rooted in the abiding constitutional norm that citizens not be detained indefinitely without trial and in the Non-Detention Act, 18 U.S.C. § 4001(a). Notably, Congress specifically enacted the Non-Detention Act to prevent the executive from imprisoning American citizens for national-security purposes without express and deliberate legislative action.

Second, the 2001 Authorization for Use of Military Force, Pub. L. 107-40, 115 Stat. 224 (2001) ("2001 AUMF"), does not provide the requisite clear statement to justify Petitioner's detention. In enacting the 2001 AUMF, Congress targeted the specific individuals and organizations responsible for the September 11 attacks and refused to give the executive broad and open-ended authority to use military force to deter future terrorism threats. The limited authority Congress conveyed to detain American citizens under the 2001 AUMF cannot be stretched to reach Petitioner under either theory advanced by the government: that ISIS is "part of" or an "associated force" of al Qaeda.

The government's "part of" argument rests largely on its assertions that ISIS's former founder and leader (who was killed more than a decade ago and who had no connection to the September 11 attacks) was once "associated" with Osama bin Laden; that the predecessor group to ISIS was once aligned with bin Laden's al Qaeda organization; and that ISIS today claims to be the "true executor of bin Laden's legacy." Even if taken as true, these facts are legally insufficient to make ISIS "part of" al Qaeda under the 2001 AUMF. Congress did not authorize force against all individual "associates" of those responsible for the September 11 attacks—much less issue the president a blank check to detain every future member of every future organization that might one day be led by such an "associate" or that might broadly claim bin Laden's mantle, whether for ideological reasons or to bolster its own ranks.

Likewise, the government's own facts cannot justify Petitioner's indefinite detention on the theory that ISIS is an "associated force" of al Qaeda. The 2001 AUMF does not authorize any "associated force" detention authority over American citizens. But even if it did, that authority requires a close nexus to the armed conflict against al Qaeda and the Taliban in Afghanistan—a nexus that does not exist here. Further, the government's "associated force"

argument—like its "part of" argument—fails for the additional reason that Petitioner was not detainable at the time of capture, the relevant time period for determining detainability under the 2001 AUMF. As the government acknowledges, whatever the prior relationship between ISIS and al Qaeda, that relationship had completely dissolved by the time of Petitioner's capture.

Third, the Authorization for Use of Military Force against Iraq Resolution of 2002, Pub. L. No. 107-243, 116 Stat. 1498 (2002) ("2002 AUMF"), also does not authorize Petitioner's detention because the operative language of that statute plainly applies only to the Iraqi regime under Saddam Hussein and does not empower the executive to detain any American citizen whom it believes poses a threat to Iraq. The 2002 AUMF did not give the president open-ended detention power to lock up American citizens without charge in support of a worldwide military campaign against any group that can trace its origins to Iraq.

Fourth, the appropriations measures on which the government relies do not support Petitioner's indefinite military detention. The various measures the government references authorize the president to spend government money against ISIS, but they not only fail to clearly authorize the detention of U.S. citizen members of ISIS, they fail to mention detention *at all*.

Finally, no court has ever suggested, let alone held, that the president has unilateral authority to imprison an American citizen without trial—unless Congress suspends habeas corpus, which of course it has not done. This Court should reject this extraordinary assertion of executive power.

## ARGUMENT

I. **The indefinite military detention of an American citizen requires clear statutory authorization.**

    A. **Under the Constitution, Congress must clearly authorize the indefinite military detention of an American citizen.**

Since the Founding, it has been the abiding norm under the Due Process Clause of the Fifth Amendment that citizens are not to be indefinitely deprived of their liberty without trial. *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (plurality op.) ("'In our society, liberty is the norm,' and detention without trial 'is the carefully limited exception.'" (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987))); *see also Foucha v. Louisiana*, 504 U.S. 71, 80, 92 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.").

Any departure from this constitutional bedrock—if permitted at all—requires an explicit statement from Congress. *See Ex parte Endo*, 323 U.S. 283, 298–300 (1944) (absent an express statement, statutes must be construed not to infringe a citizen's fundamental constitutional right against detention without trial); *see also Hamdi*, 542 U.S. at 568 (Scalia, J., dissenting) (requirement of express congressional action to authorize "indefinite wartime detention over citizens" reflects the "Founders' general mistrust of military power permanently at the Executive's disposal"). This clear-statement requirement serves a vital purpose under the Constitution and its separation of powers. It ensures that when the government acts in a constitutionally sensitive area, such as individual liberty, "the *legislature* has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (emphasis added) (quotation marks and citations omitted); *see, e.g.*, *INS v. St. Cyr*, 533 U.S. 289, 299–300, 304–05 (2001) (narrowly construing statutes'

elimination of all judicial review over final immigration-deportation orders so as not to eliminate habeas corpus review); *Greene v. McElroy*, 360 U.S. 474, 507 (1959) ("[E]xplicit action [by lawmakers], especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws."). As the Supreme Court said almost a half-century ago, "[w]here the liberties of the citizen are involved," courts must "construe narrowly all delegated powers that curtail or dilute them." *Gutknecht v. United States*, 396 U.S. 295, 306–07 (1970) (citation omitted). The clear-statement requirement applies equally in time of war as in time of peace. As the Supreme Court instructed in *Ex parte Endo*: "We must assume, when asked to find implied powers in a grant of legislative or executive authority, that the law makers intended to place no greater restraint on the citizen than was clearly and unmistakably indicated by the language they used." 323 U.S. at 300.

**B.     The Non-Detention Act reinforces the clear-statement requirement.**

To protect against executive detention of Americans, Congress reinforced the Constitution's clear-statement requirement with an explicit statutory backstop. The Non-Detention Act provides: "No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress." 18 U.S.C. § 4001(a). Congress enacted the Non-Detention Act to repeal the Emergency Detention Act of 1950, which had authorized the president to detain any person, including a U.S. citizen, whom he reasonably believed posed a threat to U.S. security. Pub. L. No. 81-831, §§ 102–103, 64 Stat. 1019, 1021 (1950) (repealed by Pub. L. No. 92-128, 85 Stat. 347 (1971)). In passing the Non-Detention Act, Congress sought "to guard against a repetition of the World War II internments" by "requir[ing] clear congressional authorization before any citizen can be placed in a cell." *Hamdi*, 542 U.S. at 543 (Souter, J., concurring in part and dissenting in part). With respect to American citizens, Congress thus

"intended to preclude reliance on vague congressional authority . . . as authority for detention or imprisonment at the discretion of the Executive." *Id.* at 543–44. Congress passed the Non-Detention Act against "an interpretive regime [subjecting] enactments limiting liberty in wartime to the requirement of a clear statement," and the Act "must be read to have teeth in its demand for congressional authorization." *Id.* at 544. Indeed, and as discussed more fully below, the plurality in *Hamdi* upheld the military detention of a citizen *only after* finding that Congress had "clearly and unmistakably authorized detention in the narrow circumstances" presented there. 542 U.S. at 519.

The government incorrectly argues in a footnote that the Non-Detention Act does not apply to military detentions. Return ¶ 50 n.28. To the contrary, the Non-Detention Act's "plain language . . . proscrib[es] detention of *any kind* by the United States, absent a congressional grant of authority to detain." *Howe v. Smith*, 452 U.S. 473, 479 n.3 (1981). This includes military detention, as the four Justices who reached that question concluded in *Hamdi*. *See* 542 U.S. at 545–47 (Souter, J., joined by Ginsburg, J., concurring in part and dissenting in part) (Non-Detention Act requires clear statement for a citizen's military detention during wartime); *id.* at 574 (Scalia, J., joined by Stevens, J., dissenting) (same).[2] The Non-Detention Act's legislative history reinforces the statute's plain language. As noted above, Congress enacted the statute to prevent a repeat of the notorious internment of Japanese–American citizens who were held in military areas during World War II. *See id.* at 543 (Souter, J., concurring in part and dissenting in part) (Congress repealed the 1950 Act and adopted section 4001(a) to "avoid[] another *Korematsu*"). Further, a chief opponent of the bill had specifically objected that the Non-Detention Act would "deprive the President of his emergency powers" to detain without criminal

---

[2] The four Justices in the plurality did not reach that question. *See id.* at 517 (plurality op.).

charge "in war-related crises." 117 Cong. Rec. 31542 (daily ed. Sept. 13, 1971) (statement of

Rep. Ichord). And the bill's sponsor similarly described it in absolute terms: "in order to prohibit

arbitrary executive action, [the bill] assures that no detention of citizens can be undertaken by the

Executive without the prior consent of the Congress." *Id.* at 31551 (statement of Rep. Railsback).

Thus, when Congress passed the Non-Detention Act, it was unmistakably "aware that § 4001(a)

would limit the Executive's power to detain citizens in wartime to protect national security" and

deliberately extended the clear-statement requirement to "detention by the Executive for reasons

of security in wartime." *Hamdi*, 542 U.S. at 546–47 (Souter, J., concurring in part, dissenting in

part). The government's effort to confine the Non-Detention Act to "civil detentions"—and

thereby render it inapplicable to the military's detention of an American citizen without

congressional authorization—contradicts the statute's language, purpose, and history.[3]

\* \* \*

In sum, both the Constitution and federal law require clear statutory authorization to

detain an American citizen. As explained below, the government cannot meet this rigorous

requirement.

---

[3] The government relies on 18 U.S.C. § 4001(b)(1), which addresses the "control and management of Federal penal and correctional institutions." *See* Return ¶ 50 n.28. But sections 4001(a) and 4001(b)(1) share only a code designation—not a common origin or meaning. *See Padilla v. Rumsfeld*, 352 F.3d 695, 721 (2d Cir. 2003), *rev'd on other grounds*, 542 U.S. 426 (2004). Congress enacted section 4001(b)(1) "many decades prior to the Emergency Detention Act as part of entirely different legislation." *Id.* Further, in subsection (b)(1), "Congress explicitly distinguished between military and civilian jurisdiction by authorizing the Attorney General to control all prisons except military institutions." *Id.* at 722. The absence of any such distinction in subsection (a) underscores that "none exists and that the Non-Detention Act applies to both civilian and military detentions." *Id.*

**II.     The 2001 AUMF does not provide the clear and unmistakable authorization necessary to detain indefinitely an American citizen for alleged membership in ISIS.**

The government makes a mockery of the clear-statement requirement by claiming that a law Congress passed more than sixteen years ago and aimed narrowly at those responsible for the September 11 attacks provides authority now to detain Petitioner. As the Supreme Court has explained, the authority Congress conveyed to detain U.S. citizens under the 2001 AUMF is narrowly limited to combatants belonging to those groups directly connected to the attacks: al Qaeda and the Taliban.[4] Nonetheless, the government now seeks to indefinitely detain an American citizen under the 2001 AUMF despite the fact that on the government's own allegations, Petitioner had no involvement in the September 11 attacks, no connection to the organization (al Qaeda) responsible for those attacks, and no connection to the group (the Taliban) that harbored the perpetrators.

