IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE,<br><br>        Petitioner,<br><br>    v.<br><br>GEN. JAMES N. MATTIS,<br>  in his official capacity as SECRETARY<br>  OF DEFENSE,<br><br>        Respondent. | )<br>)<br>)<br>)<br>)<br>)    Civil Action No. 1:17-cv-2069 (TSC)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>RESPONDENT'S NOTICE OF FILING PUBLIC VERSION OF FACTUAL RETURN</u>

NOTICE is hereby given that attached are redacted versions, suitable for public filing, of

Respondent's Factual Return and Supplemental Exhibit, previously filed under seal as ECF Nos.

46 and 49. This filing incorporates redactions requested by Petitioner for the purpose of

preventing disclosure of Petitioner's identity, as well as limited redactions by Respondent

protecting the identity of declarants in the Return and Supplemental Exhibit.

February 14, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
JESSIE K. LIU
United States Attorney
TERRY M. HENRY
Assistant Director, Federal Programs Branch

/s/ Kathryn L. Wyer
JAMES M. BURNHAM
Senior Counsel
KATHRYN L. WYER
Senior Trial Counsel, Federal Programs
OLIVIA HUSSEY SCOTT
Trial Attorney, Federal Programs
U.S. Department of Justice, Civil Division

20 Massachusetts Avenue, N.W.
Washington, DC   20530
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Respondent*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| | ) | |
| v. | ) | |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | |
| in his official capacity as SECRETARY | ) | |
| OF DEFENSE, | ) | |
| | ) | |
| Respondent. | ) | |

# ECF 46

# REDACTED VERSION FOR PUBLIC FILING

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| | ) | |
| v. | ) | |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | |
| in his official capacity as SECRETARY | ) | |
| OF DEFENSE, | ) | |
| | ) | |
| Respondent. | ) | |

**RESPONDENT'S FACTUAL RETURN**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

LEGAL JUSTIFICATION FOR DETENTION ......................................................... 4

    I.      ISIL Originated from the Al-Qaida Terrorist Organization................................... 5

    II.     The 2001 AUMF Authorizes Military Detention of Individuals Who Are
           Part of or Substantially Support ISIL.................................................................. 12

    III.    The 2002 Iraq AUMF Authorizes Military Detention of Individuals Who
           Are Part of or Substantially Support ISIL............................................................ 20

    IV.    Congress Has Ratified Applying the AUMFs to ISIL ......................................... 22

    V.     The President Has Authority Under Article II to Militarily Detain
           Individuals Who Are Part of or Substantially Support ISIL................................. 25

FACTUAL JUSTIFICATION FOR DETENTION ...................................................... 28

    I.      Evidentiary Considerations ................................................................................. 28

    II.     Al-Baghdadi Declared the Islamic State a Caliphate on July 5, 2014 ................. 30

    III.    An Internal ISIL Document Shows Petitioner Registered as an ISIL
           Fighter on July █, 2014 ...................................................................................... 31

    IV.    Petitioner Was Identified as an ISIL Member When Captured Near ISIL-
           Held Territory in September 2017 ....................................................................... 32

    V.     Petitioner Has Described His Activities as a Member of ISIL ............................ 33

           A.     Summary of Petitioner's Account............................................................ 33

           B.     Petitioner's Background........................................................................... 34

           C.     Petitioner's Account of His Travel From June 2014 to
                  January 2015 ........................................................................................... 34

           D.     Petitioner's Account of His Time With ISIL ........................................... 35

    VI.    Other Evidence Further Corroborates the Conclusion that Petitioner Joined
           and Worked for ISIL ........................................................................................... 40

           A.     Evidence Found at Petitioner's Capture Suggests He Worked for
                  ISIL ........................................................................................................ 40

           B.     Petitioner Sought Weapons During His Time With ISIL ........................ 41

            C.     Petitioner Was in or Close to ISIL-Held Territory on July █, 2014
                  and for a Period in 2014 That Was Significantly Longer Than He
                  Claimed .................................................................................................. 42

D.      Petitioner Sought to Engage With and Advise ISIL on Social
        Media in the Months Before July 5, 2014.................................................. 44

E.      Petitioner's Online Search History in the Months Before July █,
        2014 Show His Support for ISIL and Suggest He Planned to Join .......... 47

F.      Petitioner Was Described by a Friend as a Likely ISIL Recruit............... 50

G.      Petitioner's Second Trip to Syria in March 2015 Followed Months
        of Online Preoccupation With ISIL Activity ........................................... 51

CONCLUSION...................................................................................................................... 53

## INTRODUCTION

1.     Pursuant to the Court's Order of January 12, 2018 [ECF 41], Respondent respectfully submits this Factual Return.

2.     On or about September 11, 2017, ███████████████████ ("Petitioner"), a dual citizen of the United States and Saudi Arabia, was captured by Syrian Democratic Forces at a checkpoint on an active battlefield adjacent to territory controlled by the Islamic State of Iraq and the Levant ("ISIL"). Because Petitioner holds U.S. citizenship, the Syrian Democratic Forces transferred custody of Petitioner to U.S. forces stationed in Iraq. The Government had not set out to capture Petitioner that day; thus, over the past four months that Petitioner has been in U.S. military custody, the Government has worked diligently to investigate Petitioner, identify his reasons for traveling to ISIL-controlled territory in Syria, and determine an appropriate disposition of him, including whether the appropriate course of action is to prosecute Petitioner criminally (such as for material support of terrorism), to continue detaining Petitioner as an enemy combatant, or to relinquish custody of Petitioner to another sovereign with its own legitimate interest in him.

3.     While the Government was still engaged in this decisional process, Petitioner's counsel filed a petition for habeas corpus with this Court and, having been granted access to Petitioner and secured his consent to their representation, now ask the Court to order Petitioner's immediate release. That request should be denied.

4.     The following narrative and attached materials set forth the legal and factual bases for the Government's case and demonstrate by a preponderance of the evidence that Petitioner is lawfully detained. This narrative is not intended to be a complete explication of the information in

support of Petitioner's detention contained in those materials. Further, Respondent reserves the right to seek to amend this Return to add additional information supporting the lawfulness of Petitioner's detention as needed.

5.     The Government's legal authority to detain Petitioner is clear and rests on three independent bases:   The 2001 Authorization for Use of Military Force,[1] the 2002 Authorization for Use of Military Force Against Iraq,[2] and the President's authority under Article II.

6.     The Government's factual basis for detaining Petitioner is similarly clear. When assessing the bases for detention, the Supreme Court has explained that "[h]abeas corpus proceedings [with respect to enemy-combatant detainees] need not resemble a criminal trial," *Boumediene v. Bush*, 553 U.S. 723, 783 (2008), while the D.C. Circuit has affirmed that this Court can and should consider evidence that would not be admissible in a criminal prosecution, *see, e.g.*, *Al-Bihani v. Obama*, 590 F.3d 866, 879 (D.C. Cir. 2010).

7.     The evidence the Government has compiled shows that Petitioner joined ISIL on or about July ██, 2014, on an initial visit to Syria. Petitioner returned to Syria in March 2015 and, by his own admission, was an ISIL fighter recruit, attended an ISIL training camp, swore loyalty to the ISIL leader, and worked for and provided support to ISIL through his work in various capacities for two-and-a-half years, until air strikes and other military offensives against ISIL forced him to flee. When Petitioner was captured during his flight by Syrian Democratic Forces

---

[1] Pub. L. No. 107-40, 115 Stat. 224 (2001) ("2001 AUMF").

[2] Pub. L. No. 107-243, 116 Stat. 1498 ("2002 Iraq AUMF").

on ISIL-controlled territory, he was carrying a thumb drive that not only contained ISIL administrative spreadsheets consistent with some of the work that he described, but that was filled with files explaining how to make bombs, how to use different types of weapons, and how to interrogate captives, as well as other how-to manuals for an ISIL fighter. In addition, Petitioner was carrying over $4000 in cash and a GPS device—both of which were recognized by the SDF as marks of an ISIL fighter, not a civilian. Moreover, Petitioner is listed, by name and other identifying details, as a "fighter" in an internal ISIL document that independently came into the Government's possession. The Government therefore has met its burden to show that Petitioner is part of or substantially supported ISIL.

8.      ISIL is a terrorist group engaged in armed conflict against the United States and military operations against U.S. forces overseas. It is one of the most dangerous terrorist organizations in the world, responsible for countless murders and violent attacks against innocent civilians.   Petitioner traveled to Syria to support that group's efforts and came into U.S. custody as a result of that voluntary choice.   The Court should decline Petitioner's request to be immediately released and should, instead, recognize that Petitioner's current detention is lawful.

## LEGAL JUSTIFICATION FOR DETENTION

9.      As an initial matter, the authorities discussed below authorize the United States to hold individuals like Petitioner—captured on the battlefield in a zone of armed conflict—pending review, evaluation, and decision on the appropriate disposition; accordingly, Petitioner's request for release is premature and should be denied on that basis alone.   *See Boumediene*, 533 U.S. at 795 ("[A] habeas court should [not] intervene the moment an enemy combatant steps foot in a

4

territory where the writ runs.").   But should the Court nonetheless entertain Petitioner's habeas corpus petition, the United States has lawful authority to hold Petitioner in military custody for the duration of relevant hostilities on three independent bases: the 2001 AUMF, the 2002 Iraq AUMF, and the President's constitutional authority under Article II.

## I.   ISIL Originated from the Al-Qaida Terrorist Organization

10.   ISIL began as a terrorist group founded and led by Abu Mu'sab al-Zarqawi.   That group was originally called Jam'at al-Tawhid wa'al Jihad, and it conducted a series of terrorist attacks in Iraq in 2003, around the time of the U.S. arrival.[3]   Al-Zarqawi was an associate of Osama bin Laden, the leader of the al-Qaida terrorist group, dating back to al-Zarqawi's time in Afghanistan and Pakistan before al-Qaida attacked the United States on September 11, 2001.[4]   In 2003 the United States Department of Treasury designated al-Zarqawi as a Specially Designated

---

[3] *See* United States Department of State, *2005 Country Report on Terrorism*, ch.6 (April 27, 2005), *available at* https://www.state.gov/j/ct/rls/crt/45394.htm.

[4] [intentionally left blank]

Global Terrorist under Executive Order 13224,[5] based on his involvement with and actions in

support of al-Qaida.[6]

11.     On October 15, 2004, the U.S. Secretary of State designated Jam'at al-Tawhid

wa'al Jihad as a Specially Designated Global Terrorist under Executive Order 13224 and as a

Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act (8

U.S.C. § 1189).[7]   Because the group and its leader were connected to al-Qaida, the United States

---

[5] Following al-Qaida's September 2001 terrorist attacks on the United States, President Bush issued Executive Order No. 13224 (Sept. 23, 2001), pursuant to the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.* ("IEEPA"), in which he declared a national emergency with respect to the "grave acts of terrorism . . . and the continuing and immediate threat of further attacks on United States nationals or the United States."   This Executive Order blocked all property and interests in property of "Specially Designated Global Terrorists" ("SDGT's"), prohibited the provision of funds, goods or services for the benefit of SDGTs, and authorized the U.S. Treasury to block the assets of individuals and entities that provide support, services, or assistance to, or otherwise associate with, SDGTs, as well as their subsidiaries, front organizations, agents, and associates. Under the IEEPA, a violation of this Executive Order is a federal criminal offense.   *See* 50 U.S.C. § 1705

[6] United States Department of Treasury, *Treasury Designates Six Al-Qaida Terrorists* (September    24,    2003),    *available    at*    https://www.treasury.gov/press-center/press-releases/Pages/js757.aspx.

[7] *See* 69 Fed. Reg. 61292 (Oct. 15, 2004). The announcement of these designations explained:

> The Jama'at al-Tawhid wa'al-Jihad is a radical Islamist terrorist organization led by Abu Mus'ab al-Zarqawi, who has been designated and listed for international sanctions by the UN 1267 Committee for his ties to al-Qaida. The group's main goal is to undermine the establishment of a free and pluralistic Iraqi state by fomenting civil war in Iraq. Via Internet jihadi websites containing video broadcasts, this organization has publicly admitted responsibility for the brutal abductions and videotaped executions this year of seven civilians: Americans Nicholas Berg, Eugene Armstrong, and Jack Hensley; Briton Kenneth Bigley; South Korean Kim Sun-Il; Bulgarian Georgi Lazov; and Turk Murat Yuce. The group's operatives have also been responsible for the assassinations of the former Iraqi Governing Council President, the governor of Mosul, and U.S. diplomat

6

asked the United Nations Sanctions Committee to include the group on its list of entities subject to international sanctions based on that association.[8]  On October 18, 2004, the al-Qaida and Taliban Sanctions Committee of the United Nations approved the addition of Jam'at al-Tawhid wa'al Jihad, a.k.a. al-Qaida in Iraq ("AQI"), to its al-Qaida list for "participating in the financing, planning, facilitating, preparing or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf or in support of"; "supplying, selling or transferring arms and related materiel to"; or "otherwise supporting acts or activities of" Usama bin Laden and Al-Qaida.[9]

12.     Al-Zarqawi's group, AQI, targeted Coalition forces and civilians by planting vehicle improvised explosive devices (IEDs), engaging in suicide bombing, and executing

---

Laurence Foley in Amman, Jordan in 2002. The Zarqawi network specifically targets those Iraqis attempting to rebuild their country and provide for its security. Hundreds of innocent Iraqis have died and many hundreds more have been injured during the last year in the group's targeted bombings throughout Iraq - in Mosul, Baqouba, Falujah, Ramadi, Najaf, and Baghdad. The group was also responsible for the U.N. headquarters bombing in Baghdad which killed U.N. Special Representative of the Secretary General for Iraq, Sergio Vieira de Mello.

United States Department of State, *Foreign Terrorist Organization: Designation of Jama'at al-Tawhid wa'al-Jihad and Aliases* (October 15, 2004), *available at* https://2001-2009.state.gov/r/pa/prs/ps/2004/37130.htm.

[8] *Id.*

[9] *See* United Nations Security Council, *Security Council Committee Pursuant to Resolutions 1267 (1999) 1989 (2011) and 2253 (2015) Concerning ISIL (Da'esh) Al-Qaida and Associated Individuals Groups Undertakings and Entities* (Jan. 18, 2018), *available at* https://www.un.org/sc/suborg/en/sanctions/1267/aq_sanctions_list/summaries/entity/al-qaida-in-iraq.

7

hostages—all as part of a campaign to expel Coalition forces and establish an Islamic state in Iraq.[10]

13.    In October 2004, shortly after his group was designated as a Foreign Terrorist Organization, al-Zarqawi publicly pledged his group's allegiance to bin Laden.[11]   Bin Laden also publicly endorsed al-Zarqawi as al-Qaida's leader in Iraq.[12]

14.    Following al-Zarqawi's pledge, his group issued statements on jihadi websites claiming responsibility for anti-U.S. attacks in Iraq, and continued to engage in terrorist activities.[13]   The United States amended the group's Foreign Terrorist Organization designation on December 17, 2004, by adding the group's new alias Tanzin Qaidat al-Jihad Fi Bilad al-Rafidayn—translated as al-Qaida of the Jihad Organization in the Land of Two Rivers [Iraq].[14]

---

[10] *See 2005 Country Report on Terrorism*, ch. 6, *supra* note 3.

[11] *See* United States Department of State, *Addition of Al-Manar to the Terrorist Exclusion List* (December 28, 2004), *available at* https://2001-2009.state.gov/r/pa/prs/ps/2004/40081.htm.

[12] *See* "Purported bin Laden tape endorses al-Zarqawi," *CNN* (Dec. 27, 2004), http://edition.cnn.com/2004/WORLD/meast/12/27/binladen.tape/ (calling al-Zarqawi "the prince of al Qaeda in Iraq" and asking "all our organization brethren to listen to him and obey him in his good deeds").

[13] *Addition of Al-Manar to the Terrorist Exclusion List*, *supra* note 11.

[14] *See* United States Department of State, *Country Reports on Terrorism: Chapter 6 Foreign Terrorist Organizations* (2015) ("Al-Qaida in Iraq (AQI) was designated as a Foreign Terrorist Organization on December 17, 2004."), *available at* https://www.state.gov/j/ct/rls/crt/2013/224829.htm.

The United Nations Al-Qaida and Taliban Sanctions Committee also added this alias to their listing for the group.[15]

15.     The United States killed al-Zarqawi in an airstrike in June 2006, and Abu Ayyub al-Masri was named his successor.   Abu Ayyub al-Masri issued a statement pledging to continue what al-Zarqawi had started and, in October 2006, moved towards al-Qaida's goal of establishing a caliphate in the region by declaring the "Islamic State of Iraq" ("ISI") and claiming AQI's attacks under that new name.[16]   AQI further declared that ISIL would become a platform from which AQI would launch jihad throughout the world.[17]

16.     After U.S. forces killed Osama bin-Laden in May of 2011, AQI reaffirmed its support for al-Qaida and its new leader, Ayman al-Zawahiri.[18]

17.     Also in 2011, Abu Bakr al-Baghdadi, who, like his predecessors, had ties to senior al-Qaida leaders, assumed leadership of AQI.[19]   In 2013, al-Baghdadi expanded the group's

---

[15] *See* United Nations, *Security Council Committee Adds Seven A.K.A.'s of One Entity in Al-Qaida Section of Its Consolidated List* (December 6, 2004), *available at* https://www.un.org/press/en/2004/sc8260.doc.htm.

[16] *See* United States Department of State, *Country Reports on Terrorism: Chapter 6 Terrorist Organizations* (2008), *available at* https://www.state.gov/j/ct/rls/crt/2008/122449.htm

[17] *See* United States Department of State, *Country Reports on Terrorism: Chapter 6 Foreign Terrorist Organizations* (2007) ("In October 2006, AQI declared the ISI would become a platform from which AQI would launch jihad throughout the world."), *available at* https://www.state.gov/j/ct/rls/crt/2006/82738.htm.

[18] *See* Global Security, *Al-Qaeda in Iraq* (June 13, 2014) ("AQI reaffirmed its support for al-Qa'ida and Ayman al-Zawahiri following Usama Bin Ladin's death in May 2011."), *available at* https://www.globalsecurity.org/military/world/para/aqi-2.htm.

[19] In October 2011, the Secretary of State added al-Baghdadi to the Specially Designated Global Terrorist list under Executive Order 13223.   *See* https://2009-2017.state.gov/r/pa/prs/ps/2011/10/174971.htm.   Al-Baghdadi was also added to the United

9

operations into Syria and changed its public name to the Islamic State in Iraq and al-Sham ("ISIS").[20]   The following year, the Department of State designated the group's primary name as the Islamic State of Iraq and the Levant ("ISIL").[21]   In short, as Brett McGurk, the then-Deputy Assistant Secretary for Iraq and Iran in Bureau of Near Eastern Affairs at the Department of State, has testified:   "ISIL basically is al-Qaeda in Iraq."[22]

---

Nations Security Council's al-Qaida sanctions list in October 2011. *See* United Nations Security Council, *Security Council al-Qaida Sanctions Committee Ibrahim Awwad Ibrahim Ali Al-Badri Al-Samarrai to Its Sanctions List* (Oct. 5, 2011), *available at* https://www.un.org/press/en/2011/sc10405.doc.htm.

[20] *See* United States Department of State, *Country Reports on Terrorism: Chapter 6 Foreign Terrorist Organizations* (2016), *available at* https://www.state.gov/j/ct/rls/crt/2016/272238.htm.

[21] *See* United States Department of State, *Terrorist Designations of Groups Operating in Syria* (May 14, 2014), *available at* https://2009-2017.state.gov/r/pa/prs/ps/2014/05/226067.htm.

[22] United States Cong. House. Committee on Foreign Affairs, *Hearing on Al-Qaeda's Resurgence in Iraq: A Threat to U.S. Interests*, at p. 6 February 5, 2014. 113th Cong., 2nd Sess. Washington: GOP, 2014 (testimony of Brett McGurk, Deputy Assistant Secretary for Iraq and Iran, Bureau of Near Eastern Affairs, U.S. Department of State) ("McGurk Testimony") (*available at* https://www.gpo.gov/fdsys/pkg/CHRG-113hhrg86588/pdf/CHRG-113hhrg86588.pdf);*see also generally id.* at pp. 6, 23, 59; Stephen W. Preston, Department of Defense General Counsel, "*The Legal Framework for the United States' Use of Military Force Since 9/11*" ANNUAL MEETING OF THE AMERICAN SOCIETY OF INTERNATIONAL LAW (2015) ("The name may have changed, but the group we call ISIL today has been an enemy of the United States within the scope of the 2001 AUMF continuously since at least 2004."), *available at* https://www.defense.gov/News/Speeches/Speech-View/Article/606662/the-legal-framework-for-the-united-states-use-of-military-force-since-911/ ("Preston Speech"); William S. Castle, Department of Defense, Performing the Duties of General Counsel, "*The Global War on Terrorism: Do We Need a New AUMF?*" NEW YORK CITY BAR ASSOCIATION EVENT (2017), at pp. 3-4, *available at* https://www.scribd.com/document/366923593/Dod-Acting-General-Counsel-William-Castle-NYC-Bar-Remarks-Aumf-Dec-11 ("2017 Castle Speech"); White House Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations (Dec. 2016), at pp. 4-5, *available at* https://fas.org/man/eprint/frameworks.pdf ("2016 White House Report").

18.     Over the course of 2013 and 2014, a split reportedly emerged between ISIL and al-Qaida over theological and strategic disagreements.[23]   ISIL now claims that it, not al-Qaida's current leadership, is the true inheritor of bin Laden's legacy, while some members and factions of al-Qaida-aligned groups have even publicly declared allegiance to ISIL.   *See* 2016 White House Report at 6, *supra* note 22; Preston Speech, *supra* note 22.

19.     In 2014, ISIL was responsible for the majority of the 12,000 Iraqi civilians killed that year.   It was heavily involved in the fight in Syria in 2014 and engaged in widespread terrorism, including kidnapping civilians, aid workers, and reporters.   ISIL remained active throughout 2015 and 2016 and has conducted several large-scale attacks in Iraq and Syria, as well as inspiring and aiding acts of terrorism throughout the world.[24]   ISIL continues to identify the United States as its enemy and target U.S. citizens and interests worldwide; even as recently as September 2017—the month Petitioner was captured by the SDF—ISIL's leader, Abu Bakr al-Baghdadi, called for attacks against the United States.[25]

---

[23] As Deputy Assistant Secretary McGurk has testified:

We believe [the rift] happened because of ISIL's unwillingness to follow Ayman al-Zawahiri' s orders that it allow for al-Nusrah Front's continued independence within Syria and only fight in Iraq.   Zawahiri has publicly distanced the AQ leadership from ISIL's unpopular actions against Syria's Sunni population, and it now appears that ISIL is conducting operations in Syria and Iraq entirely independent of any counsel or assistance from AQ core leadership.

McGurk Testimony at 59.

[24] *See generally* United States Department of State, *Country Reports on Terrorism: Chapter 6 Foreign Terrorist Organizations* (2016), *available at* https://www.state.gov/j/ct/rls/crt/2016/272238.htm.

[25] [intentionally left blank].

11

20.     As this history demonstrates, ISIL was founded and led by associates of Osama bin Laden, was al-Qaida's official affiliate in Iraq, was publicly allied with al-Qaida until recently, and now claims to be the true successor of the man who directed the 9/11 attacks.   For over a decade, ISIL has carried out attacks against U.S. persons and interests in Iraq and the region—including the brutal murder of kidnapped American citizens in Syria and attacks against U.S. military personnel that are present in Iraq at the invitation of the Iraqi Government—and has inspired and claimed credit for terror attacks in the United States and around the world.

## II.     The 2001 AUMF Authorizes Military Detention of Individuals Who Are Part of or Substantially Support ISIL

21.     The United States has the authority to detain persons who were "part of," or provided "substantial support" to al-Qaida and "associated forces" at the time of their capture, even with respect to U.S. citizens.   This authority is derived from the 2001 AUMF, which provides Congressional authorization for the President to use all necessary and appropriate force to prosecute the war, in light of law-of-war principles that inform the understanding of what is "necessary and appropriate."   Those longstanding law-of-war principles recognize that the "capture and detention" of enemy forces "are 'important incident[s] of war.'"   *Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004) (plurality) (quoting *Ex Parte Quirin*, 317 U.S. 1, 28 (1942)); *see also Hamdi*, 542 U.S. at 579, 589 (Thomas, J., dissenting) ("I agree with the plurality that the Federal Government has power to detain those that the Executive Branch determines to be enemy combatants.").

