IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | |
| in his official capacity as SECRETARY | ) | |
| OF DEFENSE, | ) | |
| | ) | |
| Respondent. | ) | |

**RESPONDENT'S RESPONSE TO PETITIONER'S
RESPONSE TO FACTUAL RETURN**

# **TABLE OF CONTENTS**

I.      THE PRESIDENT'S CONCLUSION THAT THE USE OF FORCE
        AGAINST ISIL IS AUTHORIZED IS JUSTIFIED BY THE FACTS.................. 1

II.     THE PRESIDENT'S CONCLUSION, SUPPORTED BY CONGRESS,
        THAT FORCE IS AUTHORIZED IS ENTITLED TO WIDE
        DEFERENCE ....................................................................................................... 4

III.    THE EXECUTIVE'S AUTHORITY TO DETAIN ISIL FIGHTERS
        CAPTURED ABROAD IN A WARZONE APPLIES TO U.S. CITIZENS ....... 11

CONCLUSION............................................................................................................ 15

## **TABLE OF AUTHORITIES**

### **Cases**

*Al-Aulaqi v. Obama,*
   727 F. Supp. 2d 1 (D.D.C. 2010) ................................................................................... 5
*Al-Bihani v. Obama,*
   590 F.3d 866 (D.C. Cir. 2010) ........................................................................... 6, 7, 10
*Baker v. Carr,*
   369 U.S. 186 (1962) ........................................................................................................ 5
*Boumediene v. Bush,*
   553 U.S. 723 (2008) ........................................................................................................ 6
*Chicago & S. Air Lines v. Waterman S.S. Corp.,*
   333 U.S. 103 (1948) ........................................................................................................ 5
*Cohens v. Virginia,*
   19 U.S. (6 Wheat.) 264 (1821) .................................................................................... 13
*DaCosta v. Laird,*
   471 F.2d 1146 (2d Cir. 1973) ........................................................................................ 9
*Dames & Moore v. Regan,*
   453 U.S. 654 (1981) ........................................................................................................ 8
*El-Shifa Pharm. Indus. Co. v. United States,*
   607 F.3d 836 (D.C. Cir. 2010) ...................................................................................... 5
*Ex Parte Endo,*
   323 U.S. 283 (1944) ............................................................................................... 12, 13
*Ex Parte Quirin,*
   317 U.S. 1 (1942) .......................................................................................................... 11
*Fleming v. Page,*
   50 U.S. 603 (1850) .......................................................................................................... 7
*Gilligan v. Morgan,*
   413 U.S. 1 (1973) ............................................................................................................ 5
*Hamdi v. Rumsfeld,*
   316 F.3d 450 (4th Cir. 2003),
   *vacated,* 542 U.S. 507 (2004) ............................................................................ passim
*Harisiades v. Shaughnessy,*
   342 U.S. 580 (1952) ........................................................................................................ 5
*Hedges v. Obama,*
   724 F.3d 170 (2d Cir. 2013) ........................................................................................ 15
*Howe v. Smith,*
   452 U.S. 473 (1981) ...................................................................................................... 12
*Hussain v. Obama,*
   718 F.3d 964 (D.C. Cir. 2013) ...................................................................................... 2
*In re Territo,*
   156 F.2d 142 (9th Cir. 1946) ...................................................................................... 11
*Khan v. Obama,*
   655 F.3d 20 (D.C. Cir. 2011) ...................................................................................... 10

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994) ............................................................................................. 13
*Lichter v. United States*,
  334 U.S. 742 (1948) ............................................................................................... 7
*Massachusetts v. Laird*,
  451 F.2d 26 (1st Cir. 1971) .................................................................................... 9
*Munaf v. Geren*,
  553 U.S. 674 (2008) ............................................................................................... 7
*Padilla v. Hanft*,
  423 F.3d 386 (4th Cir. 2005) ............................................................................... 12
*Padilla v. Rumsfeld*,
  352 F.3d 695 (2d Cir. 2003),
  *rev'd* 542 U.S. 426 (2004) .................................................................................... 13
*Parhat v. Gates*,
  532 F.3d 834 (D.C. Cir. 2008) ............................................................................. 10
*People's Mojahedin Org. of Iran v. U.S. Dept. of State*,
  182 F.3d 17 (D.C. Cir. 1999) ................................................................................. 7
*Sanchez-Espinosa v. Reagan*,
  770 F.2d 202 (D.C. Cir. 1985) ............................................................................... 9
*Smith v. Obama*,
  217 F.Supp.3d 283 (D.D.C. 2016),
  *appeal pending* No. 16-5377 (D.C. Cir.) ............................................................ 5, 6
*Stewart v. Kahn*,
  78 U.S. 493 (1870) ................................................................................................. 8
*The Prize Cases*,
  67 U.S. 635 (1862) ............................................................................................... 11
*United States v. Cordova*,
  806 F.3d 1085 (D.C. Cir. 2015) ........................................................................... 13
*United States v. Curtiss-Wright Export Corp.*,
  299 U.S. 304 (1936) ............................................................................................... 7
*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ......................................................................................... 8, 11

## Statutes

8 U.S.C. § 1189 ....................................................................................................... 7
18 U.S.C. § 4001(a) ..................................................................................... 12, 13, 14
18 U.S.C. § 4001(b)(1) ........................................................................................... 13
50 U.S.C. §§ 811 *et seq.* ........................................................................................ 13

Pub. L. No. 92-128, 85 Stat. 347 (1971) ............................................................... 13
Pub. L. No. 107-40, 115 Stat. 224 ("2001 AUMF") ..................................... passim
Pub. L. No. 107-243, 116 Stat. 1498 ("2002 AUMF") ................................. passim
Pub. L. No. 112-81, 125 Stat. 1298 ("2012 NDAA") .................................... 2, 7, 8
Pub. L. No. 115-31, 131 Stat. 135 (2017) ........................................................... 8, 9
Pub. L. No. 115-91, 131 Stat. 1283 (2017) ("2018 NDAA") ................................. 9

**Other Authorities**

*Al-Qaeda's Resurgence in Iraq: A Threat to U.S. Interests*: Hearing Before the
   H. Comm. On Foreign Affairs, 113th Cong. 113-116 (2014) (testimony of
   Brett McGurk, Deputy Assistant Secretary for Iraq and Iran, Bureau of Near
   Eastern Affairs, U.S. Department of State) .................................................................... 8

Letter from President Trump (Dec. 11, 2017) .................................................................... 2

Letter from Susan Rice, Assistant to the President for Nat'l
   Sec. Affairs (July 25, 2014) ............................................................................................ 4

United Nations Sec. Council, *Sec. Council Comm. Pursuant to Resolutions 1267 (1999),*
   *1989 (2011) and 2253 (2015) Concerning Islamic State in Iraq and the Levant (Da'esh),*
   *Al-Qaida and Associated Individuals, Groups, Undertakings, and Entities*, Eighteenth
   Report of the Analytical Support and Sanctions Monitoring Team (July 19, 2016)........ 3, 4

United Nations Sec. Council, *Sec. Council Comm. Pursuant to Resolutions 1267 (1999),*
   *1989 (2011) and 2253 (2015) Concerning Islamic State in Iraq and the Levant (Da'esh),*
   *Al-Qaida and Associated Individuals, Groups, Undertakings, and Entities*,
   Twenty-first Report of the Analytical Support and Sanctions
   Monitoring Team (January 26, 2018) .......................................................................... 3, 4

White House Report on the Legal and Policy Frameworks Guiding the
   United States' Use of Military Force and Related National Security
   Operations (Dec. 2016) .................................................................................................. 2

Petitioner argues that a U.S. citizen who travels to Syria, joins the Islamic State of Iraq and the Levant ("ISIL"), and is captured on a foreign battlefield cannot be detained by the U.S. military.[1] Petitioner is wrong. The public record shows that ISIL is within the ambit of Congress's 2001 Authorization for Use of Military Force ("AUMF") because it has been part of or an associated force of al-Qaida. Further, ISIL is within the ambit of the 2002 AUMF because, as a group trying to overthrow the Iraqi government and support acts of terrorism across the globe, ISIL contributes to the "continuing threat posed by Iraq" that the 2002 AUMF sought to eliminate. The President, supported by Congress, thus has deemed ISIL a legitimate military target and this Court ought not second guess that conclusion. And because ISIL is a legitimate military target, Petitioner's detention is authorized as a fundamental incident to war—a rule the Supreme Court has already held applies even when the combatant is a U.S. citizen. For these reasons, and those detailed in the Government's Factual Return, Petitioner's detention is lawful.

## I.  THE PRESIDENT'S CONCLUSION THAT THE USE OF FORCE AGAINST ISIL IS AUTHORIZED IS JUSTIFIED BY THE FACTS

As explained in Respondent's Factual Return ("FR"), Congress has twice authorized the President to use all "necessary and appropriate" force in circumstances relevant here. First, the 2001 AUMF targeted those "organizations" responsible for the attacks of 9/11 "in order to prevent any future acts of international terrorism against the United States." 2001 AUMF, Pub. L. 107-40, 115 Stat. 224. Congress has recognized the 2001 AUMF authorizes the use of force, including military detention, against both al-Qaida and "associated forces" of al-Qaida.