The government tries to escape the strictures Congress carefully imposed on detention authority over American citizens by attempting to shoehorn ISIS into the 2001 AUMF as "part of" or an "associated force" of al Qaeda. But the government itself concedes that ISIS did not exist at the time of the September 11 attacks. And although the government claims that ISIS later "aligned" with al Qaeda, Return ¶ 28, it concedes that by 2014, ISIS and al Qaeda had "split . . . over theological and strategic disagreements," Return ¶ 18, and that since that point, ISIS has been "entirely independent" from al Qaeda, Return ¶ 18 n.23. Thus, even accepting as true the factual assertions the government relies on to render ISIS "part of" or an "associated force" of al Qaeda, those assertions are insufficient, as a matter of law, to radically rewrite the narrow

---

[4] The full text of the 2001 AUMF is appended hereto.

authority conveyed by Congress—particularly in light of the clear statement necessary to detain American citizens.[5]

### A. Congress did not authorize detention of U.S. citizens under the 2001 AUMF except as to individuals and groups directly connected to the September 11, 2001 attacks.

Congress intended the 2001 AUMF to be a narrow statute that directly responded to the September 11 attacks. In enacting the 2001 AUMF, Congress explicitly rejected a substantially broader authorization the executive branch sought at that time—"to take military action against any nation, terrorist group or individuals in the world without having to seek further authority from the Congress." Richard F. Grimmett, Cong. Research Serv., RS22357, Authorization for Use of Military Force in Response to the 9/11 Attacks (Pub. L. 107-40): Legislative History 2 (Jan. 16, 2007), https://fas.org/sgp/crs/natsec/RS22357.pdf (describing Congress's rejection of the White House's proposed statutory authority "to deter and pre-empt any future acts of terrorism or aggression against the United States"); *see also, e.g.*, David Abramowitz, *The President, the Congress, and Use of Force: Legal and Political Considerations in Authorizing Use of Force Against International Terrorism*, 43 Harv. Int'l L.J. 71, 74 (2002) (in response to legislative concerns about executive "overreach," a "consensus quickly developed [in Congress] that the authority [to use military force] should be limited to those responsible for the September 11 attacks, and to any country harboring those responsible"). Congress rejected the executive branch's proposal to ensure that the president seek authorization for the use of force to combat "future acts of terrorism." Abramowitz, *supra*, at 73.

---

[5] As explained throughout this brief, the factual assertions in the government's Return are insufficient as a matter of law to support Petitioner's detention. Should the government seek another bite at the apple by requesting leave to introduce additional facts concerning the relationship between al Qaeda and ISIS—whether at or prior to the relevant time of Petitioner's capture—Petitioner requests the opportunity to submit his own evidence as part of a more fulsome factual hearing on that issue.

Contemporaneous congressional statements from the 2001 AUMF's legislative history underscore the statute's intended limits. For example, Rep. Lamar Smith complained at the time that "the resolution limits the President to using force only against those responsible for the terrorist attacks last Tuesday," constituting "a significant restraint on the President's ability to root out terrorism wherever it may be found." 147 Cong. Rec. H5654 (daily ed. Sept. 14, 2001) (statement of Rep. Smith); *see also, e.g.*, *id.* at H5666 (statement of Rep. Cardin) ("This resolution limits [the use of military force] to respond[ing] to the September 11 attack on our Nation."); 147 Cong. Rec. S9417 (daily ed. Sept. 14, 2001) (statement of Sen. Feingold) ("[I]t does not contain a broad grant of powers, but is appropriately limited to those entities involved in the attacks that occurred on September 11."); *id.* at S9416 (statement of Sen. Levin) ("It is not a broad authorization for the use of military force against any nation, organization, or persons who were not involved in the September 11 terrorist attacks."); 147 Cong. Rec. H5663 (statement of Rep. Schakowsky) ("This resolution has been carefully drafted to restrict our response to those we know to be responsible for this atrocity."); *id.* at H5671 (statement of Rep. Udall) ("It covers the culpable but it is not aimed at anyone else.").

Congress's deliberate rejection of the expansive detention authority the executive sought in 2001 reinforces the absence of the necessary clear statement to detain an American citizen outside the narrow context approved in *Hamdi*. When the Supreme Court considered the scope of the 2001 AUMF in *Hamdi*, it emphasized that Congress did not provide an unlimited grant of wartime detention authority over U.S. citizens. Instead, the Court said, the 2001 AUMF authorizes force only "against 'nations, organizations, or persons' associated with the September 11, 2001, terrorist attacks." *Hamdi*, 542 U.S. at 518 (plurality op.) (quoting 2001 AUMF).

As *Hamdi* describes, shortly after Congress enacted the 2001 AUMF, the president dispatched the U.S. military to Afghanistan "to subdue al Qaeda and quell the Taliban regime that was known to support it." *Id.* at 510. Soon thereafter, Yaser Hamdi, an American citizen who fought on the side of the Taliban in Afghanistan, was captured and detained as an "enemy combatant." *Id.* at 513. Hamdi had joined the Taliban prior to the September 11 attacks, had "remained with his Taliban unit following the attacks," and carried arms in battle in Afghanistan against the United States and its allies. *Id.* at 513. Limiting its decision to these "narrow circumstances," the plurality explained that Congress "clearly and unmistakably" authorized Hamdi's military detention. *Id.* at 519.

Central to the lawfulness of Hamdi's detention was the clarity of the congressional intent to authorize detention in the *specific* conflict in which Hamdi fought and in the course of which he was detained: the war against al Qaeda and the Taliban in Afghanistan. As the plurality explained: "There can be no doubt that individuals who fought against the United States *in Afghanistan* as part of the Taliban, an organization known to have supported the al Qaeda terrorist network responsible for those attacks, are individuals Congress sought to target in passing the AUMF." *Id*. at 518 (emphasis added). The plurality repeatedly stressed the limited reach of its holding and refused to imply any greater power to detain American citizens. *See, e.g.*, *id.* at 516 ("answer[ing] only the narrow question" of whether Congress authorized the detention of an individual who was "part of or supporting" hostile Taliban forces in Afghanistan *and* "who engaged in an armed conflict against the United States there"); *id.* at 518 (authorization to detain in "the limited category we are considering"); *id.* at 509 (authorization to detain "in the narrow circumstances alleged here"); *see also Hussain v. Obama*, 134 S. Ct. 1621, 1622 (2014) (statement of Breyer, J., respecting the denial of certiorari) (underscoring that

*Hamdi* did not address whether the 2001 AUMF authorizes the detention of an alleged al Qaeda

and Taliban member who had "not engaged in an armed conflict against the United States *in*

*Afghanistan* prior to his capture" (emphasis added) (quotation marks omitted)).

Congress, in short, refused to grant elastic and open-ended military detention authority in

the 2001 AUMF, and—consistent with both the Constitution and the Non-Detention Act—the

Court in *Hamdi* approved only the detention of an American citizen who fell clearly and

unmistakably within the statute's scope. This Court should thus reject the government's claim

that the 2001 AUMF authorizes the indefinite detention authority of American citizens based on

alleged involvement with an organization that, as explained below, did not exist in 2001, is

unconnected to the September 11 attacks or the war in Afghanistan that followed, and is entirely

disassociated from the group specifically targeted by the statute. *See Youngstown Sheet & Tube*

*Co. v. Sawyer*, 343 U.S. 579, 609 (1952) (Frankfurter, J., concurring) ("It is quite impossible . . .

when Congress did specifically address itself to a problem . . . to find secreted in the interstices

of legislation the very grant of power which Congress consciously withheld.").

> **B.** **The 2001 AUMF does not authorize Petitioner's detention as an alleged member of ISIS under the government's theory that ISIS is "part of" or an "associated force" of al Qaeda.**

The government postulates two theories to justify Petitioner's detention: first, that ISIS is

"part of" al Qaeda; and second, that ISIS is an "associated force" of al Qaeda. Both are meritless.

> **1.** **ISIS is not a "part of" al Qaeda under the 2001 AUMF.**

In contrast to *Hamdi*, where there was no doubt that "Congress sought to target" the

Taliban in Afghanistan and thereby authorized Hamdi's detention for fighting against U.S. and

allied forces on a battlefield there, the government here offers no evidence that Congress could

have intended the 2001 AUMF to target a U.S. citizen like Petitioner or the organization he

allegedly belonged to. Instead, the government cobbles together only a few factual assertions that it maintains sweep ISIS within the ambit of the 2001 AUMF. The government's extraordinary premise is that ISIS is *itself* the same al Qaeda organization targeted by Congress in 2001—even as it concedes that neither ISIS nor any of its predecessor organizations existed in 2001, and even as it admits that whatever their prior relationship, ISIS split with al Qaeda before Petitioner even allegedly "registered" with the group (let alone was detained by the United States). Return ¶ 57. The government asserts that a predecessor group to ISIS, formed in 2003, later "aligned with bin Laden's al-Qaida organization" in the fight against the United States, including by pledging allegiance; that "ISIL was founded and led by associates of Osama bin Laden"; and that "ISIL now claims that it—not al-Qaida's current leadership—is the true executor of bin Laden's legacy," Return ¶¶ 20, 28. Even accepting those assertions, they do not establish that ISIS is "part of" al Qaeda.

The D.C. Circuit has not addressed what makes one organization "part of" another for purposes of the 2001 AUMF, and the government does not even offer argument on that question, despite bearing the burden of showing Petitioner's detainability under the 2001 AUMF. The facts the government does present, however, are a far cry from the kind of evidence that might tend to establish that an entire group was part of the same organization.[6]

The government's spare factual assertions undercut the very premise it seeks to advance. The assertion that in 2003 a predecessor group to ISIS became "aligned with bin Laden's al-

---

[6] In fact, the government itself has drawn distinctions between an organization's leader being "part of" al Qaeda *as an individual* and the entire organization being part of al Qaeda under the 2001 AUMF. *See* Charlie Savage, Eric Schmitt & Mark Mazzetti, *Obama Expands War with Al Qaeda to Include Shabab in Somalia*, N.Y. Times, Nov. 27, 2016, http://nyti.ms/2FULD9q ("In Somalia, the United States had long taken the position that a handful of Shabab leaders, as individuals, had sufficient ties to Al Qaeda to make them wartime targets [under the 2001 AUMF]. But it has debated internally for years whether the Shabab as a whole, including their thousands of foot soldiers, can or should be declared part of the enemy.").

Qaida organization," Return ¶ 28, could not establish that ISIS is *itself* "part of" al Qaeda. It is facially nonsensical to claim that two organizations could become "aligned" for a period of time if the two organizations were, in fact, the same organization all along.[7] And even accepting that a predecessor organization to ISIS was in the past "founded and led" by associates of Osama bin Laden, Return at ¶ 20, and that this history carries through to present-day ISIS, the presence of "associates of Osama bin Laden" in ISIS's historical leadership is irrelevant. Congress did not authorize force against all individual "associates" of those responsible for the September 11 attacks—much less issue the president a blank check to detain every future member of every future organization that would one day be led by such an "associate."