22.     The 2001 AUMF authorizes the use of "all necessary and appropriate force against those nations, organizations, or persons [who the President] determines planned, authorized,

committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations, or persons."   2001 AUMF, § 2(a), 115 Stat. at 224. There is longstanding consensus that this provision authorizes the use of military force not only against al-Qaida, which planned and carried out the September 11 attacks; and the Taliban, which harbored al-Qaida in Afghanistan; but also against "associated forces" of al-Qaida or the Taliban. *See, e.g., Hedges v. Obama*, 724 F.3d 170, 178 (2d Cir. 2013); *Parhat v. Gates*, 532 F.3d 834, 838 (D.C. Cir. 2008); Respondent's Memorandum Regarding the Government's Detention Authority Relative to Detainees Held at Guantanamo Bay, *In Re: Guantanamo Bay Detainee Litigation* at 7 (D.D.C. Misc. No. 08-442 (TFH)) (ECF No. 1690, filed Mar. 13, 2009).

23.     Courts have approved and accepted this interpretation of the 2001 AUMF in detainee litigation.   *See, e.g., Khan v. Obama*, 655 F.3d 20, 32-33 (D.C. Cir. 2011); *Barhoumi v. Obama*, 609 F.3d 416, 432 (D.C. Cir. 2010); *Al-Bihani v. Obama*, 590 F.3d 866, 872 (D.C. Cir. 2010).

24.     And Congress ratified this construction of the 2001 AUMF in the detention context in the National Defense Authorization Act for Fiscal Year 2012 ("FY 2012 NDAA"), Pub. L. No. 112-81, § 1021(b)(2), 125 Stat. 1298, 1562 (2011).   That Act includes a provision that makes clear it neither increases nor decreases the authority, recognized in *Hamdi*, to detain U.S. citizens as enemy combatants.   *See id.* § 1021(e) ("Nothing in this section shall be construed to affect existing law or authorities relating to the detention of United States citizens, lawful resident aliens of the United States, or any other persons who are captured or arrested in the United States.").

13

25.     This interpretation of the 2001 AUMF flows from the fact that the statute is construed in light of the principles underlying the law of war.   *See Hamdi*, 542 U.S. at 518 ; *see also Hamdan v. Rumsfeld*, 548 U.S. 557, 593-94 (2006); FY 2012 NDAA, § 1021(a), 125 Stat. at 1562; *cf.* Geneva Convention (III) Relative to the Treatment of Prisoners of War of Aug. 12, 1949, art. 4, 6 U.S.T.S. 3316 (contemplating detention of, *inter alia*, members of state armed forces, militias, and certain support personnel).   Law-of-war principles inform which "organizations" and "persons" the AUMF covers as well as what force is "necessary and appropriate" to combat those organizations and persons.   2001 AUMF, 115 Stat. at 224.   Under traditional law-of-war principles, a nation engaged in an international armed conflict may lawfully use military force against both its principal enemy and any other State that becomes a co-belligerent of that enemy by, for example, joining in the conflict. *See "Protected Person" Status in Occupied Iraq Under the Fourth Geneva Convention*, 28 Op. O.L.C. 35, 43-44 (Mar. 18, 2004). Although principles of neutrality and co-belligerency do not apply directly to the armed conflict between the United States, al-Qaida, the Taliban, and associated forces, they provide useful guidance in that conflict, and they suggest that it would be "necessary and appropriate" under the 2001 AUMF for the President to use force against "organizations" that would qualify as co-belligerents of al-Qaida or the Taliban as analogized to an international armed conflict between States.   *See, e.g.*, Curtis A. Bradley and Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2112 (2005); 2 Halleck's International Law ch. 19 § 5, at 3 (4th ed. 1908); *id.* ch. 28 § 2, at 307; Michael Bothe, *The Law of Neutrality*, Handbook of Humanitarian Law in Armed Conflict § 1107, at 485-94, 580-81 (Dieter Fleck, ed., 1995).

14

26.    To be considered an associated force of al-Qaida or the Taliban for purposes of the 2001 AUMF, an entity must satisfy two conditions. First, the entity must be an organized, armed group that has entered the fight alongside al-Qaida or the Taliban. Second, the group must be a co-belligerent with al-Qaida or the Taliban in hostilities against the United States or its coalition partners.   *See* 2017 Castle Speech at p. 3, *supra* n. 22; 2016 White House Report at pp. 4-5, *supra* n. 22.   As the General Counsel of the Department of Defense in the prior Administration explained, "The determination that a particular group is an associated force is made at the most senior levels of the U.S. Government, following reviews by senior government lawyers and informed by departments and agencies with relevant expertise and institutional roles, including all-source intelligence from the U.S. intelligence community."   Preston Speech, *supra* n. 22.

27.    The 2001 AUMF authorizes the use of force against ISIL because, as detailed above, at the time military action against the group now known as ISIL commence in 2003, that group was either part of, or an associated force of, al-Qaida.

28.    To be sure, as noted above, there was a reported rift between ISIL and current al-Qaida leadership in that began over the course of 2013 and 2014, but that rift did not remove ISIL from coverage under the 2001 AUMF.   ISIL continues to wage hostilities against the United States as it has since 2003, when it aligned with bin Laden's al-Qaida organization in its conflict against the United States.   As when it was known as AQI, ISIL had a direct relationship with bin Laden himself and waged that conflict in allegiance to him while he was alive.   ISIL now claims that it—not al-Qaida's current leadership—is the true executor of bin Laden's legacy.   Although there are reported rifts between ISIL and parts of the network bin Laden assembled, some members

15

and factions of al-Qaida-aligned groups have publicly declared allegiance to ISIL.   At the same time, ISIL continues to denounce the United States as its enemy and to target U.S. citizens and interests.[26]   In these circumstances, the President is not divested of the previously available authority under the 2001 AUMF to continue using force against ISIL simply because of conflicts between the group and al-Qaida's current leadership.   A contrary interpretation of the statute would allow an enemy force to manipulate the scope of the 2001 AUMF by splintering into rival factions while continuing to prosecute the same conflict against the United States.   *See generally* 2016 White House Report at 6, *supra* note 22; 2017 Castle Speech at pp. 3-4, *supra* note 22; Preston Speech, *supra* note 22; McGurk Testimony at pp. 6, 23, 59, *supra* note 22.

29.     The 2001 AUMF's authorization to wage war against ISIL includes the power to detain individuals under the laws of war for the duration of relevant hostilities, *Hamdi*, 542 U.S. at 521, once it is shown that those individuals are part of ISIL or substantially supported its forces. *See, e.g.*, *Ali v. Obama*, 736 F.3d 542, 544 & n.1 (D.C. Cir. 2013) ("This Court has stated that the AUMF authorizes the President to detain enemy combatants, which includes (among others) individuals who are part of al Qaeda, the Taliban, or associated forces . . .   As this Court has explained in prior cases, the President may also detain individuals who substantially support al Qaeda, the Taliban, or associated forces in the war."); *Hussain*, 718 F.3d at 967 ("[The AUMF] justifies holding a detainee at Guantanamo if the government shows, by a preponderance of the evidence, that the detainee was part of al Qaeda, the Taliban, or associated forces at the time of his

---

[26]  [intentionally left blank]

16

capture." (internal citations omitted)); *Khan v. Obama*, 655 F.3d 20, 23 (D.C. Cir. 2011) ("We

have held that the AUMF grants the President authority (inter alia) to detain individuals who are

'part of forces associated with Al Qaeda or the Taliban.'") (citation omitted); *Al-Adahi v. Obama*,

613 F.3d 1102, 1103 (D.C. Cir. 2010) ("The government may therefore hold at Guantanamo and

elsewhere those individuals who are 'part of' al-Qaida, the Taliban, or associated forces.").

> 30.      The D.C. Circuit has adopted a functional approach to determining whether an

individual is "part of" an enemy force under the AUMFs:

> [D]etermining whether an individual is part of al Qaeda, the Taliban, or an
> associated force almost always requires drawing inferences from circumstantial
> evidence, such as that individual's personal associations.   Unlike enemy soldiers
> in traditional wars, terrorists do not wear uniforms.   Nor do terrorist organizations
> issue membership cards, publish their rosters on the Internet, or otherwise publicly
> identify the individuals within their ranks.   So we must look to other indicia to
> determine membership in an enemy force.

*Ali*, 736 F.3d at 546.   In assessing detention, enemy forces can be detained even if "they have not

actually committed or attempted to commit any act of depredation or entered the theatre or zone

of active military operations," *see Ex Parte Quirin*, 317 U.S. at 38; direct participation in hostilities

is not required, *see Hussain v. Obama*, 718 F.3d 964, 967 (D.C. Cir. 2013). Further, it "is

impossible to provide an exhaustive list of criteria for determining whether an individual is 'part

of' al-Qaida. That determination must be made on a case-by-case basis" and must "focus[] upon

the actions of the individual in relation to the organization."[27]   *Bensayah v. Obama*, 610 F.3d 718,

---

[27] This functional test focuses on an individual's actions, rather than his motivations or
ideology.   The Court of Appeals has held that "there is no requirement" that an individual
"embrace every tenet of al-Qaida before United States forces may detain him," *see al-Adahi*, 613

725 (D.C. Cir. 2010), *judgment vacated as moot by Bensayah v. Obama*, No. 08-5537, Order (D.C.

Cir. Jan. 9, 2014); *see Salahi v. Obama*, 625 F.3d 745, 751-52 (D.C. Cir. 2010).

      31.      Relevant indicia and circumstances may include whether (1) the individual

intended to fight against the United States or its coalition partners, *see, e.g.*, *Awad v. Obama,* 608

F.3d 1, 9 (D.C. Cir. 2010) ("The government acknowledges that intention to fight is inadequate by

itself to make someone 'part of' al Qaeda, but it is nonetheless compelling evidence when, as here,

it accompanies additional evidence of conduct consistent with an effectuation of that intent."); (2)

the individual closely associated with members of enemy forces, *see, e.g.*, *id.* at 11; *Uthman v.*

*Obama*, 637 F.3d 400, 404-05 (D.C. Cir. 2011); *Al Alwi v. Obama*, 653 F.3d 11, 17 (D.C. Cir.

2011); *Hussain v. Obama*, 718 F.3d at 968-69 ; *Ali*, 736 F.3d at 546; *al Odah v. United States,* 611

F.3d 8, 15-17 (D.C. Cir. 2010); *al-Bihani*, 590 F.3d at 873 ; (3) other members of the enemy forces

or documents created by the enemy forces have identified the individual as a member, *see, e.g.*,

*Awad*, 608 F.3d at 7-8; *Barhoumi*, 609 F.3d at 425-26, 428-29; (4) the individual trained in a camp

associated with an enemy force, *see, e.g.*, *Barhoumi*, 609 F.3d at 425; *al-Adahi*, 613 F.3d at 1109;

*Al Alwi*, 653 F.3d at 17-18; (5) the individual stayed at a guesthouse associated with an enemy

force, *see, e.g.*, *Ali*, 736 F.3d at 546; *Barhoumi,* 609 F.3d at 427; *al-Adahi*, 613 F.3d at 1109;

*Uthman*, 637 F.3d at 406; *Al Alwi*, 653 F.3d at 17-18; *al Odah*, 611 F.3d at 16; (6) the individual

followed practices associated with enemy forces, such as the practice of turning over passports and

---

F.3d at 1109, and has rejected analysis that focuses on an individual's motivations for taking

actions on behalf of al-Qaida*, see id.*

18

money, *see, e.g.*, *Al Alwi*, 653 F.3d at 20; *Uthman*, 637 F.3d at 405-06; (7) the individual swore an oath of allegiance to an enemy force, *see, e.g.*, *Salahi*, 625 F.3d at 751; (8) the individual hosted leaders of the enemy force, *see, e.g.*, *id.* at 751-52; (9) the individual recruited or referred aspiring members to the enemy force, *see, e.g.*, *id.*; (10) the individual traveled along routes conventionally used by the enemy force, *see, e.g.*, *Uthman*, 637 F.3d at 406; *al Odah*, 611 F.3d at 15-16; (11) the individual lied to interrogators or provided implausible explanations for his or her behavior, *see, e.g.*, *Uthman*, 637 F.3d at 406; *Ali*, 736 F.3d at 546; and (12) the individual possessed a weapon, *see, e.g.*, *Hussain*, 718 F.3d at 969; *al Odah*, 611 F.3d at 15-16.   In addition, "[e]vidence that an individual operated within al-Qaida's command structure is 'sufficient but is not necessary to show he is 'part of' the organization'" for purposes of detention.   *Salahi*, 625 F.3d at 752.

32.     Under the 2001 AUMF, as informed by the law of armed conflict, detention is generally authorized until the end of hostilities.   *See Hamdi*, 542 U.S. at 521; *Ali*, 736 F.3d at 544 ("Detention under the AUMF may last for the duration of hostilities.").   During ongoing hostilities, the U.S. Government's legal authority to detain "is not dependent on whether an individual would pose a threat to the United States or its allies if released but rather upon the continuation of hostilities."   *Awad*, 608 F.3d at 11.

33.     As a matter of policy, a detainee may be released or transferred while hostilities are ongoing if a competent authority determines that the threat the individual poses to the security of the United States can be mitigated by other lawful means.   This discretionary designation of a detainee for possible transfer from a detention facility does not affect the legality of his continued

detention under the 2001 AUMF pending transfer.   *See id.*; *Almerfedi v. Obama*, 654 F.3d 1, 4 n.3 (D.C. Cir. 2011).

**III.     The 2002 Iraq AUMF Authorizes Military Detention of Individuals Who Are Part of or Substantially Support ISIL**

34.     The 2002 Iraq AUMF authorizing the use of military force against Iraq likewise provides legal authority for military operations against ISIL in Iraq and, in some circumstances, against ISIL in Syria.

35.     The Iraq AUMF states that the "President is authorized to use the Armed Forces of the United States as he determines to be necessary and appropriate in order to . . . defend the national security of the United States against the continuing threat posed by Iraq."   2002 Iraq AUMF, § 3(a)(1), 116 Stat. at 1500.   Although the focus of the Iraq AUMF was the threat posed by Saddam Hussein's regime, the preamble makes clear that the Iraq AUMF was more broadly concerned with, among other things, "restor[ing] international peace and security to the Persian Gulf region."   116 Stat. at 1500.   The preamble further establishes that Congress understood the "threat to the national security of the United States" posed by Iraq also to include the threat to the lives and safety of United States citizens and to international peace and security in the region posed by "terrorist organizations" operating in Iraqi territory.   116 Stat. at 1498.

36.     The 2002 Iraq AUMF thus authorizes the use of force both to help establish a stable, democratic Iraq to succeed Saddam Hussein's regime by addressing threats *to* Iraq, as well as using for to address terrorist threats emanating *from* Iraq.   Accordingly, after Saddam Hussein's regime fell in 2003, "the United States, with its coalition partners, continued to take military action in Iraq under the 2002 AUMF to further these purposes, including action against AQI, which then, as

now, posed a terrorist threat to the United States and its partners and undermined stability and democracy in Iraq." Preston Speech, *supra* note 22. Thus, "the 2002 AUMF authorizes military operations against ISIL in Iraq and, to the extent necessary to achieve these purposes, in Syria," *id.*, including detaining anyone who is part of or substantially supports ISIL. *See also* 2016 White House Report at 6 n.25, *supra* note 22; 2017 Castle Speech at pp. 4-5, *supra* note 22; McGurk Testimony at pp. 6, 23, 59, *supra* note 22.

37.     The Executive Branch has repeatedly confirmed for Congress that the 2002 AUMF authorized the continued use of military force in Iraq from 2008 through the initial U.S. withdrawal in 2011. *See, e.g.*, *Iraq After the Surge*, Hearing before the Sen. Comm. on Foreign Relations, S. Hrg. 110-757, at 396 (Apr. 2, 3, 8 and 10, 2008) (testimony of Amb. Satterfield); *id.* at 444 (Joint Responses of Ambassador David Satterfield and Assistant Secretary Mary Beth Long to Questions Submitted for the Record by Senator Joseph R. Biden, Jr.).

38.     Because ISIL's operations in Iraq pose both a threat to a stable, democratic Iraq and a terrorist threat to the United States and the region, the Iraq AUMF authorizes the use of the Armed Forces of the United States to counter those threats. Furthermore, although the Iraq AUMF limits the use of force to threats to or stemming from Iraq, it, like the 2001 AUMF, contains no geographic limitation on where authorized force may be employed. That AUMF thus also provides authority for U.S. military operations against ISIL in Syria, to the extent such operations are necessary to counter the threat that ISIL poses to a stable, democratic Iraq or the threat that ISIL's terrorist activities in Iraq pose to the United States and the region.

21

39.     For the same reasons as with respect to the 2001 AUMF, the 2002 Iraq AUMF's statutory authorization to use military force against ISIL includes the power to militarily detain enemy combatants who are part of or substantially support ISIL as part of the exercise of "necessary and appropriate" force.   The power to detain enemy combatants under the 2002 Iraq AUMF and the validity of such detentions depend on the same factors as under the 2001 AUMF.

## IV.     Congress Has Ratified Applying the AUMFs to ISIL

40.     Congress has repeatedly ratified the Executive Branch's invocation of the AUMFs to authorize military operations against ISIL in Iraq and Syria.

41.     Congress has repeatedly and specifically funded military actions against ISIL through an unbroken stream of appropriations over multiple years.   Shortly after announcing the military operation against ISIL in 2014, President Obama asked for and obtained from Congress $5.6 billion for the express purpose of carrying out specific military activities against ISIL in Iraq and Syria.   *See* Consolidated and Further Continuing Appropriations Act of 2015, Pub. L. No. 113-235, 128 Stat. 2130, 2285-95 (2014) ("2015 Consolidated Appropriations Act").

42.     Congress later appropriated an additional $5 billion in support of the U.S. counter-ISIL effort, virtually all of it in line with the specific amounts and categories requested by the President.   These funds were made available over the course of two annual budget cycles, in connection with close congressional oversight of the status and scope of U.S. counter-ISIL activities, and with knowledge of the specific measures the Obama Administration was taking to counter ISIL and the statutory provisions under which that Administration was acting.   *See, e.g.*, Consolidated Appropriations Act, 2016, Committee Print of the H. Comm. on Appropriations,

22

Explanatory Statement at 289, Pub. L. No. 114-113 (2015) (highlighting threat posed by the "rise of [ISIL]" and noting that the Act "moves funding from the base appropriation to the [overseas contingency operations] appropriation" for the military "to conduct counter-ISIL operations") (*available at* https://www.gpo.gov/fdsys/pkg/CPRT-114HPRT98155/pdf/CPRT-114HPRT98155. pdf ); National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, §§ 1223-1224, 129 Stat. 726, 1049 (2015) ("2016 NDAA") (expressing Congress's sense that ISIL "poses an acute threat to the people and territorial integrity of Iraq" and that "defeating ISIL is critical to maintaining a unified Iraq").

43.     Further, Congressional support for the military campaign against ISIL extends beyond the appropriation of funds for specific military activities.   Congress has also authorized the President to provide lethal and nonlethal assistance to select groups and forces fighting ISIL in Iraq and Syria.   In doing so, Congress has defined the parameters of the assistance programs and provided specific direction for the use of its appropriations.   Throughout this period, Congress has also reinforced its oversight role through reporting requirements relating to the costs and status of U.S. counter-ISIL operations, including monthly reports documenting incremental costs of the operation, *see* 2015 Consolidated Appropriations Act, 128 Stat. at 2276, § 8097; Consolidation Appropriations Act, 2016, Pub. L. No. 114-113, § 8093, 129 Stat. 2242, 2373 (2015) ("2016 Consolidated Appropriations Act"); quarterly reports on the status of U.S. forces deployed in support of the operation, *see* 2016 NDAA § 1223; regular reporting from the inspector general for the military operation against ISIL, *see* LEAD INSPECTOR GENERAL FOR OVERSEAS CONTINGENCY OPERATIONS, OPERATION INHERENT RESOLVE, REPORT TO THE U.S. CONGRESS ii, 116-22 (Mar. 31,

23

2016), *available at* https://oig.state.gov/system/files/oir_quarterly_march2016.pdf; *see also* 5 U.S.C. app. 3 § 8L (2013); and reporting consistent with the requirements in the War Powers Resolution, *see* 2015 Consolidated Appropriations Act, 128 Stat. at 2285, 2300, §§ 8140, 9014; 2016 Consolidated Appropriations Act, 129 Stat. at 2380, 2397, §§ 8122, 9019 (providing that funds could not be used "in contravention of the War Powers Resolution," including the congressional consultation and reporting requirements).

44.     This extensive reporting is in addition to information Congress receives from the Executive Branch during regular oversight hearings.  *See, e.g.*, *U.S. Policy Towards Iraq and Syria and the Threat Posed by the Islamic State of Iraq and the Levant (ISIL): Hearing Before the S. Comm. on Armed Services*, 113th Cong. 5-72 (Sept. 2014) (statements of Chuck Hagel, Secretary of Defense, and General Martin E. Dempsey, Chairman of the Joint Chiefs of Staff); *The Administration's Strategy and Military Campaign Against Islamic State in Iraq and the Levant: Hearing Before the H. Comm. On Armed Services*, 113th Cong. 4-46 (Nov. 2014) (statements of Chuck Hagel, Secretary of Defense, and General Martin E. Dempsey, Chairman, Joint Chiefs of Staff).

45.     These funding, oversight, and authorizing measures do not *themselves* authorize the military campaign against ISL; rather, they *confirm* that the campaign is authorized by the 2001 AUMF and, in certain circumstances (including those Petitioner presents), the 2002 Iraq AUMF. In other words, these repeated congressional enactments make clear that the specific authorizations in the 2001 and 2002 AUMFs apply here.  *See, e.g.*, *Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111, 116 (1947) ("[T]he appropriation by Congress of funds for the use of such agencies

24

stands as confirmation and ratification of the action of the Chief Executive." (citing *Brooks v. Dewar*, 313 U.S. 354, 361 (1941)); *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 n.7 (D.C. Cir. 2006) ("Congress may ratify an agency action through appropriation acts." (internal quotation omitted)).

## V.  The President Has Authority Under Article II to Militarily Detain Individuals Who Are Part of or Substantially Support ISIL

46.    In addition to relying on the statutory authority Congress provided in the 2001 and 2002 AUMFs, Presidents have long directed the use of military force overseas in defense of the nation pursuant to their authority under Article II of the U.S. Constitution.   The United States has, for the reasons described above, relied upon the statutory authorities contained in the 2001 and 2002 AUMFs as the legal justification for its ongoing military operations against ISIL in Iraq and Syria (including the current detention of Petitioner).   But the Executive Branch also has inherent authority to direct the deployment of military forces and, as part of that authority, the power to detain combatants captured on the battlefield for as long as U.S. troops are engaged in active hostilities on that battlefield.

47.    The President's power to employ military force abroad derives from his constitutional responsibility as Commander in Chief and Chief Executive for foreign and military affairs, and it has been confirmed by "the historical gloss on the 'executive Power' vested in Article II of the Constitution," *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003).   This authority "has long been recognized as extending to the dispatch of armed forces outside of the United States, either on missions of goodwill or rescue, or for the purpose of protecting American lives

or property or American interests." *Training of British Flying Students in the United States*, 40 Op. Att'y Gen. 58, 62 (1941).

48.     Indeed, there are over two centuries of Executive Branch practice in support of this authority.  Examples from recent decades in which Presidents directed the use of military force without specific prior authorization legislation include "bombing in Libya (1986), an intervention in Panama (1989), troop deployments to Somalia (1992), Bosnia (1995), and Haiti (twice, 1994 and 2004), air patrols and airstrikes in Bosnia (1993-1995), and a bombing campaign in Yugoslavia (1999)."  Memorandum for Eric Holder, Attorney General of the United States, from Caroline D. Krass, Principal Deputy Assistant Attorney General, Office of Legal Counsel, U.S. Department of Justice, to the Attorney General, *Re: Authority to Use Military Force in Libya* at 7 (April                    1,                    2011),                    *available*                    *at* https://www.justice.gov/sites/default/files/olc/opinions/2011/04/31/authority-military-use-in-libya_0.pdf. ("Krass Memo.").  President Obama authorized the use of military force against Libya in 2011.  President Trump similarly did so against a Syrian military airfield following a 2017 chemical weapons attack by the Syrian regime.

49.     In considering the President's authority to use military force in Libya in 2011, the Department of Justice's Office of Legal Counsel (OLC) asked whether the operations would "serve sufficiently important interests to permit the President's action as Commander in Chief and Chief Executive and pursuant to his authority to conduct U.S. foreign relations."  Krass Memo. at 10. In that opinion, OLC noted that defense of the United States to repel a direct and immediate

26

military attack is one basis—but not the exclusive one—on which the President may use military force without congressional approval.   *Id.* at 10 n.2

50.     This constitutional authority is likewise sufficient basis to exercise military force against ISIL, a hostile organization that has both inspired and aided attacks on United States soil and that has attacked U.S. military forces overseas.   And "[b]ecause detention to prevent a combatant's return to the battlefield is a fundamental incident of waging war," *Hamdi*, 542 U.S. at 519, the President's constitutional authority to use military force against ISIL includes the power to detain individuals who are part of or substantially support ISIL "for the duration of these hostilities," *id.* at 521.[28]   There can be no dispute that U.S. operations against ISIL continue given the ongoing deployment of forces in Iraq and Syria.   While the 2001 and 2002 AUMF provide clear statutory authorization for those operations, even absent those provisions, the United States would have the authority to conduct operations against ISIL and detain ISIL combatants apprehended by the United States or its co-belligerents in that military theater of operations.