---

[1] Petitioner has chosen, at this stage, not to dispute the facts supporting the Government's assessment that he qualifies as an enemy combatant. *See* ECF No. 59. For purposes of Petitioner's legal argument, the Court therefore must assume that Petitioner was part of ISIL as alleged in the Government's Factual Return (ECF Nos. 46, 49).

FR ¶¶ 22-23; National Defense Authorization Act for FY 2012, Pub. L. 112-81, § 1021(a), 125 Stat. 1298 ("2012 NDAA"); *see Hussain v. Obama*, 718 F.3d 964, 967 (D.C. Cir. 2013). Second, the 2002 AUMF targeted "the continuing threat posed by Iraq" to "the national security of the United States," noting, among other things, that "members of al Qaida . . . are known to be in Iraq"; that "other international terrorist organizations, including organizations that threaten the lives and safety of United States citizens," are "aid[ed] and harbor[ed]" in Iraq; and that "it is in the national security interests of the United States to restore international peace and security to the Persian Gulf region." 2002 AUMF, Pub. L. 107-243, 116 Stat. 1498. As discussed below, courts should broadly defer to the President's conclusion, supported by Congress, that using force against ISIL is "necessary and appropriate" under the AUMFs.[2]

　　　　As an initial matter, however, ample facts support the conclusion that ISIL falls within both AUMFs. Contrary to Petitioner's assertion that "the government cobbles together only a few factual assertions that it maintains sweep ISIS within the ambit of the 2001 AUMF," Pet'r Br., at 14, the Factual Return and public materials cited therein provide a robust description of ISIL's history, including its formation, its extensive campaign of terror within and outside Iraq, its formal merger with al-Qaida, its leaders' repeated pledges of loyalty and support to al-Qaida and al-Qaida's reciprocal recognition of the organization as its branch in Iraq, its common cause with al-Qaida including goals to expel U.S. and coalition forces from

---

[2] The determination that ISIL is a necessary and appropriate target for the President's use of force "was made at the most senior levels of the U.S. Government . . . only after a careful and lengthy evaluation of the intelligence." White House Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations (Dec. 2016), at 5-8 & n.25, *available at* https://fas.org/man/eprint/frameworks.pdf; *see also* Letter from President Trump (Dec. 11, 2017), *available at* https://www.whitehouse.gov/briefings-statements/text-letter-president-speaker-house-representatives-president-pro-tempore-senate-2/ (reaffirming use of force against ISIL is authorized by President's constitutional and statutory authority, including both AUMFs).

Iraqi territory and establish a new state in Iraqi territory, and its continued use of force, within and from Iraqi territory, against U.S. and coalition forces and interests. (*See* App. A, attached.)[3]

Even the split between ISIL and al-Qaida resulted in part from ISIL's claim that *it*— and not al-Qaida's current leadership—is the true executor of bin Laden's legacy.[4] (*Id.*) Operationally, the two organizations remain engaged to achieve common goals through hostilities against the United States and its coalition partners. (*Id.*) Recent U.N. reports even note the possibility of "potential convergence" in some regions because "some members of both organizations have been willing and able to support each other in the preparation of [terrorist] attacks."[5] And especially pertinent to the 2002 AUMF, ISIL, for its part, occupied

---

[3] The Factual Return narrative did not purport to be a complete explication of the cited materials. *See* FR ¶ 4. Given Petitioner's assertion, Appendix A provides excerpts from the cited materials supporting Respondent's position. Among other things, this material refutes Petitioner's claim that "the government itself concedes that ISIS did not exist at the time of the September 11 attacks." Pet'r Br. at 9. To the contrary, the organization now known as ISIL is described as using some 31 aliases over the last 15 years. (App. A, at No. 1.) ISIL founder, al-Zarqawi, was an associate of Osama bin Laden before 9/11, and al-Zarqawi's operatives first arrived in Afghanistan in 1999, some training at an al-Qaida-associated training camp with al-Qaida's full support. (*Id.*, at Nos. 2, 4.) Under Saddam Hussein's regime, the group found refuge and established a poisons and explosives training camp in Iraq. (*Id.*, at No. 6.)

[4] Petitioner complains that the "credibility of the government's position that it has had 2001 AUMF authority to detain members of ISIS" since 2003 "is undermined by its failure to articulate that position prior to *late 2014*." Pet'r Br. at 27-28. But this argument ignores that prior to its announced split with al-Qaida, ISIL had merged with al-Qaida and operated as al-Qaida in Iraq while renaming itself multiple times over the years. (FR ¶ 17; *supra* note 3; App. A, at Nos. 14-34, 38.) The U.S. Government only amended its designation of al-Qaida in Iraq to identify ISIL as its primary name in May 14, 2014. (App. A, at No. 39; FR ¶17.) The timeline thus reflects an appropriate response to a continually metastasizing threat.

[5] United Nations Sec. Council, *Sec. Council Comm. Pursuant to Resolutions 1267 (1999), 1989 (2011) and 2253 (2015) Concerning Islamic State in Iraq and the Levant (Da'esh), Al-Qaida and Associated Individuals, Groups, Undertakings, and Entities*, Twenty-first Report of the Analytical Support and Sanctions Monitoring Team, at p. 4, S/2018/14, (January 26, 2018) ("2018 UN Monitoring Report"); United Nations Sec. Council, *Sec. Council Comm. Pursuant to Resolutions 1267 (1999), 1989 (2011) and 2253 (2015) Concerning Islamic State in Iraq and the Levant (Da'esh), Al-Qaida and Associated Individuals, Groups, Undertakings, and Entities*, Eighteenth Report of the Analytical

major cities in Iraq until driven out with U.S. assistance in 2017.[6]

In sum, the facts support the President's conclusion that ISIL falls within (1) the 2001 AUMF, because ISIL is part of or an associated force of al-Qaida, the "organization" responsible for the 9/11 attacks, and the use of force against ISIL is "necessary and appropriate" "to prevent any future acts of international terrorism against the United States"; and (2) the 2002 AUMF, because the use of force against ISIL, a group whose objectives include establishing an Islamic state in Iraq and using that state to support terrorism against the United States, is "necessary and appropriate" to "defend the national security of the United States against the continuing threat posed by Iraq."

## II.   THE PRESIDENT'S CONCLUSION, SUPPORTED BY CONGRESS, THAT FORCE IS AUTHORIZED IS ENTITLED TO WIDE DEFERENCE

Despite the detailed and compelling facts supporting the President's conclusion, which spans multiple administrations, that the use of force against ISIL is authorized, Petitioner urges the Court to overturn this conclusion and adopt a narrow, even parsimonious, construction of the AUMFs. But under well-established principles applicable to issues involving foreign affairs and decisions to use military force, the President's conclusion deserves wide deference.

---

Support and Sanctions Monitoring Team, at p. 5, S/2016/629 (July 19, 2016), *both available at* http://www.un.org/en/ga/documents/symbol.shtml.

[6] *See* 2018 U.N. Monitoring Report at 5. Petitioner contends that the 2002 AUMF cannot authorize his detention because in 2014 then-National Security Advisor Susan Rice stated in a letter that, given the 2011 withdrawal of troops from Iraq, the 2002 AUMF was "no longer used for any government activities and the Administration fully supports its repeal." Pet'r Br. at 33. But Rice's letter did not purport to disclaim the President's authority to rely on the 2002 AUMF in the future. Moreover, the letter explicitly reiterated that the President will continue to use his authority to "help Iraqis as they take the fight to terrorists who threaten the Iraqi people, the region, and American interests" and "take targeted and precise military action if and when we determine that the situation on the ground requires it." Letter from Susan Rice, Assistant to the President for Nat'l Sec. Affairs (July 25, 2014), *available at* http://freebeacon.com/wp-content/uploads/2014/07/3989-Boehner.pdf. If anything, that Congress did *not* repeal the 2002 AUMF confirms that it, in addition to the 2001 AUMF, continues to supply congressional authority for the President's use of force against ISIL.

For one thing, the nature of the President's decision to use military force against ISIL pursuant to his authority under the AUMFs, implicates concerns that, in other contexts, have led courts to find a political question constitutionally committed to the political branches. *See Smith v. Obama*, 217 F.Supp.3d 283, 298-304 (D.D.C. 2016) (Kollar-Kotelly, J.) (whether use of force against ISIL is authorized under AUMFs is political question), *appeal pending*, No. 16-5377 (D.C. Cir.). There is no "clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches. . . [than the] complex, subtle, and professional decisions as to the . . . control of a military force. . . ." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973); *see also Baker v. Carr*, 369 U.S. 186, 212 (1962) ("recognition of belligerency abroad is an executive responsibility"); *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 843-44 (D.C. Cir. 2010) ("The conclusion that the strategic choices directing the nation's foreign affairs are constitutionally committed to the political branches reflects the institutional limitations of the judiciary and the lack of manageable standards to channel any judicial inquiry into these matters") (collecting cases); *al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 44-52 (D.D.C. 2010) (validity of President's use of force under 2001 AUMF is political question).