In short, the government here seeks to radically expand the authority Congress did confer by way of limitless daisy-chaining. According to the government's logic, it may imprison a U.S. citizen based on the allegation that he is associated with an organization (ISIS) that was once associated with a leader (al-Zarqawi, although he was killed more than a decade ago), who was in turn an associate of bin Laden. Notably absent from this daisy chain is any connection of Petitioner, ISIS (or its predecessors), or al-Zarqawi, to the September 11 attacks themselves, as required by the plain text of the 2001 AUMF. Petitioner, who allegedly joined ISIS thirteen years after the September 11 attacks and after ISIS completely dissolved whatever prior relationship it had with al Qaeda, cannot be subjected to indefinite detention on so attenuated a chain of associations.

Critically, the government incorrectly asserts that it need show only that ISIS was "part of" al Qaeda in 2003, when it alleges that "military action against the group now known as ISIL

---

[7] As a matter of logic and common sense, the threshold is necessarily higher for an organization to be "part of" another organization than merely to be "associated" with it. As explained below, *see infra* Part II.B.2, because the government cannot even establish that ISIS is an "associated force" of al Qaeda, it cannot establish that ISIS is "part of" al Qaeda.

commence[d]," Return ¶ 27, rather than in September 2017, at the time of Petitioner's capture. The government fails to provide any legal justification for its chosen temporal focus—and its position is foreclosed by D.C. Circuit law. Courts in this Circuit have repeatedly made clear that for purposes of the 2001 AUMF, an individual must be detainable at the *time of capture*. *See, e.g.*, *Alsabri v. Obama*, 764 F. Supp. 2d 60, 94–95 (D.D.C. 2011) ("As noted, it is not enough for the government to show simply that the petitioner was, at one time, a member of the Taliban, al-Qaida of associated forces; to be lawfully detained, the petitioner must have been 'part of' those forces *at the time of his capture*." (emphasis added)), *aff'd*, 684 F.3d 1298 (D.C. Cir. 2012); *Salahi v. Obama*, 625 F.3d 745, 751 (D.C. Cir. 2010) ("Here, as noted, the relevant inquiry is whether Salahi was 'part of' al-Qaida *when captured*." (emphasis added)); *Al Ginco v. Obama*, 626 F. Supp. 2d 123, 128 (D.D.C. 2009); *see also, e.g.*, *al Odah v. United States*, 62 F. Supp. 3d 101, 112–13 (D.D.C. 2014); *Khalifh v. Obama*, No. 05-CV-1189, 2010 WL 2382925, at *2 (D.D.C. May 28, 2010); *Al-Adahi v. Obama*, 698 F. Supp. 2d 48, 56 (D.D.C. 2010); *Gherebi v. Obama*, 609 F. Supp. 2d 43, 71 (D.D.C. 2009). Indeed, the government itself has previously conceded that time of capture is the relevant time for the purposes of detention authority under the 2001 AUMF. *See, e.g.*, *Salahi*, 625 F.3d at 750; *Al Ginco*, 626 F. Supp. 2d at 127.

The only allegation the government advances with respect to ISIS's relationship to al Qaeda at the time of Petitioner's capture is that ISIS claims to be "the true executor of bin Laden's legacy." Return ¶ 28. But that has nothing to do with the authority conferred in the AUMF against those connected to the September 11 attacks. As described above, although the White House sought a forward-looking AUMF aimed at future terrorism threats, Congress expressly declined to issue such an unlimited authorization. In passing the 2001 AUMF,

Congress did not authorize the military to wage war against and detain members of any group that has "inspired" or "claimed credit" for acts of terrorism, Return ¶ 20.

Unsurprisingly, when the government announced its "part of" theory concerning ISIS in late 2014, the theory provoked incredulity from experts and scholars. Ryan Goodman, who served as Special Counsel to the General Counsel of the Department of Defense in the Obama administration, noted the "remarkable consensus of opinion" among experts "that ISIS is not covered by the 2001 AUMF." Ryan Goodman, *The President Has No Congressional Authorization to Use Force Against ISIS in Iraq*, Just Security, June 19, 2014, https://www.justsecurity.org/11873/president-congressional-authorization-force-isis-iraq. Jack Goldsmith, who had earlier occupied the same position in the Bush administration and later headed the Office of Legal Counsel, wrote that the premise was "unconvincing," and warned that "if this remarkably loose affiliation with al Qaeda brings a terrorist organization under the 2001 law, then Congress has authorized the President to use force endlessly against practically any ambitious jihadist terrorist group that fights against the United States." Jack Goldsmith, *Obama's Breathtaking Expansion of a President's Power to Make War*, Time, Sept. 11, 2014, http://time.com/3326689/obama-isis-war-powers-bush. Robert Chesney, who served in the Obama administration on the Detention Policy Task Force, called the argument that ISIS is included in the 2001 AUMF "just stunning from a legal perspective." Robert Chesney, *The 2001 AUMF: From Associated Forces to (Disassociated) Successor Forces*, Lawfare, Sept. 10, 2014, https://www.lawfareblog.com/2001-aumf-associated-forces-disassociated-successor-forces. Jennifer Daskal, who served as counsel to the Assistant Attorney General for National Security at the Department of Justice during the Obama administration, wrote, "[C]all me naïve, but law matters. The re-interpretation of laws in totally implausible ways shakes the principles of legality

at its core." Jennifer Daskal, *Democracy's Failure*, Just Security, Sept. 11, 2014,

https://www.justsecurity.org/14820/democracys-failure.

> **2.      The 2001 AUMF does not authorize the detention of American
> citizens as members of "associated forces" of al Qaeda, and in any
> event ISIS is not an "associated force."**

Like its "part of" theory, the government's "associated force" theory fails for several

reasons. As an initial matter, Congress has never provided the requisite clear statement to detain

a U.S. citizen as a member of an "associated force" of al Qaeda or the Taliban. But even if

American citizens were detainable under the 2001 AUMF as members of certain "associated

forces," the government cannot establish the lawfulness of Petitioner's detention under this

theory because: (1) the definition of "associated force" the government offers is insupportable;

and (2) even under its own test, the government's proffered facts fail to establish that ISIS is an

"associated force" of al Qaeda.

> **a.      Congress has not clearly and unmistakably authorized the
> detention of U.S. citizens as members of "associated forces."**

The government claims that its broad authority under the 2001 AUMF to "detain U.S.

citizens as enemy combatants" extends beyond members of al Qaeda or the Taliban and reaches

members of certain "associated forces." *See* Return ¶¶ 21, 24. But the requisite clear statement to

detain U.S. citizens who are members of such groups on this basis is nowhere to be found, and

no court has ever upheld the detention of a U.S. citizen as a member of an "associated force."

The government appears to rely on an overbroad reading of *Hamdi* to argue this authority

is implicit in the 2001 AUMF. *See* Return ¶ 24. But none of the opinions in *Hamdi*—like nothing

in the text of the 2001 AUMF itself—say anything about "associated forces." Instead, as

described above, the *Hamdi* plurality emphasized repeatedly that its holding applied only to

individuals fighting in Afghanistan who personally associated themselves with the explicit

targets of the 2001 AUMF: al Qaeda and the Taliban. *See supra* Part II.A; *see also Hamdi*, 542

U.S. at 517 ("[T]he AUMF is explicit congressional authorization for the detention of individuals

in the narrow category we describe."). The Supreme Court was fractured over the issue of

whether—if at all—the government could detain U.S. citizens militarily, and the plurality

carefully hewed its narrow finding of U.S. citizen detention authority to the text of the statute.

*See* 542 U.S. at 518. Because of this, there is simply no room to read into the 2001 AUMF the

authority to detain U.S. citizen members of an untold number of "associated" groups.

Nor can this authority be found in the National Defense Authorization Act for Fiscal Year

2012, Pub. L. No. 112-81, 125 Stat. 1298 (2012) ("2012 NDAA"), in which Congress sought to

clarify the meaning of the 2001 AUMF. [8] Although there Congress *did* acknowledge some

detention authority over members of "associated forces," *see* 2012 NDAA § 1021(b)(2), it was

careful not to expand any authority to detain U.S. citizens. *See id.* § 1021(e) ("Nothing in this

section shall be construed to affect existing law or authorities relating to the detention of United

States citizens . . . ."). By its own terms, therefore, the 2012 NDAA cannot serve as the clear

statement of authority the government needs to detain a U.S. citizen member of an "associated

force."

Moreover, because Congress took pains to preserve the status quo in the 2012 NDAA, the

statute should be interpreted in light of the law at the time. *See Hedges v. Obama*, 724 F.3d 170,

181–82 (2d Cir. 2013) (explaining the legislative history of section 1021(e), the "compromise

amendment"). Significantly, Congress was legislating against a backdrop in which no court had

ever held that a U.S. citizen member of an "associated force" could be detained under the 2001

AUMF. The D.C. Circuit's limited application of the term "associated forces" has come

---

[8] The text of the relevant portions of the 2012 NDAA is appended hereto.

exclusively in the context of cases involving noncitizens. *See infra* Part II.B.2.b. And when addressing the scope of detention authority over associated forces, the D.C. Circuit looked for guidance to statutory authorizations that specifically excluded citizens from their reach. In particular, in *Al-Bihani v. Obama*, 590 F.3d 866 (D.C. Cir. 2010), the court's conclusion that it possessed detention authority rested on Congress's "guidance on the class of persons subject to detention under the AUMF" in other statutes—specifically, the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (2006) ("2006 MCA"), and the Military Commissions Act of 2009, Pub. L. No. 111-84, tit. XVIII, 123 Stat. 2190 (2009) ("2009 MCA"). *Al-Bihani*, 590 F.3d at 872. Critically, the 2006 MCA was expressly limited to noncitizens, as was its replacement, the 2009 MCA. *See* 2006 MCA sec. 3, § 948b(a); 2009 MCA sec. 1902, §§ 948b(a).

Congress must clearly and unmistakably grant authority for the detention of U.S. citizens. It has not done so here with respect to the category of "associated forces."

### b.   There is no legal support for the government's self-created definition of "associated force."

Because the 2001 AUMF does not refer at all to an "associated force," the government has created its own definition of the term. According to the government, an "associated force" is an entity that satisfies two independent conditions: (1) "the entity must be an organized, armed group that has entered the fight alongside al-Qaida or the Taliban"; and (2) "the group must be a co-belligerent with al-Qaida or the Taliban in hostilities against the United States or its coalition partners." Return ¶ 26. To justify this self-created definition, the government invokes D.C. Circuit precedent, the 2012 NDAA, and law-of-war principles. But none of these sources support it.

First, D.C. Circuit precedent underscores that the term "associated forces" must be interpreted narrowly.[9] And the only forces the D.C. Circuit has held to be "associated" under the AUMF are armed groups fighting closely alongside al Qaeda and the Taliban in Afghanistan.