51.     Finally, for purposes of this case, the fact remains that United States forces are currently engaged in hostilities in Syria.   Regardless of the specific authorizations for such

─────────────────────

[28] This constitutional authority exists regardless of 18 U.S.C. § 4001(a), which does not intrude on the authority of the Executive to capture and detain enemy combatants in wartime.   To the contrary, Congress placed § 4001 in Title 18 of the United States Code—which governs "Crimes and Criminal Procedure"—and addressed it to the control of *civilian* prisons and related detentions rather than military ones.   And indeed, the legislative history of § 4001(a) confirms it was enacted to repeal the Emergency Detention Act of 1950, 50 U.S.C. §§ 811 *et seq.* (1970), which was addressed solely to civil detentions.   The fact that § 4001(a) does not apply to military detentions is bolstered by subsection (b) of § 4001, which is addressed to "control and management of Federal penal and correctional institutions," and exempts "military or naval institutions." 18 U.S.C. § 4001(b).

hostilities, the Executive necessarily has the inherent power under Article II to detain enemy combatants captured on a battlefield where U.S. forces are deployed and in harm's way. *See, e.g.*, Krass Memo at 6-9 (explaining that the President has the authority to "take military action for the purpose of protecting important national interests") (citing dozens of authorities) (quotations omitted). Just as the U.S. military has the inherent authority to defend itself using deadly force on a battlefield, it has the inherent authority to detain enemy combatants captured on that battlefield. While this inherent detention authority likely exists throughout the "duration of hostilities," *Hamdi*, 542 U.S. at 521, it certainly exists until U.S. forces either leave the military theater of operations (and are out of harm's way), or are able to arrange for release of a battlefield detainee in a manner that does not endanger U.S. forces (such as by relinquishing custody of the detainee to another sovereign).

## FACTUAL JUSTIFICATION FOR DETENTION

### I.    Evidentiary Considerations

52.    The Supreme Court has recognized that, when a court presides over the petition for habeas corpus of a detained individual, "[t]he intended duration of the detention and the reasons for it bear upon the precise scope of the inquiry"; thus, "[h]abeas corpus proceedings [with respect to enemy combatants detainees] need not resemble a criminal trial." *Boumediene v. Bush*, 553 U.S. 723, 783 (2008); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 538–39 (2004) (plurality) ("[A] habeas court in a case such as this [involving a U.S. citizen captured overseas and detained as an enemy combatant] may accept affidavit evidence . . . so long as it also permits the alleged combatant to present his own factual case to rebut the Government's return. We anticipate that a

28

District Court would proceed with the caution that we have indicated is necessary in this setting, engaging in a factfinding process that is both prudent and incremental.").[29]

53.     In the materials discussed herein related to the factual basis for Petitioner's detention, there are documents reflecting interviews with Petitioner and others conducted by law enforcement and intelligence personnel, as well as information derived from other sources and methods. The D.C. Circuit has held that hearsay evidence is admissible in habeas proceedings, including reports of the type relied upon by Respondent to establish the lawfulness of Petitioner's detention in this case. *See Al-Bihani v. Obama*, 590 F.3d 866, 879 (D.C. Cir. 2010) ("[T]he question a habeas court must ask when presented with hearsay is not whether it is admissible—it is always admissible—but what probative weight to ascribe to whatever indicia of reliability it exhibits.").

54.     The D.C. Circuit has also expressly held that the district court must afford a rebuttable presumption of regularity to official government records, including intelligence reports. *See Latif v. Obama*, 666 F.3d 746, 755 (D.C. Cir. 2011); *see also id.* at 750–51 (explaining that the presumption of regularity means that a government interview report is presumed to have accurately recorded a statement).

---

[29] The Supreme Court's *Hamdi* plurality suggested that "once the Government puts forth credible evidence that the habeas petitioner meets the enemy-combatant criteria, the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria." *Id.* at 534; *see also Salahi v. Obama*, 625 F.3d 745, 750-51 (D.C. Cir. 2010). The Court of Appeals has held that the Government bears the burden of proving by no more than a preponderance of the evidence the lawfulness of the detention of a Guantanamo Bay detainee. *See, e.g.*, *Al-Adahi v. Obama*, 613 F.3d 1102, 1105 (D.C. Cir. 2010).

55.     Further, a court should assess the probative value and reliability of the evidence by viewing the evidence collectively rather than in isolation.  *See Latif v. Obama*, 677 F.3d 1175, 1193 (D.C. Cir. 2012) ("[A] habeas court may not ignore relevant evidence, for a court cannot view collectively evidence that it has not even considered."); *Awad v. Obama*, 608 F.3d 1, 7 (D.C. Cir. 2010) ("We will begin with Awad's challenges to the individual items of evidence. In evaluating these challenges, we do not weigh each piece of evidence in isolation, but consider all of the evidence taken as a whole. . . . [T]he fact that the district court generally relied on items of evidence that contained hearsay is of no consequence.  To show error in the court's reliance on hearsay evidence, the habeas petitioner must establish not that it is hearsay, but that it is unreliable hearsay.").

## II.    Al-Baghdadi Declared the Islamic State a Caliphate on July 5, 2014

56.     Abu Bakr al-Baghdadi was ISIL's leader during all the material events set forth herein. Declaration ██████████████████ (████ Decl.," attached hereto) ¶ 8. On or about July 5, 2014, in a public address within a mosque in Mosul, Iraq, Al-Baghdadi declared the Islamic State a caliphate, and he anointed himself the caliph, or leader, of the organization.[30]  *Id.* The objective of the terrorist organization is the forcible acquisition of land for the stated goal of

---

[30] Al-Baghdadi's July 5, 2014 address was widely reported, including in United States media outlets. *See* Alissa J. Rubin, *Militant Leader in Rare Appearance in Iraq*, New York Times (July 5, 2014), *available at* https://www.nytimes.com/2014/07/06/world/asia/iraq-abu-bakr-al-baghdadi-sermon-video.html; Hannah Strange, *Islamic State Leader Abu Bakr al-Baghdadi Addresses Muslims in Mosul*, The Telegraph (July 5, 2014), *available at* http://www.telegraph.co.uk/news/worldnews/middleeast/iraq/10948480/Islamic-State-leader-Abu-Bakr-al-Baghdadi-addresses-Muslims-in-Mosul.html.

creating an Islamic State without recognizing any national boundaries. *Id.* ISIL seeks to accomplish its goals through the commission of various criminal acts and acts of terror against the United States and the world community. *Id.* In furtherance of those goals, ISIL's leadership seeks to recruit and accept new members from across the globe, including the United States, primarily through the Internet and social media platforms. *Id.*

### III. An Internal ISIL Document Shows Petitioner Registered as an ISIL Fighter on July █, 2014

57.     In November 2015, the Department of Defense came into possession of data from a thumb drive that had been found by local Syrian forces during an offensive into ISIL-held Syrian territory in July 2015 ███ Decl. ¶ 12. The data consists of foreign fighter bio sheets, including a form that indicates Petitioner registered as an ISIL fighter on July █, 2014. *Id.* ¶¶ 12-13 & ex.9; *see also* Intelligence Investigation Report ("IIR," attached hereto), at 7.[31]  .

58.     The form, which appears to essentially be an intake form for new ISIL recruits, contains registration information for ███████████████, a citizen of Saudi Arabia, born in the United States on or about ████████. IIR, at 8; ███ Decl. ¶ 13. The intake form identifies ██████'s role within ISIL as "fighter." IIR, at 8; ███ Decl. ¶ 13. His date of entry into the terrorist organization is listed as July █, 2014, with a point of entry of Jarabulus, Syria (a town that ISIL captured in or about July 2013). IIR, at 8; ███ Decl. ¶ 13. Significantly, July █, 2014 was ██████ after Abu Bakr al-Baghdadi declared the Islamic State a caliphate and anointed

---

[31] A footer has been added in the lower right-hand corner of this document, identifying it as "IIR," along with the page number (*e.g.*, "IIR page 1").

himself the caliph, an event which ISIL later used as a recruiting tool for attracting foreign fighters. ▮▮ Decl. ¶ 13. The data also notes that ▮▮ is married with one child, that his mother's name is ▮▮, and that he surrendered some of his personal belongings, including a passport, phone and camera. IIR, at 8; ▮▮ Decl. ¶ 13. ▮▮'s contact telephone number is listed as ▮▮. IIR, at 8; ▮▮ Decl. ¶ 13.

59.     Petitioner is a dual citizen of the United States and Saudi Arabia. *Id.* ¶ 11. He was born on ▮▮ in ▮▮. *Id.* He is currently married with one daughter approximately three and a half years old. *Id.* The FBI has determined that, based on the similarity of the information, the ISIL intake form identifies and pertains to Petitioner. *Id.* ¶ 13.

## IV.     Petitioner Was Identified as an ISIL Member When Captured Near ISIL-Held Territory in September 2017

60.     On or about September 11, 2017, Petitioner was taken into custody by Syrian Democratic Forces ("SDF") at a screening point near ISIL-held territory and turned over to United States forces. *Id.* ¶¶ 54, 58; *see also* Declaration of Steven W. Dalbey ("Dalbey Decl.," ECF 11-1) ¶ 3 (Oct. 30, 2017). As described in interviews with the FBI, the SDF encountered Petitioner while the SDF was engaged in a military offensive heading south towards Dayr az Zur, Syria. ▮▮ Decl. ¶ 54. The screening point was set up because fleeing ISIL fighters sometimes attempted to blend in with civilians who were also attempting to flee the conflict. *Id.*

61.     Petitioner appeared at the screening point, traveling alone on foot. *Id.* ¶ 56. SDF forces identified Petitioner's physical appearance, including his beard, as typical of an ISIL devotee. *Id.* His clothing also did not resemble the traditional clothing worn in the region. *Id.* According to SDF forces, there would be no reason for a foreigner to be in this area unless he were

32

supporting ISIL. *Id.* ¶ 55. ISIL employed many foreign fighters, and although foreign fighters tended to be stationed in Raqqa and Dayr az Zur city, foreigners had begun to flee into the desert due to the SDF offensive. *Id.* When questioned, Petitioner stated that he had been walking for two days. *Id.* ¶ 56. The SDF noted that all territory within two days' walk of the screening point was ISIL-held territory. *Id.*

62.     Petitioner identified himself to SDF forces as "daesh"—an ISIL alias—and stated that he wanted to turn himself in and to speak to the Americans. *Id.* ¶ 56. The SDF took Petitioner into custody. *Id.* ¶ 58. As noted above, the SDF then turned Petitioner over to United States forces.

## V.     Petitioner Has Described His Activities as a Member of ISIL

### A.     Summary of Petitioner's Account

63.     In a series of Department of Defense interviews, conducted after Petitioner came into U.S. custody, Petitioner described his involvement with ISIL over a period of at least thirty-one months. During that period, according to Petitioner's own description as set forth in detail below, Petitioner joined ISIL, attended an ISIL training camp, swore bayat to ISIL's leader, and worked for ISIL in various capacities, including as an Administrator responsible for distributing vehicles and money to other ISIL members; as a guard for an oil field under ISIL control; as a monitor ensuring adherence by Imams and prayer callers to Sharia requirements; and as a monitor of civilians working in ISIL's heavy equipment office.

64.     During this period, again according to his own description, Petitioner continued to have access to his cell phone and was in contact with his wife and sister. Petitioner also had the freedom to travel, rented 200 acres of land from ISIL near Hamah, and was allowed to cultivate

the land and raise sheep. Having entered Syria with $40,000, Petitioner was also able to keep possession and control over his money, and use that money to rent land, cultivate almond and olive trees, buy sheep, buy a car, and buy a GPS device.

65.     The relevant details of Petitioner's interviews are set forth below:

**B.     Petitioner's Background**

66.     In Petitioner's first interview, he described his background as follows: Petitioner attended ███████████████ and ███████████████, graduating in ███ with a bachelor's degree in electrical engineering. Tactical Interrogation Report ("TIR") 01 at 3.[32] Petitioner spent the years from 2006 to 2014 in Saudi Arabia and Bahrain, working in various family businesses, including a women's tailoring shop and a construction company. *Id.* He married his wife in 2008 and had a child in June 2014. *Id.* Petitioner traveled to Indonesia, Singapore, China, and Malaysia on business from March to May 2014, while his wife was pregnant. *Id.* After his trip, he returned to Bahrain and took his wife to Saudi Arabia to have their child. *Id.*    Petitioner provided his cell phone number to the interviewer as █████████, *id.*, which is the same phone number reflected in ISIL's internal document registering Petitioner as a "fighter."

**C.     Petitioner's Account of His Travel From June 2014 to January 2015**

---

[32] A TIR is a raw intelligence report containing information derived from interrogations of detainees. TIRs 01–08, referenced here and below, are attached hereto. A footer has been added in the lower right-hand corner below the page number, identifying the TIR (*e.g.*, "TIR 01").

67.     Petitioner described going to the United States three weeks after his daughter was born in order to "register" his daughter. *Id.* He spent two months in New Orleans but was unsuccessful in getting his daughter "registered" because the baby was not present. *Id.*

68.     Petitioner stated he returned to Bahrain in August 2014, remained there for one month, then went to Istanbul, Turkey for one day, and then flew to Gaziantep, Turkey. *Id.* Petitioner stated that he stayed in Gaziantep for two to three weeks and returned to Bahrain in September 2014. *Id.*

69.     Petitioner stated that he submitted journalism articles to the U.S. press and then informed his wife they were going to the United States on vacation. *Id.* According to Petitioner, he, his wife, and his daughter traveled to New Orleans in August 2014.[33] *Id.* Petitioner stated that they spent six to seven months in the United States. *Id.* He stated that he returned to Bahrain in late December 2014 and that he stayed in Bahrain for four months. *Id.* He stated that he then flew to Athens, Greece, stayed there for three weeks, and then flew to Gaziantep, Turkey. *Id.* at 3-4.

70.     Petitioner then stated that he entered Syria in January 2015 with $40,000 in his possession. *Id.* at 4. He stated that he paid an individual by the name of Abu Muhammad $300 to be smuggled from Gaziantep, Turkey, into Syria. *Id.* Abu Muhammad took him to a house in Ar-Rai, Syria, where he remained for three days. *Id.* Petitioner claimed that he intended to enter Syria to be a freelance writer and that he obtained press credentials from the ███████████ using his U.S. passport, as well as from other press outlets. *Id.*

---

[33] This timeline contains clear inconsistencies, but it is set forth as related by Petitioner during his interview.

35

### D.    Petitioner's Account of His Time With ISIL

71.    According to Petitioner, he was kidnapped by ISIL members three days after his arrival in Syria and was imprisoned for seven months, until October 2015. *Id.* at 4, 5. Petitioner stated that ISIL eventually took him to Dayr az Zawr, Syria, and he registered as an ISIL recruit at the ISIL recruiting office there. *Id.* at 4. Petitioner stated that he then was taken to an ISIL Sharia training site near Mayadin, Syria, where he stayed for two months, until December 2015. *Id.* at 4, 5.

72.    Petitioner attended Sharia training with fifty other ISIL recruits, most of whom were Syrian. *Id.* at 4. The Sharia training was provided by Abu Hafs al-Maghrebi. *Id.* Petitioner swore bayat (an oath of allegiance to a leader) to Abu Hafs al-Maghrebi acting on behalf of Abu Bakr al-Baghdadi. *Id.*

73.    After Petitioner's training, ISIL assigned him to be a fighter in ISIL's Provincial Army in the ISIL Zarqawi Brigade, a brigade that was responsible for guarding the front lines and operated in the Dayr az Zawr province in Syria. *Id.* at 4-5. As part of the Zarqawi Brigade, Petitioner was the Administrator for Asud Sharia, a subunit of the Zarqawi Brigade. *Id.* at 5. In that role, Petitioner's responsibilities included getting fuel (gasoline) for ISIL vehicles, handing out money to the Amir of the Brigade for expenses, and coordinating with the Liwa Administrator Amir. *Id.* Petitioner continued as a fighter in the Zarqawi Brigade until February 2016. *Id.*

74.    That month, ISIL relocated Petitioner to an oil field in Dayr az Zawr Province, where he was assigned to guard the gate of a compound. *Id.* He remained there until April 2016. *Id.*

36

75.     Petitioner stated that he left his assignment at the oil field without permission and went to the city of Dayr az Zawr, where he was caught by ISIL military police and detained in an ISIL security prison in Mayadin for two months, until July 2016. *Id.*

76.     Thereafter, Petitioner resumed his activities for ISIL. *Id.* He spent one month in the ISIL Missionary and Mosques Diwan (section), monitoring whether the Imam and prayer caller were present. *Id.* In August 2016, ISIL moved Petitioner to the ISIL Solider Diwan, or heavy equipment section, where Petitioner was responsible for monitoring civilians working on heavy equipment. *Id.* Petitioner remained in that position until December 2016. *Id.*

77.     During the period when Petitioner was living in Dayr az Zawr, on or about September 2016, Petitioner and other ISIL members were asked to identify any special skills. *Id.* at 7. Petitioner told ISIL that he had an electrical engineering background. *Id.* Petitioner was given a car to drive to Raqqah, Syria, in order to meet with Abu Umar al-Masri. *Id.* Petitioner met Abu Umar as scheduled and joined two other individuals in an apartment. *Id.* Abu Umar and the others told Petitioner about an ISIL plan to use a type of machine, similar to a satellite dish, to transmit microwaves that could bring down an airplane. *Id.* Abu Umar asked Petitioner if he wanted to work on this special project but did not offer any money for doing so. *Id.* Petitioner remained at the meeting for two to three hours. *Id.* According to Petitioner, he declined to work on the special project. *Id.*

78.     Petitioner met again with Abu Umar the following day. Abu Umar showed him ISIL's plans, videos, and documents pertaining to ISIL's use of electronic bombs and the plan to build a device that would use microwaves to bring down an aircraft. *Id.* According to Petitioner,

37

he declined to work on the special project and returned to Dayr az Zawr. *Id.* Petitioner stated that approximately four or five months later, on or about January or February 2017, he purchased a GPS device in Raqqah. *Id.* at 6.

79.     In December 2016, while still assigned to ISIL's heavy equipment section in Dayr az Zawr, Petitioner went to Hamah, Syria, which was then under ISIL control, and rented 200 acres of land from ISIL by paying $750 to the ISIL Diwan of Agriculture. *Id.* at 5. Petitioner spent $12,000 to $15,000 on almond and olive tree cultivation on this land. *Id.*

80.     Meanwhile, Petitioner returned to Dayr az Zawr and continued working at the heavy equipment section. *Id.* Petitioner received approval for a transfer and spent the next three and a half months going back and forth between Dayr az Zawr and Hamah. *Id.* Petitioner spent $4000 to buy 80 sheep. *Id.* According to Petitioner, he hoped to flee into Turkey as a shepherd. *Id.*

81.     Ultimately, Petitioner sold his 80 sheep for $4800. *Id.* at 6. He also claimed he sold 20 acres but lost $12,000 because of air strikes. *Id.* He was forced to leave Hamah because of the danger from air strikes and left in June 2017. *Id.*

82.     Petitioner then returned to Dayr az Zawr and from there went to al-Salihya, three kilometers to the northwest. *Id.* He spent three months in al-Salihya and bought a car for $3500. *Id.* Petitioner still had his cell phone and continued using it until sometime in August 2017. *Id.* Petitioner remained in contact with his wife, and last spoke with her via WhatsApp in July 2017. *Id.* at 7. Petitioner and his wife were fighting because she would travel without telling him. *Id.* Petitioner went to Mayadin and contacted his sister by text and through WhatsApp, telling her that everyone was leaving the Islamic State, which made it easier for him to leave, and asking that she

send him money so he could do so. *Id.* at 6. Petitioner stated that this communication occurred two or three weeks before he was captured and was the last time he used his cell phone. *Id.* He waited in Mayadin for a week, but his sister was not able to send him money. *Id.* He returned to al-Salihya. *Id.*

83.     Petitioner heard from civilians that many people were attempting to leave the Dayr az Zawr area. *Id.* Petitioner attempted to hire someone to take him to an SDF area for $700, but the man he tried to hire took Petitioner's money and left without him. *Id.* Petitioner left al-Salihyah by taxi, then attempted to join several groups of refugees to cross the front line, but the refugees did not allow him to join them. *Id.* at 6-7. Petitioner eventually jumped onto the back of a water truck approximately 100 meters before the SDF checkpoint and was seen at that time by an SDF soldier. *Id.* at 7. Petitioner identified himself to the SDF soldier as an American. *Id.*

84.     A second interview with Petitioner took place on September 12, 2017. *See* TIR 02, at 1. In that interview, Petitioner provided three email addresses but claimed he had never used or had any social media accounts. *Id.* at 3. Petitioner indicated his cell phone was either lost or stolen some time during the previous month and that he had not bought a replacement because he did not see a purpose in doing so. *Id.*

85.     Petitioner also provided information about ISIL locations and personnel, primarily in Dayr az Zawr and Mayadin. *Id.* at 4-5; *see also* TIR 06, at 2-3.

86.     In his third interview, Petitioner attempted to minimize his involvement with ISIL, stating that he was a freelance writer for the U.S. press and only wanted to learn the truth of what was happening in the war in Syria. *See* TIR 03, at 2-3. Petitioner claimed that he was released from

ISIL's prison on condition that he work for ISIL, and that he attempted to escape. *Id.* at 3. Petitioner also acknowledged that even after his attempted escape, ISIL continued to trust him, so much so that it allowed him to work in various mosques in and around Mayadin, allowed him to move freely, and even rented him a farm. *Id.* In later interviews, Petitioner provided no information, and the substantive content in subsequent TIRs is limited to remarks by the interviewer. *See* TIR 04; TIR 05; TIR 07; TIR 09.

87.     In one later interview, Petitioner acknowledged that he spent time in an ISIL military prison, which is a kind of prison reserved for ISIL members who have broken ISIL laws or are deserters. TIR 06, at 3. As described by Petitioner, ISIL has a separate prison system for civilians, as well as a separate prison for those who are suspected of being a spy. *Id.*

88.     The last interview occurred on September 18, 2017. TIR 09, at 1.

## VI.     Other Evidence Further Corroborates the Conclusion that Petitioner Joined and Worked for ISIL

### A.     Evidence Found at Petitioner's Capture Suggests He Worked for ISIL

89.     Physical evidence corroborates Petitioner's admission that he was an ISIL member and engaged in the activities he described on behalf of ISIL.

90.     After SDF forces took Petitioner into custody, they inventoried his possessions, which included a GPS device, $4210 in U.S. currency, two thumb drives, clothes, hats, a scuba snorkel and mask, and a Koran. *Id.* ¶ 58. SDF forces found the GPS device highly suspicious because GPS devices were strictly controlled in ISIL territory and, if possessed by a civilian, would immediately lead to accusations of being a spy. *Id.* ¶ 59. SDF forces also found the amount of currency in Petitioner's possession very unusual because civilians fleeing the conflict rarely had

time or ability to sell their possessions before fleeing. *Id.* Attempting to sell possessions could alert ISIL to the individual's plan to flee and lead to imprisonment. *Id.*

91.    The FBI's later search of Petitioner's thumb drives revealed thousands of files, including over 10,000 jpegs or photos. Many of the photos depicted pages of military style handbooks with information on weaponry, warfare combat, building trenches, and interrogation techniques. *Id.* ¶ 60. There were also numerous files on how to make specific types of improvised explosive devices ("IEDs") and bombs. *Id.* Among the files were approximately ten excel spreadsheets in Arabic, including one, dated November 11, 2016, and labeled "Islamic State Spoils and Booty Bureau" in the upper right corner. *Id.* The title of that spreadsheet was "Disclosure for the Battalion, Participants in the Attack," and the spreadsheet listed six ISIL fighters, with information about whether they were killed or injured, their ID number, type of participation (which for all six fighters indicated their involvement with IEDs), the name of the group they were in (al-Zar' Battalion), and the name of the group leader (Abu al-Zubary al-Sahili). Another spreadsheet, dated November 16, 2016, was labeled "Islamic State Plunder Bureau." *Id.* The title was "Ledger for Battalion Participation in the Attack," and eight fighters were listed, including their names, ID numbers, battalion group, and whether they were killed or injured. *Id.* Another spreadsheet was labeled "Islamic State Soldiers Bureau Military Machinery" and included lists of vehicles. *Id.*

**B.    Petitioner Sought Weapons During His Time With ISIL**

92.    Between April 1 and April 30, 2016, Petitioner conducted approximately 120 weapons-related searches on Google in Arabic and English, on sites including purchasing sites

such as Ebay, AliExpress, and Gunauction.com. *Id.* ¶ 43. The majority of these searches were for

the Dragunov sniper rifle and accessories, including a scope for the Dragunov rifle. *Id.*

### C. Petitioner Was in or Close to ISIL-Held Territory on July ▮, 2014 and for a Period in 2014 That Was Significantly Longer Than He Claimed

93.     While Petitioner's account places him in the United States in July 2014, other

evidence contradicts that account and corroborates the information in internal ISIL records

obtained by the Department of Defense, which state that Petitioner joined ISIL on July ▮, 2014.