In many instances, the mere existence of a political question is dispositive. *El–Shifa Pharm. Indus. Co.*, 607 F.3d at 840. But even where not dispositive, the political question doctrine is pertinent because courts must avoid using "standards which would require us to equate [the judiciary's] political judgment with that of [the political branches]." *Harisiades v. Shaughnessy*, 342 U.S. 580, 589-90 (1952). As the Supreme Court explained, political questions:

> are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

*Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111-12 (1948). The Court of

5

Appeals has accordingly recognized the need for wide deference to political branches on such questions, even in the context of reviewing the legality of an individual's detention. *See al-Bihani v. Obama*, 590 F.3d 866, 874-75 (D.C. Cir. 2010) (in Guantanamo habeas case, stating that "[t]he determination of when hostilities have ceased is a political decision, and we defer to the Executive's opinion on the matter, at least in the absence of an authoritative congressional declaration purporting to terminate the war," and noting "the wide deference the judiciary is obliged to give to the democratic branches with regard to questions concerning national security"); *see also Boumediene v. Bush*, 553 U.S. 723, 796-97 (2008) ("In considering both the procedural and substantive standards used to impose detention to prevent acts of terrorism, proper deference must be accorded to the political branches.").

Such an approach is warranted here on the question of the President's legal authority to use force, including detention authority, against ISIL. As Judge Kollar-Kotelly explained, the legality of the President's use of force against ISIL is a political question for three reasons:

(1) "[t]he necessity and appropriateness of military action is precisely the type of discretionary military determination that is committed to the political branches and which the Court has no judicially manageable standards to adjudicate;"

(2) the "factual questions are not of a type the Court is equipped to handle with traditional judicially manageable standards" because "[r]esolving this dispute would require inquiries into sensitive military determinations, presumably made based on intelligence collected on the ground in a live theatre of combat, and potentially changing and developing on an ongoing basis" (citation omitted); and

(3) the Court "is not presented with a dispute between the two political branches regarding the challenged action" because Congress has repeatedly provided support for the use of force against ISIL.

*Smith*, 217 F.Supp.3d at 298, 300-01.

Although in a habeas case the political question doctrine does not preclude judicial review—to be sure, the Court must determine whether the facts pertaining to the individual petitioner bring that person within the scope of the President's detention authority—this

habeas Court should not impose its own views regarding whether the President correctly determined that (1) using force against ISIL is "necessary and appropriate," as informed by the laws of war, for the purposes of "prevent[ing] any future acts of international terrorism against the United States" or "defend[ing] national security," respectively, under the AUMFs; or (2) that ISIL is part of or associated with al-Qaida, an "organization" he determined "planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001," 2001 AUMF § 2(a);[7] or (3) that ISIL constitutes a "continuing threat posed by Iraq," 2002 AUMF § 3(a)(1). *See, e.g., al-Bihani*, 590 F.3d at 874-75; *People's Mojahedin Org. of Iran v. U.S. Dept. of State*, 182 F.3d 17, 23-24 (D.C. Cir. 1999) (under 8 U.S.C. § 1189, court could determine whether organization was foreign or engaged in terrorist activities, but not the political question of whether those activities threatened national security); *Munaf v. Geren,* 553 U.S. 674, 702 (2008) (courts are "not suited to second-guess" political questions on "sensitive foreign policy issues") (citation omitted).   Here, indeed, Congress specifically granted the President wide discretion to make those determinations called for under both AUMFs.

This broad grant of authority is well-rooted in commonsense and practicality, for "[t]he war power of the national government is the power to wage war successfully." *Lichter v. United States*, 334 U.S. 742, 767 n. 9 (1948) (quotation omitted). After all, the President "has the better opportunity of knowing the conditions which prevail in foreign countries, and especially is this true in time of war." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936); *see Fleming v. Page*, 50 U.S. 603, 615 (1850) (the President has the authority to "employ [U.S. forces] in the manner he may deem most effectual to harass and conquer and

---

[7] In the 2012 NDAA, §1021(b)(2), Congress reaffirmed its broad grant of authority to the President under the 2001 AUMF, and expressly recognized that the President's interpretation was correct in that the 2001 AUMF authorizes the military detention against both al-Qaida and "associated forces" of al-Qaida.

subdue the enemy"). And as particularly relevant to the 2002 AUMF, the Supreme Court has explained that the war power "is not limited to victories in the field" but "carries with it inherently the power to guard against the immediate renewal of the conflict, and to remedy the evils which have arisen from its rise and progress." *Stewart v. Kahn*, 78 U.S. 493, 507 (1870). That "Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take or every possible situation in which he might act . . . does not, especially … in the areas of foreign policy and national security, imply congressional disapproval." *Dames & Moore v. Regan,* 453 U.S. 654, 678 (1981) (quotation omitted).

But here, Congress not only vested broad discretion in the President to make these decisions, it also fortified the President's decisions with its sustained support. Judicial adjudication of questions committed to the political branches is all the more inappropriate when the political branches are in agreement. *See, e.g., Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-36 (1952) (President's power to act is strongest when coupled with Congress's specific authorization) (Jackson, J., concurring).  And Congress's support for the use of force against ISIL is clear. Congress has: (1) expressly ratified the President's detention authority under the 2001 AUMF, *see* 2012 NDAA § 1021(b)(2); (2) repeatedly funded the President's counter-ISIL military actions after extensive oversight (*see* FR ¶¶ 41-45); and (3) authorized the President to provide lethal and nonlethal assistance to select groups and forces fighting ISIL in Iraq and Syria (*id.,* ¶43).[8] *See also* Consolidated Appropriations Act, 2017, Pub.

---

[8] The political branches have engaged in ongoing dialogue regarding the President's use of force against ISIL, often leading to close coordination between the Executive Branch and Congress to ensure there is appropriate oversight and funding for the President's efforts in this regard. *See, e.g., Al-Qaeda's Resurgence in Iraq: A Threat to U.S. Interests*: Hearing Before the H. Comm. On Foreign Affairs, 113th Cong. 113-116 (2014) (testimony of Brett McGurk, Deputy Assistant Secretary for Iraq and Iran, Bureau of Near Eastern Affairs, U.S. Department of State), at pp. 18-20, 52 (*available at* https://www.gpo.gov/fdsys/pkg/CHRG-113hhrg86588/pdf/CHRG-113hhrg86588.pdf).

L. 115-31, 131 Stat. 135, 281, 289, 295-96 (2017); National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91, §§ 1222, 1263, 131 Stat. 1283 (2017). Numerous courts have recognized that this type of ongoing congressional support shows the political branches are working in concert. *See, e.g., Sanchez-Espinosa v. Reagan*, 770 F.2d 202, 211 (D.C. Cir. 1985) (R.B. Ginsburg, J., concurring) (continued funding showed congressional support); *Massachusetts v. Laird*, 451 F.2d 26, 34 (1st Cir. 1971) (continued appropriations showed "steady Congressional support"); *DaCosta v. Laird*, 471 F.2d 1146, 1157 (2d Cir. 1973) (Congress had "taken a position" by "not cutting off appropriations").

The Court should not substitute its views for those of the political branches on whether ISIL is part of or an associated force of al-Qaida, or whether fighting ISIL is necessary and appropriate in order to prevent future acts of international terrorism or to defend the national security against the continuing threat posed by Iraq. Nor should the Court second-guess the President's assessment of, for example, the announced split between the modern-day al-Qaida leadership and ISIL, which Petitioner contends stripped the President of authority to use force against ISIL. Pet'r Br. at 13-17.

Indeed, Petitioner's focus on the "split" between ISIL and al-Qaida reflects his own oversimplification of ISIL's history, which has no bearing on how the President should effectuate the AUMFs. When it comes to determining whether using force against ISIL is "necessary and appropriate" to carry out the AUMFs, ISIL's history and current conduct amply justify the President's conclusion: After years of fighting as part of or alongside al-Qaida, ISIL now claims to be the true executor and continuation of bin Laden's and al-Qaida's legacy; and, having originated in Iraq, continues to present serious threats to and from Iraq.

Furthermore, the need to respond to unforeseen developments like the split between ISIL and al-Qaida is *why* the Executive has broad discretion to determine who to target under

the AUMFs. Nothing in the AUMFs requires perpetual amity between organizations subject to their authorization of force. And that al-Qaida and ISIL now manifest themselves as two heads of a modern day Lernaean Hydra should not undermine the Executive's ability to battle both heads to defeat the beast.[9] Holding otherwise would interfere with Executive and military decisions about how to prosecute a war against resilient non-state organizations that may disagree, even violently, over strategy and tactics.[10] *See* FR ¶¶ 18 & n.23, 28. At worst, this result could convert the President's congressionally-conferred authority to analyze and respond to threats into a shell game that enemies can exploit.[11] The Court should defer to the

---

[9] The Court of Appeals in *al-Bihani*, 590 F.3d at 874, rejected an argument that the defeat of the Taliban as the governing power Afghanistan marked the end of the conflict against the organization and thereby stripped the President of his authority to use force under the 2001 AUMF, even though the Taliban had subsequently reemerged as an insurgent force. The Court's decision noted the deference due the political branches on such issues and acknowledged the grave consequences of a different approach, which would make "each successful campaign of a long war but a Pyrrhic prelude to defeat." Likewise, this Court should defer to the political branches regarding the use of force to defeat al-Qaida and ISIL.