In *Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008), the court declined to "decide the precise meaning of ['associated forces']," but underscored that "even under the government's own definition, the evidence must establish a connection between [an alleged associated force] and al Qaeda or the Taliban that is considerably closer than the relationship suggested by the usual meaning of the word 'associated.'" *Id.* at 844; *see also id.* (explaining that the government itself maintained that an "associated force" under the 2001 AUMF must be an entity that "subsequent to September 11, becomes *so closely associated* with al Qaida or the Taliban that it is *effectively 'part of the same organization'* . . . that perpetrated the September 11 attacks" (emphases added)). The D.C. Circuit has determined only three groups to be "associated forces" of al Qaeda or the Taliban—all of which are armed groups fighting U.S. forces closely alongside the Taliban and/or al Qaeda in Afghanistan:

- <u>The Arab 55th Brigade.</u> In *Al-Bihani v. Obama*, the court upheld the district court's conclusion that "associated forces" encompassed "a paramilitary group allied with the Taliban, known as the 55th Arab Brigade, which included Al Qaeda members within its command structure and which fought on the front lines against the Northern Alliance [a U.S. Coalition partner]." 590 F.3d at 869; *see id.* at 872 ("The district court found Al Qaeda members participated in the command structure of the 55th Arab Brigade, making the brigade an Al Qaeda-affiliated outfit, and it is unquestioned that the 55th fought alongside the Taliban while the Taliban was harboring Al Qaeda." (citation omitted)).

- <u>Abu Zubaydah's militia.</u> In a few cases, the D.C. Circuit has held that a second group qualifies as an "associated force" under the 2001 AUMF: a militia

---

[9] The D.C. Circuit has also confirmed that the meaning of "associated forces" is a legal question for courts to decide. *See Khan v. Obama*, 655 F.3d 20, 26 (D.C. Cir. 2011) ("[W]hether the alleged connections between [a] force and al Qaeda and/or the Taliban are sufficient to render it an 'associated force' [is a] legal question[] that we review de novo."); *accord Barhoumi v. Obama*, 609 F.3d 416, 423 (D.C. Cir. 2010).

commanded by Abu Zubaydah, "a reputed terrorist leader" who allegedly ran a training camp called Khaldan and "agreed with Usama bin Laden to coordinate training efforts and allow Khaldan recruits to join al-Qaida." *Barhoumi v. Obama*, 609 F.3d at 418; *see Ali v. Obama*, 736 F.3d 542, 543–44 (D.C. Cir. 2013) (following *Barhoumi* to conclude that "the force commanded by Abu Zubaydah constitutes an 'associated force' for purposes of the AUMF"). Notably, the petitioners in *Barhoumi* and *Ali* did not dispute the militia's status as an "associated force." *Barhoumi*, 609 F.3d at 423; *Ali*, 736 F.3d at 544.

- <u>Hezb-i-Islami Gulbuddin.</u> In *Khan v. Obama*, the D.C. Circuit identified a third "associated force": Hezb-i-Islami Gulbuddin, which shared a "joint office" with the Taliban intended to "recruit new members and raise money for attacks on Afghan and U.S. security forces" and had "long-established ties with Bin Ladin." 655 F.3d at 32 (quotation marks omitted).[10]

As these cases make clear, the D.C. Circuit's acceptance of the "associated forces" theory has been extremely limited, and it has never even addressed (let alone endorsed) an interpretation of the term that would reach a new group without a close nexus to the 2001 AUMF-authorized conflict against al Qaeda and the Taliban in Afghanistan.[11] If the government's self-created definition of "associated forces" were to include Petitioner's detention, it would radically expand the limited authority approved by the D.C. Circuit.

---

[10] The D.C. Circuit has discussed other groups in determining whether the detentions of individuals pursuing habeas petitions are lawful. But while the Circuit has sometimes considered evidence of individuals' associations with certain groups that were themselves connected to al Qaeda or the Taliban, the court has never held that any group other than the three named above legally constitutes an "associated force" under the 2001 AUMF.

For example, in a pair of cases, the D.C. Circuit discussed individuals' extended contacts with Jama'at Tablighi, a Pakistan-based "Islamic missionary organization that is a [government-designated] Terrorist Support Entity closely aligned with al Qaeda." *Almerfedi v. Obama*, 654 F.3d 1, 6 (D.C. Cir. 2011) (quotation marks omitted); *see Hussain v. Obama*, 718 F.3d 964, 969–70 (D.C. Cir. 2013). But in both, the courts concluded that the relevant AUMF group was al Qaeda itself. *See Hussain*, 718 F.3d at 970; *Almerfedi*, 654 F.3d at 6.

[11] Notably, in *Parhat*, the D.C. Circuit held that the government's evidence was insufficient to establish that an independence group from western China with camps in Afghanistan, the East Turkistan Islamic Movement, was an "associated force" under the 2001 AUMF. *See* 532 F.3d at 844–46.

Second, as explained above, the 2012 NDAA, which references "associated forces," does not support the government's expansive conception of the term. In the 2012 NDAA, Congress legislated against the backdrop of the D.C. Circuit's cabined interpretation of this term under the 2001 AUMF. *See supra* Part II.B.2.a. Based on the D.C. Circuit case law described above, Congress thus could have understood "associated force" as reaching only those groups with a tight nexus to armed groups fighting in Afghanistan alongside, and in close coordination with, al Qaeda and the Taliban, the two entities targeted by the 2001 AUMF.

Third, the government claims that its definition of associated forces is "inform[ed]" by the "traditional law-of-war principles" of neutrality and co-belligerency. *See* Return ¶¶ 25–26. But the government concedes that the law-of-war concepts of neutrality and co-belligerency apply exclusively to conflicts between states (*i.e.*, international armed conflicts). Return ¶ 25. It nevertheless claims that these concepts "provide useful guidance" in the armed conflict against al Qaeda and the Taliban. *Id.* But these concepts are neither compatible with nor applicable to armed conflicts against non-state actors such as al Qaeda, and do not provide a firm grounding for interpreting "associated forces" under the 2001 AUMF. *See, e.g.*, Rebecca Ingber, *Co-Belligerency*, 42 Yale J. Int'l L. 67, 89 (2017) ("[N]eutrality law as a general framework simply does not map onto the conflict between the United States and ISIS or al Qaeda, neither as a formal matter nor as a functional one."); Marko Milanovic, *The End of Application of International Humanitarian Law*, *in* 96 Int'l Rev. of Red Cross: Scope of the Law in Armed Conflict 163, 187 (2014) (concept of co-belligerency "was imported [by the United States] from the law of [international armed conflict] without much consideration as to whether the analogy can actually be drawn"). Neutrality and co-belligerency, in short, are not remotely the kind of

"longstanding law-of-war principles" on which to ground the clear legislative authority

necessary to detain an American citizen under the 2001 AUMF. *Cf. Hamdi*, 542 U.S. at 521.

> **c.      The government's allegations fail to establish that ISIS was an "associated force" of al Qaeda at the time of Petitioner's detention in September 2017.**

Even accepting the government's account as true, the government's allegations are

insufficient to detain Petitioner because the government's allegations address the wrong time

period—2003, rather than 2017—for purposes of detention under the 2001 AUMF.

Because ISIS was not an "associated force" at the time of capture, Petitioner's detention

is not authorized under the AUMF. As explained above, courts in this Circuit have repeatedly

made clear that for purposes of the 2001 AUMF, an individual must be detainable at the *time of*

*capture. See supra* Part II.B.1; *Khan*, 655 F.3d at 32–33 (analyzing whether "[Hezb-i-Islami

Gulbuddin] was an associated force of al Qaeda and the Taliban in November 2002," when

petitioner was captured). Here, the government concedes that beginning in 2013, the leaders of

ISIS and al Qaeda "split . . . over theological and strategic disagreements," and that since then

ISIS has been "conducting operations in Syria and Iraq entirely independent" of al Qaeda, Return

¶ 18 n.23. The sole allegation the government puts forward concerning ISIS's connection to al

Qaeda at the time of Petitioner's capture is that "ISIL now claims that it—not al Qaeda's current

leadership—is the true executor of bin Laden's legacy." Return ¶ 28. But a mere abstract

ideological connection is legally insufficient to make ISIS an "associated force" (let alone "part

of") al Qaeda. *See, e.g.*, *Hamlily v. Obama*, 616 F. Supp. 2d 63, 75 n.17 (D.D.C. 2009) (rejecting

sufficiency of "common purpose" or shared "philosophy" and requiring "actual association in the

current conflict with al Qaeda or the Taliban"). Plainly, whatever the "pre-existing relationship"

between ISIS and al Qaeda, that relationship had, by September 2017, "sufficiently eroded" such

that any association has been conclusively "vitiated," *Al Ginco*, 626 F. Supp. 2d at 128–29.

Indeed, the former executive-branch official on whom the government principally relies for its

co-belligerency theory, *see* Return ¶ 25, says the theory that ISIS is an associated force of al

Qaeda is "presidential unilateralism masquerading as implausible statutory interpretation."

Goldsmith, *supra*.

Additionally, even putting aside the public and conceded split between al Qaeda and

ISIS, the government has failed even to allege anything close to the type of evidence that the

D.C. Circuit has required to deem a group an "associated force" under the 2001 AUMF. *See,

e.g.*, *supra* Part II.B.2.b; *Al-Bihani*, 590 F.3d at 869, 872 (finding Arab 55th Brigade was an

"associated force" because it included al Qaeda members in its command structure and fought on

front lines with Taliban against U.S. coalition partner in Afghanistan); *Barhoumi*, 609 F.3d at

419 (same for militia, when it was commanded by leader who trained recruits and coordinated

with bin Laden to send them to al Qaeda in Afghanistan); *Ali*, 736 F.3d at 543–44 (same); *Khan*,

655 F.3d at 32 (same for group that shared office with Taliban, had longstanding ties to bin

Laden, and recruited members and raised money for attacks on U.S. forces in Afghanistan).[12]

Indeed, it would be particularly improper to detain Petitioner based on a purported

association between al Qaeda and ISIS that ended before he is alleged to have even joined the

latter group, and long before the time he was captured. *See, e.g.*, *Al Ginco*, 626 F. Supp. 2d at

128 ("By taking a position that defies common sense, the Government forces this Court to

address an issue novel to these habeas proceedings: whether a prior relationship between a

detainee and al Qaeda (or the Taliban) can be sufficiently vitiated by the passage of time,

---

[12] Although the government doesn't suggest it, even if the relevant time period were somehow deemed to be the time of Petitioner's "registration" as an ISIS fighter, the result would be the same. According to the government, Petitioner "registered" with ISIS in July 2014, Return ¶¶ 57–58, but ISIS's split with al Qaeda began in 2013, Return ¶¶ 18, 28.

intervening events, or both, such that the detainee could no longer be considered to be 'part of'
either organization at the time he was taken into custody. The answer, of course, is yes."
(footnote omitted)).[13]