Travel records indicate that, coinciding with Al-Baghdadi's declaration of an Islamic State

Caliphate on July 5, 2014, Petitioner left the United States and, ▮▮▮▮ later, on July ▮, 2014,

arrived in Gaziantep, Turkey, near the Syrian border. Petitioner also stayed in that area far longer

than he claimed, not leaving until October 2014. Petitioner was thus well-positioned to enter Syria

and join ISIL ▮▮▮▮ later, on July ▮, 2014, exactly as the ISIL intake form indicates.

Meanwhile, Petitioner's social media activity during the preceding months, engaging directly with

a known media arm of ISIL, demonstrates his keen interest in encouraging and participating in

ISIL's efforts to unify different groups and oppose the Syrian regime. Petitioner's second trip to

the United States was only two months, not seven, and he was back in Gaziantep by March 2015,

when he entered Syria once again and began the activities in support of ISIL that he described in

his Department of Defense interviews.

94.     U.S. Custom and Border Protection ("CBP") records confirm that Petitioner did not

return to the United States, after spending several years in Louisiana during college, until June 19,

2014. ▮▮▮ Decl. ¶ 14. However, Petitioner stayed in the United States only two and a half weeks,

until July 5, 2014, *Id.*, not two months as he claimed, *see* TIR 01, at 3. An individual interviewed

by the FBI, who was Petitioner's friend from the time he was in college (referred to herein as "Identified Associate" or "IA") and who indicated that Petitioner stayed with him during his June 2014 visit, confirmed that Petitioner spent only a few weeks in the United States at that time. ███ Decl. ¶ 63. IA confirmed that, as Petitioner stated, Petitioner came to the United States to try to get a U.S. passport for his daughter. *Id.* But according to IA, Petitioner was unable to get the passport not because the baby was not present, as Petitioner claimed, TIR 01, at 3, but because Petitioner could not prove his U.S. residency for the requisite period and did not have his paperwork in order. ███ Decl. ¶ 63.

95.     The day that Petitioner left the United States for Saudi Arabia—July 5, 2014— was the same day that Al-Baghdadi declared the Islamic State a caliphate. *Id.* ¶¶ 8, 14. ███ later, on July █, 2014, Petitioner booked a trip to Gaziantep, Turkey, a known entry point into ISIL-controlled territory, often used by foreigners wishing to join ISIL. *Id.* ¶¶ 19-20. ███ later, on July ██, 2014, Petitioner traveled from Bahrain to Gaziantep. *Id.* ¶ 19 & n.1.[34] The internal ISIL intake form for Petitioner indicates that ███ after that, he entered Syria and joined ISIL. *Id.* ¶¶ 12-13.

96.     While Petitioner claimed his trip to Turkey lasted only two to three weeks, TIR 01, at 3, travel records show that Petitioner did not return to Bahrain until October 6, 2014—over two and a half months later. ███ Decl. ¶ 20.

---

[34] The town identified on the July ██, 2014 ISIL intake form as the point where Petitioner entered Syria, Jarabulus, is approximately 100 miles from Gaziantep, Turkey, and, according to Google Maps, can be reached by car in less than four hours.

**D.     Petitioner Sought to Engage With and Advise ISIL on Social Media in the Months Before July 5, 2014**

97.     Although Petitioner claimed that he had never used or had any social media accounts, TIR 02, at 3, the FBI was able to identify Petitioner's Twitter account. ████ Decl. ¶ 44. Petitioner's tweets during the months leading up to July 5, 2014, demonstrate Petitioner's support for ISIL. As detailed below, Petitioner not only posted his own ISIL propaganda on Twitter during this period but also attempted to engage directly with ISIL in order to advise it on how to best overthrow the Syrian government.

98.     ISIL makes extensive and sophisticated use of social media to spread information and propaganda and recruit foreign fighters to join its cause. *Id.* ¶ 9. One of the most prominent ISIL media presences is Asawirti Media. Asawirti Media creates pro-ISIL videos, posts, and graphics. *Id.* Asawirti Media's Twitter account has been active since at least 2014 (under hundreds of different "handles," which are changed when the account is suspended) and is recognized as a prominent "face" of the ISIL online community. *Id.* Tweets from Asawirti Media's Twitter account are viewed within the ISIL community as conveying the official message of ISIL, not just a related association or ISIL sympathizer. *Id.* Asawirti Media has distributed graphic anti-American content through its Twitter account, such as a picture of British ISIL executioner "Jihadi John" striking former President Barack Obama with a knife. *Id.* Between February 2014 and May 2014, Asawirti Media used the Twitter handle @AsawirtiMedia. At that time the account had over 10,000 followers. *Id.* (Some Asawirti Media Twitter handles have had as many as 90,000 followers. *Id.*)

99.     Between February and May 2014, Petitioner, using the Twitter handle @████, tweeted to @AsawirtiMedia 22 times, providing standard 140 character limit

44

diatribes, links to articles calling for unity within the jihadist ranks, and recruitment and propaganda postings and pictures from different countries of ISIL flags with Koran surahs. *Id.* ¶ 45.

100.     During this period, Petitioner traveled to Indonesia and then to Singapore and China. *Id.* ¶ 18. On or about ███████, 2014, while in Indonesia, *Id.* ¶ 18(a)-(f), Petitioner issued the following tweet, in Arabic, directed to Asawirti Media (@AsawirtiMedia): "The Islamic State of Iraq and Sham support for the Islamic State in Iraq and Sham It will endure; this is God's promise." *Id.* ¶ 46 & ex. 1. The tweet included a picture of the ISIL flag on a piece of paper that also stated, in Arabic, "All will be vanquished and be gone. I wish my people understand," with a signature block stating, "Your brother, ███████." *Id.*

101.     On or about ███████, 2014, also while in Indonesia, *Id.* ¶ 18(a)-(f), Petitioner issued two tweets, in Arabic, directed to Asawirti Media (@AsawirtiMedia) "The Islamic State of Iraq and Sham support for the Islamic State in Iraq and Sham It will endure; this is God's promise." *Id.* ¶ 47 & exs. 2-3. Both tweets included a picture of the ISIL flag on a piece of paper that also stated, in Arabic, "All will be vanquished and be gone. I wish my people understand," with a signature block stating, "Your brother, ███████." *Id.*

102.     On or about ███████, 2014, Petitioner sent three tweets to @AsawirtiMedia. First, he tweeted: "Peace be upon you, my noble brother. I would like you to do a service for the sake of God. God provided you with a great weapon—that is the media, so use it to reconcile the brothers, because reconciliation is good." *Id.* ¶ 48. Petitioner's second tweet stated: "I swear, I am longing for this day, and I pray to God for it night and day. Let's unite that the word of God may be realized

45

in us and that we may cut off the hand and cut out the tongue of the troublemakers." *Id.* ¶ 49.
Petitioner's third tweet to @AsawirtiMedia that day stated: "Muhammed is the messenger of God,
and those who are with him are harsh against the infidels and merciful among themselves." *Id.* ¶
50.

103.     On or about ▮▮▮▮▮, 2014, while in Singapore, *Id.* ¶ 18(l)-(m), Petitioner sent the
following tweet to @AsawirtiMedia: "In support of the Islamic State in Iraq and Sham. From the
far east." *Id.* ¶ 51 & ex.4. The tweet included a picture of a piece of paper showing the ISIL flag
with Arabic script above and below, including the statement "All will be vanquished and be gone.
I wish my people understand," signed "Your brother, [Petitioner]." *Id.* The piece of paper appeared
against a background where the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in Singapore were visible.
*Id.* ¶ 51 & exs.4-6.

104.     Also on or about ▮▮▮▮▮, 2014, Petitioner tweeted to @AsawirtiMedia an article
he had written, which was posted on justpaste.it, a known ISIL propaganda tool. *Id.* ¶ 52. The
article, titled "▮▮▮▮▮▮▮▮▮▮▮▮▮▮," detailed the groups involved in the fighting
in Syria, and called for someone within ISIL to unite the current groups fighting in order to fight
together in a united effort. *Id.* He called for ISIL leadership to unite the groups under the ISIL flag
and form the Caliphate. *Id.* In his tweet containing the URL to the article, he asked AsawirtiMedia:
"Important; I implore you to edit and publish it. The Islamic State in Iraq and Sham. Hidden hands

in the jihadist conflicts." *Id.* Petitioner sent three additional tweets to @AsawirtiMedia on the same day, urging it to publish more calls for unity. *Id.*[35]

105.     On or about ▮▮▮▮, 2014, Petitioner tweeted to @AsawirtiMedia "The Islamic State in Iraq and Sham. In support of the Islamic State of Iraq and Sham. It will endure, this is God's promise." *Id.* ¶ 51 & ex.7. The tweet included a picture of a piece of paper showing the ISIL flag with Arabic script above and below, including the statement "All will be vanquished and be gone. I wish my people understand," signed "Your brother, [Petitioner]." *Id.* The piece of paper appeared against a background where views of or from the ▮▮▮▮▮▮▮, where Petitioner had recently stayed in China, were visible. *Id.* ¶ 51 & exs.7-8.

106.     On June 14, 2014, Asawirti Media announced an international day of support for ISIL on June 20, 2014, tweeting a new hashtag "Friday of support for ISIS." *Id.* ¶ 10. The account tweeted "We want demonstrations of support in every country where there are supporters of ISIS" and instructed supporters to hold protests, raise the flags of ISIL, film the protests and distribute the videos on YouTube. *Id.*

**E.     Petitioner's Online Search History in the Months Before July ▮, 2014 Show His Support for ISIL and Suggest He Planned to Join**

107.     Petitioner's internet searches on Google and YouTube during this period further demonstrate his support for ISIL and suggest he was planning to join the terrorist organization.

---

[35] It was approximately two and a half months after Petitioner's ▮▮▮▮▮ posts that al-Baghdadi declared the Islamic State a caliphate, declared himself the leader, and called for unity "under a single flag and goal." *Id.* ¶ 8.

108.    Between January 1, 2014, and March 18, 2015, Petitioner searched YouTube for videos related to "Islamic State" approximately 859 times, and "Daesh" approximately 285 times. *Id.* ¶ 29.

109.    From January 1, 2014, to February 28, 2014, Petitioner conducted approximately twenty-five Google searches, in Arabic, for Quran Surah 54, Ayat 45, which roughly translates to: "[T]heir assembly will be defeated, and they will turn their backs [in retreat]." *Id.* ¶ 33.

110.    On or about January 10-11, 2014, Petitioner searched for and visited the Wikipedia webpage for Al-Baghdadi. *Id.* ¶ 34.

111.    On or about January 28, 2014, Petitioner conducted the following Google searches, in Arabic: "Is the road open to Syria?"; "Abu Khaled Syrian." *Id.* ¶ 35.

112.    On or about February 2 and 4, Petitioner searched and visited websites regarding "al-Rihaniya," a town on the border between Turkey and Syria. *Id.* ¶ 36.

113.    One day in late February 2014, before traveling to Indonesia, Petitioner conducted the following Google searches, in Arabic: "Demonstrations for ISIS in Indonesia" (one time); "Demonstrations in support of ISIS in Indonesia" (approximately four times); "The poor and downtrodden area in Indonesia" (two times); "The poor areas of Indonesia" (approximately one time). *Id.* ¶ 37. On another day during the same period, Petitioner conducted the following Google searches, in Arabic: "ISIS" (approximately eight times); "the ISIS flag" (approximately six times);

48

"Abu-Khalid al-Suri" [36] (approximately three times); "The death of Abu-Khalid al-Suri" (approximately two times). *Id.* ¶ 38.

114.    On or about March 3, 2014, Petitioner conducted the following Google searches, in Arabic: photos of the person who killed Abu-Khalid al-Suri (approximately three times); photos of the person who blew himself up against Abu-Khalid al-Suri (approximately one time).

115.    On or about April 3, 2014, Petitioner conducted the following Google searches, in Arabic: Abu-Usamah al-Maghribi (approximately three times); The killing of Abu-Usamah al-Maghribi (approximately two times).[37] *Id.* ¶ 40.

116.    On or about May 30, 2014, Petitioner sent an email to the ███████████ at ███████████████████████, expressing his interest in applying for ███████████████████ *Id.* ¶ 25. In June 2014, Petitioner emailed the ███████ ███████████ , indicating that he planned to cover "various events and stories in a number of areas/countries in the Middle East." *Id.* ¶ 26. ████ is a registered international press and journalist press agency that, unlike many other journalist organizations or agencies, allows anyone claiming to be engaged as a part-time freelance journalist to obtain a press pass upon payment of a fee. *Id.* ¶ 24. In October 2014, Petitioner sent additional emails to ████, indicating



---

[36] Abu Khalid al-Suri cofounded the Sunni Syrian Islamist Group Ahrar al-Sham. *Id.* He was allegedly assassinated in an ISIL suicide operation in late February 2014. ████ Decl. ¶ 33 n.2.

[37] Abdel Aziz Al Mehdali AKA Abu-Usamah al-Maghribi was an early member of Al Nusrah Front but later joined ISIL. ████ Decl. ¶ 34 n.3. In March 2014, Mehdali was killed in an ambush while traveling to negotiate on behalf of ISIL with senior members of Al Nusrah Front. *Id.*

that he "gathered a great deal of information living in refugee tents on the Turkish-Syrian border." *Id.* ¶ 26. He requested a link to upload his written articles, and ███ provided one. *Id.* The FBI investigation of Petitioner has thus far not revealed any instances where Petitioner published any news stories, blogs, or other written accounts relating to the Middle East or otherwise. *Id.*

### F.    Petitioner Was Described by a Friend as a Likely ISIL Recruit

117.    Almost immediately after Petitioner returned to Bahrain on October 6, 2014, he began another effort to obtain a U.S. passport for his daughter. *Id.* ¶ 65. Petitioner traveled with his wife and daughter from Saudi Arabia to the United States on October 15, 2014. *Id.* ¶ 15. Although Petitioner claimed that he spent six to seven months in the United States on this second trip, TIR 01, at 3, CBP records indicate that he stayed in the United States less than two months, departing December 11, 2014. ███ Decl. ¶ 15. Petitioner's friend IA confirmed that Petitioner stayed in the United States approximately two months during this second visit, staying in a hotel near another friend, who was married. *Id.* ¶ 65.

118.    IA stressed Petitioner's persistence in seeking to obtain a U.S. passport for his daughter. *Id.* ¶ 70. IA expressed the belief that Petitioner undertook the great effort to obtain a U.S. passport for his daughter because he wanted to secure her future before he left to fight with ISIL, knowing he likely would not return home. *Id.* ¶ 70.

119.    IA characterized Petitioner as easily misled, and as passionate in his opposition to the Syrian regime of Hafez al-Assad and in the belief that the regime must be overthrown. *Id.* ¶¶ 67, 69. IA expressed the view that it would not be hard to recruit and radicalize Petitioner or for

Petitioner to radicalize himself. *Id.* ¶ 67. IA regarded Petitioner as someone who would not recognize that ISIL was not the solution. *Id.*

120.    IA described two conversations with Petitioner in late 2014 that led IA to believe Petitioner would join ISIL. *Id.* ¶ 69. The first was when Petitioner spoke very passionately about the Syrian regime and that it had to be overthrown. *Id.* The second discussion focused on ISIL's beheading its prisoners. *Id.* IA stated that he told Petitioner that the prophet Mohammed, during a time of war, did not kill his prisoners and would set them free at the end of the war. *Id.* Petitioner said that times were different now and spoke of how it was justified for ISIL to behead prisoners. *Id.*

121.    According to IA, Petitioner disappeared shortly after he left the United States in late 2014, and his wife did not know where he had gone. *Id.* ¶ 66. IA stated that when he heard that Petitioner had disappeared, he thought Petitioner may have gone to Syria to join ISIL because jihadis don't tell anyone what they are going to do, and then one day they just disappear. *Id.* ¶ 68.

**G.    Petitioner's Second Trip to Syria in March 2015 Followed Months of Online Preoccupation With ISIL Activity**

122.    Although Petitioner claimed that he entered Syria in January 2015, TIR 01, at 4,[38] the FBI's search of travel records in his email indicates that Petitioner flew from Athens, Greece,

---

[38] Petitioner's own account is inconsistent, first stating that he stayed four months in Bahrain and three weeks in Athens after leaving the United States in December 2014, and then stating that he entered Syria in January 2015. *See id.* at 3-4.

to Istanbul, and on to Gaziantep, Turkey on March 10, 2015. ▮▮▮▮ Decl. ¶ 11. Petitioner also had

a 90-day electronic visa for the Republic of Turkey valid beginning on March 4, 2015. *Id.*[39]

123.    On March 16, 2015, Petitioner emailed the ▮▮▮▮ and the ▮▮▮▮▮▮▮▮,

stating an intent to "cover some recent events in Turkey as well as in some Syrian refugee camps

in Turkey." *Id.* ¶ 27. Petitioner did not mention his intended entry into Syria. *See id.*

124.    Petitioner's online activity in the months before March 2015 indicates his

preoccupation with ISIL, including ISIL's recent acts of violence.

125.    Between December 24, 2014 and February 9, 2015, Petitioner conducted

approximately 191 searches on YouTube for videos of the Jordanian pilot who was captured by

ISIL and burned alive in a cage. *Id.* ¶ 30. ISIL released the video depicting the pilot being burned

alive on February 3, 2015. *Id.* Petitioner conducted approximately seven YouTube searches for

videos of the Jordanian pilot on that day. *Id.*

126.    Between January 31 and February 1, 2015, Petitioner searched YouTube for videos

of ISIL's beheading of a Japanese hostage approximately 35 times. *Id.* ¶ 31.

127.    On March 4, 2015, Petitioner conducted the following YouTube searches: "Abu

Bakr Al Baghdadi" (approximately two times), "Abu Bakr Al Baghdadi and Mossad"

(approximately eight times), "Islamic State" (approximately 30 times), "Daesh" (approximately

eight times). *Id.* ¶ 32.

---

[39] While Petitioner's flight from Athens to Turkey was round trip, Petitioner apparently never used the return flight, scheduled for June 4, 2015. *See id.*

128.    Emails reviewed by the FBI are consistent with Petitioner's continuing presence in Syria over the next thirty months. Petitioner received Google login notifications on November 17, 2015, from Mosul, Iraq; and on July, 2016 from Turkey. *Id.* ¶¶ 22-23. Both notifications indicated that the location was approximate and determined by the IP address used. *Id.*

## CONCLUSION

The evidence attached to this Return and described above is more than enough to carry the Government's burden of showing by a preponderance of the evidence that Petitioner is part of or substantially supported ISIL and is thus properly detained as an enemy combatant.    Among other things, (1) documents created by ISIL forces identify Petitioner as a member, *see, e.g.*, *Awad*, 608 F.3d at 7-8; *Barhoumi*, 609 F.3d at 425-26, 428-29; (2) there is evidence Petitioner intended to take up the fight by joining ISIL as a fighter, *Awad,* 608 F.3d at 9; (3) there is evidence that Petitioner spent significant time in ISIL territory and closely associated with the group, *see, e.g.*, *id.* at 11; *Uthman*, 637 F.3d at 404-05; *Al Alwi*, 653 F.3d at 17; *Hussain*, 718 F.3d at 968-69 ; *Ali*, 736 F.3d at 546; *al Odah,* 611 F.3d at 15-17; *al-Bihani*, 590 F.3d at 873; (4) Petitioner admitted that he trained in a camp run by ISIL, *see, e.g.*, *Barhoumi*, 609 F.3d at 425; *al-Adahi*, 613 F.3d at 1109; *Al Alwi*, 653 F.3d at 17-18; (5) Petitioner followed practices associated with ISIL, *see, e.g.*, *Al Alwi*, 653 F.3d at 20; *Uthman*, 637 F.3d at 405-06; (6) Petitioner swore an oath of allegiance to ISIL's leader, *see, e.g.*, *Salahi*, 625 F.3d at 751; (7) Petitioner's accounts of his travel and the amount of time he spent with ISIL are inconsistent with objective evidence and facially implausible, *see, e.g.*, *Uthman*, 637 F.3d at 406; *Ali*, 736 F.3d at 546; and (8) when captured, Petitioner was armed with bomb-making schematics and military manuals useful only for someone

53

who intends to engage in armed conflict, *see, e.g.*, *Hussain*, 718 F.3d at 969; *al Odah*, 611 F.3d at 15-16.

In short, Petitioner travelled to ISIL territory on two occasions; is reflected in an internal ISIL document as a registered ISIL "fighter"; has admitted to serving ISIL in a variety of roles; and was captured by an enemy force at war with ISIL on an active battlefield with bomb-making manuals and ISIL administrative spreadsheets on a thumb drive in his pocket.   Petitioner is part of or substantially supported ISIL and is thus detainable as an enemy combatant. His request for immediate release should be denied.

January 22, 2018                                     Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
JESSIE K. LIU
United States Attorney

TERRY M. HENRY
Assistant Director, Federal Programs Branch

/s/ Kathryn L. Wyer
JAMES M. BURNHAM
Senior Counsel
KATHRYN L. WYER
Senior Trial Counsel, Federal Programs
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, N.W.
Washington, DC   20530
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Respondent*

## CERTIFICATE OF SERVICE

I hereby certify that this document, along with attachments, will be served today by email on counsel for Petitioner.

/s/ Kathryn L. Wyer



R 181729Z JAN 16
FM HOTR WASHINGTON DC//NMEC WASHINGTON DC//











S E C R E T//NOFORN
SECTION 1 OF 3
QQQQ

SERIAL: (U) IIR 6 089 1568 16.

DATE OF PUBLICATION:  181729Z JAN 16.

------------------------------------------------------------------
                    DEPARTMENT OF DEFENSE
    INFORMATION REPORT, NOT FINALLY EVALUATED INTELLIGENCE.
------------------------------------------------------------------

PAGE 12 RUZDHTR6570 S E C R E T//NOFORN
COUNTRY OR NONSTATE ENTITY: (U) Syria (SYR); Iraq (IRQ); CT Level 1
Terrorist Groups and Terrorist Support Entities (TC); al-Qa ida and

Sunni Affiliates (GU); Insurgents in Iraq (TU); United States (USA);
Saudi Arabia (SAU); Turkey (TUR).

SUBJECT: (S//NF) IIR 6 089 1568 ████ █████████ - ISIL General Border
Administr          Saudi
Citizen
Found on █████████████████████      in ███████████████
██

DATE OF INFORMATION: (U) 15 Jan 2016.

CUTOFF: (U) 14 Dec 2015.

SUMMARY: (U) SEE EXECUTIVE SUMMARY, TEXT PARAGRAPH 1, BELOW.

SOURCE NUMBER A: (U//FOUO) Exploited media - SYR

PAGE 13 RUZDHTR6570 S E C R E T//NOFORN
SOURCE A: (U//FOUO) Media exploited during operations in Syria.

CONTEXT A: (U//FOUO) The source of information for this report came
from a Black 4GB Sandisk Cruzer thumb drive recovered during
operations in Syria and provided by ██████████████████████
Foreign Terrorist Fighter Task Force.  All translations, summaries,
and gists of a foreign language represent the viewpoint of its
origin. Where statements of fact appear in the translated text, they
are made from the originator's point of view as translated into
English. Unless otherwise stated, all references are taken directly
from the original material found in the captured media.

WARNING: (U) THIS IS AN INFORMATION REPORT, NOT FINALLY EVALUATED
INTELLIGENCE. REPORT CLASSIFIED SECRET//NOFORN.

TEXT: 1. (U//FOUO) EXECUTIVE SUMMARY. Islamic State of Iraq and the
Levant (IS
form for ████████████████████████████████████████████ a
fighter an ████████████████████████████████████████ was
born in the United States. ██████████████ entered ISIL-controlled

PAGE 14 RUZDHTR6570 S E C R E T//NOFORN
█████      20 ███████████ ria, facilitated by
██████████████████    . ████████████████████████████
███████████████ ve
██████████████  provides the probable Saudi A█
████████████  , as a point of contact.

2. (U//FOUO) (U//FOUO) This product contains U.S. Persons
information, which has been deemed necessary for the intended

recipient to understand, assess or act on the information provided, in accordance with Department of Defense Directive 5240.1R and Executive Order 12333. It should be handled in accordance with the recipient's intelligence oversight and/or information handling procedures.