[10] In a similar vein, Petitioner advocates for an improper, narrowly circumscribed definition of "associated force" under the AUMFs, conflating the Court of Appeals discussion in *Parhat v. Gates*, 532 F.3d 834, 844 (D.C. Cir. 2008), of whether an organization is "part of" al-Qaida with the issue of what constitutes an "associated force," and arguing that ISIL is not similarly situated to the three forces found in D.C. Circuit case law to be associated forces of al-Qaida. Petitioner ignores, however, that the Court of Appeals has considered such issues under a commonsense, functional standard. *See Khan v. Obama*, 655 F.3d 20, 32-33 (D.C. Cir. 2011) (finding Hezb-i-Islami Gulbuddin to be an associated force of the Taliban although recounting the volatile history between the two organizations). Further, although the Court of Appeals has not squarely addressed what deference is due the Executive regarding the designation of an associated force, its consideration of similar issues indicates that wide deference is owed such a determination, as it is also on a determination that an organization is sufficiently part of al-Qaida to fall within the AUMFs. *Cf. al-Bihani*, 590 F.3d at 872-74 (considering similar legal issues from commonsense factual perspective while according Executive "wide deference"). Applying a similar commonsense and deferential perspective here, the facts demonstrate that ISIL acted for years as part of or an associated force of al-Qaida and is now appropriately treated as such, whatever the current disagreements among their leadership.

[11] Incredibly, Petitioner even suggests that the Court must strike down the President's determination *unless* Respondent can demonstrate such "gamesmanship" aimed at manipulating the scope of the AUMFs. Petr's Br. at 26 n.13. There is no support, however,

President's judgment on these issues that the use of force against ISIL is fully authorized.[12]

## III.   THE EXECUTIVE'S AUTHORITY TO DETAIN ISIL FIGHTERS CAPTURED ABROAD IN A WARZONE APPLIES TO U.S. CITIZENS

Rather than acknowledging the deference owed the Executive when it comes to determining whether the use of military force is necessary and appropriate, Petitioner argues that the President lacks *any* authority to detain a U.S. citizen, even "in time of war," unless Congress has issued a "clear statement" of authorization, and that no such statement appears in the 2001 and 2002 AUMFs. Pet'r Br. at 5-6. The Supreme Court, however, has recognized that "[c]itizenship in the United States of an enemy belligerent does not relieve him from the consequences of a belligerency which is unlawful." *Ex parte Quirin*, 317 U.S. 1, 37 (1942); *cf. In re Territo*, 156 F.2d 142, 144 (9th Cir. 1946) (legality of petitioner's military detention did not

---

for injecting the intent of an opposing force in such a manner into the analysis regarding the scope of an authorization for use of military force.

[12] As explained in the Factual Return, ¶¶ 46-51, the President also has inherent authority as Commander in Chief to direct military action against hostile terrorist organizations abroad and, as part of that authority, to detain combatants captured on the battlefield in that conflict, at least until U.S. forces leave the theater of operations or can arrange for a detainee's release or transfer. (Petitioner seems to suggest that such authority equates to suspension of the habeas writ, Pet'r Br. at 36-40, but that a detainee may, as a procedural matter, assert a habeas claim in no way undermines the authorities the Government may rely on to justify detention.) Congress specifically recognized in the 2001 and 2002 AUMFs that the "President has authority under the Constitution to deter and take action to prevent acts of international terrorism against the United States." 115 Stat. 224, Preamble; 116 Stat. 1498, Preamble. Article II grants the President the power to defend the Nation when it is attacked, and he "is bound to accept the challenge without waiting for any special legislative authority." *The Prize Cases*, 67 U.S. 635, 668 (1862). Further, where, as here, the President is acting "pursuant to an express or implied authorization of Congress," in this case the AUMFs and other expressions of the support of Congress, "his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown*, 343 U.S. at 635-36; *see also infra* § III (nonapplication of 18 U.S.C. § 4001(a)). Even if the Court were to reach the Article II issue, however, it should not address the broad (and nonjusticiable) question of whether the President has Article II authority to deploy troops in Iraq, Syria, or elsewhere. This proceeding would only require the Court to recognize that when U.S. troops are deployed within a theater of active hostilities, their authority to secure their surroundings necessarily includes the lesser power to detain combatants for at least as long as those troops remain in the theater and in harm's way. The military detention of Petitioner is a basic exercise of such authority.

depend on "whether petitioner is or is not a citizen"). A majority in *Hamdi* confirmed that U.S. citizenship does not immunize an enemy combatant captured on the battlefield from wartime detention.[13] *See Hamdi v. Rumsfeld*, 542 U.S. 507, 519 (2004) (plurality) ("There is no bar to this Nation's holding one of its own citizens as an enemy combatant."); *id.* at 594 (Thomas, J., dissenting) ("the Government's detention of [a U.S. citizen] as an enemy combatant does not violate the Constitution").[14] Indeed, *Hamdi* implicitly rejected the type of argument Petitioner raises, that is, that there must be a "clear statement" beyond what the AUMFs provide; the Court determined that the 2001 AUMF authorized Hamdi's detention, despite "not us[ing] specific language of detention," with respect to citizens or in general. *Hamdi*, 542 U.S. at 517, 519; *id.* at 587, 589 (Thomas, J., dissenting).

As further support for his "clear statement" argument, Petitioner also cites the Non-Detention Act, 18 U.S.C. § 4001(a). Pet'r Br. at 6-8. But § 4001(a) does not apply to military detentions of enemy combatants captured on foreign battlefields and held abroad. Although Petitioner cites *Howe v. Smith*, 452 U.S. 473 (1981), as suggesting the contrary, that case did not consider the provision's application to a battlefield; it involved a federal prison holding a state prisoner and is not properly extended beyond that domestic context. Indeed, as the Supreme Court has long made clear, such "'general expressions . . .are to be taken in connection with

---

[13] Furthermore, the *Hamdi* plurality recognized, "based on longstanding law-of-war principles," that the authority to detain in a wartime context encompasses "the authority to detain for the duration of the relevant conflict," even if, as a practical matter, it is unclear when that conflict may end. *Hamdi*, 542 U.S. at 520-21.

[14] Petitioner cites *Ex parte Endo*, 323 U.S. 283 (1944), but that case addressed a civilian agency's detention in the United States of a concededly loyal citizen based solely on her Japanese ancestry—not military detention of a citizen captured on a battlefield abroad, due to his own wartime actions; nor did the case adopt the "clear statement" rule Petitioner suggests. *See id.* at 294, 298; *Padilla v. Hanft*, 423 F.3d 386, 395-96 (4th Cir. 2005). Petitioner's other quotes are similarly from cases that are unrelated to wartime detention.

the case in which those expressions are used.'" *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821) (Marshall, C.J.)).

Moreover, although § 4001(a) is silent on whether it applies to military wartime detentions abroad, "the specific context in which that language is used, and the broader context of the statute as a whole," *United States v. Cordova*, 806 F.3d 1085, 1099 (D.C. Cir. 2015) (internal quotation omitted), make clear it does not.[15] The structure and statutory placement of the provision in Title 18, Part III, which addresses the incarceration in penal and correctional institutions of those charged or convicted of a federal crime, shows that it pertains solely to the detention of American citizens by *civilian* authorities.[16] The legislative history of § 4001(a) also confirms it was aimed solely at civil detentions. Congress added the provision at the same time it repealed the Emergency Detention Act of 1950, 50 U.S.C. §§ 811 *et seq.*, which allowed for emergency civil detention of individuals deemed likely to engage in espionage or sabotage. Pub. L. 92-128, 85 Stat. 347 (1971); *see Hamdi*, 542 U.S. at 517 (plurality). The law's purpose was to prevent a repeat of the Japanese-American internment camps of World War II, *see id.*, which had been operated by the War Relocation Authority, a civilian agency, *see Ex Parte Endo*, 323 U.S. at 286, 298. Nothing in this history suggests that Congress intended § 4001(a) to interfere with U.S. military operations abroad during armed conflict.[17]

---

[15] Petitioner cites *Padilla v. Rumsfeld*, 352 F.3d 695 (2d Cir. 2003), *rev'd*, 542 U.S. 426 (2004), in support of his interpretation of § 4001(a). Pet'r Br. at 8 n.3. However, that court concluded that § 4001(a) unambiguously applied to the wartime context because it did not say otherwise. *Padilla*, 352 F.3d at 721-22. In *Cordova*, however, the D.C. Circuit recognized that when a statute "is silent" on a particular question—such as its application to the U.S. military—it is "therefore ambiguous." *Cordova*, 806 F.3d at 1099.

[16] Section 4001 originally consisted of two paragraphs, now renumbered as § 4001(b)(1) and (b)(2), which vested control and management of federal prisons, "except military or naval institutions," in the Attorney General. 18 U.S.C. § 4001(b)(1).

[17] To the extent Petitioner cites the *Hamdi* dissents to the contrary, they fail to account properly for the distinction between civilian detention in the United States and wartime detention of an

But even if the Court accepted Petitioner's claim regarding a "clear statement" requirement, pursuant to § 4001(a) or otherwise, the 2001 and 2002 AUMFs satisfy that requirement. The Supreme Court in *Hamdi* determined that the 2001 AUMF "satisfied § 4001(a)'s requirement that a detention be 'pursuant to an Act of Congress' (assuming, without deciding, that § 4001(a) applies to military detentions)." 542 U.S. at 517. Ultimately, a majority concluded that the 2001 AUMF authorized the detention of Hamdi, a U.S. citizen who fought with the Taliban and was captured in Afghanistan. *Id.* at 518 (plurality); *id.* at 587 (Thomas, J., dissenting) (while "the President very well may have inherent authority to detain those arrayed against our troops, . . . Congress has authorized the President to do so [in the 2001 AUMF]").[18]

The Supreme Court's decision in *Hamdi* compels the same conclusion here—certainly with respect to the 2001 AUMF, which *Hamdi* addressed directly. And the 2002 AUMF, like the 2001 AUMF, authorizes the use of "necessary and appropriate" military force—language that *Hamdi* held authorizes military detention, including of U.S. citizens. And again, Congress has repeatedly supported the President's use of force under the 2001 and 2002 AUMFs, including as against ISIL. *See* FR ¶¶ 24, 40-45.