For similar reasons, even if the principle of co-belligerency were somehow to be
superimposed on the United States' current conflict with al Qaeda (despite the lack of any
international-law basis for doing so), it would be of no help to the government. Even among
states, a relationship of co-belligerency does not arise simply from the fact that two separate
entities are fighting the same enemy. Rather, co-belligerency requires allied cooperation and
working in concert. *See* Int'l Comm. of Red Cross, *Commentary IV: Geneva Convention Relative
to the Protection of Civilian Persons in Time of War* 49 (Jean S. Pictet ed. 1958) (equating "co-
belligerent States" with "allies"); *see also* Nathalie Weizmann, *The End of Armed Conflict, the
End of Participation in Armed Conflict, and the End of Hostilities: Implications for Detention
Operations Under the 2001 AUMF*, 47 Colum. Hum. Rts. L. Rev. 204, 230 (2016) ("[O]nly
certain *relationships* will render a State a *co*-belligerent," including "[t]hat State's *association,
cooperation*, or *common cause* with the pre-existing belligerent"). And those alliances revolve
around cooperation, "*assistance* to," or making "*common cause* with belligerent forces." Report

---

[13] Recognizing the weakness of its position concerning the proper temporal focus of the Court's
inquiry here, the government puts forward a policy argument that "[a] contrary interpretation of
the statute would allow an enemy force to manipulate the scope of the 2001 AUMF by
splintering into rival factions while continuing to prosecute the same conflict against the United
States." Return ¶ 28. But even accepting that fanciful theoretical possibility, the government has
not provided any evidence of such gamesmanship *concerning ISIS's split with al Qaeda*, and it
does not dispute that the split was genuine. Indeed, government officials admit that "there is no
doubt the [expulsion of ISIS from AQ] was real and not a ruse." Karen DeYoung & Greg Miller,
*Al-Qaeda's Expulsion of Islamist Group in Syria Prompts U.S. Debate*, Wash. Post, Feb. 10,
2014, http://wapo.st/1fb2mR1.

of the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions, ¶ 60, Gen.

Assembly, U.N. Doc. A/68/382 (Sept. 13, 2013) (emphasis added).[14]

The term "co-belligerency," moreover, must be interpreted in a manner consistent with

the statutory grant of authority in the 2001 AUMF. That authority does not extend to *any* force

contemporaneously involved in a fight against the United States; instead, the force must both be

"engaged in hostilities against the United States or its coalition partners" *and* be "associated."

*See* 2012 NDAA § 2012(b)(2). If "co-belligerency" were interpreted to mean that simply any

two forces with a common enemy, without any cooperation or relationship between them, were

co-belligerents, it would deprive the term "associated" in the 2012 NDAA of any effect. *See*

*Duncan v. Walker*, 533 U.S. 167, 174 (2001) (describing the Court's "duty, to give effect, if

possible, to every clause and word of a statute" (quotation marks omitted)). This black-letter

principle of statutory construction is fatal to the government's claim that al Qaeda and ISIS are

properly considered to be co-belligerents against the United States under the 2001 AUMF—

indeed, far from cooperating in common cause, those groups are independent from and at odds

with each other.

Thus, the government's allegations are plainly insufficient to establish co-belligerency

between al Qaeda and ISIS at the time of Petitioner's capture.

Finally, the credibility of the government's position that it has had 2001 AUMF authority

to detain members of ISIS as an "associated force" of al Qaeda *since 2003*, Return ¶¶ 27–28*, is

undermined by its failure to articulate that position prior to *late 2014*. Indeed, not only had the

---

[14] Indeed, in a 2009 district court decision that *did* interpret the term "associated forces" through
a co-belligerency lens, the court interpreted the term in a similar manner, concluding that
"'associated forces' do not include terrorist organizations who merely share an abstract
philosophy or even a common purpose with the al Qaeda—there must be an actual association in
the current conflict with al Qaeda or the Taliban." *Hamlily*, 616 F. Supp. 2d at 75 n.17.

government never articulated this position to the public, it had apparently failed to even

articulate it to Congress. As late as July 2014, the executive branch submitted a statutorily

mandated report to Congress explaining the government's designations of various groups as

"associated forces" under the AUMF. *See* U.S. Dep't of Defense, Report on Associated Forces

(July 2014), https://www.aclu.org/sites/default/files/field_document/drone_tk3_Report_on_

Associated_Forces.pdf. The document is partially classified, but nevertheless makes clear that

the government had only named two sets of groups as "associated forces": "Groups Fighting in

Afghanistan . . . alongside al-Qa'ida and the Taliban," and "Al-Qa'ida in the Arabian Peninsula."

*Id.* at 2. ISIS's omission from the "associated forces" category—a mere three months before the

executive branch would land upon its new 2001 AUMF theory—is striking.

* * *

In sum, sixteen years ago, Congress deliberately declined to provide the government with

unlimited authorization to wage war and engage in military detention "to deter and pre-empt any

future acts of terrorism or aggression against the United States." Grimmett, *supra*, at 2 (quoting

rejected White House proposal). Congress instead required that the executive secure new

authority for conflicts unrelated to responsibility for the September 11, 2001 attacks. The

government must now respect Congress's decision and return to the legislature for new authority

if it wishes to subject U.S. citizens to indefinite military detention in new conflicts against new

adversaries, rather than implausibly and insupportably claiming that they are "part of" or

"associated forces" of al Qaeda.[15]

---

[15] Congress knows how to provide the executive with the type of authority to address newly developed terrorist threats the government claims here. For example, in authorizing the executive to designate "foreign terrorist organizations," Congress clearly stated that the Secretary of State is authorized to evaluate whether an "organization" threatens U.S. security and to impose repercussions that include the creation of criminal liability and the freezing of financial assets.

**III.    The 2002 AUMF specifically targeted the Saddam Hussein regime in Iraq and does not authorize Petitioner's indefinite military detention.**

More than fifteen years ago, Congress authorized the executive to use military force against the Saddam Hussein regime in Iraq. *See* 2002 AUMF.[16] The government concedes that "the focus of the Iraq AUMF was the threat posed by Saddam Hussein's regime," Return ¶ 35, but nonetheless maintains that the 2002 AUMF constitutes congressional authorization for indefinite military detention of an American citizen in 2018 based solely on alleged activities in Syria. In the face of statutory text clearly authorizing force only against the "threat posed by Iraq" in 2002, the government offers several unconvincing reasons why this authority should be read to now authorize the indefinite detention of Americans throughout the entire Middle East and perhaps beyond. First, the government suggests that the preamble to the 2002 AUMF establishes broad authority to indefinitely detain Americans if it deems them threats to "international peace and security [in] the Persian Gulf region." Return ¶ 35. Second, the government maintains that the 2002 AUMF applies not merely to the threat "posed by Iraq" under Saddam Hussein, but also authorizes the use of force in perpetuity against any threats posed *to* Iraq, with "no geographic limitation." Return ¶ 38. Finally, the government asserts that in authorizing force against Iraq in 2002, Congress also implicitly authorized perpetual war against any terrorist group that would in the future arise on Iraqi soil, no matter where in the world such a group ended up. Return ¶ 38. None of these arguments is grounded in the actual

*See* 8 U.S.C. § 1189. It would be particularly anomalous for Congress to silently provide the executive with the ability to add "associated forces" not otherwise covered in the 2001 AUMF indefinitely into the future. The powers conferred by that statute, including indefinite military detention of U.S. citizens, far exceed the powers conferred in section 1189. Congress "does not . . . hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *see also ACLU v. Clapper*, 785 F.3d 787, 818–19 (2d Cir. 2015) ("Such a monumental shift in our approach to combating terrorism requires a clearer signal from Congress . . . .").

[16] The full text of the 2002 AUMF is appended hereto.

text of the 2002 AUMF or can satisfy the constitutionally and statutorily required clear-statement rule concerning the detention of U.S. citizens. None, therefore, can justify the indefinite detention of an American citizen whose only connection to Iraq is that the government transferred him there—for detention—from Syria.

First, although the operative language of the 2002 AUMF authorizes force only against the "threat posed by Iraq" under Saddam Hussein and says nothing about other regional actors, 2002 AUMF § 3(a)(1), 116 Stat. at 1501, the government asserts that this limitation should be disregarded and instead urges the Court to rely on the preamble's broad concerns, "with, among other things, 'restor[ing] international peace and security to the Persian Gulf region,'" and "terrorist organizations," Return ¶ 35 (citing preamble). But as the Supreme Court made clear over a century ago, "the preamble is no part of the act, and cannot enlarge or confer powers" that Congress did not grant in the operative text of the act. *Yazoo & M.V.R. Co. v. Thomas*, 132 U.S. 174, 188 (1889). The Supreme Court recently confirmed that a preamble can in no way modify the authorization conferred by a statute: "[I]n America the settled principle of law is that the preamble cannot control the enacting part of the statute in cases where the enacting part is expressed in clear, unambiguous terms." *District of Columbia v. Heller*, 554 U.S. 570, 578 n.3 (2008); *see also, e.g.*, *Ass'n of Am. Railroads v. Costle*, 562 F.2d 1310, 1316 (D.C. Cir. 1977) ("A preamble no doubt contributes to a general understanding of a statute, but it is not an operative part of the statute and it does not enlarge or confer powers on administrative agencies or officers."). The government's resort to the preamble thus merely serves to demonstrate the weakness of its reliance on the 2002 AUMF. No part of the operative language in the 2002 AUMF can be read to broadly and in perpetuity authorize force and indefinite detention against

whomever the government deems a threat to regional peace and security, let alone provide the clear legislative authorization necessary to detain an American citizen.

But even if the Court were to consider the preamble, both the preamble and the operative language indicate that when Congress authorized force against the threat posed by Iraq, it was referring to the Saddam Hussein regime in Iraq, and not any threat that might arise in Iraq in perpetuity. For example, the preamble refers to "Iraq's war of aggression against an illegal occupation of Kuwait," "Iraq's continuing weapons of mass destruction program," "Iraq persist[ing] in violating resolution of the U.N. Security Council," and "Iraq's demonstrated capability and willingness to use weapons of mass destruction." Preamble, 2002 AUMF, 116 Stat. at 1498–99. Moreover, the operative language of the statute confirms this meaning of Iraq as the Saddam Hussein regime in Iraq. *Id.* sec. 2, 116 Stat. at 1501 (affirming congressional support for "obtain[ing] prompt and decisive action by the Security Council to ensure that Iraq abandons its strategy of delay, evasion, and noncompliance").