3. (U//FOUO) This report includes the information on terrorism/extremism linked identities and related biographic, biometric, and/or terrorism association or activity information. The provided information may include individuals of interest who should be considered for input into a Terrorist Identity Nomination (TIN) for entry into NCTC'S TIDE, and subsequent onward movement of this

PAGE 15 RUZDHTR6570 S E C R E T//NOFORN
information to the TSC for inclusion in the Terrorist Screening Database (TSDB).

4. (S//REL TO USA, MESE) Access was provided to a 4GB thumb drive acquired in Syria from Islamic State in Iraq and Levant (ISIL) ████████████████████. The thumb drive contains more than 5,000 forms created by the ISIL General Border Administration to document individual foreign fighters who traveled to Syria to join the group in 2013 and 2014. On 15 December 2015, a forensic image of the 4GB (Sandisk Cruzer) black thumb drive was provided to NMEC for exploitation.

5. (U//FOUO) NMEC-2016-105770 (MD5: 37F2E8F13EAEEEBD674C8CCB982E793D) is a Mujahid information form issued by ISIL's General Border Administration for ████████████████, who is a citizen of United States of Saudi Arabian origin. The form states that his most recent place of residence was ██████████████, Saudi Arabia, that he has previously traveled to the U.S. and the ████ ███████████████████, and that he entered ISIL territory through Jarabulus. He was recommended by ██████████████ and under

PAGE 16 RUZDHTR6570 S E C R E T//NOFORN
address where he can be reached the form provides the phone number ███████ as a point of contact. The file was found at the filepath "████████████████████████████████████ ████████████████████ : ██████████████████████████" and has a last modified date of ██ July 2014. A copy of NMEC-2016-105770 is attached as ENCLOSURE 1, and a full translation follows.

[Begin Full Translation]

1. Full name: ████████████████████████████.
2(a). Nickname: ██████████████
2(b). Nickname location: Saudi Arabia.
3. Mother's name: ████████.

4. Blood type: O+.
5(a). Date of birth (Hijri): ███████
5(b). Date of birth (Gregorian) Bracketed, if converted from a Hijri date: ███████ .
5(c). Citizenship: Jaziri [Saudi Arabia] born in the United States.
6(a). Marital status: Married.
██
███████
███████

██
S E C R E T//NOFORN
SECTION 2 OF 3
QQQQ
6(b). Number of children: 1.
7(a). Full address: ██████████████████████████ [Saudi Arabia].
7(b). City of residence: ███████
7(c). Region of residence: [Blank]
7(d). Country of residence: Saudi Arabia.
8. Education Level: College, Electrical [Engineering].
9. Level of Sharia expertise Advanced student, Intermediate, Basic: [Blank]
10. Previous occupation: Commerce.

PAGE 12 RUZDHTR6571 S E C R E T//NOFORN
11. Countries visited and time spent in each: America [United States] and ████████████████ .
12(a). Point of entry: Jarabulus.
12(b). Entry facilitator or method of entry: ████████████ .
13(a). Recommending party (first): ████████████ [Saudi Arabia].
13(b). Recommending party (second): [Blank]
14(a). Date of entry (Hijri): ███████/1435.
14(b). Date of entry (Gregorian) bracketed, if a converted Hijri date: [07/██/2014].
15. Have you engaged in Jihad before and where?: No.
16. Fighter, suicide bomber, or inghimasi suicide fighter: Fighter.
17. Specialty Fighter, Security, Sharia, or Admin: [Blank]
18. Current work location: [Blank]
19. Personal belongings handed over: Passport, phone, and camera.
20. Level of compliance: [Blank]
21(a). (First) Address/Phone number where he can be reached: Unspecified: ███████
21(b). (Second) Address/Phone number where he can be reached: [Blank]

22. Date and location of Death: [Blank]

PAGE 13 RUZDHTR6571 S E C R E T//NOFORN
23. Notes, affiliations, general information, and whether or not he
is wanted: [Blank]

[End Full Translation]

COMMENTS: (Other Comments) 1. (U//FOUO) All date stamps are only as
accurate as the original settings on the device. Created dates
represent the dates files first appear on a device. A created date
may not reflect the actual date of file creation, particularly if one
file overwrote another. An accessed date represents the last date a
file was opened by a user, and it can represent the date a file was
transferred to a new media device. A modified date, aka last written
date, represents the last date a file was altered. In cases of file
transfer, a modified date can be earlier than a created date.



PAGE 14 RUZDHTR6571 S E C R E T//NOFORN



PAGE 15 RUZDHTR6571 S E C R E T//NOFORN
428-1393.

4. 

5. (U//FOUO) DISSEM: Field: None.  Sent to: ▮▮▮▮▮▮.

6. (U) Source A is available for recontact.

ATTACHMENTS: (U) TO FOLLOW - 1 ATTACHMENT(S).
1. Digital, Document - (U//FOUO) 6089156816ENCL01.01, 1/Powerpoint
copy of NMEC-2016-105770/1 page, 20160115, 6089156816ENCL01.01.PPTX
(U//FOUO)

TOPIC: (U) TERR; SRCC; DEPS.

PAGE 16 RUZDHTR6571 S E C R E T//NOFORN

MGT CODE: (U)▮▮▮▮▮▮▮.

INSTR: (U) U.S. YES 5.

PREP: (U) ▮▮▮▮.

JOINT REP: (U) NONE.

DATE OF ACQUISITION: (U) 14 Dec 2015; Syria.

POC: (U//FOUO) ▮▮▮▮▮▮▮▮▮▮▮▮



S E C R E T//NOFORN
FINAL SECTION OF 3
QQQQ

A.

PAGE 12 RUZDHTR6572 S E C R E T//NOFORN
B.
- 
- 
-                                                          ).
-                                            .

WARNING: (U) THIS IS AN INFORMATION REPORT, NOT FINALLY EVALUATED
INTELLIGENCE. REPORT CLASSIFIED SECRET//NOFORN.

==============================DISSEMINATION==============================

AGENCY: (U) None.

U.S. MISSION: (U) None

MILITARY: (U) None.

STATE/LOCAL: (U) None
==============================CLASSIFICATION==============================

CLASSIFIED BY:

PAGE 13 RUZDHTR6572 S E C R E T//NOFORN

DERIVED FROM:

DECLASSIFY ON:          .

SECRET//NOFORN

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| | ) | |
| v. | ) | |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | |
| in his official capacity as SECRETARY | ) | |
| OF DEFENSE, | ) | |
| | ) | |
| Respondent. | ) | |

**DECLARATION OF** ███████████████

I, ████████, hereby declare pursuant to 28 U.S.C. § 1746 as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have

served in this capacity since ████. I am currently assigned to a ████████████

████████████, where I work on investigations of crimes related to international

terrorism. As a Special Agent with the FBI, it is part of my duties to investigate violations of

federal criminal law, including terrorism-related violations. I am authorized to execute search

and arrest warrants issued under the authority of the United States.

2.      The statements made below are based upon: (a) my personal participation in this

investigation; (b) my review of records and reports generated by other law enforcement agents in

the United States and elsewhere; (c) my review of communications data recovered during the

investigation; (d) information provided to me by other agents and law enforcement officials; (e)

information otherwise obtained by credible and reliable sources; and (f) my training and

experience as a Special Agent.

3.      Unless otherwise noted, the documents referenced by or attached to this Declaration are or reflect content from true and correct copies of documents and other materials from the official files of the FBI, including returns from duly issued and executed search warrants. This Declaration does not contain an exhaustive recitation of all information developed by the FBI in its investigation relevant to Petitioner.

4.      I am aware that the above-captioned proceeding involves a petition for habeas corpus relating to an individual named ██████████████████████████. ██████ is a dual citizen of the United States and Saudi Arabia currently detained by the Department of Defense

## **BACKGROUND**

### **A. ISIL-Designated Foreign Terrorist Organization**

5.      Based on my training and experience as a counterterrorism agent of the FBI, including my review of open source materials, law enforcement materials, and my conversations with other FBI agents who have reviewed, among other things, the materials referenced below, I have learned the following:

6.      Foreign Terrorist Organizations ("FTO's") are foreign organizations that are designated by the Secretary of State. On or about October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jama'at al Tawhid wa'al-Jihad, as a PTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section l(b) of Executive Order 13224.

7.      On or about May 15, 2014, the Secretary of State amended the designation of

2

AQI as a FTO under section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section l(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary of State also added the following aliases to the ISIL FT0 listing: the Islamic State of Iraq and al-Sham, the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al-Islamiya, and Al-Furqan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the ISIL FTO listing: Islamic State, ISIL, and ISIS (a term that is interchangeable with ISIL). To date, ISIL remai ns a designated FTO.

8.      Abu Bakr al-Baghdadi was ISIL's leader during all the material events set forth herein. On or about July 5, 2014, in a rare public address within a mosque in Mosul, Iraq, al-Baghdadi declared the ISIL a caliphate, and he anointed himself the caliph, or leader, of the organization. The objective of the terrorist organization was, and remains, the forcible acquisition of land for the stated goal of creating an Islamic State without recognizing any national boundaries. ISIL seeks to accomplish its goals through the commission of various criminal acts and acts of terror against the United States and the world community. In furtherance of those goals, ISIL's leadership seeks to recruit and accept new members from across the globe, including the United States, primarily through the Internet and social medial platforms.

3

**B.  Asawirti Media**

9.      Based on information obtained during the course of the investigation, FBI
conducted open source research on Asawirti Media. The following information is based on
that research and an overall working knowledge of ISIL from other investigations and
experience. ISIL makes extensive and sophisticated use of social media to spread
information and propaganda and recruit foreign fighters to join its cause. One of the most
prominent ISIL media presences is Asawirti Media, also known as Turjuman Asawirti, or al-
Asawirti. Asawirti Media creates pro-ISIL videos, posts, and graphics. Asawirti Media's
Twitter account has been active since at least 2014 (under hundreds of different "handles,"
which are changed when the account is suspended) and is recognized as a prominent "face"
of the ISIL online community. Tweets from Asawirti Media's Twitter account are viewed
within the ISIL community as conveying the message of ISIL, not just a related association
or ISIL sympathizer. Asawirti Media has distributed graphic anti-American content through
its Twitter account, such as a picture of British ISIL executioner "Jihadi John" striking
former President Barack Obama with a knife. Between February 2014 and May 2014,
Asawirti Media used the Twitter handle @AsawirtiMedia. At that time the account had over
10,000 followers. (Some Asawirti Media Twitter handles have had as many as 90,000
followers.)

10.      On June 14, 2014, Al-Asawirti announced an international day of support for
ISIL on June 20, 2014, tweeting a new hashtag "Friday of support for ISIS." The account
tweeted "We want demonstrations of support in every country where there are supporters of

ISIS" and instructed supporters to hold protests, raise the flags of ISIL, film the protests and distribute the videos on YouTube.

[redacted]

11. [redacted] is a [redacted]-year-old, dual United States and Saudi Arabian citizen, who was born in [redacted] on [redacted]. Between 1999 and 2004, he attended college in Louisiana. He is currently married with one daughter approximately three and a half years old.

**U.S. GOVERNMENT RECORDS**

12. I am aware that, since at least 2013, ISIL has engaged in a concerted campaign to acquire by force substantial land in Syria. Since then, and continuing to the present day, military forces have engaged in an effort to push out and/or capture ISIL fighters in Syria, to include foreign fighters, in an effort to reclaim land that ISIL had acquired by force. According to information passed by the Department of Defense to the FBI, in or about July 2015, local Syrian forces overran ISIL positions in Tal Abyad, Syria. In one of the captured ISIL Headquarters, these forces found the data associated with foreign fighter bio sheets stored on a thumb drive. The data was stored by these forces until late November of 2015 when it was passed through a vetted, trusted contact to the Department of Defense.

13. Contained within the above-described data is an entry record listing "[redacted], with a date of birth of [redacted]. [redacted]'s citizenship is listed as Saudi Arabia, along with a note stating that he was born in the United States. [redacted]

█████'s role within ISIL is listed as "fighter." His date of entry into the terrorist organization is listed as July ██, 2014, with a point of entry of Jarabulus, Syria (a town that ISIL captured in or about July 2013). Significantly, July ██, 2014 was approximately ██████ after Abu Bakr al-Baghdadi declared the Islamic State a caliphate and anointed himself the caliph, an event which ISIL later used as a recruiting tool for attracting foreign fighters. The data also notes that ██ ██████ is married with one child, that his mother's name is ██████, and that he surrendered some of his personal belongings, including a passport, phone and camera. ███████'s contact telephone number is listed as ███████. Based on the similarity of the information and known information about the Petitioner, ██████, from other sources and FBI investigation, the FBI assesses that the ISIL entry record obtained by the Department of Defense identifies and pertains to ██████, the Petitioner in the instant matter.

14.    U.S. Customs and Border Protection ("CBP") records indicate that on May 2, 2006, ██████ departed the United States aboard a flight from Baton Rouge, Louisiana to Dammam, Saudi Arabia. ███████ reentered the United States on June 19, 2014 on a flight from Dammam, Saudi Arabia to New Orleans, Louisiana. ██████ provided the phone numbers, ██████ and ███████, and the e-mail address, ██████@gmail.com, as methods of contact on his airline reservation. ██████ departed the United States on a flight on July 5, 2014 from New Orleans, Louisiana to Dammam, Saudi Arabia. ██████ again provided ███████, ███████, and ██████@gmail.com as methods of contact on his airline reservation.

15.    ██████ returned to the United States on October 15, 2014 aboard a flight from



Bahrain to New Orleans, Louisiana. ▮▮▮ once again provided ▮▮▮,
▮▮▮, and ▮▮▮ @gmail.com as methods of contact on the reservation. ▮▮▮
departed the United States on December 11, 2014 aboard.a flight from New Orleans, Louisiana
to Bahrain. ▮▮▮ yet again provided ▮▮▮, ▮▮▮, and
▮▮▮ @gmail.com as methods of contact on the reservation. ▮▮▮ has not returned to the
United States since departing in December 2014.

16.     In his most recent (2014) U.S. Department of State passport renewal application,
▮▮▮ listed his mother's maiden name as ▮▮▮. The passport application
also indicates that ▮▮▮ was born in the United States (in ▮▮▮). ▮▮▮ also listed the
email, ▮▮▮ @gmail.com, on the application.

**SEARCH WARRANT RETURNS**

**GOOGLE**

17.     On September 15, 2017, FBI served Google with a search warrant for email
account ▮▮▮ @gmail.com. Google provided the returns on September 20, 2017. Search
warrant returns for the content of ▮▮▮ @gmail.com are described below. Along with the
search warrant returns, Google provided a Certificate of Authenticity which, in summary,
verifies: the Records Custodian is employed by Google Inc., is authorized to submit the
Certificate of Authenticity, has personal knowledge of the facts and could testify if called as a
witness; Google Inc., provides Internet based services to subscribers and does not verify any
personal information that is submitted by a user at the time of account creation; the records
provided are true and correct; the information is a record made and retained by Google.

7

18. The search warrant returns on ██████ @gmail.com contained airline and accommodation travel bookings reflecting travel by ██████ from about late February 2014 through mid-May 2014 from Saudi Arabia to Indonesia, Singapore, and China. In particular, the search warrant returns contain the following:

a. A confirmation email dated on or about February 23, 2014, from Qatar Airways for a round trip flight departing February ██, 2014 from Dammam, Saudi Arabia to Jakarta, Indonesia (through Doha, Qatar). The return flight is listed as March ██, 2014. The passenger's name is listed as Mr. ██████████████, ██████ @gmail.com, mobile phone ████████████;

b. A Lion Air eTicket Itinerary / Receipt dated on or about February 23, 2014, for a one way ticket from Jakarta to Denpasar, Bali on February ██, 2014, for passenger ██████████████;

c. An eTicket Itinerary / Receipt dated on or about February 23, 2014, for a one-way ticket from Denpasar Bali to Jakarta, departing March ██, 2014, for passenger ██████████████;

d. An Airbnb customer receipt dated on or about February 26, 2014, for accommodation in Bali February ██, 2014;

e. A confirmation email from ██████████ in Lombok, Indonesia, dated on or about March 9, 2014, for accommodation March ██, 2014;

f. An eTicket Itinerary / Receipt dated on.or about March 23, 2014, for a one-way ticket from Denpasar, Bali to Jakarta on March ██, 2014;

8

g.  A confirmation email from Qatar Airways dated on or about April 5, 2014, for a round trip flight departing on April █, 2014 from Dammam, Saudi Arabia to Jakarta, Indonesia. The return flight is listed as May █, 2014. The passenger's name is listed as Mr. ███████████ ; █████ @gmail.com, mobile phone ██████████ ;

h.  An eTicket Itinerary / Receipt dated on or about April 5, 2014, for a one-way ticket from Jakarta to Denpasar, Bali on April █, 2014, for passenger ████████████ ;

i.  An eTicket Itinerary / Receipt dated on or about April 12, 2014, for a one-way ticket from Denpasar, Bali to Surabaya on April █, 2014, for passengers Mr. ██████████ and Ms. ██████████ ;

j.  An eTicket Itinerary / Receipt dated on or about April 12, 2014, for a one-way ticket from Surabaya to Denpasar, Bali on April █, 2014, for passengers Mr. ██████████ and Ms. █████████ ;

k.  A booking confirmation email dated on or about April 18, 2014, from ██████ █████████████████ in Surabaya for April █████, 2014, guest name ██████████ ;

l.  A reservation confirmation email dated on or about April 22, 2014, through booking.com for ██████████ in Singapore, April █████, 2014, booked by ██████████ ;

m.  An eTicket Itinerary / Receipt dated on or about April 22, 2014, for a one-way

9

ticket on Tiger Airlines from Singapore to Shenzhen, China on April ██, 2014, for

passenger ████████████████;

n.   An itinerary dated on or about April 23, 2014, for a one-way ticket on Tiger

Airlines from Shenzhen, China to Singapore on May █, 2014, for passenger

████████████████;

o.   A hotel receipt dated on or about April 24, 2014, for the ██████████ in

Shenzhen, China, April 25-27, 2014, for ██████████████;

p.   A hotel receipt dated on or about April 26, 2014, for the ██████████ in

Shenzhen, China, April 27-28, 2014, for ██████████████;

q.   A hotel receipt, dated on or about April 26, 2014, for the ██████████ in

Shenzhen, China, April 23-May 1, 2014, for ████████████████;

r.   A hotel receipt dated on or about April 30, 2014, for the ██████████ in

Shenzhen, China, May 1-2, 2014, for ██████████████;

s.   An eTicket Itinerary *I* Receipt dated on or about April 30, 2014, for a one-way

ticket on Mandala Airlines from Singapore to Denpasar, Bali on May █, 2014.

19.   The search warrant returns also reflect that, on or about July 9, 2014,

████████@gmail.com received an email from makemytrip.com.  The email contained flight

reservations for ████████████████ for a roundtrip ticket from Bahrain to Gaziantep, Turkey,

on Turkish Airlines.[1] The flight departed Bahrain on July ██, 2014, with a layover in Istanbul,

Turkey, and arrived in Gaziantep, Turkey, the same day. The return flight departed Gaziantep,

---

[1] Based on my training, experience, and other investigations I know that, during this time frame, foreign fighters frequently used Gaziantep, Turkey, as an entry point to come into Syria in order to join ISIL.

Turkey on October ▓, 2014, with a layover in Istanbul, Turkey, and arriving in Bahrain on
October ▓, 2014.

20.      On or about July 9, 2014, ▓▓▓▓▓ @gmail.com received an email from
▓▓▓▓▓ @hotmail.com,  which was a reservation for ▓▓▓▓▓ hotel. ▓▓▓▓▓
hotel is listed in online hotel booking websites as located in Gaziantep, Turkey. The email stated
"Mr. ▓▓▓▓▓, I am the owner of the hotel. Please let me know if there is anything I can do to
make your stay more comfortable at Gaziantep."

21.      The search warrant returns on ▓▓▓▓▓ @gmail.com also contained a booking
receipt for ▓▓▓▓▓ from onetravel.com for an Air Pegasus flight on March ▓, 2015, from
Athens, Greece, to Istanbul (Sabiha Gokcen), Turkey, and onward to Gaziantep, Turkey. The
booking, which was a round-trip ticket, contained a return flight on June ▓, 2015. Search warrant
returns for ▓▓▓▓▓ @gmail.com also contained a 90-day electronic visa for the Republic of
Turkey valid beginning on March 4, 2015.

22.      On or about November 17, 2015, Google sent an email to ▓▓▓▓▓ @gmail.com,
which stated "Your Google account ▓▓▓▓▓ @gmail.com was just used to sign in from Chrome
on Android." The email provided the date, time and location of login, which was Tuesday
November 17, 2015 at 3:19 PM (Arabian Standard Time) in Mosul, Iraq. The email also stated
the location is approximate and determined by the IP address it was coming from.

23.      On or about July 4, 2016, Google sent an email to ▓▓▓▓▓ @gmail.com, which
stated "Your Google account ▓▓▓▓▓ @gmail.com was just used to sign in from Chrome on
Samsung Galaxy Note IL." The email provided the date, time and location of login, which was
Monday July 4, 2016 at 4:59 PM (Eastern European Summer Time) in Turkey. The email also

stated the location is approximate and determined by the IP address it was coming from.

24.     Search warrant returns for the account ██████ @gmail.com also revealed a number of emails in which ████████ communicated with the ████████████████ and the ████████████████ about obtaining an identification for $25 that identified him as a member of the press. From their website FAQ's, the ████████████████████ is a registered international press and journalist press agency with a registered office in the USA. Anyone who is employed or works as a freelance journalist can apply for membership. Unlike many other journalist organizations or agencies, the █████ does not differentiate between part- or full-time workers. ███████ offers fee based membership and press passes for persons who apply through their website.

25.     On or about May 30, 2014, ██████ @gmail.com sent an email to ████████████████████, which stated: "Dear Sir, my name is ████████████ and I am interested to apply for ████████████████████. I tried clicking on the application and there was a malfunction. Can you assist me by sending me the application form link via e-mail? For future reference, I am currently overseas and therefore, the shipping address will be an international (overseas) address. I prefer DHL as the shipping service and I will provide you with the necessary information later on. Thank you, █████."

26.     Through review of the initial search warrant returns, ████████ @gmail.com was identified as another email address utilized by ███████. Search warrant returns for ████████ @gmail.com revealed that ████████ sent an email to the █████ in June 2014 indicating that he planned to cover "various events and stories in a number of areas/countries in the Middle East," followed by additional emails to the █████ in October 2014 indicating that he "gathered a

12

great deal of information living in refugee tents on the Turkish-Syrian border" by interviewing "various individuals to obtain the true stories behind this Middle Eastern conflict." ███████ then indicated, in a subsequent email to the █████, that one "cannot imagine how many stories I gathered in the short time I was on my journey and this is only the beginning." He then requested a link to upload his written articles, and stated that he does not "mind having my name mentioned (i.e. I don't need to remain anonymous)." ████████ also offered to "do much more" if requested by the ██████, to include gathering photographs and videos, but indicated that he needed "the financial means to do so." The ██████ provided him with a link to upload his materials. However, to date, FBI investigation has not revealed any instances where ████████ published any news stories, blogs or any written accounts of any sort, whether they be related to events in the Middle East, or anywhere else in the world.

27.   In a communication from ███████@gmail.com to ████████████████████████ on or about March 16, 2015, ███████ indicated that he wanted to travel to Turkey to cover recent events in Turkey as well as in some Syrian refugee camps in Turkey. On or about March 16, 2015, ███████@gmail.com emailed ███████ ███████ and stated "To Whom It May Concern, I want to cover some recent events in Turkey as well as in some Syrian refugee camps in Turkey. Therefore, I will need a Residence Permit in Turkey. They need a letter from the press company that I am working for to be sent to the Ministry of Foreign Affairs in Turkey to get the Residence Permit in Turkey. Thank you for your cooperation, ███████." On or about March 16, 2015, ████████████████ responded to the above email and stated "Dear Mr. ███████, A letter of Accreditation did you get already

13

(sic)! Further confirmation cannot be given."

28.     The search warrant returns for ████ @gmail.com also provided search history information for searches conducted through that email account on YouTube and Google.

**YouTube Searches**

29.     Between January 1, 2014 and March 18, 2015, ████ searched YouTube for "Islamic State" approximately 859 times, and for "Daesh" approximately 285 times.

30.     Between December 24, 2014 and February 9, 2015, ████ conducted approximately 191 searches on YouTube for the Jordanian pilot who was captured by ISIL and burned alive in a cage. ISIL released the video depicting the pilot being burned alive on or about February 3, 2015. ████ conducted approximately seven YouTube searches of the Jordanian pilot on that day.

31.     Between January 31 and February 1, 2015, ████ searched YouTube for ISIL's beheading of a Japanese hostage approximately 35 times.

32.     On or about March 4, 2015, ████ conducted the following YouTube searches: "Abu Bakr Al Baghdadi" (approximately two times), "Abu Bakr Al Baghdadi and Mossad" (approximately eight times), "Islamic State" (approximately 30 times), "Daesh" (approximately eight times).