Petitioner argues that the 2012 NDAA § 1021(b)(2), and other congressional measures, fail to "clearly authorize the detention of U.S. citizen members of ISIS." Pet'r Br. at 34. But § 1021(b) is explicit that the 2001 AUMF authorizes detention. And by stating that it should

---

enemy combatant who, though a U.S. citizen, has voluntarily left this country to fight against it abroad. Congress cannot have intended § 4001(a) to apply in the latter circumstance. *See Hamdi v. Rumsfeld*, 316 F.3d 450, 468 (4th Cir. 2003), *vacated*, 542 U.S. 507 (2004) (if Congress had intended for Section 4001(a) to "override . . . well-established precedent and provide American belligerents some immunity from capture and detention, it surely would have made its intentions explicit").

[18] Justices Souter and Ginsburg also would have held the 2001 AUMF authorized Hamdi's detention absent a concern, rejected by a majority of the Court, that the detention might fall outside "customary usages of war." 542 U.S. at 549-51 (Souter, J., dissenting in part).

not "be construed to affect existing law or authorities relating to the detention of United States citizens, 2012 NDAA § 1021(e), the NDAA expressly left existing law—including *Hamdi*'s recognition that the 2001 AUMF *does* authorize the detention of U.S. citizens who are enemy combatants captured on the battlefield—unchanged. *See Hedges v. Obama*, 724 F.3d 170, 193 (2d Cir. 2013) (§ 1021(e) "does not foreclose the possibility that previously 'existing law' may permit the detention of American citizens in some circumstances"). Petitioner does not counter the fact that, even after *Hamdi*, and throughout the evolution of the group now known as ISIL, Congress has continued to fund U.S. military operations in Iraq and Syria along with all that entails—including the real possibility, which has now come to pass, that a U.S. citizen would voluntarily join ISIL, be captured on the battlefield, and wind up in U.S. military custody. Congress's explicit decision not to change existing law in the 2012 NDAA meant just that—Congress did not change or diminish the President's pre-existing authority.[19]

## CONCLUSION

Petitioner joined ISIL in July 2014, has admitted being an ISIL fighter recruit, attended an ISIL training camp, swore loyalty to the ISIL leader, and worked for ISIL in various capacities for two-and-a-half years until military offensives forced him to flee, leading to his capture on a battlefield with enemy paraphernalia and other indicia of ISIL involvement. On those facts, which are not contested here, the President has authority to detain Petitioner under the 2001 AUMF, the 2002 AUMF, and Article II of the Constitution.

February 28, 2018                                    Respectfully submitted,

                                                     CHAD A. READLER

---

[19] Any notion that the President's authority to detain U.S. citizen enemy combatants is less than coextensive with the AUMFs' authorizations of force is foreclosed by the *Hamdi* plurality's recognition that such detention is a "fundamental . . . incident to war." 542 U.S. at 518. Such a notion is also contrary to common sense, leaving the U.S. military without recourse when confronted with a U.S. citizen fighting against it on the battlefield.

Acting Assistant Attorney General
JESSIE K. LIU
United States Attorney
TERRY M. HENRY
Assistant Director, Federal Programs Branch

/s/ Kathryn L. Wyer
JAMES M. BURNHAM
Senior Counsel
KATHRYN L. WYER
Senior Trial Counsel, Federal Programs
OLIVIA HUSSEY SCOTT
Trial Attorney, Federal Programs
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, N.W.
Washington, DC  20530
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Respondent*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | |
| in his official capacity as SECRETARY | ) | |
| OF DEFENSE, | ) | |
| | ) | |
| Respondent. | ) | |

### APPENDIX A IN SUPPORT OF RESPONDENT'S RESPONSE TO PETITIONER'S RESPONSE TO FACTUAL RETURN

For the convenience of the Court, Respondents provide this appendix that identifies more specifically citations from Respondent's Factual Return and Supplement ("FR") (ECF Nos. 46, 49) supporting details surrounding ISIL's history, including its formation, its extensive campaign of terror within and outside Iraq, its formal merger with al-Qaida, its leaders' repeated pledges of loyalty and support to al-Qaida and al-Qaida's reciprocal recognition of the organization as its branch in Iraq, its common cause with al-Qaida including the goal to expel U.S. and coalition forces from Iraqi territory and establish a new state in Iraqi territory, and its continued use of force, within and from Iraqi territory, against U.S. and coalition forces and interests.

| No. | Fact | Cite |
|---|---|---|
| 1. | The group now known as Islamic State of Iraq and the Levant ("ISIL") or the Islamic State of Iraq and Syria ("ISIS") has used over 31 aliases over the past 15 years, including, but not limited to, al-Qa'ida in Iraq; al-Qa'ida Group of Jihad in Iraq; al-Qa'ida Group of Jihad in the Land of the Two Rivers; al-Qa'ida in Mesopotamia; al-Qa'ida in the Land of the Two Rivers; al-Qa'ida of Jihad in Iraq; al-Qa'ida of Jihad Organization in the Land of the Two Rivers; al-Qa'ida of the Jihad in the Land of the Two Rivers; al-Tawhid; Jama'at al-Tawhid Wa'al-Jihad; Tanzeem Qa'idat al Jihad/Bilad al Raafidaini; Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn; The Monotheism and Jihad Group; The Organization Base of Jihad/Country of the Two Rivers; The Organization Base of Jihad/Mesopotamia; The Organization of al-Jihad's Base in Iraq; The Organization of al-Jihad's Base in the Land of the Two Rivers; The Organization of al-Jihad's Base of Operations in Iraq; The Organization of al-Jihad's Base of Operations in the Land of the Two Rivers; The Organization of Jihad's Base in the Country of the Two Rivers; al-Zarqawi Network; Islamic State in Iraq; Islamic State in Iraq and al-Sham; Islamic State in Iraq and Syria; ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham; Daesh; Dawla al Islamiya; Al-Furqan Establishment for Media Production; Islamic State. | United States Department of State, *2016 Country Reports on Terrorism: Chapter 6: Foreign Terrorist Organizations* (2016) at 27-31 (under the heading for "Islamic State of Iraq and Syria"), *available at* https://www.state.gov/j/ct/rls/crt/2016/272238.htm (hereinafter "State Dept. 2016 Country Report on Terrorism"); *see also* U.S. Department of Treasury, *Treasury Designates Six Al-Qaida Terrorists* (Sept. 24, 2003), *available at* *https://www.treasury.gov/press-center/press-releases/Pages/js757.aspx*, at 1; *see also* See United States Department of State, Country Reports on Terrorism: Chapter 6; Foreign Terrorist Organizations (2013) (under the heading for "Al-Qa'ida in Iraq"), *available at* https://www.state.gov/j/ct/rls/crt/2013/224829.htm (hereinafter, "State Dept. 2013 Country Report on Terrorism"); *see also* Global Security, *Al-Qaeda in Iraq* (June 13, 2014), *available at* https://www.globalsecurity.org/military/world/para/aqi-2.htm; *see also* United Nations, *Security Council Committee Adds Seven A.K.A.'s of One Entity in Al-Qaida Section of Its Consolidated List* (Dec. 6, 2004), *available at* https://www.un.org/press/en/2004/sc8260.doc.htm. [Reports cited in FR, at n. 6, 14, 15, 18, 20, and 24.] |
| 2. | ISIL founder Abu Musab al-Zarqawi ("al-Zarqawi") was a close associate of Osama bin Laden. | United Nations Security Council, *Security Council Committee Pursuant to Resolutions 1267 (1999) 1989 (2011) and 2253 (2015) Concerning ISIL (Da'esh) Al-Qaida and Associated Individuals Groups Undertakings and Entities* (Jan. 18, 2018), *available at* https://www.un.org/sc/suborg/en/sanctions/1267/aq_sanctions_list/summaries/entity/al-qaida-in-iraq; *see also* ECF No. 49, at ¶ 3. [Report cited in FR, at n. 9.] |