Second, the government's argument that the 2002 AUMF actually authorizes force against all "threats *to* Iraq," Return ¶ 36, is baseless, and proves far too much. Once again, the statute's text unambiguously refers only to the threat posed *by* Iraq (under Saddam Hussein); the text nowhere supports the government's claim that it may search for and attack all perceived threats *to* Iraq. The government's reading is thus wholly divorced from Congress's enacted language and plainly insufficient under the clear-statement rule. Moreover, endorsing the government's reading of the 2002 AUMF as authorizing war against all perceived threats *to* Iraq with "no geographic limitation," Return ¶ 38, would lead to absurd and dangerous results. U.S. military leaders, for example, have recently described Iran as the single greatest threat to regional peace and security and to Iraq's future. *See, e.g.*, Cristina Silva, *Iran is the 'Greatest Long-Term*

*Threat to Stability,' Army General Warns*, Newsweek, Mar. 29, 2017,

http://www.newsweek.com/iran-threat-us-and-middle-east-army-general-warns-576363; Jake

Miller, *David Petraeus: Biggest Threat to Iraq's Future is Iran, Not ISIS*, CBS News, Mar. 20,

2015, https://perma.cc/9US8-SGTH. Under the government's expansive reading of the 2002

AUMF, then, the president need not consult Congress if he decides to invade Iran. According to

the sweeping theory the government advances here, the president may use military force—and

therefore indefinitely detain Americans—anywhere in the world to protect Iraq. This reading of

the 2002 AUMF is implausible on its face. Congress did not provide the government with a

blank check to make war and imprison Americans without charge to keep Iraq safe in perpetuity.

Finally, the government argues that it has unlimited authorization to use force against any

group that at some point emanated "*from* Iraq," Return ¶ 36, even though that term does not

appear in the 2002 AUMF. According to this logic, the government maintains that it may

indefinitely detain Petitioner after his capture in Syria, and for his alleged activities in Syria,

based only on the fact that long before Petitioner allegedly joined ISIS, the organization

originated in Iraq. But there is no indication in the statutory text that Congress intended the 2002

AUMF to authorize indefinite military detention of American citizens in support of a worldwide

military campaign against any group that can trace its origins to Iraq. Such a strained reading of

the 2002 AUMF cannot meet the clear-statement rule or the clear targeting required by the

Supreme Court in *Hamdi*.

Not only are the government's statutory arguments as to the 2002 AUMF implausible on

their face and unsupported by the text of the statute, they contradict the government's own

representations. On August 31, 2010, President Obama addressed the nation to announce "the

end of our combat mission in Iraq." M. Alex Johnson, *Obama Formally Ends Iraq Combat*

*Mission*, NBC News, Aug. 31, 2010, http://nbcnews.to/2GYtkSp. In July 2014, the White House

issued an official statement through Susan E. Rice, Assistant to the President for National

Security Affairs, that "the Iraq AUMF is no longer used for any government activities and the

Administration fully supports its repeal." Letter from Susan E. Rice, Assistant to the President

for Nat'l Security Aff., to John A. Boehner, Speaker of the House of Representatives (July 25,

2014), http://freebeacon.com/wp-content/uploads/2014/07/3989-Boehner.pdf. Having admitted

for years that the war Congress authorized in 2002 is over, the government cannot credibly claim

that the 2002 AUMF now authorizes the indefinite military detention of an American citizen as

part of a different conflict.

## IV.    The National Defense Appropriations Act of 2012 and other appropriations acts do not support the government's claims of detention authority.

The government readily concedes that congressional "funding, oversight, and authorizing

measures do not themselves authorize the military campaign against IS[I]L." Return ¶ 45

(emphasis omitted). Despite this concession, the government makes two arguments about these

subsequent measures: first, that Congress specifically "ratified [the government's] construction

of the 2001 AUMF in the detention context" in the 2012 NDAA, Return ¶ 24; and second, that

other congressional measures "confirm" that the 2001 and 2002 AUMFs authorize the campaign

against ISIS, Return ¶¶ 40–45. Both arguments fail.

First, far from "ratifying" the government's expansive interpretation of its detention

authority as to U.S. citizens, the 2012 NDAA explicitly remains silent on the question. Section

1021(e) of that Act is explicit that "[n]othing in this section shall be construed to affect existing

law or authorities relating to the detention of United States citizens . . . ." 2012 NDAA § 1021(e);

*see also, e.g.*, 157 Cong. Rec. S8094, S8124 (daily ed. Dec. 1, 2011) (statement of Sen. Graham)

("We are doing nothing to change the law when it comes to American citizen detention to

enhance it or to restrict whatever rights the government has or the citizen has."). The Second

Circuit confirmed that "Section 1021 says nothing at all about the President's authority to detain

American citizens." *Hedges*, 724 F.3d at 174.[17]

Second, the government argues that other congressional measures "confirm" that the

2001 and 2002 AUMFs authorize the campaign against ISIS. *See* Return ¶¶ 40–45. This

argument is meritless: when it comes to detaining U.S. citizens, the government needs clear

congressional authorization. *See supra* Part I. The various provisions the government references

authorize the president to spend government money against ISIS and impose reporting

requirements, but they not only fail to clearly authorize the detention of U.S. citizen members of

ISIS, they fail to mention detention *at all. See* Consolidated and Further Continuing

Appropriations Act of 2015, Pub. L. No. 113-235, 128 Stat. 2130, 2276, 2285–95 (2014);

Consolidation Appropriations Act, 2016, Pub. L. No. 114-13, § 8093, 129 Stat. 2242, 2373

(2015); National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, §§ 1223–

24, 129 Stat. 726, 1049 (2015).

Notably, the government attempted to make a similar argument in *Hamdi*, asserting that a

"statutory authorization to spend money appropriated for the care of prisoners of war"

constituted a detention-authorizing "Act of Congress." *Hamdi*, 542 U.S. at 547 n.3 (Souter, J.,

concurring in part and dissenting in part). The plurality in *Hamdi* disregarded that argument, and

four other Justices rejected it. As Justice Souter noted in summarily dismissing the government's

argument, "this statute is an authorization to spend money if there are prisoners, not an

---

[17] As the government implicitly acknowledges, section 1021(e) applies without geographical limitation to U.S. citizens—not just U.S. citizens captured in the United States. *See* Return ¶ 24; *see also Hedges*, 724 F.3d at 192 n.134 (statutory language and legislative history confirm that Congress restricted the 2012 NDAA from any application to "the detention of American citizens generally").

authorization to imprison anyone to provide the occasion for spending money." *Id*. And Justice

Scalia dismissed this argument as well, since he rejected all of the government's arguments put

forth to justify Hamdi's military detention. *Id*. 574–75 (Scalia, J., dissenting).

* * *

While Congress has not authorized military detention of U.S. citizens with alleged ties to

ISIS, it has provided ample tools to address the threat posed by ISIS. The U.S. government

routinely uses the federal court system to prosecute American citizens captured abroad and

accused of providing material support to ISIS and other foreign terrorist organizations,[18] and

even, as particularly relevant here, to prosecute another American citizen captured in Syria by

Kurdish forces and accused of joining ISIS.[19] And Justice Department officials have repeatedly

---

[18] *See, e.g.*, Press Release, U.S. Dep't of Justice, Wisconsin Man Sentenced to 10 Years in Prison for Attempting to Provide Material Support to ISIS (Feb. 17, 2017), https://perma.cc/W7FH-6WNG (U.S. citizen detained in Turkey and transported back to the U.S., where he was charged with providing material support to ISIS); Press Release, U.S. Dep't of Justice, New Jersey Man Admits Conspiring to Provide Material Support to ISIS (Oct. 29, 2015), https://perma.cc/8EY8-8WL6 (U.S. citizen detained in Jordan and returned to the U.S., where he was charged with providing material support to ISIS); Press Release, U.S. Dep't of Justice, Queens Man Charged with Attempting to Provide Material Support to ISIS (Aug. 29, 2017), https://perma.cc/6ML9-GNTN (U.S. citizen "detained in a Middle Eastern country bordering Syria" as he allegedly attempted to join ISIS and deported back to the U.S. for prosecution); Press Release, U.S. Dep't of Justice, United States Citizen Pleads Guilty to Providing Material Support to Al Shabaab (Sept. 8, 2017), https://perma.cc/38UR-4YXY (U.S. citizen who traveled to Somalia and was a member of Al Shabaab returned to the U.S. to face prosecution); Press Release, U.S. Dep't of Justice, American Citizen Convicted of Conspiring to Murder U.S. Nationals in Bombing Attack Against Military Base in Afghanistan (Sept. 29, 2017), https://perma.cc/P75T-6EQV (U.S. citizen captured in Pakistan and brought back to the U.S. for criminal prosecution related to his involvement with al Qaeda).

[19] *See, e.g.*, Press Release, U.S. Dep't of Justice, American Sentenced to 20 Years for Joining ISIS (Oct. 27, 2017), https://perma.cc/8PBR-C4W6 (U.S. citizen captured in Syria by "Kurdish Peshmerga military forces" and brought back to the U.S. to stand trial).

emphasized their capacity to prosecute alleged terrorists, including alleged ISIS members, captured anywhere in the world.[20]

It is undisputed that members of ISIS have attacked U.S. citizens and other civilians, and that the group apparently "continues to denounce the United States as its enemy and to target U.S. citizens and interests." Return ¶ 28. For those who participate in them, ISIS's violent actions against Americans are undeniably criminal. But as former CIA Director and Deputy National Security Advisor for Homeland Security and Counterterrorism John Brennan underscored, "when it comes to U.S. citizens involved in terrorist-related activity, whether they are captured overseas or at home, we will prosecute them in our criminal justice system." Remarks of John O. Brennan, Director, CIA, Remarks at Harvard Law School, *Strengthening Our Security by Adhering to Our Values and Laws* (Sept. 16, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/09/16/remarks-john-o-brennan-strengthening-our-security-adhering-our-values-an.[21]

## V.     The president has no inherent authority to detain indefinitely an American citizen.

Finally, the government argues that the president has "inherent" authority under Article II of the Constitution to detain Petitioner indefinitely without congressional authorization. Return ¶¶ 46–51. No court has ever suggested, let alone held, that the president has unilateral authority to imprison an American citizen without trial—unless Congress suspends habeas

---

[20] *See, e.g.*, Queens Man Charged with Attempting to Provide Material Support to ISIS (Aug. 29, 2017), *supra* (FBI Assistant Director-in-Charge William F. Sweeney, Jr., discussing charges against a U.S. citizen captured abroad and asserting that "like others before him who chartered a similar path to join [ISIS, this citizen] now finds his journey ends the same way—in a New York courtroom answering for his actions").

[21] In fact, the U.S. government has not subjected a U.S. citizen captured abroad to indefinite military detention under the 2001 AUMF since Hamdi, who was captured in Afghanistan that same year.

corpus, which of course it has not done. This Court should reject this extraordinary assertion of executive power.

Because Congress has not authorized Petitioner's military detention, and because Congress expressly prohibited any such unauthorized detention in the Non-Detention Act, the president's "power is at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring); *see also Hamdan v. Rumsfeld*, 548 U.S. 557, 593 n.23 (2006) (the president "may not disregard limitations that Congress has, in the proper exercise of its own war powers, placed on his powers"). The president may therefore "rely only on his own constitutional powers minus any powers of Congress over the matter." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). To sustain the government's claim of Article II power here, therefore, would "disabl[e] Congress" from protecting the right of American citizens against executive detention without trial. *Id.* at 637–38. Not even the most expansive reading of the president's Article II authority can justify the powers claimed here.