**Google Searches**

33.     From January 1, 2014 to February 28, 2014, ████ conducted approximately twenty-five Google searches, in Arabic, for Quran Surah 54, Ayat 45, which roughly translates to: "[Their] assembly will be defeated, and they will turn their backs [in retreat]."

14

34.      On or about January 10-11, 2014, ███████ searched for and visited the Wikipedia webpage for Al-Baghdadi.

35.      On or about January 28, 2014, ██████ conducted the following Google searches, in Arabic: "Is the road open to Syria?"; "Abu Khaled Syrian."

36.      On or about February 2 and 4, ██████ searched and visited websites regarding "al-Rihaniya" on the border between Turkey and Syria

37.      On or about February 22, 2014, ██████ conducted the following Google searches, in Arabic: "Demonstrations for ISIS in Indonesia" (approximately one time); "Demonstrations in support of ISIS in Indonesia" (approximately four times); "The poor and downtrodden area in Indonesia" (approximately two times); "The poor areas of lndonesia" (approximately one time). These searches coincide with the email confirmation referenced above, that ██████ received on February 23, 2014, for a round trip flight with him as passenger from Damman to Doha and Doha to Jakarta, Indonesia. The flight departed Dammam on February 26, 2014 and returned on March 21, 2014.

38.      On or about February 26, 2014 ██████ conducted the following Google searches, in Arabic: "ISIS" (approximately eight times); "the ISIS flag" (approximately six times); "Abu-Khalid al-Suri"[2] (approximately three times); "The death of Abu-Khalid al-Suri" (approximately two times).

39.      On or about March 3, 2014, ██████ conducted the following Google searches,

_____

[2] Abu Khalid al-Suri cofounded the Sunni Syrian Islamist Group Ahrar al-Sham. He was allegedly assassinated in an ISIL suicide operation in late February 2014.

in Arabic: photos of the person who killed Abu-Khalid al-Suri (approximately three times);

photos of the person who blew himself up against Abu-Khalid al-Suri (approximately one time).

40.     On April 3, 2014, ▇▇▇▇▇ conducted the following Google searches, in

Arabic: Abu-Usamah al-Maghribi (approximately three times); The killing of Abu-Usamah al-

Maghribi (approximately two times).[3]

41.     On November 18, 2014, ▇▇▇▇▇ conducted the following Google searches, in

Arabic: "video of the al-Furquan foundation" (approximately two times); "new videos for daesh"

(approximately two times).

42.     On November 18, 2014, ▇▇▇▇▇ also visited the website and Facebook page

of Da'wat Al-Haq, a pro-ISIL website (approximately two times). ▇▇▇▇▇ again visited the

website and Facebook page of Da'wat Al-Haq on or about February 9-11, 2015 (approximately

eight times).

43.     Between April 1 and April 30, 2016, ▇▇▇▇▇ conducted approximately 120

weapons-related searches on Google in Arabic and English, on sites including purchasing sites

such as Ebay, AliExpress, and Gunauction.com. The majority of these searches were for the

Dragunov sniper rifle and accessories, including a scope for the Dragunov rifle.

**TWITTER**

44.     Located in ▇▇▇▇▇'s email account [▇▇▇▇▇@gmail.com] was an email sent

on February 1, 2014 from Twitter related to Twitter account [@▇▇▇▇▇]. The email stated:

---

[3] Abdel Aziz Al Mehdali AKA Abu-Usamah al-Maghribi was an early member of Al Nusrah
Front but later joined ISIL. In March 2014, Mehdali was killed in an ambush while traveling to
negotiate on behalf of ISIL with senior members of Al Nusrah Front.

"You recently changed the password associated with your Twitter account @███████." On September 23, 2017, FBI served a search warrant on Twitter Inc. for Twitter account @███████. Twitter Inc. provided the search warrant returns on September 25, 2017. Search warrant returns related to this Twitter handle identified an active Twitter account. Review of Twitter account @███████, UID ███████, revealed, among other content, the indicated Twitter information described below.

45.     Review of Twitter account @███████, UID ███████, revealed that during the period from February 2014 to May 2014, ███████ tweeted to @AsawirtiMedia approximately 22 times. Within those 22 tweets, ███████ provided standard 140 character limit diatribes, provided links to articles calling for unity within the Jihadist ranks, and provided recruitment and propaganda postings and pictures across multiple countries of ISIL flags with Koran surahs.

46.     On or about ███████, 2014, ███████ issued a tweet, in Arabic, directed to Asawirti Media (@AsawirtiMedia): "The Islamic State of lraq and Sham support for the Islamic State in Iraq and Sham It will endure; this is God's promise." The tweet included a picture of the ISIL flag on a piece of paper that also stated, in Arabic, "All will be vanquished and be gone. I wish my people understand," with a signature block stating, "Your brother, ███████." A true and correct copy of this tweet is attached as Exhibit 1.

47.     On or about ███████, 2014, ███████ issued two tweets, in Arabic, directed to Asawirti Media (@AsawirtiMedia): "The Islamic State of lraq and Sham support for the Islamic State in Iraq and Sham It will endure; this is God's promise." Both tweets included a picture of

the ISIL flag on a piece of paper that also stated, in Arabic, "All will be vanquished and be gone. I wish my people understand," with a signature block stating, "Your brother, ██████." True and correct copies of these tweets are attached as Exhibits 2 and 3.

48.    On or about ██████, 2014, ██████ tweeted to @AsawirtiMedia: "Peace be upon you, my noble brother. I would like you to do a service for the sake of God. God provided you with a great weapon-that is the media, so use it to reconcile the brothers, because reconciliation is good."

49.    On the same day, ██████ tweeted to @AsawirtiMedia: "I swear, I am longing for this day, and I pray to God for it night and day. Let's unite that the word of God may be realized in us and that we may cut off the hand and cut out the tongue of the troublemakers."

50.    On the same day, ██████ tweeted to @AsawirtiMedia: "Muhammed is the messenger of God, and those who are with him are harsh against the infidels and merciful among themselves."

51.    On or about ██████, 2014 ██████ tweeted to Asawirti Media (@AsawirtiMedia): "In support of the Islamic State in Iraq and Sham. From the far east." The tweet included a picture of a piece of paper showing the ISIL flag with Arabic script above and below, including the statement "All will be vanquished and be gone. I wish my people understand," signed "Your brother, ██████." The piece of paper appeared against a background where the ██████████████████ in Singapore were visible. A true and correct copy of this tweet is attached as Exhibit 4. This posting coincides with an email confirmation ██████ received on or about April 22, 2014 from booking.com for ██████

18

████████████████████ in Singapore. The booking was for two nights, checking in April

23, 2014 and checking out April 25, 2014. Open source images of views near the hotel indicate

that the ██████████ is visible. *See* Exhibits 5 & 6, attached.

52.     On or about ████████, 2014, ██████████ tweeted to @AsawirtiMedia an article he

had written, which was posted on justpaste.it, a known ISIL propaganda tool. The article, titled

"████████████████████,'" detailed the groups involved in the fighting in Syria,

and called for someone within ISIL to unite the current groups fighting in order to fight together

in a united effort. He called for ISIL leadership to unite the groups under the ISIL flag and form

the Caliphate. In his tweet containing the URL to the article, he asked AsawirtiMedia:

"Important; I implore you to edit and publish it. The Islamic State in Iraq and Sham. Hidden

hands in the jihadist conflicts." ██████████ sent three additional tweets to @AsawirtiMedia on the

same day, urging it to publish more calls for unity.

53.     On or about ████████, 2014, ██████████ tweeted to @AsawirtiMedia "The Islamic

State in Iraq and Sham. In support of the Islamic State of lraq and Sham. It will endure, this is

God's promise." The tweet included a picture with a piece of paper with Arabic script above an

ISIL flag, additional Arabic below the flag, and a signature block, which stated "Remaining,

that's God's promise. All will be vanquished and be gone. I wish my people understand. Your

brother, ██████████." A true and correct copy of this tweet is attached as Exhibit 7. This tweet

was sent approximately two weeks after ██████████'s e-mail receipts from the ██████████ in

Shenzhen, China, identified above. A view of the hotel found through open source research is

attached as Exhibit 8.

## ████████'S CAPTURE

54.     According to FBI interviews conducted on or about September 12, 2017, the Syrian Democratic Forces ("SDF") encountered ████████ on or about September 11, 2017 while manning a screening point near Abu Khashab, Syria. At that time, the SDF was engaged in a military offensive near Dayr az Zur, Syria. As the SDF moved across the battlefield, they set up screening points because fleeing ISIL fighters sometimes attempted to blend in with civilians who were also attempting to flee the conflict.

55.     All territory within two days' walk of the screening point was ISIL-held territory. The area south of Shaddadi was primarily desert and had been under ISIL control since 2014. ISIL used this desert area for fighter training camps. According to SDF forces interviewed, there would be no reason for a foreigner to be in this area unless he were supporting ISIL. ISIL employed many foreign fighters. Although foreign fighters tended to be stationed in Raqqa and Dayr az Zur city, foreigners had begun to flee into the desert due to the SDF offensive.

56.     ████████ appeared at the screening point, traveling alone on foot. SDF forces identified ████████'s physical appearance, including his beard, as typical of an ISIL devotee. His clothing did not resemble the traditional clothing worn in the region. ████████ told the soldiers he was "daesh," and that he wanted to turn himself in and wanted to speak to the Americans. ████████ also told the soldiers that he had been walking for two days and, as set forth above, the SDF noted that all territory within two days' walk of the checkpoint was ISIL territory.

57.     Based on information ████████ provided to SDF, the SDF provided a report to

the FBI, which included photos of ▮▮▮▮ and the following information:

    a.    Name: ▮▮▮▮▮▮▮▮

    b.    Nickname: ▮▮▮▮▮▮▮

    c.    Mother Name: ▮▮▮▮▮

    d.    Father Name: ▮▮▮▮▮▮▮

    e.    DPOB: ▮▮▮▮▮▮

    f.    General Info: Arab from Saudi origin, American, Muslim, married to ▮▮

        ▮▮▮▮▮ (Bahrain citizen)

    g.    Occupation: Electrical Engineer, Merchant

    h.    Reason for Arrest: ISIS member

    i.    Captured by: Al-Shaddadi Group

58.    SDF forces took ▮▮▮▮ into custody and searched and inventoried his possessions. Among ▮▮▮▮'s possessions were the following:

    a.    Thumb drive, Kingston Datatraveler 64 GB, yellow

    b.    Thumb drive, Kingston 256 GB, blue

    c.    Turk Cell 4.5 Sim card, Sim 8990011326000369678

    d.    Navignon GPS, S/N 01N9280442A, black

    e.    Personal effects including clothes, hats, scuba snorkel and mask, a Koran, an Arabic book, $4,210 USD.

59.    SDF forces stated that they found the GPS device to be highly suspicious because GPS devices were highly controlled in ISIL territory and, if possessed by a civilian, would

immediately lead to accusations of being a spy. SDF forces also stated that they found the

amount of currency in ▓▓▓▓▓▓▓'s possession very unusual because civilians fleeing the conflict

rarely had time or ability to sell their possessions before fleeing. An attempt to sell possessions

could alert ISIL to the individual's plan to flee and lead to imprisonment.

60.    On September 18, 2017, FBI obtained a search warrant to search these

possessions. A search of the thumb drives revealed thousands of files which included over

100,000 jpegs or photos. A large number of the photos depicted pages of military style

handbooks with information on weaponry, warfare combat, building trenches, and interrogation

techniques. There were also numerous files on how to make specific types of IED's and bombs.

Among the files were approximately ten excel spreadsheets in Arabic, which included ISIL

identification. One spreadsheet, dated November 11, 2016, was labeled "Islamic State Spoils and

Booty Bureau" in the upper right corner. The title of the spreadsheet was "Disclosure for the

Battalion, Participants in the Attack." The spreadsheet listed six names of ISIL fighters, whether

they were killed or injured, their ID number, type of participation (all of which listed IED), the

name of the group they were in (al-Zar' Battalion) and the name of the group leader (Abu

al-Zubary al-Sahili). Another spreadsheet, dated November 16, 2016, was labeled "Islamic State

Plunder Bureau." The title was "Ledger for Battalion Participation in the Attack." The

spreadsheet included names of eight fighters, their ID numbers, battalion group, and whether

they were killed or injured. Another spreadsheet was labeled, "Islamic State Soldiers Bureau

Military Machinery." The spreadsheet included entries for vehicles, vehicle chassis number, type

of vehicle, condition of the vehicle, color of vehicle, and fuel type.

**INTERVIEW OF AN IDENTIFIED ASSOCIATE OF** ███████████

61.      ████████ listed an identified associate (hereinafter referred to as "IA") as his

emergency contact on his 2014 U.S. Passport Renewal Application. FBI interviewed IA on

September 15, 2017. IA indicated that he met ████████ in New Orleans, Louisiana in July 2005,

when ████████ was a student at ██████████████████. IA described ████████'s behavior

during the time he was in college as "wild" and typical of a college student with drinking,

partying, gambling, and using marijuana. According to IA, ████████ did not work but received

a sizable amount of money from the Saudi Arabian government each month; in addition, ███

████'s mother was very wealthy.

62.      IA further stated that after ████████ left ███ in approximately 2005 or 2006, he

briefly lived in Covington, Louisiana, where he frequently gambled at casinos and frequented

strip clubs. ████████ repeatedly borrowed money from other friends in order to gamble and did

not pay them back, leading to an argument with some friends. ████████ left Louisiana and

returned to Saudi Arabia in late 2005 or 2006.

63.      From 2005 to 2014, IA did not have any direct contact with ████████. IA agreed

that ████████ could stay with him in the summer of 2014 when ████████ came to the United

States in an attempt to obtain a United States passport for his daughter. According to IA, ███

████ had visited the U.S. Embassy in Saudi Arabia several times but was unable to obtain a

U.S. passport for his daughter; ████████ thought he would have greater success obtaining the

passport in the United States. According to IA, ████████ continued to have problems getting the

U.S. passport for his daughter due to the fact that he could not prove his U.S. residency for the

requisite period and he did not have his paperwork in order.

64.     IA reported that he noticed a change in ████████'s behavior in 2014 in that he was not as "wild" as he had been. However, during the time ████████ stayed with IA in 2014, ████████ repeatedly gambled at Harrah's Casino in New Orleans.

65.     ████████ stayed only a few weeks in the United States during this first visit in summer 2014. ████████ then returned to New Orleans after a short period of time with his wife and daughter. During this second visit, ████████ and his family stayed at a hotel near another friend of ████████, who was married. ████████ and his wife and daughter left the United States after a couple months, in late 2014. IA had no contact with ████████ after that time.

66.     Approximately two months after ████████ left the United States, IA heard from ████████'s other friend that ████████'s wife had contacted the other friend's wife. ████████'s wife informed the other friend's wife that she was contacting everyone she knew in an attempt to try and find ████████, who had disappeared.

67.     IA described ████████ as having a good heart but noted ████████ could be misled. ████████ was very enthusiastic and committed to what he was passionate about. IA provided the example that ████████ was very angry at the regime of Hafez al-Assad in Syria and was supportive of anyone fighting against Assad. AI stated his opinion that it would not be hard to recruit and radicalize ████████ or for ████████ to radicalize himself. IA also stated that ████████ was very smart, but not smart enough to recognize that ISIL was not the solution. IA stated that if ████████ had become a jihadi, he would not have told IA.

68.     IA advised that when he heard ████████ had gone missing, he thought that ██

24

███████ may have gone to Syria to join ISIL because jihadis don't tell anyone what they are going to do and then one day they just disappear. IA again emphasized that ███████ was enthusiastic to an extreme.

69.     IA described two prior conversations with ███████ that made him believe ███ ███████ would join ISIL. The first was when ███████ spoke very passionately about the Syrian regime and that it had to be overthrown. The second focused on ISIL beheading its prisoners. IA advised that he told ███████ that the prophet Mohammed, during a time of war, did not kill his prisoners and would set them free at the end of the war. ███████ said that times were different now and spoke of how justified ISIL was to behead their prisoners.

70.     IA stated his belief that ███████ was trying to take care of his infant daughter's future by getting her a U.S. passport before he left to fight with ISIL, knowing he most likely would not return home. IA stressed how persistent ███████ was in trying to get the U.S. passport for his daughter and how hard he worked in that effort with repeated visits to the passport office.

71.     IA stated that ███████ never worked as a journalist.

72.     A true and correct copy of the foreign fighter bio sheet for ███████, described in Paragraph 13 above, is attached as Exhibit 9.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge and belief.

Executed January 19, 2018



26

Tweet on or about ████████, 2014





Tweet on or about ████████ , 2014





On or about ████, 2014





EXHIBIT

4

Photo of the tweet on or about ████, 2014



Open source research on the ████████████ provided the following image of the hotel.



EXHIBIT

5

Open source image searches provided the below image from the ███████ looking out

across the street at the ███████





EXHIBIT

7
PENGAD 800-631-6989

On or about ████████, 2014



Open source research on the ████████████ provided the following image of the hotel.





EXHIBIT

8
PENGAD 800-631-6989

بســـم الله الـــرحمن الـــرحيم
الدولــــة الإسلامية فــي العراق والشــام
الإدارة العامـــــــــــــة للحـــــدود

بيانات المجاهدين

| | | |
|---|---|---|
| الإدارة العامة للحدود | | |

| ██████████ | الإسم واللقب | 1 |
|---|---|---|
| ██████████ | الكنية | 2 |
| ██ | إسم الأم | 3 |
| O+ | فصيلة الدم | 4 |
| ████████████████ | تاريخ الولادة و الجنسية | 5 |
| أعزب ( )  متزوج ( * )  عدد الأطفال ( 1 ) | الحالة الإجتماعية | 6 |
| بلاد الحرمين ██████-██ | العنوان و مكان الإقامة | 7 |
| جامعي – الكهرباء | التحصيل الدراسي | 8 |
| طالب علم ( )   متوسط ( ) بسيط ( ) | المستوى الشرعي | 9 |
| تجاره | ماهي مهنتك  قبل المجيئ ؟ | 10 |
| ███████ ██ امريكا | البلدان التي سافرت إليها وكم لبثت بها؟ | 11 |
| ██████ جرابلس | المنفذ الذي دخلت منه ؟ والواسطة ؟ | 12 |
| ██████████ | هل لديك تزكية ومن من ؟ | 13 |
| ██1435/██ | تاريخ الدخول ؟ | 14 |
| لا | هل سبق لك الجهاد ؟ وأين ؟ | 15 |
| مقاتل | مقاتل أم إستشهادي أم إنغماسي ؟ | 16 |
| مقاتل ( ) شرعي ( ) أمني ( ) إداري ( ) | الإختصاص ؟ | 17 |
| | مكان العمل الحالي | 18 |
| جواز – هاتف – كمره | الأمانات التي تركتها ؟ | 19 |
| | مستوى السمع والطاعة ؟ | 20 |
| ██████████ | العنوان الذي نتواصل معه ؟ | 21 |
| | تاريخ القتل و المكان | 22 |
| | ملاحظات | 23 |

EXHIBIT
9

مسؤول الحدود

الدولة الإسلامية في العراق والشام __ سري __



SECRET//NOFORN//LIMDIS

# Tactical Interrogation Report

**FROM**: J2
**TO**:     Coalition Forces
**SUBJ**: TACTICAL INTERROGATION REPORT

**Name of Detainee**: ███████████████

**Report No.**: TIR01

**Alias**: Abu ███████

**Captive Tag #**: | 1.4a |

**ISN#**: Click here to enter ISN#.

**Interrogator**: | 3.5c |

**Date/Time**: 111200ZSEP17

**Language Used**: English; Arabic

**Interpreter**: | 1.4a |

**Maps Used**: None

## Part I:  General Information (S//NF)

1. **Date/Time**: 10/1900/Z/SEP/17

2. **Place/OBJ**:              1.4c          Albu Hashudah, Jazirah Canton, SY

3. **Circumstance**: Detainee was captured by Syrian Democratic Forces (SDF) while attempting to flee Syria to Turkey.

4. **Documents Captured**: TBD

5. **Equipment Captured**: TBD

6. **Weapons Captured**: None

## Part II: Administrative (S//NF)

A. (U) Personal Particulars of Detainee

1. **Full Name**: ███████████████

2. **Nationality**: U.S., Saudi Arabia

3. **Languages and Proficiency**: Arabic (F), English (N),

4. **Date/Place of Birth**: ███████████████████

5. **Current Residence**: Dayr az Zawr, SY

6. **Sex**: Male

7. **Marital Status**: Married

8. **Religion**: Islam - Sunni

SECRET//NOFORN//LIMDIS

9. **Occupation**: None

10. **Military Experience**: None

11. **Civilian Education**: Attended University, dropped out, attended trade school

12. **Children**: One

13. **Father's Name**: TBD

14. **Grandfather's Name:** TBD

15. **Brothers**: One

16. **Tribe/Subtribe**: None

17. **Jihad Experience**: Joined ISIS in 2015

18. **Foreign Travel**: TBD

19. **Previous Detention:** None

B. (U) <u>Features</u>

1. **Current Eye Color**: Brown

2. **Current Hair Color**: Black

3. **Current Height**: 65 inches

4. **Current Weight**: 140 pounds

5. **Distinguishing Features**: None

6. **Comments**: Detainee was medically cleared for questioning

WARNING: THIS IS A U.S. MILITARY INTELLIGENCE REPORT. NO FURTHER
DISTRIBUTION, DISSEMINATION, OR DOWNGRADE IS AUTHORIZED WITHOUT
SPECIFIC APPROVAL FROM THE ORIGINATING AGENCY. THIS INFORMATION IS NOT
FINISHED INTELLIGENCE AND IS NOT FOR USE WITH FOREIGN GOVERNMENTS OR
DETAINEES WITHOUT PRIOR AUTHORIZATION. THIS INFORMATION SHOULD NOT BE
CONSIDERED CORROBORATION OF SIMILAR INFORMATION DISSEMINATED IN
SEPARATE INTELLIGENCE CHANNELS

OVERALL REPORT CLASSIFIED SECRET//NOFORN//LIMDIS

## Part III: Information Obtained (S//NF)

### Summary:

- **Detainee provided information regarding Detainee's time while in Syria since 2015**

- **Detainee provided information pertaining to Detainee's activities in the years leading up to entering Syria**

- **Detainee provided information on joining ISIS and working in the Zarqawi Brigade and various ISIS Diwans in the Dayr az Zawr Province**

SECRET//NOFORN//LIMDIS

SECRET//NOFORN//LIMDIS

| 1.4c |
| --- |

Detainee's social security number is [ 3.5c ] Detainee attended ▮ to pursue a degree in electrical engineering, but did not finish. Detainee graduated from ▮ in ▮ with a Bachelor's Degree in electrical engineering.

Detainee owned a business named ▮ in ▮, SA. Detainee owned the business with family. Detainee owned the business from 2006 to 2013. The business closed because the business was not profitable and took up too much time.

Detainee owned a women's tailoring shop in ▮, SA. Detainee owned the business with Detainee's two sisters. Detainee owned the business from 2007 to 2010.

Detainee's family owned a three level apartment complex, which they rented out in ▮, SA. Detainee's family owned the apartment complex 2009-2011.

Detainee owned a small construction company in ▮, SA. Detainee employed 15 people. Detainee would have these 15 employees work across the other businesses, which Detainee and his family owned.

Detainee married his wife in 2008. Detainee and his wife had their only child in June 2014. Detainee travelled to Indonesia while Detainee's wife was pregnant in 2014. Detainee travelled to Indonesia, Singapore, China and Malaysia on business for ▮. Detainee spent three to four months on Detainee's business trip from March to May 2014.

Detainee returned to Bahrain from Detainee's Asian business trip. Detainee then took Detainee's wife to ▮, SA to have their child.

Detainee went to the United States three weeks after Detainee's daughter was born. Detainee went to New Orleans. Detainee spent two months in New Orleans. Detainee went alone to register Detainee's daughter. Detainee was unsuccessful getting Detainee's daughter registered because the baby was not present.

Detainee went back to Bahrain in August 2014. Detainee remained in Bahrain for one month. Detainee left Bahrain and flew to Istanbul, TU. Detainee stayed in Istanbul for one day and then flew to Gaziantep, TU. Detainee stayed in Gaziantep for two to three weeks. Detainee then went back to Bahrain in September 2014.

| 1.4c |
| --- |

Detainee submitted his journalism articles to the U.S. press and then informed Detainee's wife they were going on a vacation to the United States. Detainee remained in Bahrain for less than one month.

Detainee, his wife, and daughter travelled to New Orleans in August 2014. Detainee spent six to seven months in the United States. Detainee returned to Bahrain in late December 2014. Detainee stayed in Bahrain for four months. Detainee flew to Athens, GE and remained there

SECRET//NOFORN//LIMDIS

for three weeks. Detainee flew to Istanbul, TU then to Gaziantep, TU to travel to various cities within Syria to be a freelance writer.