| No. | Fact | Cite |
|-----|------|------|
| 3. | Al-Zarqawi arranged for training for Jordanian terrorists in al-Qaida camps. | U.S. Department of Treasury, *Treasury Designates Six Al-Qaida Terrorists* (Sept. 24, 2003), at 1, *available at* *https://www.treasury.gov/press-center/press-releases/Pages/js757.aspx*. [Report cited in FR, n. 6.] |
| 4. | Zarqawi's operatives began to arrive in Afghanistan in large numbers in 1999 and "[s]ome of these operatives trained at al-Qaida's al-Faruq Camp, where they received full support from al-Qaida." | U.S. Department of Treasury, *Treasury Designates Six Al-Qaida Terrorists* (Sept. 24, 2003), *available at* *https://www.treasury.gov/press-center/press-releases/Pages/js757.aspx*; *see also* Global Security, *Al-Qaeda in Iraq* (June 13, 2014), *available at* https://www.globalsecurity.org/military/world/para/aqi-2.htm. [Reports cited in FR, at n. 6, 18.] |
| 5. | In October 2000, al-Zarqawi was indicted in absentia in Jordan for his role in the al-Qaida Millennium bombing plot targeting the Radisson SAS hotel in Ammam, among other targets. | U.S. Department of Treasury, *Treasury Designates Six Al-Qaida Terrorists* (Sept. 24, 2003), at 2, *available at* *https://www.treasury.gov/press-center/press-releases/Pages/js757.aspx*. [Report cited in FR, at n. 6.] |
| 6. | "[U]nder the regime of Saddam Hussein, [al-]Zarqawi and his network found refuge in Iraq and Zarqawi himself was treated in a Baghdad hospital." | U.S. Department of Treasury, *Treasury Designates Six Al-Qaida Terrorists* (Sept. 24, 2003), at 1, *available at* *https://www.treasury.gov/press-center/press-releases/Pages/js757.aspx*. [Report cited in FR, at n. 6.] |
| 7. | Al-Zarqawi's network also "established a poisons and explosives training camp in Northwest Iraq." | U.S. Department of Treasury, *Treasury Designates Six Al-Qaida Terrorists* (Sept. 24, 2003), at 1, *available at* *https://www.treasury.gov/press-center/press-releases/Pages/js757.aspx*. [Report cited in FR, at n. 6.] |
| 8. | Al-Zarqawi provided financial and material support for the October 28, 2002, assassination of U.S. diplomat Laurence Foley, an officer with U.S. Agency for International Development, which was planned and executed, in part, by al-Qaida. | U.S. Department of Treasury, *Treasury Designates Six Al-Qaida Terrorists* (Sept. 24, 2003), at 1-2, *available at* *https://www.treasury.gov/press-center/press-releases/Pages/js757.aspx*; *see also* United States Department of State, *2008 Country Reports on Terrorism: Chapter 6 Terrorist Organizations* (2008) at 26 (under section for "Al-Qa'ida in Iraq"), *available at* https://www.state.gov/j/ct/rls/crt/2008/122449.htm; *see also* United States Department of State, *2007 Country Reports on* |

| No. | Fact | Cite |
|-----|------|------|
|  |  | *Terrorism: Chapter 6 Foreign Terrorist Organizations* (2007) at 23 (under section for "Al-Qaida in Iraq (AQI)"), *available at* https://www.state.gov/j/ct/rls/crt/2006/82738.htm (hereinafter, "State Dept. 2007 Country Report on Terrorism"); *see also* United States Department of State, *2005 Country Reports, Chapter 6: Terrorist Groups*, at 36 (under section for "Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn (QJBR)"), *available at* https://www.state.gov/j/ct/rls/crt/45394.htm (hereinafter, "State Dept. 2005 Country Report on Terrorism"). [Reports cited in FR, at n. 3, 6, 10, 16, 17.] |
| 9. | Soon after U.S. forces arrived in Iraq with the commencement of Operation Iraqi Freedom, al-Zarqawi's network established cells in Iraq to "bring together jihadists and other insurgents in Iraq fighting against US and Coalition forces." | State Dept. 2005 Country Report on Terrorism at 36; *see also* State Dept. 2016 Country Report on Terrorism, at 27; *see also* ECF No. 49, at ¶¶ 3-4. [Reports cited in FR at n. 3, 10, 20, 24.] |
| 10. | By 2004, Al-Zarqawi's network was known primarily as Jama'at al-Tawhid wa-al Jihad. | United States Department of State, *Foreign Terrorist Organization: Designation of Jama'at al-Tawhid wa'al-Jihad and Aliases* (Oct. 15, 2004), *available at* https://2001-2009.state.gov/r/pa/prs/ps/2004/37130.htm; United Nations Security Council, *Security Council Committee Pursuant to Resolutions 1267 (1999) 1989 (2011) and 2253 (2015) Concerning ISIL (Da'esh) Al-Qaida and Associated Individuals Groups Undertakings and Entities* (Jan. 18, 2018), at 2, *available at* https://www.un.org/sc/suborg/en/sanctions/1267/aq_sanctions_list/summaries/entity/al-qaida-in-iraq; *see also* 69 Fed. Reg. 61292 (Oct. 15, 2004). [Reports cited in FR, at n. 7-9.] |
| 11. | In 2004, Jama'at al Tawhid wa'al-Jihad's "main goal [was] to undermine the establishment of a free and pluralistic Iraqi state by fomenting civil war in Iraq." | United States Department of State, *Foreign Terrorist Organization: Designation of Jama'at al-Tawhid wa'al-Jihad and Aliases* (Oct. 15, 2004), *available at* https://2001-2009.state.gov/r/pa/prs/ps/2004/37130.htm. [Report cited in FR, at n. 7-8.] |

| No. | Fact | Cite |
|---|---|---|
| 12. | By at least 2004, Jamaʻat al Tawhid waʼal-Jihad had "publicly admitted responsibility for the brutal abductions and videotaped executions of seven civilians," as well as "the assassinations of the former Iraqi Governing Council President, the governor of Mosul, and U.S. diplomat Laurence Foley. . . ." | United States Department of State, *Foreign Terrorist Organization: Designation of Jamaʻat al-Tawhid waʼal-Jihad and Aliases* (Oct. 15, 2004), *available at* https://2001-2009.state.gov/r/pa/prs/ps/2004/37130.htm. [Report cited in FR at n. 7-8.] |
| 13. | Jamaʻat al Tawhid waʼal-Jihad "specifically targets those Iraqi's attempting to rebuild their country and provide for its security.  Hundreds of innocent Iraqis have died and many hundreds more have been injured during the last year in the group's targeted bombings throughout Iraq – in Mosul, Baqouba, Falujah, Ramadi, Najaf, and Baghdad.  The group was also responsible for the U.N. headquarters bombing in Baghdad which killed U.N. Special Representative of the Secretary General for Iraq, Servio Vieira de Mello." | United States Department of State, *Foreign Terrorist Organization: Designation of Jamaʻat al-Tawhid waʼal-Jihad and Aliases* (Oct. 15, 2004), *available at* https://2001-2009.state.gov/r/pa/prs/ps/2004/37130.htm; *see also* United Nations Security Council, *Security Council Committee Pursuant to Resolutions 1267 (1999) 1989 (2011) and 2253 (2015) Concerning ISIL (Da'esh) Al-Qaida and Associated Individuals Groups Undertakings and Entities* (Jan. 18, 2018), at 2, *available at* https://www.un.org/sc/suborg/en/sanctions/1267/aq_sanctions_list/summaries/entity/al-qaida-in-iraq. [Reports cited in FR, at n. 7-9.] |
| 14. | In October 2004, al-Zarqawi publicly pledged his group's allegiance to bin Laden, and bin Laden publicly endorsed al-Zarqawi as al-Qaida's leader in Iraq. | ECF No. 49, at ¶ 4; *see also* United Nations Security Council, United Nations Security Council, *Security Council Committee Pursuant to Resolutions 1267 (1999) 1989 (2011) and 2253 (2015) Concerning ISIL (Da'esh) Al-Qaida and Associated Individuals Groups Undertakings and Entities* (Jan. 18, 2018), at 2, *available at* https://www.un.org/sc/suborg/en/sanctions/1267/aq_sanctions_list/summaries/entity/al-qaida-in-iraq; *see also* United States Department of State, *Addition of Al-Manar to the Terrorist Exclusion List* (Dec. 28, 2004) (On October 17, 2004, "Abu-Mus'ab al-Zarqawi pledged his group's allegiance to al-Qaida and its leader, Usama bin Laden."), *available at* https://2001-2009.state.gov/r/pa/prs/ps/2004/40081.htm. [Reports cited in FR at n. 9, 11, 13.] |

| No. | Fact | Cite |
|-----|------|------|
| 15. | Following this pledge, Zarqawi's group issued statements on October 20, 2004, on jihadist websites claiming responsibility for recent anti-U.S. attacks in Iraq. | United States Department of State, *Addition of Al-Manar to the Terrorist Exclusion List* (Dec. 28, 2004), *available at* https://2001-2009.state.gov/r/pa/prs/ps/2004/40081.htm; *see also* United States Department of State, State Dept. 2005 Country Report on Terrorism at 22; *see also* Global Security, *Al-Qaeda in Iraq* (June 13, 2014) at 3, *available at* https://www.globalsecurity.org/military/world/para/aqi-2.htm. [Reports cited in FR, at n. 3, 10, 11, 13, 18.] |
| 16. | Al-Qaida (a.k.a Usama Bin Ladin Organization) "[m]erged with Abu Musab al-Zarqawi's organization in Iraq in late 2004, with al-Zarqawi's group changing its name to 'Qa'idat al-Jihad fi Bilad al-Rafidayn' (al-Qa'ida in the Land of the Two Rivers)." | State Dept. 2005 Country Report on Terrorism at 18 (under section for "Al-Qa'ida a.k.a. Usama Bin Ladin Organization"); *see also* United Nations Security Council, *Security Council Committee Pursuant to Resolutions 1267 (1999) 1989 (2011) and 2253 (2015) Concerning ISIL (Da'esh) Al-Qaida and Associated Individuals Groups Undertakings and Entities* (Jan. 18, 2018), at 2, *available at* https://www.un.org/sc/suborg/en/sanctions/1267/aq_sanctions_list/summaries/entity/al-qaida-iniraq; ECF No. 49, at ¶ 4 (identifying that "al-Zarqawi's group adopted the name al-Qa'ida in Iraq ('AQI').""). [Report cited in FR at n. 3, 9-10.] |
| 17. | From the time of the October 2004 merger with al-Qaida and "continuing through the time the U.S. and coalition forces left Iraq in 2011, AQI conducted fatal terrorist attacks against those forces, even after al-Zarqawi was killed by an airstrike in June 2006." | ECF No. 49, at ¶ 4. |
| 18. | "[T]he organization continued to engage in terrorist activities and claimed responsibility for the October 24th [2004] massacre of 49 unarmed, out-of-uniform Iraqi soldiers and the October 26th [2004] kidnapping and beheading of Japanese citizen Shosei Koda." | United States Department of State, *Addition of Al-Manar to the Terrorist Exclusion List* (Dec. 28, 2004), *available at* https://2001-2009.state.gov/r/pa/prs/ps/2004/40081.htm. [Report cited in FR at n. 11, 13.] |