Constitutional text and history demonstrate that executive detention was a central concern of the Framers. *See, e.g., St. Cyr*, 533 U.S. at 301 ("At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest"); *Hamdi*, 542 U.S. at 552 (Souter, J., concurring in part and dissenting in part) ("[W]e are heirs to a tradition given voice 800 years ago by Magna Carta, which, on the barons' insistence, confined executive power by 'the law of the land.'"); *Rasul v. Bush*, 542 U.S. 466, 474 (2004) ("'Executive imprisonment has been considered oppressive and lawless since John, at Runnymede, pledged that no free man should be imprisoned . . . save by the judgment of his peers or by the law of the land. . . . [Judges] developed the writ of habeas corpus largely to preserve these immunities from executive

restraint.'" (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 218–19 (1953) (Jackson, J., dissenting))).

Time and again, the Supreme Court has therefore reaffirmed Alexander Hamilton's oft-cited observation that the powers conferred on the president by the Commander-in-Chief Clause "amount to nothing more than the supreme command and direction of the military and naval forces." *The Federalist No. 69*, at 418 (Alexander Hamilton) (Clinton Rossiter ed., 1961); *see, e.g.*, David J. Barron & Martin S. Lederman, *The Commander-in-Chief at the Lowest Ebb— Framing the Problem, Doctrine, and Original Understanding*, 121 Harv. L. Rev. 689, 802 (2008) ("Far from reflecting impracticality, the system of war powers the Framers appear to have favored comports . . . with their well-established embrace of checks and balances, a belief that was itself rooted in their practical experience with the dangers of unconstrained executive authority, particularly in war."). In *Youngstown*, the Supreme Court rejected the president's claim of Article II authority to seize the nation's steel mills, despite his impassioned plea that it was vital to the war effort. 343 U.S. at 587. As Justice Jackson explained, "[a]side from suspension of the privilege of the writ of habeas corpus in time of rebellion or invasion," the Framers "made no express provision for exercise of extraordinary authority because of a crisis." *Youngstown*, 343 U.S. at 650 (Jackson, J., concurring). For such "emergency powers" to remain "consistent with free government," their control must be "lodged elsewhere than in the Executive who exercises them." *Id.* at 652; *see, e.g.*, Barron & Lederman, *supra*, at 804 ("[C]onstitutional practice, no less than originalist understanding, also fails to provide a grounding for the claim to preclusive presidential power.").

Even assuming that in "a moment of genuine emergency, when the Government must act with no time for deliberation, the Executive may be able to detain a citizen if there is reason to

fear he is an imminent threat to the safety of the Nation and its people," *Hamdi*, 542 U.S. at 552

(Souter, J., concurring in part and dissenting in part), no such circumstances exist here. Petitioner

has been detained for nearly five months, and the federal courts have, of course, remained open

throughout Petitioner's detention. During this time, moreover, the government has sought to

engage in law-enforcement interrogations of Petitioner. *See* Respondent's Resp. to Court's

Order, ECF No. 18. As in *Hamdi*, there is no genuine emergency that remotely justifies

Petitioner's indefinite military detention by executive fiat. *See Hamdi*, 542 U.S. at 552 (any

"emergency power of necessity must at least be limited by the emergency"); *see also Ex parte*

*Milligan*, 71 U.S. (4 Wall.) 2, 127 (1866) (military jurisdiction over a citizen justified only by

"actual and present" necessity that renders regular civilian courts unavailable).

Unlike Congress, the president has no power to suspend the writ. *See, e.g.*, *Ex parte*

*Bollman*, 8 U.S. (4 Cranch) 75, 101 (1807) ("If at any time the public safety should require the

suspension of the [habeas] powers vested . . . in the courts of the United States, it is for the

legislature to say so."); Joseph Story, 3 *Commentaries on the Constitution* § 676, at 483 (1833)

("[A]s the power is given to Congress to suspend the writ of habeas corpus in cases of rebellion

or invasion, . . . the right to judge, whether exigency had arisen, must exclusively belong to that

body."). The situations of wartime contemplated by the Suspension Clause are exactly the

situations in which the inherent power claimed by the executive to detain citizens as "enemy

combatants" without statutory authorization under the Commander-in-Chief Clause would be

most relevant; and yet the Constitution allows such executive detention only when Congress has

suspended habeas corpus. *See, e.g.*, Amanda L. Tyler, *The Forgotten Core Meaning of the*

*Suspension Clause*, 125 Harv. L. Rev. 901, 991–92 (2012) (noting that "[e]ven Lincoln did not

believe the President had inherent authority to detain" citizens captured fighting on a battlefield against U.S. forces).

The government cannot sustain its radical contention that the president, acting in contravention of congressional legislation, and absent a compelling military exigency warranting suspension of the writ, can condemn an American citizen to indefinite military detention without charge. The government cites *American Insurance Association v. Garamendi*, 539 U.S. 396 (2003), for support, Return ¶ 47, but *Garamendi* is not remotely relevant. In that case, the Supreme Court addressed the president's authority to enter into executive agreements to settle monetary claims of U.S. nationals against foreign governments, *id.* at 414–15; nowhere in that decision or anywhere else has the Court suggested that the president has inherent authority to imprison an American citizen. The government also cites instances in which the president authorized the use of military force without prior specific authorization legislation. Return ¶¶ 48–51. But these presidential actions are irrelevant here. Whatever the scope of the president's Article II authority to use military force in Syria or elsewhere, that authority does not give the president *carte blanche* to imprison American citizens indefinitely in defiance of the Constitution's explicit protection of habeas corpus and the essential requirement that detention be pursuant to the law of the land.[22]

---

[22] The government seeks to resuscitate its argument that this Court should not exercise its habeas jurisdiction because "Petitioner's request for release is premature." Return ¶ 9. This argument was meritless when the Court effectively rejected it after Petitioner had been detained for three months. Mem. Op. 11–12, ECF No. 29 (denying motion to dismiss habeas petition and rejecting government's misplaced reliance on *Boumediene v. Bush*, 553 U.S. 723, 795 (2008), to deny immediate counsel access). It is even more meritless today, after Petitioner has been detained for nearly five months and where he challenges the government's legal authority to imprison him. *See* 28 U.S.C. § 2241(c)(1), (3) (habeas extends to individuals detained without legal "authority" and/or "in violation of the Constitution or laws . . . of the United States").

## CONCLUSION

For the foregoing reasons, the Petition for a Writ of Habeas Corpus should be granted, and the Court should order the Petitioner's release from unlawful U.S. custody.


Dated: February 9, 2018

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the District of Columbia
915 15th Street, NW, 2nd Floor
Washington, DC 20005
Tel: 202-457-0800
Fax: 202-457-0805
aspitzer@acludc.org

*Counsel for Petitioner*

Respectfully submitted,


/s/ Jonathan Hafetz
Jonathan Hafetz (D.C. Bar No. NY0251)
Brett Max Kaufman (D.C. Bar No.
  NY0224)
Dror Ladin
Hina Shamsi (D.C. Bar No. MI0071)
Anna Diakun
American Civil Liberties Union
  Foundation
125 Broad Street, 18th Floor
New York, New York 10004
Tel: 212-549-2500
Fax: 212-549-2654
jhafetz@aclu.org
bkaufman@aclu.org
dladin@aclu.org
hshamsi@aclu.org
adiakun@aclu.org

# **Appendix**

**2001 Authorization for Use of Military Force**
**Pub. L. 107-40, 115 Stat. 224 (2001)**
**("2001 AUMF")**

115 STAT. 224        PUBLIC LAW 107–40—SEPT. 18, 2001

Public Law 107–40
107th Congress

Joint Resolution

Sept. 18, 2001
[S.J. Res. 23]

To authorize the use of United States Armed Forces against those responsible for the recent attacks launched against the United States.

Whereas, on September 11, 2001, acts of treacherous violence were committed against the United States and its citizens; and

Whereas, such acts render it both necessary and appropriate that the United States exercise its rights to self-defense and to protect United States citizens both at home and abroad; and

Whereas, in light of the threat to the national security and foreign policy of the United States posed by these grave acts of violence; and

Whereas, such acts continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States; and

Whereas, the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States: Now, therefore, be it

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,*

Authorization for Use of Military Force.
50 USC 1541 note.

**SECTION 1. SHORT TITLE.**

This joint resolution may be cited as the "Authorization for Use of Military Force".

**SEC. 2. AUTHORIZATION FOR USE OF UNITED STATES ARMED FORCES.**

President.

(a) IN GENERAL.—That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

(b) WAR POWERS RESOLUTION REQUIREMENTS.—

(1) SPECIFIC STATUTORY AUTHORIZATION.—Consistent with section 8(a)(1) of the War Powers Resolution, the Congress declares that this section is intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution.

PUBLIC LAW 107–40—SEPT. 18, 2001        115 STAT. 225

(2) APPLICABILITY OF OTHER REQUIREMENTS.—Nothing in this resolution supercedes any requirement of the War Powers Resolution.

Approved September 18, 2001.

LEGISLATIVE HISTORY—S.J. Res. 23 (H.J. Res. 64):
CONGRESSIONAL RECORD, Vol. 147 (2001):
    Sept. 14, considered and passed Senate and House.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 37 (2001):
    Sept. 18, Presidential statement.

○

**Authorization for Use of Military Force Against Iraq Resolution of 2002**
**Pub. L. No. 107-243, 116 Stat. 1498 (2002)**
**("2002 AUMF")**

Public Law 107–243
107th Congress

## Joint Resolution

Oct. 16, 2002
[H.J. Res. 114]

To authorize the use of United States Armed Forces against Iraq.