Detainee entered Syria with 40,000 USD in January 2015. Detainee acquired press credentials from the ███████ using Detainee's U.S. passport. Detainee also acquired press credentials from the U.S. press and a German press outlet of which Detainee cannot remember the name.

Detainee was smuggled from Gaziantep, TU by Abu Muhammad for a fee of 300 USD. Abu Muhammad took Detainee to a house in Ar Rai, SY. Detainee remained at the house for three days and does not know the names of anyone at the house with Detainee. ⬜ 1.4c

1.4c

<br>

1.4c

After three days in Ar Rai, ISIS members kidnapped Detainee and took him to the Raqqah, SY prison located in the basement of the stadium. ISIS conducted three interrogations during Detainee's first week of detainment. Over the next seven months of Detainee's detention, ISIS interrogated Detainee an additional four times. ⬜ 1.4c
Abu Ayyub AKA Abu Luqman conducted the fourth interrogation. Detainee assumes this information because of the way the others in the room respected the interrogator. Abu Luqman asked many questions about Detainee's father-in-law and told to contact Detainee's father-in-law. ████████ Detainee's father-in-law was the former ███████
.

1.4c

ISIS called Detainee's wife while Detainee was detained and said her husband is captured. Detainee's wife was in Bahrain during Detainee's detention.

ISIS took Detainee to Dayr az Zawr, SY after Detainee spent seven months at the ISIS prison in Raqqah, SY. ISIS held Detainee for one week in Dayr az Zawr and then moved to an ISIS recruiting office in Dayr az Zawr.

Detainee registered with ISIS at the ISIS recruiting office and immediately moved from the ISIS recruiting office to an ISIS Sharia training site located near Mayadin, SY.

Detainee spent two months at the ISIS Sharia training site. Detainee was not allowed to leave and the location was underground.

Abu Hafs al-Maghrebi was the ISIS member who gave the Sharia lectures. Detainee was with 50 others ISIS recruits and most were Syrian. Detainee swore bayat to Abu Hafs al-Maghrebi on behalf of Abu Bakr al-Baghdadi.

ISIS then assigned Detainee to be a fighter in ISIS' Provincial Army in the ISIS Zarqawi Brigade. Detainee told ISIS detainee could not fight because Detainee has back problems. The Zarqawi

Brigade operated in the Dayr az Zawr province, SY.  The Zarqawi Brigade was responsible for guarding the frontlines.  Detainee was the Administrator for ISIS' Asud Sharia, which is subordinate to the Zarqawi Brigade.  Detainee's responsibilities as the Administrator included getting gas for ISIS vehicles, handing out money to the ISIS group Amir for expenses and coordinating with the Liwa Administrator Amir.

Salah al-Din al-Belgiki was the ISIS Amir for the Zarqawi Brigade.  Salah died in an airstrike. Detainee does not know when Salah al-Din died.

Abu Albukhari al-Shishani took over for Salah.  An airstrike also killed Abu Albukhari.  Detainee does not know who took over for Shishani after Shishani's death.

Abu Mawai Mayadin was the ISIS Liwa Administrative Amir.  Abu Mawai was killed in 2015 after Detainee left the ISIS Liwa.

Detainee provided the following timeline for Detainee's time in Syria:

- Detained at a prison in Raqqah, SY for seven months, left October 2015
- ISIS prison in Dayr az Zawr, SY for one week, left October 2015
- Sharia training, near the city of Mayadin, SY, left December 2015
- Liwa Zaraqwi as fighter, two months in the unit, left February 2016
- ISIS relocated Detainee and moved to an oil field in Dayr az Zawr Province, two months there, guarding the gate of a compound, left April 2016
- Detainee quit and fled the job at the oil field without telling anyone, remained in city of Dayr az Zawr for one month, left May 2016
- ISIS military police captured Detainee in Dayr az Zawr because Detainee was an ISIS member who quit his post, detained at an ISIS prison in Dayr az Zawr for two days, then ISIS security moved Detainee to an ISIS security prison in Mayadin because Detainee was previously in prison and because Detainee was accused of being a spy for being American, stayed in Mayadin for one and a half months, left July 2016
- Detainee became an active member of ISIS again, working in ISIS Diwan Missionary and Mosques.  Detainee would check if the Imam and prayer caller was present, at this job for one month, left August 2016
- ISIS moved Detainee to ISIS Solider Diwan, heavy equipment section, Detainee was responsible to check on the civilians working in the heavy equipment, stayed for five months, left December 2016
- Detainee searched for a way out of the Islamic State through Idlib, Detainee wanted to go to Turkey to the U.S. Embassy. Detainee went to Hamah, SY and rented land. ISIS was still in control of Hamah. Detainee rented 200 acres from ISIS for 750 USD. Detainee paid the money to the ISIS Diwan of Agriculture. Detainee's total expenses to grow almonds and olives was 12,000 to 15,000 USD, January 2017
- Detainee returned to the city of Dayr az Zawr and worked at the heavy equipment section. Detainee went to the first ISIS General Administrator for the heavy weapons section and asked for a transfer. Detainee caught many thieves stealing parts and money and the General Administrator said no to the ISIS transfer, but ISIS Wali office in Hamah said yes. Detainee spent approximately three and a half months going back and forth to Hamah to grow Detainee's land. Detainee bought 80 sheep and paid 4,000 USD in hopes to act as a shepherd to flee into Turkey, bought the sheep while in Hamah, left April 2017
- Detainee did not receive permission from Dayr az Zawr heavy weapons section, but Detainee went to Hamah. Detainee went to Hamah in hopes of escaping Syria from Idlib.

SECRET//NOFORN/LIMDIS

Detainee was sitting in the house on the rented land for three months. Detainee asked locals for routes into Turkey, but locals did not know and it was too dangerous. Detainee sold all 80 sheep for 4,800 USD at the end of Detainee's time in Hamah. Detainee sold 20 acres and lost 12,000 USD because of air strikes. The danger forced Detainee to leave Hamah, left June 2017.
- Detainee returned to Dayr az Zawr and went to al-Saliyah to find another route out of Syria. Detainee spent three months in al-Saliyah. Detainee bought a car for 3,500 USD during this time. Detainee went to Mayadin to contact Detainee's sister to ask for money during this time. August 2017.

Detainee last used Detainee's cell phone three weeks prior to date of capture (PTDOC). Detainee texted his sister and used WhatsApp. Detainee talked about needing money to leave Syria because everyone is leaving the Islamic State and with everyone leaving, it makes it easier to leave. Detainee asked his sister for money. Detainee texted his sister from Mayadin, SY 14 to 16 days PTDOC. Detainee remained in Mayadin, SY for one week because Detainee was waiting for Detainee's sister to wire Detainee money. Detainee's sister was never able to provide Detainee with money. Detainee left Mayadin for al-Salihya 10 days PTDOC.

Detainee returned to al-Salihya, which is three kilometers northwest of Dayr az Zawr. Detainee remained in al-Saliyha for three days. Detainee heard from civilians many people were packing and attempting to leave the Dayr az Zawr area. Detainee approached civilians to see if they could take Detainee out of the area. Detainee asked a man in a red truck if he was going into an SDF area. Detainee paid the unknown man 700 USD, but the unknown man did not take Detainee with him and only took Detainee's money.

Detainee's residence in al-Salihya is located ⟨1.4c⟩ l-Salihya, SY. Detainee left al-Salihya in a taxi by himself in the morning and travelled to the desert near Hawji Musa. The unknown man in the red truck told Detainee to travel to Hawji Musa because a large group of refugees was trying to leave the area.

When Detainee left al-Salihya, Detainee had a duffle bag, which contained clothes, a snorkel, snorkel mask, scuba diving certification card, camera, shoes, GPS, two USB drives and 4,910 USD. Detainee bought the GPS while in Raqqah, SY eight to nine months PTDOC. Detainee uses the two thumb drives for business. The thumb drives were reformatted six months PTDOC while Detainee was in Dayr az Zawr, SY. Detainee had 4,910 USD to pay people money to smuggle Detainee out of the area and to buy food.

Detainee slept in a mud house located ⟨1.4c⟩ Hawji Musa, SY. Detainee slept in the mud house alone. Detainee woke up while at the mud house and asked the villagers where the refugees were located and the villagers told Detainee the refugees had already left.

Detainee paid an unknown man, who rode his motorcycle into the desert to find the refugees, 5,000 Syrian Lira. The unknown man returned, picked Detainee up and drove Detainee to the refugee location.

Detainee and approximately 40 refugees slept in the desert for four nights. Civilians on motorcycles would travel up to the front lines to see if there were any ISIS guards. Detainee and 40 refugees reached the front lines 30 minutes before on Detainee's time of capture, but the refugees got upset because the unknown man in the red truck was not with Detainee. Detainee was kicked out of the truck and waited for another refugee group. Detainee heard the

SECRET//NOFORN/LIMDIS

SDF would shoot anyone crossing the front line. Detainee begged each group of refugees who passed by to take Detainee across the front line. The last vehicle, which was attempting to cross the front line, was a water truck. Detainee jumped onto the back of the water truck approximately 100 meters before the SDF checkpoint. An SDF solider told Detainee to get down on the ground and Detainee was searched. Detainee told the SDF soldier Detainee was an American.

ISIS members approached Detainee and other ISIS members approximately one year PTDOC while Detainee was living in Dayr az Zawr, SY and asked each member if they had any special skills. Detainee told the ISIS members Detainee had an electrical engineering background so the ISIS members told Detainee he needed to travel to Raqqah, SY the following day. ISIS members gave Detainee a white Hyundai Avanti to drive to the al-Naim traffic circle in Raqqah and meet Abu Umar al-Masri at 1600HLT.

Abu Umar al-Masri approached Detainee at the al-Naim traffic circle in Raqqah and told Detainee to drive to the first floor of an apartment building located IVO 1.4c 1.4c

1.4c

Detainee and Abu Umar arrived at the first floor apartment and met Abu Abd-al-Rahman al-Masri and Abu Dhar al-Tunisi. Abu Umar, Abu Abd-al-Rahman and Abu Dhar discussed with Detainee ISIS' plan of using a type of machine, similar to a satellite dish, which would transmit microwaves to bring down an airplane. The satellite device would be comprised of used microwaves. Abu Umar asked Detainee if Detainee wanted to work on the special project. Abu Umar did not offer any money. Detainee said no to Abu Umar's offer of working on the special project. Detainee remained at the meeting for two to three hours.

Detainee left the meeting and went to an ISIS guesthouse located at 1.4c 1.4c Detainee remained at the ISIS guesthouse for one night.

The following day, Detainee went to an ISIS house located at 1.4c 1.4c for a second meeting with Abu Umar. Abu Umar requested Detainee come to the ISIS house to convince Detainee to join ISIS' special project. Abu Umar showed Detainee ISIS' plans, videos, and documents pertaining to ISIS' use of electronic bombs and theories regarding the use of microwave technology to bring down an aircraft. Abu Umar was the leader of the group discussing ISIS special projects. Detainee refused to assist and returned to the ISIS guesthouse. The following morning, Detainee returned to Dayr az Zawr, SY. 1.4c 1.4c

Abu Umar told Detainee the microwave project had started and the project would move to the north side of the Euphrates River across from Mayadin, SY.

1.4c

Detainee last spoke with Detainee's wife two months PTDOC via WhatsApp. Detainee and his wife were fighting because Detainee's wife would travel without telling Detainee.

Approved For Release

SECRET//NOFORN//LIMDIS

## Part IV:  Remarks (S//NF)

A. Interrogator Assessment of Detainee

1.4c

C. Recommendations for Further Interrogations

1.4c

1.4c

SECRET//NOFORN//LIMDIS

SECRET//NOFORN/LIMDIS

1.4c

**Classified By: Manual 380-5 1 MAY 06**
**Declassify On: 25X1**

Approved For Release

SECRET//NOFORN/LIMDIS

SECRET//NOFORN//LIMDIS

# Tactical Interrogation Report

**FROM**: 1.4c

**TO**:

**SUBJ**: TACTICAL INTERROGATION REPORT

**Name of Detainee**: █████████████████

**Report No.**: TIR02

**Alias**: Abu █████

**Captive Tag #**: 1.4a

**ISN#**: Click here to enter ISN#.

**Interrogator**: 1.4c

**Date/Time**: 121100ZSEP17

**Language Used**: English; Arabic

**Interpreter**: 1.4c

**Maps Used**: None

## Part I: General Information (S//NF)

1. **Date/Time**: 09/1900/Z/SEP/17
2. **Place/OBJ**: 1.4c
3. **Circumstance**: Detainee was captured by Syrian Democratic Forces (SDF) while attempting to flee Syria to Turkey
4. **Documents Captured**: TBD
5. **Equipment Captured**: TBD
6. **Weapons Captured**: None

## Part II: Administrative (S//NF)

A. (U) Personal Particulars of Detainee

1. **Full Name**: █████████████
2. **Nationality**: US
3. **Languages and Proficiency**: Arabic (F), English (N),
4. **Date/Place of Birth**: █████████████████
5. **Current Residence**: Dayr az Zawr, SY
6. **Sex**: Male
7. **Marital Status**: Married; ████████████ lives in Bahrain, last seen early 2015, wife's father is Former ████████████████
8. **Religion**: Islam - Sunni

SECRET//NOFORN//LIMDIS

9. **Occupation**: None

10. **Military Experience**: None

11. **Civilian Education**: Attended University, dropped out, attended trade school

12. **Children**: One daughter

13. **Father's Name**: TBD

14. **Grandfather's Name:** TBD

15. **Brothers' Names**: One brother

16. **Tribe/Subtribe**: None

17. **Jihad Experience**: Joined ISIS in 2015

18. **Foreign Travel**: TBD

19. **Previous Detention:** None

B. (U) <u>Features</u>

1. **Current Eye Color**: Brown

2. **Current Hair Color**: Black

3. **Current Height**: 65 inches

4. **Current Weight**: 140 pounds

5. **Distinguishing Features**: None

6. **Comments**: Detainee was medically cleared for questioning

WARNING: THIS IS A U.S. MILITARY INTELLIGENCE REPORT. NO FURTHER
DISTRIBUTION, DISSEMINATION, OR DOWNGRADE IS AUTHORIZED WITHOUT
SPECIFIC APPROVAL FROM THE ORIGINATING AGENCY. THIS INFORMATION IS NOT
FINISHED INTELLIGENCE AND IS NOT FOR USE WITH FOREIGN GOVERNMENTS OR
DETAINEES WITHOUT PRIOR AUTHORIZATION. THIS INFORMATION SHOULD NOT BE
CONSIDERED CORROBORATION OF SIMILAR INFORMATION DISSEMINATED IN
SEPARATE INTELLIGENCE CHANNELS

OVERALL REPORT CLASSIFIED SECRET//NOFORN//LIMDIS

## Part III: Information Obtained (S//NF)

### Summary:

- Detainee provided a phone number for Detainee's father's house
- Detainee provided three email addresses and email passwords used by Detainee
- Detainee provided map tracks to an ISIS military prison and an ISIS office for track-enabled machinery in Dayr az Zawr, SY

SECRET//NOFORN//LIMDIS

SECRET//NOFORN/LIMDIS

- **Detainee provided map tracks to a former ISIS Zarqawi Brigade Headquarters and ISIS tank workshop in Dayr az Zawr, SY**
- **Detainee provided information pertaining to ISIS Military Police Amir,** 1.4c 1.4c
- **Detainee provided information regarding ISIS military police member,** 1.4c 1.4c
- **Detainee provided information pertaining to ISIS Wail of Hamah,** 1.4c 1.4c
-                                               1.4c

Detainee received Saudi Arabian citizenship following a trip to Saudi Arabia with Detainee's parents and family when Detainee was 10-years-old. Detainee's family was a middle-class family during this trip to Saudi Arabia. Detainee's father taught at the
                        Detainee's father had a specialty working as a computer engineer.
Detainee's father retired approximately 17 years prior to Detainee's date of capture (PTDOC).
Detainee's mother did not work. Detainee's mother has a wealthy family and Detainee's cousins are        wristwatch dealers in Saudi Arabia.

Detainee's father's house phone number is        1.4c

3.5c

Detainee last used a cell phone in Mayadin one month PTDOC. Detainee had a Samsung Galaxy S3. Detainee's phone was either lost or stolen within the month leading to Detainee's capture. Detainee did not purchase another cell phone because Detainee did not see a purpose.

Detainee has never used or had any social media accounts.

An ISIS military prison is located at        1.4c        Mayadin, SY. Detainee was last at the ISIS military prison because the military police arrested Detainee for not having official papers and being AWOL five to eight months PTDOC.

SECRET//NOFORN/LIMDIS

SECRET//NOFORN//LIMDIS

1.4c

1.4c

· 1.4c

1.4c

1.4c

Zubayr Bin Awam is the largest ISIS Division within ISIS. There are approximately 4,000 ISIS fighters in the Division. Zubayr Bin Awam is responsible for the entire city of Dayr az Zawr. Since Dayr az Zawr is a military city, all ISIS locations belong to Zubayr Bin Awam.

The ISIS Office for Tracks and Tanks is located at [1.4c] Dayr az Zawr, SY. Ansari is the Amir of this office. Detainee went to this location because Detainee knew Abu Mahid al-Jazrawi is dead. Abu Dawla Ayyash is the Deputy Amir.

The ISIS shop for the Office of Tracks and Tanks is located at [1.4c] Dayr az Zawr, SY. Detainee has never been inside of the shop.

An ISIS Islamic Police Headquarters is located at [1.4c] Dayr az Zawr, SY. Detainee has never been inside of the headquarters, but all the people in Dayr az Zawr know this location. The ISIS Islamic Police Headquarters is approximately four stories tall.

1.4c

1.4c

SECRET//NOFORN//LIMDIS

SECRET//NOFORN//LIMDIS

1.4c

| 1.4c |
| --- |

The former ISIS Zarqawi Brigade Headquarters building is located at [1.4c]
[1.4c] Dayr az Zawr, SY.  ISIS' Zarqawi Brigade vacated this location as their headquarters
one year PTDOC.  However, ISIS members are still using this location for an unknown reason.

| 1.4c |
| --- |

An ISIS tank workshop is located IVO [1.4c] Dayr az Zawr, SY.  The
ISIS tank workshop is located underground.

| 1.4c |
| --- |

# Part IV:  Remarks (S//NF)

A. Interrogator Assessment of Detainee

| 1.4c |
| --- |

C. Recommendations for Further Interrogations

| 1.4a, 3.5c |
| --- |

| 1.4c |
| --- |

   SECRET//NOFORN//LIMDIS

SECRET//NOFORN//LIMDIS

1.4c

1.4c

Approved For Release

SECRET//NOFORN//LIMDIS

SECRET//NOFORN/LIMDIS

# Tactical Interrogation Report

**FROM**: J2
**TO**:  Coalition Forces
**SUBJ**: TACTICAL INTERROGATION REPORT

**Name of Detainee**: 

**Report No.**: TIR03

**Alias**: Abu 

**Captive Tag #**: 1.4(a)

**ISN#**: Click here to enter ISN#.

**Interrogator**: b(6)

**Date/Time**: 122100ZSEP17

**Language Used**: English; Arabic

**Interpreter**: 1.4c

**Maps Used**: None

## Part I: General Information (S//NF)

1. **Date/Time**: 09/1900/Z/SEP/17

2. **Place/OBJ**: 1.4c  Albu Hashudah, Jazira Canton, SY

3. **Circumstance**: Detainee was captured by Syrian Democratic Forces (SDF) while attempting to flee Syria to Turkey

4. **Documents Captured**: TBD

5. **Equipment Captured**: TBD

6. **Weapons Captured**: None

## Part II: Administrative (S//NF)

A. (U) Personal Particulars of Detainee

1. **Full Name**: 

2. **Nationality**: US

3. **Languages and Proficiency**: Arabic (F), English (N),

4. **Date/Place of Birth**: 

5. **Current Residence**: Dayr az Zawr, SY

6. **Sex**: Male

7. **Marital Status**: Married;  lives in Bahrain, last seen early 2015, wife's father is Former 

8. **Religion**: Islam - Sunni

SECRET//NOFORN//LIMDIS

9.  **Occupation**: None

10. **Military Experience**: None

11. **Civilian Education**: Attended University, dropped out, attended trade school

12. **Children**: One daughter

13. **Father's Name**: TBD

14. **Grandfather's Name:** TBD

15. **Brothers' Names**: One brother

16. **Tribe/Subtribe**: None

17. **Jihad Experience**: Joined ISIS in 2015

18. **Foreign Travel**: TBD

19. **Previous Detention:** None

B. (U) Features

1.  **Current Eye Color**: Brown

2.  **Current Hair Color**: Black

3.  **Current Height**: 65 inches

4.  **Current Weight**: 140 pounds

5.  **Distinguishing Features**: None

6.  **Comments**: Detainee was medically cleared for questioning

1.4(c)

OVERALL REPORT CLASSIFIED SECRET//NOFORN//LIMDIS

## Part III: Information Obtained (S//NF)

Summary:

* 1.4(c)

1.4(c)

Detainee claims to be a freelance writer for the U.S. press. Detainee claims to have dropped
out of school due to poor grades at , Louisiana, US. Detainee
traveled to Syria to discover the truth of what was happening in the war in Syria.

SECRET//NOFORN/LIMDIS

Detainee traveled to refugee camps in Gaziantep, TU to interview the refugees there. Detainee later returned to Gaziantep to find a way into Syria. Once in Syria, ISIS blindfolded Detainee and took him to an ISIS prison located under a stadium in Raqqah, SY. Detainee claims to have been in this prison for approximately seven months. Convinced Detainee was a spy, Detainee claims ISIS members interrogated him thoroughly. Detainee claims he turned to god for help and became more religious while incarcerated by ISIS.

1.4(c)

After a Korean prisoner committed suicide, ISIS released Detainee under the condition Detainee worked for ISIS. Detainee claims Detainee moved around various departments within ISIS as ISIS attempted to discover what skills Detainee possessed. Detainee claims he made multiple attempts to escape ISIS custody. ISIS sent Detainee to be a security guard at a camp near the Umar Oil Fields located outside of Mayadin, SY. Detainee claims he attempted to escape, but was caught in Dayr az Zawr, SY. Detainee remained trusted by ISIS, enough to work in the various Mosques in and around Mayadin.

1.4(c)

Detainee was able to move freely and rented a farm south of Mayadin, SY to have an excuse to travel out of Mayadin. Detainee wanted to use the location of the farms IOT facilitate an escape though Idlib, SY.

Detainee claims to have no knowledge of intelligence value and maintains Detainee was a captive and gave all available information to the previous Collector.