| No. | Fact | Cite |
|---|---|---|
| 19. | The group now known as ISIL claimed responsibility for the 2004 beheadings of three Americans, Nicholas Berg, Jack Armstrong, and Jack Hensley. | State Dept. 2007 Country Report on Terrorism at 23; *see also* United States Department of State, *Foreign Terrorist Organization: Designation of Jama'at al-Tawhid wa'al-Jihad and Aliases* (Oct. 15, 2004), *available at* https://2001-2009.state.gov/r/pa/prs/ps/2004/37130.htm. [Report cited in FR at n. 7-8, 17.] |
| 20. | By 2005, al-Qaida in Iraq had the "immediate goal" to "expel the Coalition -- through a campaign of bombings, kidnappings, assassinations, and intimidation -- and establish an Islamic state in Iraq." | State Dept. 2005 Country Report on Terrorism at 36. [Report cited in FR at n. 3, 10.] |
| 21. | "AQI increased its external operations in 2005 by claiming credit for three attacks: suicide bomber attacks against hotels in Amman on November 9; a rocket attack against U.S. Navy ships in the port of Aqaba in August . . ; and the firing of several rockets into Israel from Lebanon in December." | State Dept. 2007 Country Report on Terrorism at 23. [Report cited in FR at n. 17.] |
| 22. | "In an attempt to unify Sunni jihadists in Iraq, in January 2006, al-Qaida in Iraq (AQI) created the Mujahidin Shura Council, an umbrella organization meant to encompass the various Sunni jihadist groups in Iraq. AQI claimed its attacks under the MSC until mid-October, when Abu Musab al-Zarqawi's successor, Abu Ayyub al Masri, took the first step toward al-Qaida's goal of establishing a caliphate in the region by declaring the 'Islamic State of Iraq' (ISI), under which AQI now claims its attacks." | State Dept. 2007 Country Report on Terrorism at 23. [Report cited in FR at n. 17.] |
| 23. | After al-Zarqawi was killed in a U.S. airstrike on June 7, 2006, Zarqawi's successor, Abu Ayyub al-Masri, "issued a statement pledging to continue what Zarqawi had started, and AQI has continued its strategy of targeting Coalition Forces and Shi'a civilians in an attempt to foment sectarian strife." | State Dept. 2007 Country Report on Terrorism at 23; *see also* United Nations Security Council, *Security Council Committee Pursuant to Resolutions 1267 (1999) 1989 (2011) and 2253 (2015) Concerning ISIL (Da'esh) Al-Qaida and Associated Individuals Groups Undertakings and Entities* (Jan. 18, 2018), at 2 (identifying Zarqawi's death in June 2006), *available at* |

| No. | Fact | Cite |
|-----|------|------|
| | | https://www.un.org/sc/suborg/en/sanctions/1267/aq_sanctions_list/summaries/entity/al-qaida-in-iraq; *see also* ECF No. 49, at ¶4. [Report cited in FR at n. 9, 17.] |
| 24. | In October 2006, AQI publicly re-named itself the Islamic State of Iraq. | State Dept. 2013 Country Report on Terrorism, at 22. [Report cited in FR at n. 14.] |
| 25. | Al-Qaida in Iraq carried out several major international attacks in Iraq that were aimed at the U.S. and Coalition forces, including, but not limited to, an August 2003 bombing of the Jordanian Embassy in Baghdad, a vehicle-borne improvised explosive device attack against the UN headquarters in Baghdad, and suicide attacks inside the Green Zone perimeter in Baghdad. | State Dept. 2007 Country Report on Terrorism at 23; U.S. Department of Treasury, *Treasury Designates Six Al-Qaida Terrorists* (Sept. 24, 2003), at 2, *available at* https://www.treasury.gov/press-center/press-releases/Pages/js757.aspx. [Report cited in FR at n. 6 and 17.] |
| 26. | "As AQI, ISIS conducted numerous high profile attacks, including improvised explosive device attacks against U.S. military personnel and Iraqi infrastructure, videotaped beheadings of U.S. citizens, suicide bombings against both military and civilian targets, and rocket attacks." | State Dept. 2016 Country Report on Terrorism, at 28. [Report cited in FR at n. 20, 24.] |
| 27. | By April 2007, U.S. Department of State identified that "[a]lthough Coalition and Iraqi security force operations also have cost AQI dozens of lieutenants and high-ranking network members, overall violence in Iraq is at a higher level than it was while Zarqawi was alive." | State Dept. 2007 Country Report on Terrorism 23. [Report cited in FR at n. 17.] |
| 28. | AQI was responsible for the simultaneous attacks in July on prisons at al-Taji and Abu Ghraib[, near Baghdad,] that killed approximately 29 and freed hundreds of prisoners; a wave of bombings in Baghdad in August that killed approximately 52; and the September bombing of the Kurdistan Democratic Party's Directorate of Security headquarters in Irbil[, Iraq] that killed six.  On October 6, in Ninewa Province[, Iraq,] two Vehicle Borne Improvised Explosive Devices (VBIEDs) were | State Dept. 2013 Country Report on Terrorism, at 22; *see also* United States State Dept. 2005 Country Report on Terrorism at 23. [Report cited in FR at n. 3, 10, 14.] |

| No. | Fact | Cite |
|---|---|---|
| | detonated in the al-Aiyathiya neighborhood.  The first VBIED was detonated near an elementary school and the second one targeted an Iraqi Police checkpoint.  The attacks [injured many and] killed up to 13 school children and one Iraqi police officer."  "On October 17, near the end of Eid al-Adaha holiday, a suicide bomber detonated a VBIED in a Shabak minority neighborhood in eastern Mosul[, Iraq,] killing 15 … and wounding more than 50 others.  On December 23, five people were killed in a suicide bombing after armed AQI militants stormed a television complex in the city of Tikrit[, Iraq.]" | |
| 29. | Abu Bakr al-Baghdadi (a.k.a. Ibrahim Awwad Ibrahim Ali al-Badri, a.k.a. Abu Du'a) "is in charge of running AQI operations currently based in Iraq and is responsible for managing and directing large scale [terrorist] operations, such as the August 28, 2011 attack on the Umm al-Qura mosque in Baghdad, which killed prominent Sunni lawmaker Khalid al-Fahdawi." | United States Department of State, *Terrorist Designation of Ibrahim Awwad Ibrahim Ali al-Badri* (Oct. 4, 2011), *available at* https://2009-2017.state.gov/r/pa/prs/ps/2011/10/174971.htm; *see also* State Dept. 2016 Country Report on Terrorism, at 27. [Report cited in FR at n. 24.] |
| 30. | "In a statement eulogizing Usama Bin Laden, Abu Du'a threatened violent retaliation for bin Laden's death." | United States Department of State, *Terrorist Designation of Ibrahim Awwad Ibrahim Ali al-Badri* (Oct. 4, 2011), *available at* https://2009-2017.state.gov/r/pa/prs/ps/2011/10/174971.htm. [Report cited in FR at n. 19.] |
| 31. | "Three days after bin Laden's death, Abu Du'a claimed responsibility for an attack in Hilla, Iraq, that killed 24 policemen and wounded 72 others.  The group claimed 23 other attacks south of Baghdad between March and April 2011; all of these attacks have been carried out under Abu Du'a's guidance." | United States Department of State, *Terrorist Designation of Ibrahim Awwad Ibrahim Ali al-Badri* (Oct. 4, 2011), *available at* https://2009-2017.state.gov/r/pa/prs/ps/2011/10/174971.htm. [Report cited in FR at n. 19.] |