Whereas in 1990 in response to Iraq's war of aggression against and illegal occupation of Kuwait, the United States forged a coalition of nations to liberate Kuwait and its people in order to defend the national security of the United States and enforce United Nations Security Council resolutions relating to Iraq;

Whereas after the liberation of Kuwait in 1991, Iraq entered into a United Nations sponsored cease-fire agreement pursuant to which Iraq unequivocally agreed, among other things, to eliminate its nuclear, biological, and chemical weapons programs and the means to deliver and develop them, and to end its support for international terrorism;

Whereas the efforts of international weapons inspectors, United States intelligence agencies, and Iraqi defectors led to the discovery that Iraq had large stockpiles of chemical weapons and a large scale biological weapons program, and that Iraq had an advanced nuclear weapons development program that was much closer to producing a nuclear weapon than intelligence reporting had previously indicated;

Whereas Iraq, in direct and flagrant violation of the cease-fire, attempted to thwart the efforts of weapons inspectors to identify and destroy Iraq's weapons of mass destruction stockpiles and development capabilities, which finally resulted in the withdrawal of inspectors from Iraq on October 31, 1998;

Whereas in Public Law 105–235 (August 14, 1998), Congress concluded that Iraq's continuing weapons of mass destruction programs threatened vital United States interests and international peace and security, declared Iraq to be in "material and unacceptable breach of its international obligations" and urged the President "to take appropriate action, in accordance with the Constitution and relevant laws of the United States, to bring Iraq into compliance with its international obligations";

Whereas Iraq both poses a continuing threat to the national security of the United States and international peace and security in the Persian Gulf region and remains in material and unacceptable breach of its international obligations by, among other things, continuing to possess and develop a significant chemical and biological weapons capability, actively seeking a nuclear weapons capability, and supporting and harboring terrorist organizations;

Whereas Iraq persists in violating resolution of the United Nations Security Council by continuing to engage in brutal repression of its civilian population thereby threatening international peace

and security in the region, by refusing to release, repatriate, or account for non-Iraqi citizens wrongfully detained by Iraq, including an American serviceman, and by failing to return property wrongfully seized by Iraq from Kuwait;

Whereas the current Iraqi regime has demonstrated its capability and willingness to use weapons of mass destruction against other nations and its own people;

Whereas the current Iraqi regime has demonstrated its continuing hostility toward, and willingness to attack, the United States, including by attempting in 1993 to assassinate former President Bush and by firing on many thousands of occasions on United States and Coalition Armed Forces engaged in enforcing the resolutions of the United Nations Security Council;

Whereas members of al Qaida, an organization bearing responsibility for attacks on the United States, its citizens, and interests, including the attacks that occurred on September 11, 2001, are known to be in Iraq;

Whereas Iraq continues to aid and harbor other international terrorist organizations, including organizations that threaten the lives and safety of United States citizens;

Whereas the attacks on the United States of September 11, 2001, underscored the gravity of the threat posed by the acquisition of weapons of mass destruction by international terrorist organizations;

Whereas Iraq's demonstrated capability and willingness to use weapons of mass destruction, the risk that the current Iraqi regime will either employ those weapons to launch a surprise attack against the United States or its Armed Forces or provide them to international terrorists who would do so, and the extreme magnitude of harm that would result to the United States and its citizens from such an attack, combine to justify action by the United States to defend itself;

Whereas United Nations Security Council Resolution 678 (1990) authorizes the use of all necessary means to enforce United Nations Security Council Resolution 660 (1990) and subsequent relevant resolutions and to compel Iraq to cease certain activities that threaten international peace and security, including the development of weapons of mass destruction and refusal or obstruction of United Nations weapons inspections in violation of United Nations Security Council Resolution 687 (1991), repression of its civilian population in violation of United Nations Security Council Resolution 688 (1991), and threatening its neighbors or United Nations operations in Iraq in violation of United Nations Security Council Resolution 949 (1994);

Whereas in the Authorization for Use of Military Force Against Iraq Resolution (Public Law 102–1), Congress has authorized the President "to use United States Armed Forces pursuant to United Nations Security Council Resolution 678 (1990) in order to achieve implementation of Security Council Resolution 660, 661, 662, 664, 665, 666, 667, 669, 670, 674, and 677";

Whereas in December 1991, Congress expressed its sense that it "supports the use of all necessary means to achieve the goals of United Nations Security Council Resolution 687 as being consistent with the Authorization of Use of Military Force Against

Iraq Resolution (Public Law 102–1)," that Iraq's repression of its civilian population violates United Nations Security Council Resolution 688 and "constitutes a continuing threat to the peace, security, and stability of the Persian Gulf region," and that Congress, "supports the use of all necessary means to achieve the goals of United Nations Security Council Resolution 688";

Whereas the Iraq Liberation Act of 1998 (Public Law 105–338) expressed the sense of Congress that it should be the policy of the United States to support efforts to remove from power the current Iraqi regime and promote the emergence of a democratic government to replace that regime;

Whereas on September 12, 2002, President Bush committed the United States to "work with the United Nations Security Council to meet our common challenge" posed by Iraq and to "work for the necessary resolutions," while also making clear that "the Security Council resolutions will be enforced, and the just demands of peace and security will be met, or action will be unavoidable";

Whereas the United States is determined to prosecute the war on terrorism and Iraq's ongoing support for international terrorist groups combined with its development of weapons of mass destruction in direct violation of its obligations under the 1991 cease-fire and other United Nations Security Council resolutions make clear that it is in the national security interests of the United States and in furtherance of the war on terrorism that all relevant United Nations Security Council resolutions be enforced, including through the use of force if necessary;

Whereas Congress has taken steps to pursue vigorously the war on terrorism through the provision of authorities and funding requested by the President to take the necessary actions against international terrorists and terrorist organizations, including those nations, organizations, or persons who planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such persons or organizations;

Whereas the President and Congress are determined to continue to take all appropriate actions against international terrorists and terrorist organizations, including those nations, organizations, or persons who planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such persons or organizations;

Whereas the President has authority under the Constitution to take action in order to deter and prevent acts of international terrorism against the United States, as Congress recognized in the joint resolution on Authorization for Use of Military Force (Public Law 107–40); and

Whereas it is in the national security interests of the United States to restore international peace and security to the Persian Gulf region: Now, therefore, be it

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,*

Authorization for Use of Military Force Against Iraq Resolution of 2002. 50 USC 1541 note.

## SECTION 1. SHORT TITLE.

This joint resolution may be cited as the "Authorization for Use of Military Force Against Iraq Resolution of 2002".

**SEC. 2. SUPPORT FOR UNITED STATES DIPLOMATIC EFFORTS.**

The Congress of the United States supports the efforts by the President to—

(1) strictly enforce through the United Nations Security Council all relevant Security Council resolutions regarding Iraq and encourages him in those efforts; and

(2) obtain prompt and decisive action by the Security Council to ensure that Iraq abandons its strategy of delay, evasion and noncompliance and promptly and strictly complies with all relevant Security Council resolutions regarding Iraq.

**SEC. 3. AUTHORIZATION FOR USE OF UNITED STATES ARMED FORCES.**

(a) AUTHORIZATION.—The President is authorized to use the Armed Forces of the United States as he determines to be necessary and appropriate in order to—

(1) defend the national security of the United States against the continuing threat posed by Iraq; and

(2) enforce all relevant United Nations Security Council resolutions regarding Iraq.

(b) PRESIDENTIAL DETERMINATION.—In connection with the exercise of the authority granted in subsection (a) to use force the President shall, prior to such exercise or as soon thereafter as may be feasible, but no later than 48 hours after exercising such authority, make available to the Speaker of the House of Representatives and the President pro tempore of the Senate his determination that—

(1) reliance by the United States on further diplomatic or other peaceful means alone either (A) will not adequately protect the national security of the United States against the continuing threat posed by Iraq or (B) is not likely to lead to enforcement of all relevant United Nations Security Council resolutions regarding Iraq; and

(2) acting pursuant to this joint resolution is consistent with the United States and other countries continuing to take the necessary actions against international terrorist and terrorist organizations, including those nations, organizations, or persons who planned, authorized, committed or aided the terrorist attacks that occurred on September 11, 2001.

(c) WAR POWERS RESOLUTION REQUIREMENTS.—

(1) SPECIFIC STATUTORY AUTHORIZATION.—Consistent with section 8(a)(1) of the War Powers Resolution, the Congress declares that this section is intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution.

(2) APPLICABILITY OF OTHER REQUIREMENTS.—Nothing in this joint resolution supersedes any requirement of the War Powers Resolution.

**SEC. 4. REPORTS TO CONGRESS.**

(a) REPORTS.—The President shall, at least once every 60 days, submit to the Congress a report on matters relevant to this joint resolution, including actions taken pursuant to the exercise of authority granted in section 3 and the status of planning for efforts that are expected to be required after such actions are completed, including those actions described in section 7 of the Iraq Liberation Act of 1998 (Public Law 105–338).

President.

8

116 STAT. 1502          PUBLIC LAW 107–243—OCT. 16, 2002

(b) SINGLE CONSOLIDATED REPORT.—To the extent that the submission of any report described in subsection (a) coincides with the submission of any other report on matters relevant to this joint resolution otherwise required to be submitted to Congress pursuant to the reporting requirements of the War Powers Resolution (Public Law 93–148), all such reports may be submitted as a single consolidated report to the Congress.

(c) RULE OF CONSTRUCTION.—To the extent that the information required by section 3 of the Authorization for Use of Military Force Against Iraq Resolution (Public Law 102–1) is included in the report required by this section, such report shall be considered as meeting the requirements of section 3 of such resolution.

Approved October 16, 2002.

---

LEGISLATIVE HISTORY—H.J. Res. 114 (S.J. Res. 45) (S.J. Res. 46):

HOUSE REPORTS: No. 107–721 (Comm. on International Relations).
CONGRESSIONAL RECORD, Vol. 148 (2002):
    Oct. 8, 9, considered in House.
    Oct. 10, considered and passed House and Senate.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 38 (2002):
    Oct. 16, Presidential remarks and statement.

○

**National Defense Authorization Act for Fiscal Year 2012, § 1021**
**Pub. L. No. 112-81, 125 Stat. 1298, 1562 (2012)**
**("2012 NDAA")**

required by subsection (a), the Comptroller General of the United States shall submit to Congress an assessment by the Comptroller General of the report, including a determination whether or not the report complies with applicable best practices.

# Subtitle D—Counterterrorism

10 USC 801 note.

**SEC. 1021. AFFIRMATION OF AUTHORITY OF THE ARMED FORCES OF THE UNITED STATES TO DETAIN COVERED PERSONS PURSUANT TO THE AUTHORIZATION FOR USE OF MILITARY FORCE.**

(a) IN GENERAL.—Congress affirms that the authority of the President to use all necessary and appropriate force pursuant to the Authorization for Use of Military Force (Public Law 107–40; 50 U.S.C. 1541 note) includes the authority for the Armed Forces of the United States to detain covered persons (as defined in subsection (b)) pending disposition under the law of war.

(b) COVERED PERSONS.—A covered person under this section is any person as follows:

(1) A person who planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored those responsible for those attacks.

(2) A person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities in aid of such enemy forces.

(c) DISPOSITION UNDER LAW OF WAR.—The disposition of a person under the law of war as described in subsection (a) may include the following:

(1) Detention under the law of war without trial until the end of the hostilities authorized by the Authorization for Use of Military Force.

(2) Trial under chapter 47A of title 10, United States Code (as amended by the Military Commissions Act of 2009 (title XVIII of Public Law 111–84)).

(3) Transfer for trial by an alternative court or competent tribunal having lawful jurisdiction.

(4) Transfer to the custody or control of the person's country of origin, any other foreign country, or any other foreign entity.

(d) CONSTRUCTION.—Nothing in this section is intended to limit or expand the authority of the President or the scope of the Authorization for Use of Military Force.

(e) AUTHORITIES.—Nothing in this section shall be construed to affect existing law or authorities relating to the detention of United States citizens, lawful resident aliens of the United States, or any other persons who are captured or arrested in the United States.

(f) REQUIREMENT FOR BRIEFINGS OF CONGRESS.—The Secretary of Defense shall regularly brief Congress regarding the application of the authority described in this section, including the organizations, entities, and individuals considered to be "covered persons" for purposes of subsection (b)(2).