## Part IV:  Remarks (S//NF)

1.4(c)

SECRET//NOFORN/LIMDIS

SECRET//NOFORN/LIMDIS

1.4(c)

3.5c

1.4(c)

1.4c

SECRET//NOFORN//LIMDIS

# Tactical Interrogation Report

**FROM:** J2
**TO:**   Coalition Forces
**SUBJ:**  TACTICAL INTERROGATION REPORT

---

**Name of Detainee:** ▮▮▮▮▮▮▮▮▮▮▮▮

**Report No.:** TIR04

**Alias:** Abu ▮▮▮▮▮

**Captive Tag #:**  1.4c

**ISN#:** Click here to enter ISN#.

**Interrogator:** 1.4c

**Date/Time:** 132200ZSEP17

**Language Used:** English

**Interpreter:** None

**Maps Used:** None

## Part I: General Information (S//NF)

1. **Date/Time:** 09/1900/Z/SEP/17
2. **Place/OBJ:**         1.4c           Albu Hashudah, Jazira Canton, SY
3. **Circumstance:** Detainee was captured by Syrian Democratic Forces (SDF) while attempting to flee Syria to Turkey
4. **Documents Captured:** TBD
5. **Equipment Captured:** TBD
6. **Weapons Captured:** None

## Part II: Administrative (S//NF)

A. (U) Personal Particulars of Detainee

1. **Full Name:** ▮▮▮▮▮▮▮▮▮▮▮
2. **Nationality:** US
3. **Languages and Proficiency:** Arabic (F), English (N),
4. **Date/Place of Birth:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5. **Current Residence:** Dayr az Zawr, SY
6. **Sex:** Male
7. **Marital Status:** Married; ▮▮▮▮▮▮▮ lives in Bahrain, last seen early 2015, wife's father is Former ▮▮▮▮▮▮
8. **Religion:** Islam - Sunni

SECRET//NOFORN//LIMDIS

9.  **Occupation**: None
10. **Military Experience**: None
11. **Civilian Education**: Attended University, dropped out, attended trade school
12. **Children**: One daughter
13. **Father's Name**: TBD
14. **Grandfather's Name:** TBD
15. **Brothers' Names**: One brother
16. **Tribe/Subtribe**: None
17. **Jihad Experience**: Joined ISIS in 2015
18. **Foreign Travel**: TBD
19. **Previous Detention:** None

B. (U) <u>Features</u>

1.  **Current Eye Color**: Brown
2.  **Current Hair Color**: Black
3.  **Current Height**: 65 inches
4.  **Current Weight**: 140 pounds
5.  **Distinguishing Features**: None
6.  **Comments**: Detainee was medically cleared for questioning

WARNING: THIS IS A U.S. MILITARY INTELLIGENCE REPORT. NO FURTHER
DISTRIBUTION, DISSEMINATION, OR DOWNGRADE IS AUTHORIZED WITHOUT
SPECIFIC APPROVAL FROM THE ORIGINATING AGENCY. THIS INFORMATION IS NOT
FINISHED INTELLIGENCE AND IS NOT FOR USE WITH FOREIGN GOVERNMENTS OR
DETAINEES WITHOUT PRIOR AUTHORIZATION. THIS INFORMATION SHOULD NOT BE
CONSIDERED CORROBORATION OF SIMILAR INFORMATION DISSEMINATED IN
SEPARATE INTELLIGENCE CHANNELS

OVERALL REPORT CLASSIFIED SECRET//NOFORN//LIMDIS

## Part III: Information Obtained (S//REL TO USA, FRA, FVEY)

<u>Summary:</u>

1.4c

SECRET//NOFORN//LIMDIS

## Part IV: Remarks (S//NF)

A. Interrogator Assessment of Detainee

1.4c

C. Recommendations for Further Interrogations

1.4c

1.4c

1.4c

SECRET//NOFORN//LIMDIS

# Tactical Interrogation Report

**FROM**: J2
**TO**:      Coalition Forces
**SUBJ**: TACTICAL INTERROGATION REPORT

**Name of Detainee**:

**Report No.**: TIR05

**Alias**: Abu

**Captive Tag #**:                     1.4c

**ISN#**:  Click here to enter ISN#.

**Interrogator**:   1.4c

**Date/Time**: 141800ZSEP17

**Language Used**: English

**Interpreter**: None

**Maps Used**: None

## Part I:  General Information (S//NF)

1. **Date/Time**: 09/1900/Z/SEP/17

2. **Place/OBJ**:        1.4c             Albu Hashudah, Jazira Canton, SY

3. **Circumstance**: Detainee was captured by Syrian Democratic Forces (SDF) while attempting to flee Syria to Turkey.

4. **Documents Captured**: TBD

5. **Equipment Captured**: TBD

6. **Weapons Captured**: None

## Part II: Administrative (S//NF)

A. (U) Personal Particulars of Detainee

1. **Full Name**:

2. **Nationality**:  US

3. **Languages and Proficiency**: Arabic (F), English (N),

4. **Date/Place of Birth**:

5. **Current Residence**: Dayr az Zawr, SY

6. **Sex**: Male

7. **Marital Status**: Married;                        lives in Bahrain, last seen early 2015, wife's father is Former

8. **Religion**: Islam - Sunni

9. **Occupation**: None
10. **Military Experience**: None
11. **Civilian Education**: Attended University, dropped out, attended trade school
12. **Children**: One daughter
13. **Father's Name**: TBD
14. **Grandfather's Name:** TBD
15. **Brothers' Names**: One brother
16. **Tribe/Subtribe**: None
17. **Jihad Experience**: Joined ISIS in 2015
18. **Foreign Travel**: TBD
19. **Previous Detention:** None

B. (U) Features
1. **Current Eye Color**: Brown
2. **Current Hair Color**: Black
3. **Current Height**: 65 inches
4. **Current Weight**: 140 pounds
5. **Distinguishing Features**: None
6. **Comments**: Detainee was medically cleared for questioning

WARNING: THIS IS A U.S. MILITARY INTELLIGENCE REPORT. NO FURTHER DISTRIBUTION, DISSEMINATION, OR DOWNGRADE IS AUTHORIZED WITHOUT SPECIFIC APPROVAL FROM THE ORIGINATING AGENCY. THIS INFORMATION IS NOT FINISHED INTELLIGENCE AND IS NOT FOR USE WITH FOREIGN GOVERNMENTS OR DETAINEES WITHOUT PRIOR AUTHORIZATION. THIS INFORMATION SHOULD NOT BE CONSIDERED CORROBORATION OF SIMILAR INFORMATION DISSEMINATED IN SEPARATE INTELLIGENCE CHANNELS

OVERALL REPORT CLASSIFIED SECRET//NOFORN//LIMDIS

## Part III: Information Obtained (S//REL TO USA, FRA, FVEY)

Summary:

1.4c

SECRET//NOFORN//LIMDIS

## Part IV:  Remarks (S//NF)

A. Interrogator Assessment of Detainee

1.4c

C. Recommendations for Further Interrogations

1.4c

1.4c

1.4c

SECRET//NOFORN//LIMDIS

SECRET//NOFORN//LIMDIS

# Tactical Interrogation Report

**FROM**: J2
**TO**:     Coalition Forces
**SUBJ**: TACTICAL INTERROGATION REPORT

**Name of Detainee**: ███████████████

**Report No.**: TIR06

**Alias**: Abu ████████

**Captive Tag #**: |      1.4c |

**ISN#**: Click here to enter ISN#.

**Interrogator**: | 1.4c |

**Date/Time**: 151630ZSEP17

**Language Used**: English

**Interpreter**: None

**Maps Used**: None

## Part I: General Information (S//NF)

1. **Date/Time**: 09/1900/Z/SEP/17

2. **Place/OBJ**:                  1.4c                  Albu Hashudah, Jazira Canton, SY

3. **Circumstance**: Detainee was captured by Syrian Democratic Forces (SDF) while attempting to flee Syria to Turkey

4. **Documents Captured**: TBD

5. **Equipment Captured**: TBD

6. **Weapons Captured**: None

## Part II: Administrative (S//NF)

### A. (U) Personal Particulars of Detainee

1. **Full Name**: ███████████████

2. **Nationality**: US

3. **Languages and Proficiency**: Arabic (F), English (N),

4. **Date/Place of Birth**: ███████████████

5. **Current Residence**: Dayr az Zawr, SY

6. **Sex**: Male

7. **Marital Status**: Married; ████████████ lives in Bahrain, last seen early 2015, wife's father is Former ████████████

8. **Religion**: Islam - Sunni

SECRET//NOFORN//LIMDIS

SECRET//NOFORN//LIMDIS

9.  **Occupation**: None

10. **Military Experience**: None

11. **Civilian Education**: Attended University, dropped out, attended trade school

12. **Children**: One daughter

13. **Father's Name**: TBD

14. **Grandfather's Name**: TBD

15. **Brothers' Names**: One brother

16. **Tribe/Subtribe**: None

17. **Jihad Experience**: Joined ISIS in 2015

18. **Foreign Travel**: TBD

19. **Previous Detention**: None

B. (U) Features

1.  **Current Eye Color**: Brown

2.  **Current Hair Color**: Black

3.  **Current Height**: 65 inches

4.  **Current Weight**: 140 pounds

5.  **Distinguishing Features**: None

6.  **Comments**: Detainee was medically cleared for questioning

WARNING: THIS IS A U.S. MILITARY INTELLIGENCE REPORT. NO FURTHER
DISTRIBUTION, DISSEMINATION, OR DOWNGRADE IS AUTHORIZED WITHOUT
SPECIFIC APPROVAL FROM THE ORIGINATING AGENCY. THIS INFORMATION IS NOT
FINISHED INTELLIGENCE AND IS NOT FOR USE WITH FOREIGN GOVERNMENTS OR
DETAINEES WITHOUT PRIOR AUTHORIZATION. THIS INFORMATION SHOULD NOT BE
CONSIDERED CORROBORATION OF SIMILAR INFORMATION DISSEMINATED IN
SEPARATE INTELLIGENCE CHANNELS

OVERALL REPORT CLASSIFIED SECRET//NOFORN//LIMDIS

## Part III: Information Obtained (S//NF)

### Summary:

- Detainee provided information on the ISIS prison system in SY
- Detainee provided information on ISIS Military Police in Mayadin, SY
- Detainee map tracked to the ISIS Military Prison complex
- Detainee map tracked to the ISIS Military Police headquarters
- Detainee provided a physical description of an ISIS Advisor    1.4c
  1.4c

SECRET//NOFORN//LIMDIS

SECRET//NOFORN//LIMDIS

- **Detainee provided a physical description of the ISIS** 1.4c **Military** 1.4c
- **Detainee provided a physical description of an ISIS Military** 1.4c 1.4c
- **Detainee map tracked to the administration office of the ISIS Wali of** 1.4c 1.4c
- **Detainee map tracked to the ISIS Money Exchange in Mayadin, SY**

ISIS maintains a prison system consisting of three different types of prisons:

1. **Military prison.** Military Prisons are reserved for ISIS members who have broken ISIS laws or are deserters. Prisoners in Military Prisons are mistreated, but not tortured.

2. **Civilian Prison.** Civilian Prisons are reserved for local civilians who have committed basic crimes within ISIS territory. Civilians in these prisons are mistreated and beaten if not compliant.

3. **Security Prison.** Security Prison is reserved for anyone in ISIS custody who has committed murder, theft of large sums of money, or is suspected of being a spy. Security prisoners are tortured, interrogated, and abused.

ISIS does not hold western hostages in normal ISIS prison systems. Western hostages are held in homes with boarded up windows in Mayadin, SY. ISIS uses several homes in Mayadin, SY for western hostages and keeps several western hostages in each home. Detainee is unaware of the locations of these homes.

The Military Prison located at ___1.4c___ Mayadin, Dayr az Zawr, SY became over crowded at the time Detainee was imprisoned there. ISIS heard that another prison in the Mayadin area was going to be bombed and moved several prisoner's to the Military Prison in Mayadin, SY. 1.4c
1.4c

1.4c

SECRET//NOFORN//LIMDIS

1.4c

1.4a, 1.4c

1.4c

SECRET//NOFORN//LIMDIS

029  01/18/18
4

TIR 06

SECRET//NOFORN//LIMDIS

1.4c

1.4a, 1.4c

1.4c

SECRET//NOFORN//LIMDIS

SECRET//NOFORN//LIMDIS

1.4c

1.4c

1.4c

1.4c

1.4c

SECRET//NOFORN//LIMDIS

SECRET//NOFORN//LIMDIS

1.4c

1.4c

1.4c

SECRET//NOFORN//LIMDIS

SECRET//NOFORN//LIMDIS

1.4c



1.4a, 1.4c

SECRET//NOFORN//LIMDIS

SECRET//NOFORN//LIMDIS



1.4c

1.4c

1.4c

**Part IV:** **Remarks** (S//NF)

1.4c

SECRET//NOFORN//LIMDIS

SECRET//NOFORN//LIMDIS

1.4c

1.4c

Approved For Release

SECRET//NOFORN//LIMDIS

SECRET//NOFORN/LIMDIS

## Tactical Interrogation Report

**FROM**: J2
**TO**:      Coalition Forces
**SUBJ**: TACTICAL INTERROGATION REPORT

**Name of Detainee**: 

**Report No.**: TIR07

**Alias**: Abu

**Captive Tag #**: | 1.4c |

**ISN#**: Click here to enter ISN#.

**Interrogator**: | 1.4c |

**Date/Time**: 171500ZSEP17

**Language Used**: English

**Interpreter**: None

**Maps Used**: None

## Part I:  General Information (S//NF)

1. **Date/Time**: 09/1900/Z/SEP/17

2. **Place/OBJ**:              1.4c                / Albu Hashudah, Jazira Canton, SY

3. **Circumstance**: Detainee was captured by Syrian Democratic Forces (SDF) while attempting to flee Syria to Turkey.

4. **Documents Captured**: TBD

5. **Equipment Captured**: TBD

6. **Weapons Captured**: None

## Part II: Administrative (S//NF)

A. (U) Personal Particulars of Detainee

1. **Full Name**: 

2. **Nationality**: US

3. **Languages and Proficiency**: Arabic (F), English (N),

4. **Date/Place of Birth**: 

5. **Current Residence**: Dayr az Zawr, SY

6. **Sex**: Male

7. **Marital Status**: Married              lives in Bahrain, last seen early 2015, wife's father is Former

8. **Religion**: Islam - Sunni

SECRET//NOFORN/LIMDIS

9.  **Occupation**:  None

10. **Military Experience**:  None

11. **Civilian Education**:  Attended University, dropped out, attended trade school

12. **Children**:  One daughter

13. **Father's Name**:  TBD

14. **Grandfather's Name:**  TBD

15. **Brothers' Names**:  One brother

16. **Tribe/Subtribe**:  None

17. **Jihad Experience**:  Joined ISIS in 2015

18. **Foreign Travel**:  TBD

19. **Previous Detention:** None

B. (U) Features

1.  **Current Eye Color**:  Brown

2.  **Current Hair Color**: Black

3.  **Current Height**:  65 inches

4.  **Current Weight**:  140 pounds

5.  **Distinguishing Features**: None

6.  **Comments**:  Detainee was medically cleared for questioning

WARNING: THIS IS A U.S. MILITARY INTELLIGENCE REPORT. NO FURTHER
DISTRIBUTION, DISSEMINATION, OR DOWNGRADE IS AUTHORIZED WITHOUT
SPECIFIC APPROVAL FROM THE ORIGINATING AGENCY. THIS INFORMATION IS NOT
FINISHED INTELLIGENCE AND IS NOT FOR USE WITH FOREIGN GOVERNMENTS OR
DETAINEES WITHOUT PRIOR AUTHORIZATION. THIS INFORMATION SHOULD NOT BE
CONSIDERED CORROBORATION OF SIMILAR INFORMATION DISSEMINATED IN
SEPARATE INTELLIGENCE CHANNELS

OVERALL REPORT CLASSIFIED SECRET//NOFORN/LIMDIS

## Part III: Information Obtained (S//REL TO USA, FRA, FVEY)

Summary:

|  |
|---|
| 1.4c |

  SECRET//NOFORN/LIMDIS

SECRET//NOFORN//LIMDIS

## Part IV: Remarks (S//NF)

A. Interrogator Assessment of Detainee

1.4c

1.4c

1.4c

1.4c

1.4c

SECRET//NOFORN//LIMDIS

SECRET//NOFORN/LIMDIS

# Tactical Interrogation Report

**FROM:** J2
**TO:**    Coalition Forces
**SUBJ:** TACTICAL INTERROGATION REPORT

**Name of Detainee:** ▮▮▮▮▮▮▮▮▮▮

**Report No.:** TIR08

**Alias:** Abu ▮▮▮

**Captive Tag #:** | 1.4c |

**ISN#:** Click here to enter ISN#.

**Interrogator:** | 1.4c |

**Date/Time:** 172100ZSEP17

**Language Used:** English

**Interpreter:** None

**Maps Used:** None

## Part I: General Information (S//NF)

1. **Date/Time:** 09/1900/Z/SEP/17
2. **Place/OBJ:**                1.4c                Albu Hashudah, Jazira Canton, SY
3. **Circumstance:** Detainee was captured by Syrian Democratic Forces (SDF) while attempting to flee Syria to Turkey.
4. **Documents Captured:** TBD
5. **Equipment Captured:** TBD
6. **Weapons Captured:** None

## Part II: Administrative (S//NF)

A. (U) Personal Particulars of Detainee

1. **Full Name:** ▮▮▮▮▮▮▮▮▮▮
2. **Nationality:** US
3. **Languages and Proficiency:** Arabic (F), English (N),
4. **Date/Place of Birth:** ▮▮▮▮▮▮▮▮▮▮
5. **Current Residence:** Dayr az Zawr, SY
6. **Sex:** Male
7. **Marital Status:** Married; ▮▮▮▮▮▮▮ lives in Bahrain, last seen early 2015, wife's father is Former ▮▮▮▮▮▮▮
8. **Religion:** Islam - Sunni

MDR 18-0015 (LD 0005-18)

SECRET//NOFORN/LIMDIS

039  01/18/18
1

SECRET//NOFORN/LIMDIS

9. **Occupation**: None

10. **Military Experience**: None

11. **Civilian Education**: Attended University, dropped out, attended trade school

12. **Children**: One daughter

13. **Father's Name**: TBD

14. **Grandfather's Name:** TBD

15. **Brothers' Names**: One brother

16. **Tribe/Subtribe**: None

17. **Jihad Experience**: Joined ISIS in 2015

18. **Foreign Travel**: TBD

19. **Previous Detention**: None

B. (U) Features

1. **Current Eye Color**: Brown

2. **Current Hair Color**: Black

3. **Current Height**: 65 inches

4. **Current Weight**: 140 pounds

5. **Distinguishing Features**: None

6. **Comments**: Detainee was medically cleared for questioning

WARNING: THIS IS A U.S. MILITARY INTELLIGENCE REPORT. NO FURTHER
DISTRIBUTION, DISSEMINATION, OR DOWNGRADE IS AUTHORIZED WITHOUT
SPECIFIC APPROVAL FROM THE ORIGINATING AGENCY. THIS INFORMATION IS NOT
FINISHED INTELLIGENCE AND IS NOT FOR USE WITH FOREIGN GOVERNMENTS OR
DETAINEES WITHOUT PRIOR AUTHORIZATION. THIS INFORMATION SHOULD NOT BE
CONSIDERED CORROBORATION OF SIMILAR INFORMATION DISSEMINATED IN
SEPARATE INTELLIGENCE CHANNELS

OVERALL REPORT CLASSIFIED SECRET//NOFORN/LIMDIS

## Part III: Information Obtained (S//NF)

**Summary:**

•                                      1.4c

SECRET//NOFORN//LIMDIS

1.4c

3.5c

1.4c

## Part IV:  Remarks (S//NF)

A. Interrogator Assessment of Detainee

1.4c

SECRET//NOFORN//LIMDIS

SECRET//NOFORN//LIMDIS



SECRET//NOFORN//LIMDIS

042  01/18/18
4

TIR 08

SECRET//NOFORN//LIMDIS

# Tactical Interrogation Report

**FROM**: J2
**TO**:  Coalition Forces
**SUBJ**:  TACTICAL INTERROGATION REPORT

**Name of Detainee**: ███████

**Report No.**: TIR09

**Alias**: Abu ███

**Captive Tag #**: | 1.4c |

**ISN#**:  Click here to enter ISN#.

**Interrogator**: | 1.4c |

**Date/Time**: 181500ZSEP17

**Language Used**: English

**Interpreter**: None

**Maps Used**: None

## Part I:  General Information (S//NF)

1. **Date/Time**: 09/1900/Z/SEP/17
2. **Place/OBJ**: 1.4c  Albu Hashudah, Jazira Canton, SY
3. **Circumstance**: Detainee was captured by Syrian Democratic Forces (SDF) while attempting to flee Syria to Turkey.
4. **Documents Captured**: TBD
5. **Equipment Captured**: TBD
6. **Weapons Captured**: None

## Part II: Administrative (S//NF)

A. (U) Personal Particulars of Detainee

1. **Full Name**: ███████
2. **Nationality**: US
3. **Languages and Proficiency**: Arabic (F), English (N),
4. **Date/Place of Birth**: ███████
5. **Current Residence**: Dayr az Zawr, SY
6. **Sex**: Male
7. **Marital Status**: Married ███████ lives in Bahrain, last seen early 2015, wife's father is Former ███████
8. **Religion**: Islam - Sunni

SECRET//NOFORN//LIMDIS

9. **Occupation**: None
10. **Military Experience**: None
11. **Civilian Education**: Attended University, dropped out, attended trade school
12. **Children**: One daughter
13. **Father's Name**: TBD
14. **Grandfather's Name:** TBD
15. **Brothers' Names**: One brother
16. **Tribe/Subtribe**: None
17. **Jihad Experience**: Joined ISIS in 2015
18. **Foreign Travel**: TBD
19. **Previous Detention:** None

B. (U) <u>Features</u>
1. **Current Eye Color**: Brown
2. **Current Hair Color**: Black
3. **Current Height**: 65 inches
4. **Current Weight**: 140 pounds
5. **Distinguishing Features**: None
6. **Comments**: Detainee was medically cleared for questioning

WARNING: THIS IS A U.S. MILITARY INTELLIGENCE REPORT. NO FURTHER DISTRIBUTION, DISSEMINATION, OR DOWNGRADE IS AUTHORIZED WITHOUT SPECIFIC APPROVAL FROM THE ORIGINATING AGENCY. THIS INFORMATION IS NOT FINISHED INTELLIGENCE AND IS NOT FOR USE WITH FOREIGN GOVERNMENTS OR DETAINEES WITHOUT PRIOR AUTHORIZATION. THIS INFORMATION SHOULD NOT BE CONSIDERED CORROBORATION OF SIMILAR INFORMATION DISSEMINATED IN SEPARATE INTELLIGENCE CHANNELS

OVERALL REPORT CLASSIFIED SECRET//NOFORN//LIMDIS

## Part III: Information Obtained (S//REL TO USA, FRA, FVEY)

**Summary:**

1.4c

SECRET//NOFORN//LIMDIS

## Part IV: <u>Remarks</u> (S//NF)



1.4c

1.4c, 3.5c

1.4c

1.4c

SECRET//NOFORN//LIMDIS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| | ) | |
| v. | ) | |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | |
| in his official capacity as SECRETARY | ) | |
| OF DEFENSE, | ) | |
| | ) | |
| Respondent. | ) | |

# ECF 49

# REDACTED VERSION FOR PUBLIC FILING

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| | ) | |
| v. | ) | |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | ~~UNDER SEAL~~ |
| in his official capacity as SECRETARY | ) | |
| OF DEFENSE, | ) | |
| | ) | |
| Respondent. | ) | |

**NOTICE OF SUPPLEMENTAL EXHIBIT**

Respondent hereby gives notice that attached hereto is an additional exhibit in support of Respondent's Return, filed today as ECF 46 in the above-captioned case. The exhibit was not available in time to be included in Respondent's noon filing of the Return.

January 22, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
JESSIE K. LIU
United States Attorney
TERRY M. HENRY
Assistant Director, Federal Programs Branch

/s/ Kathryn L. Wyer
JAMES M. BURNHAM
Senior Counsel
KATHRYN L. WYER
Senior Trial Counsel, Federal Programs
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, N.W.
Washington, DC   20530
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Respondent*

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed under seal, along with attachments, will be served today by email on counsel for Petitioner.

/s/ Kathryn L. Wyer

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | |
| in his official capacity as SECRETARY | ) | |
| OF DEFENSE, | ) | |
| | ) | |
| Respondent. | ) | |

## DECLARATION OF ███████

1. I am ███████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

████████████████████████████

2. The statements in this declaration are based on my personal knowledge and information that I have received in my official capacity.

3. A terrorist group founded and led by Abu Mu'sab al-Zarqawi conducted a series of terrorist attacks in Iraq beginning in 2003, around the time of the U.S. arrival in Iraq. Al-Zarqawi had ties to Osama bin Laden that went back to al-Zarqawi's time in Afghanistan and Pakistan before the 11 September 2001 attacks against the United States. This relationship with bin Laden and a shared Salafi-Jihadist ideology prompted al-Zarqawi and his group to join al-Qa'ida.

4. In October 2004, al-Zarqawi publicly pledged his group's allegiance to bin Laden, and bin Laden publicly endorsed al-Zarqawi as al-Qa'ida's leader in Iraq. At this time, al-Zarqawi's group adopted the name al-Qa'ida in Iraq ("AQI"). From that time and continuing through the time U.S. and coalition forces left Iraq in 2011, AQI conducted fatal terrorist attacks against those forces, even after al-Zarqawi was killed by a U.S. airstrike in June 2006. U.S. forces responded by engaging in combat operations against the group throughout this time period.

5. In 2013, now led by Abu Bakr al-Baghdadi (who had ties to al-Qa'ida's top leader Ayman al-Zawahiri), the group changed its name to the Islamic State in Iraq and al-Sham (ISIS, also referred to as ISIL). Since that time, the group has continued to plot and execute attacks against U.S. persons and interests in Iraq, Syria, and the region. ISIL is directly responsible for the murder and beheading of at least four kidnapped American citizens in Syria and multiple fatal attacks against U.S. military personnel who were present in Syria and in Iraq (at the invitation of the Iraqi Government).

6. ISIL split from al-Qa'ida in 2014. This rift was prompted by theological and strategic disagreements and included claims from ISIL that it is the true executor of bin Laden's legacy, rather than al-Qa'ida's current leadership. Some members and factions of al-Qa'ida-aligned groups subsequently publicly declared allegiance to ISIL. Meanwhile, ISIL continues to denounce the United States as its enemy and to target U.S. citizens and interests worldwide. ISIL emir Abu Bakr al-Baghdadi highlighted the group's continued intent on attacking the United States and its interests worldwide by specifically calling for attacks against the United States in a September 2017 statement.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of knowledge.

2

Dated this 22ND day of January 2018, at the Department of Defense, Washington, D.C.