| No. | Fact | Cite |
|-----|------|------|
| 32. | "On August 15, 2011, a wave of AQI suicide attacks began in Mosul, Iraq, which has resulted in over 70 deaths. Shortly thereafter, AQI, under Abu Du'a's direction, pledged on its website to carry out 100 attacks across Iraq in retaliation for bin Laden's death. The statement claimed the campaign would include varied attacks, including raids, suicide attacks, roadside bombs and small arms attacks in all cities and rural areas across Iraq." | United States Department of State, *Terrorist Designation of Ibrahim Awwad Ibrahim Ali al-Badri* (Oct. 4, 2011), *available at* https://2009-2017.state.gov/r/pa/prs/ps/2011/10/174971.htm. [Report cited in FR at n. 19.] |
| 33. | In 2013, led by Abu Bakr al-Baghdadi (a.k.a. Abu Du'a), the group changed its name to the Islamic State in Iraq and al-Sham (ISIS, also referred to as ISIL). | ECF No. 49, at ¶ 5; *see also* State Dept. 2013 Country Report on Terrorism, at 22. [Report cited in FR at n. 14.] |
| 34. | Since 2013, ISIL "has continued to plot and execute attacks against U.S. persons and interests in Iraq, Syria, and the region. ISIL is directly responsible for the murder and beheading of at least four kidnapped American citizens in Syria and multiple fatal attacks against U.S. military personnel who were present in Syria and in Iraq (at the invitation of the Iraqi Government)." | ECF No. 49, at ¶ 5. |
| 35. | When ISIL took Fallujah and Ramadi they did so with "convoys of up to 100 trucks with mounted heavy machine guns and anti-aircraft guns flying the black flag of al-Qaeda." | Brett McGurk Testimony, United States Cong. House Comm. On Foreign Affairs, *Hearing on Al-Qaeda's Resurgence in Iraq: A threat to U.S. Interests*, p. 7 (February 5, 2014). 113th Cong., 2nd Sess. Washington: GOP, 2014 (testimony of Brett McGurk, Deputy Assistant Secretary for Iraq and Iran, Bureau of Near Eastern Affairs, U.S. Department of State) (hereinafter "McGurk Testimony"), *available at* https://www.gpo.gov/fdsys/pkg/CHRG-113hhrg86588/pdf/CHRG-113hhrg86588.pdf. [McGurk Testimony cited in FR at n. 22-23.] |

| No. | Fact | Cite |
|---|---|---|
| 36. | In January 2014, "ISIL fighters captured a group of Iraqi soldiers, paraded them around the city flying al-Qaeda's black flag and then executed them." | McGurk Testimony, at 8.  [McGurk Testimony cited in FR at n. 22-23.] |
| 37. | "In a rare audio statement, on January 21ˢᵗ [2014] ISIL's leader directed his fighters "to be on the front lines against the Shi'a and march toward Baghdad."  This audio statement also had "a direct message to the Americans:  Soon we will be in direct confrontation so watch for us for we are with you watching." | McGurk Testimony, at 8. [McGurk Testimony cited in FR at n. 22-23.] |
| 38. | "ISIL basically is al-Qaeda in Iraq.  Its leader was the al-Qaeda in Iraq leader since 2010." | McGurk Testimony, at 6.  [McGurk Testimony cited in FR at n. 22-23.] |
| 39. | On May 14, 2014, the U.S. Government amended its designation of al-Qaida in Iraq to identify the Islamic State of Iraq and the Levant ("ISIL") as the organization's primary name. | United States Department of State, *Terrorist Designations of Groups Operating in Syria* (May 14, 2014), *available at* https://2009-2017.state.gov/r/pa/prs/ps/2014/05/226067.htm. |
| 40. | "In June 2014, ISIS leader al-Baghdadi declared an Islamic caliphate." | State Dept. 2016 Country Report on Terrorism, at 27. [Report cited in FR at n. 20, 24.] |
| 41. | "ISIL split from al-Qa'ida in 2014.  This rift was prompted by theological and strategic disagreements and included claims from ISIL that it is the true executor of bin Laden's legacy, rather than al-Qa'ida's current leadership." | ECF No. 49, at ¶ 6. |
| 42. | Since the 2014 announced split, "[s]ome members and factions of al-Qa'ida-aligned groups . . . publicly declared allegiance to ISIL." | ECF No. 49, at ¶ 6. |
| 43. | "ISIL continues to denounce the United States as its enemy and to target U.S. citizens and interests worldwide." | ECF No. 49, at ¶ 6. |
| 44. | "In November 2015, ISIS carried out a series of coordinated attacks in Paris, France, including at a rock concert at the Bataclan concert hall, killing approximately 130 people and | State Dept. 2016 Country Report on Terrorism, at 29. [Report cited in FR at n. 20, 24.] |

| No. | Fact | Cite |
|---|---|---|
|  | injuring more than 350 others; 23-year-old U.S. citizen Nohemi Gonzalez was among the dead." |  |
| 45. | "In March [2016], ISIS carried out a suicide attack at a crowded park in Iskandariya, Iraq at the end of a football match, killing approximately 29 and wounding more than 60 others." | State Dept. 2016 Country Report on Terrorism, at 28. [Report cited in FR at n. 20, 24.] |
| 46. | "Also in March [2016], at least 60 people were killed in an attack claimed by ISIS in Hilla, Iraq when an explosives-laden fuel tanker ran into an Iraqi security checkpoint." | State Dept. 2016 Country Report on Terrorism, at 28. [Report cited in FR at n. 20, 24.] |
| 47. | "In early May 2016, two suicide car bombs claimed by ISIS killed 32 and wounded another 75 in Samawa, in southern Iraq. In mid-May, ISIS conducted a series of attacks in and around Baghdad, including suicide bombings and a car bombing at a crowded market in Sadr City that killed at least 88 people" | State Dept. 2016 Country Report on Terrorism, at 28. [Report cited in FR at n. 20, 24.] |
| 48. | "In July [2016], ISIS claimed a car bombing at a popular shopping center in Baghdad that killed nearly 300 people, making it the single deadliest bombing in Iraq's capital city since 2003." | State Dept. 2016 Country Report on Terrorism, at 28. [Report cited in FR at n. 20, 24.] |
| 49. | "In October, it was revealed that ISIS was using hundreds to thousands of Iraqi civilians as human shields. The group reportedly rounded up and massacred 284 men and boys before dumping their bodies in a mass grave in northern Mosul, Iraq." | State Dept. 2016 Country Report on Terrorism, at 28. [Report cited in FR at n. 20, 24.] |
| 50. | "In Iraq and Syria, ISIS's use of military equipment captured in the course of fighting gave the group greater capabilities in line with a more conventional military force, including the reported use of eastern bloc tanks, artillery, and self-developed unmanned aerial drones." | State Dept. 2016 Country Report on Terrorism, at 28. [Report cited in FR at n. 20, 24.] |

| No. | Fact | Cite |
|-----|------|------|
| 51. | "ISIS also directs, enables, and inspires individuals to conduct attacks and act on behalf of the group around the world, including in the United States and Europe." | State Dept. 2016 Country Report on Terrorism, at 29. [Report cited in FR at n. 20, 24.] |
| 52. | "In March 2016, ISIS directed two simultaneous attacks in Brussels, Belgium – one at the Zaventem Airport and the other at a metro station. The attacks killed 32 people, including four U.S. citizens, and injured more than 250 people." | State Dept. 2016 Country Report on Terrorism, at 29. [Report cited in FR at n. 20, 24.] |
| 53. | "In June 2016, a gunman who pledged allegiance to ISIS killed 49 individuals and injured 53 others at the Pulse nightclub in Orlando, Florida." | State Dept. 2016 Country Report on Terrorism, at 29. [Report cited in FR at n. 20, 24.] |
| 54. | "In July 2016, ISIS claimed an attack in which a cargo truck drove into a crowd in Nice, France, during Bastille Day celebrations, resulting in 86 deaths, including three U.S. citizens." | State Dept. 2016 Country Report on Terrorism, at 29. [Report cited in FR at n. 20, 24.] |
| 55. | "In December 2016, ISIS claimed responsibility for a truck attack on a crowded Christmas market in Berlin, Germany that killed 12 people and injured 48 others." | State Dept. 2016 Country Report on Terrorism, at 29. [Report cited in FR at n. 20, 24.] |
| 56. | In a September 2017 statement, ISIL emir Abu Bakr al-Baghdadi highlighted the group's continued intent on attacking the United States and its interests worldwide by specifically calling for attacks against the United States." | ECF No. 49, at ¶ 6. |
| 57. | ISIL occupied major cities in Iraq until driven out in 2017. | United Nations Sec. Council, *Sec. Council Comm. Pursuant to Resolutions 1267 (1999), 1989 (2011) and 2253 (2015) Concerning Islamic State in Iraq and the Levant (Da'esh), Al-Qaida and Associated Individuals, Groups, Undertakings, and Entities,* Twenty-first Report of the Analytical Support and Sanctions Monitoring Team, at 5, S/2018/14, (January 26, 2018) ("2018 UN Monitoring Report"), *available at* http://www.un.org/en/ga/documents/symbol.shtml |

| No. | Fact | Cite |
|-----|------|------|
|     |      | (cited in Respondent's Response in Support of Factual Return); *see also* McGurk Testimony, at 6.  [McGurk Testimony cited in FR at 20, 24.] |
| 58. | Recent U.N. reports note the possibility of "potential convergence" in some regions because "some members of both organizations have been willing and able to support each other in the preparation of [terrorist] attacks." | 2018 UN Monitoring Report at 4; *see also* United Nations Sec. Council, *Sec. Council Comm. Pursuant to Resolutions 1267 (1999), 1989 (2011) and 2253 (2015) Concerning Islamic State in Iraq and the Levant (Da'esh), Al-Qaida and Associated Individuals, Groups, Undertakings, and Entities*, Eighteenth Report of the Analytical Support and Sanctions Monitoring Team, at 5, S/2016/629 (July 19, 2016), *available at* http://www.un.org/en/ga/documents/symbol.shtml (cited in Respondent's Response in Support of Factual Return). |