UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE,<br><br>*Petitioner*,<br><br>v.<br><br>GEN. JAMES N. MATTIS,<br> in his official capacity as SECRETARY OF DEFENSE,<br><br>*Respondent*. | No. 17-cv-2069 (TSC) |

**PETITIONER'S REPLY TO RESPONDENT'S RESPONSE TO
PETITIONER'S RESPONSE TO FACTUAL RETURN**

# TABLE OF CONTENTS

I. The executive is not entitled to deference on its legal authority to detain. ................................... 1

II. Congress must clearly authorize Petitioner's detention. .................................................................. 4

III. Respondent has not established that ISIS was "part of" or an "associated force" of al Qaeda at the time of Petitioner's capture in September 2017 ........................................................ 7

IV. The president lacks "inherent authority" to detain Petitioner. ....................................................... 10

# TABLE OF AUTHORITIES

### Cases

*Al-Aulaqi v. Obama*,
  727 F. Supp. 2d 1 (D.D.C. 2010) ................................................................................................3

*Al-Aulaqi v. Panetta*,
  35 F. Supp. 3d 56 (D.D.C. 2014) .................................................................................................2

*\*Al-Bihani v. Obama*,
  590 F.3d 866 (D.C. Cir. 2010) .....................................................................................................2

*Al-Ginco v. Obama*,
  626 F. Supp. 2d 123 (D.D.C. 2009) .............................................................................................8

*Baker v. Carr*,
  369 U.S. 186 (1962) .....................................................................................................................3

*Boumediene v. Bush*,
  553 U.S. 723 (2008) ................................................................................................................ 1, 2

*Comm. of U.S. Citizens Living in Nicar. v. Reagan*,
  859 F.2d 929 (D.C. Cir. 1988) .....................................................................................................2

*DaCosta v. Laird*,
  471 F.2d 1146 (2d Cir. 1973) ......................................................................................................4

*Detweiler v. Pena*,
  38 F.3d 591 (D.C. Cir. 1994) .......................................................................................................4

*El-Shifa Pharm. Indus. Co. v. United States*,
  607 F.3d 836 (D.C. Cir. 2010) .....................................................................................................3

*Ex parte Endo*,
  323 U.S. 283 (1944) .....................................................................................................................4

*Ex parte Milligan*,
  71 U.S. (4 Wall.) 2 (1866) .........................................................................................................10

*Gherebi v. Obama*,
  609 F. Supp. 2d 43 (D.D.C. 2009) .............................................................................................10

*Hamdan v. Rumsfeld*,
  548 U.S. 557 (2006) .....................................................................................................................9

*\*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004) ............................................................................................................passim

*Hamlily v. Obama*,
  616 F. Supp. 2d 63 (D.D.C. 2009) .............................................................................................. 7, 10

*INS v. St. Cyr*,
  533 U.S. 289 (2001) ............................................................................................................................ 1

*Massachusetts v. Laird*,
  451 F.2d 26 (1st Cir. 1971) .............................................................................................................. 4

*Munaf v. Geren*,
  553 U.S. 674 (2008) ..................................................................................................................... 2, 3

*\*Padilla v. Rumsfeld*,
  352 F.3d 695 (2d Cir. 2003), *rev'd and remanded on other grounds*, 542 U.S. 426 (2004) ...................... 4, 5

*Parhat v. Gates*,
  532 F.3d 834 (D.C. Cir. 2008) ....................................................................................................... 9

*Rasul v. Bush*,
  542 U.S. 466 (2004) ........................................................................................................................... 3

*Sanchez-Espinoza v. Reagan*,
  770 F.2d 202 (D.C. Cir. 1985) ....................................................................................................... 4

*Smith v. Obama*,
  217 F. Supp. 3d 283 (D.D.C. 2016), *appeal pending*, No. 16-5377 (D.C. Cir. filed July 1, 2014) ......... 3

*Whitman v. Am. Trucking Ass'ns, Inc.*,
  531 U.S. 457 (2001) ............................................................................................................................ 5

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .......................................................................................................................... 10

**Statutes**

18 U.S.C. § 4001 ........................................................................................................................................ 4

2001 Authorization for Use of Military Force, Pub. L. 107-40, 115 Stat. 224 (2001)
  ("2001 AUMF") ................................................................................................................... passim

Authorization for Use of Military Force against Iraq Resolution of 2002, Pub. L. No.
  107-243, 116 Stat. 1498 (2002) ("2002 AUMF") ............................................................. passim

National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, 125 Stat.
  1298 (2012) ("2012 NDAA") ............................................................................................................ 6

**Other Authorities**

Gerald L. Neuman, *Jurisdiction and the Rule of Law after the 1996 Immigration Act*, 113 Harv. L. Rev. 1963 (2000) ...................................................................................................................1

*Hydra*, Britannica.com, https://www.britannica.com/topic/Hydra-Greek-mythology .........................9

Press Release, Sen. Ben Cardin, Cardin Statement on Authorization for Use of Military Force Against the Islamic State (Dec. 9, 2014), https://www.cardin.senate.gov/newsroom/press/release/cardin-statement-on-authorization-for-the-use-of-military-force-against-the-islamic-state ...................................3

*The Authorizations for the Use of Military Force: Administration Perspective*: *Hearing before the S. Comm. on Foreign Relations*, 115th Cong. (2017), https://www.foreign.senate.gov/hearings/watch?hearingid=2F070326-5056-A066-606C-530296B48DBE ................................................................................................................3

United Nations Sec. Council, *Twenty-First Report of the Analytical Support and Sanctions Monitoring Team*, S/2018/14/Rev.1 (Jan. 26, 2018) ..................................................................8

This Court is the first to be confronted with an exceedingly important question: can the executive indefinitely detain without charge a U.S. citizen member of ISIS, absent any statute specifically authorizing the use of force against that group? Because the government fails to establish the clear and unmistakable congressional authorization that the Constitution and federal law require for Petitioner's military detention, the answer is no. Petitioner respectfully asks this Court to order that the government either charge him with a crime in an Article III court or release him.

**I.      The executive is not entitled to deference on its legal authority to detain.**

The government concedes that "the political question doctrine does not preclude judicial review" in this case. Response ("Resp.") 6, ECF No. 74. Nonetheless, it cites a number of cases addressing non-justiciable political questions—almost all of which explicitly distinguish habeas actions, like this one, in which individual liberties are at stake—and argues that they favor granting "wide deference" to the executive's unilateral interpretations of congressional statutes and the Constitution. Resp. 4. The Court should reject this extreme argument.

Judicial review of the executive's legal authority to detain has been a quintessential function of habeas corpus for centuries. *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723, 740–41 (2008); *INS v. St. Cyr*, 533 U.S. 289, 301 (2001); *see also* Gerald L. Neuman, *Jurisdiction and the Rule of Law after the 1996 Immigration Act*, 113 Harv. L. Rev. 1963, 1965 (2000) ("[T]he fundamental historical purpose of the writ was to control unlawful executive detention, including executive detention without legal authority and executive detention in violation of legal restrictions."). Contrary to the government's suggestion, Resp. 4–8, courts have *never* deferred to the executive's unilateral determination of its legal authority to detain a citizen, even in wartime. Indeed, in *Hamdi*, the Supreme Court reviewed the executive's authority to detain a citizen as an enemy combatant, and it nowhere suggested any deference was due to the executive on this legal determination. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 516–21 (2004). The Court, moreover, "reject[ed] the Government's assertion that separation of

powers principles mandate a heavily circumscribed role for the courts" in determining the legality of a citizen's detention, even in the circumstances of an alleged battlefield capture—the same argument the government tries to revive here. *Id.* at 535.[1]

Contrary to the government's argument, neither *Boumediene* nor *Al-Bihani v. Obama*, 590 F.3d 866 (D.C. Cir. 2010), supports the government's claim of "wide deference" on its legal authority to detain Petitioner. *See* Resp. 6. As an initial matter, because neither case involved U.S. citizens, neither court needed to confront the effects of the Constitution's and the Non-Detention Act's clear-statement requirements. *See infra* Part II; *see* Petitioner's Response ("Traverse") 5–8, ECF No. 59. Further, *Boumediene*—a case that resolved a dispute between non-citizens' habeas rights and the executive's detention authority *in favor of the non-citizens*—did not address the "content of the law that governs petitioners' detention." 553 U.S. at 798. In fact, the Supreme Court even stressed that "[t]he habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain," *id.*; *see id.* at 788. And in *Al-Bihani*, the D.C. Circuit did not afford the executive any deference in reviewing petitioner's threshold legal claim that the particular group to which he allegedly belonged—the 55th Arab Brigade—fell outside the scope of the 2001 AUMF. 590 F.3d at 873. The passage from *Al-Bihani* on which the government relies, *see* Resp. 6, concerned the end of hostilities against the Taliban, and came *after* the court agreed that "the government's detention authority [had been] established as an initial matter." 590 F.3d at 874.[2]

---

[1] Courts have also rejected the government's political question argument in non-habeas cases involving the adjudication of individual rights. *See, e.g.*, *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 69–70 (D.D.C. 2014) (rejecting political question doctrine's application to *Bivens* action seeking remedy for missile strikes killing U.S. citizens because "[t]he Bill of Rights was passed to protect individuals from an overreaching government," even though the strikes "'implicate[d] foreign policy decisions'" (quoting *Comm. of U.S. Citizens Living in Nicar. v. Reagan*, 859 F.2d 929, 935 (D.C. Cir. 1988))).

[2] The government also briefly references the Supreme Court's decision in *Munaf v. Geren*, 553 U.S. 674 (2008), Resp. 7, which addressed a habeas challenge to transfer, not to detention. And the government's quoted passage related solely to a court's limited ability to "second-guess" the executive's *factual* determination about a risk of torture in a receiving country *after* the executive had

2

The government relies heavily on non-habeas cases addressing issues that—unlike habeas challenges to executive detention—are subject to the political question doctrine. *See* Resp. 5–6. But these same cases underscore that "the Constitution specifically contemplates a judicial role" in habeas cases challenging detention. *See, e.g.*, *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 848 (D.C. Cir. 2010); *accord Smith v. Obama*, 217 F. Supp. 3d 283, 303 n.17 (D.D.C. 2016) (noting the "traditional and appropriate judicial role" for judicial review of detention on habeas), *appeal pending*, No. 16-5377 (D.C. Cir. filed July 1, 2014); *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 49–50 (D.D.C. 2010) ("[T]he Suspension Clause reflects a 'textually demonstrable commitment' of habeas corpus claims to the Judiciary . . . ." (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962))).[3] The Court should reject the government's attempt to import deference from non-habeas cases through the back door.

Despite the inapplicability of the political question doctrine here, the government argues that "[j]udicial adjudication" of the executive's legal authority to detain Petitioner "is all the more inappropriate" because "Congress's support" for the executive's expansive interpretations of the 2001 and 2002 AUMFs in the form of spending and oversight measures "is clear." Resp. 8. But Congress's "support"—through appropriations bills or otherwise—is hardly clear,[4] and as the

---

established affirmative legal authority for a citizen's transfer. *Munaf*, 553 U.S. at 702.

[3] The government's argument for deference effectively seeks to relitigate its past argument that the executive's authority to detain "enemy combatants" is a "quintessentially military judgment." Resp't Br. 25, *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (No. 03-6696); *see also* Resp't Br. 47–50, *Rasul v. Bush*, 542 U.S. 466 (2004) (Nos. 03-334, 03-343). The Supreme Court decisively rejected that argument. *See Hamdi*, 542 U.S. at 531, 517–34 (2004) (plurality op.); *Rasul v. Bush*, 542 U.S. 466, 484 (2004).

[4] *The Authorizations for the Use of Military Force: Administration Perspective: Hearing before the S. Comm. on Foreign Relations*, 115th Cong. at 2:35:00 (2017) (statement of Sen. Rand Paul, Member, S. Comm. on Foreign Relations), https://www.foreign.senate.gov/hearings/watch?hearingid=2F070326-5056-A066-606C-530296B48DBE (discussing passing a new AUMF and stating that "[w]hile some would argue that we could just not appropriate money, that becomes very difficult, even in Vietnam, no one wanted to cut off the money because no one wants to be accused of not giving money to soldiers in the field. So our real, only chance of preventing war is not to initiate the war"); Press Release, Sen. Ben Cardin, Cardin Statement on Authorization for Use of Military Force Against the Islamic State (Dec. 9, 2014), https://www.cardin.senate.gov/newsroom/press/release/cardin-statement-on-authorization-for-the-use-of-military-force-against-the-islamic-state.

3

government acknowledges, these measures "do not *themselves* authorize the military campaign against" ISIS. Return ¶ 45, ECF No. 66-1. In any event, whatever "support" Congress may have shown fails to satisfy the clear-statement requirement for the detention of a U.S. citizen. *See infra* Part II; Traverse 33–35.[5]

## II.   Congress must clearly authorize Petitioner's detention.

The text of the Non-Detention Act is plain: "No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress." 18 U.S.C. § 4001(a).[6] Plain meaning is overcome only in the "rare cases" where "the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters." *Detweiler v. Pena*, 38 F.3d 591, 596 (D.C. Cir. 1994) (citation omitted). That is not the case here.

Searching for ambiguity, the government argues that "§ 4001(a) is silent on whether it applies to military wartime detentions abroad," Resp. 13. But the statute regulates *any* detention of citizens "by the United States," full stop.[7] If Congress meant to exclude the military from this

---

[5] The government cites then-Judge Ruth Bader Ginsburg's concurrence in *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985), which addressed a claim (dismissed as a non-justiciable political question) by Members of Congress that the president's lethal actions in Nicaragua had "deprived [them] of their right to participate in the decision to declare war in violation of the war powers clause of the Constitution," *id.* at 210. But *Justice* Ginsburg joined Justice Souter's *Hamdi* concurrence—which the government conspicuously fails to address—rejecting the argument that funding measures can authorize the detention of U.S. citizens. *See* 542 U.S. at 547 (Souter, J., concurring in part and dissenting in part). Like *Sanchez-Espinoza*, the other cases cited by the government, which both unsuccessfully challenged the legality of the war in Vietnam, involved non-justiciable political questions—unlike the detention of a U.S. citizen. *See* Resp. 9 (citing *Massachusetts v. Laird*, 451 F.2d 26 (1st Cir. 1971); *DaCosta v. Laird*, 471 F.2d 1146 (2d Cir. 1973)),

[6] This clear-statement requirement is also rooted in the Constitution. *See* Traverse 5–6 (citing, *inter alia*, *Ex parte Endo*, 323 U.S. 283 (1944)). The government tries to distinguish the circumstances in *Endo* and those here by focusing on the fact that the detention in *Endo* was domestic and carried out by a "civilian agency." Resp. 12 n.14. But, as here, *Endo* concerned wartime authorities passed in a time of crisis in an effort to protect national security. *See* 323 U.S. at 300–01.

[7] *See Padilla v. Rumsfeld*, 352 F.3d 695, 718–19 (2d Cir. 2003) ("We read the plain language of section 4001(a) to prohibit all detentions of citizens . . . . Not only has the government not made an extraordinary showing of contrary intentions, but the legislative history of the . . . Act is fully consistent with our reading of it." (citation omitted)), *rev'd and remanded on other grounds*, 542 U.S. 426

4

protection, it certainly could—and would—have said so. *See Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) (Congress "does not . . . hide elephants in mouseholes."). It did not.

The government further argues that "[t]he structure and statutory placement of the provision in Title 18, Part III . . . shows that it pertains solely to the detention of American citizens by *civilian* authorities." Resp. 13. To make the same point, the government cites the Act's legislative history, which it argues "confirms [the Act] was aimed solely at civil detentions" because "[t]he law's purpose was to prevent a repeat of the Japanese–American internment camps of World War II," which were operated by "a civilian agency." Resp. 13 (citations omitted). But the legislative history actually discredits the government's theory. *See Hamdi*, 542 U.S. at 545–46 (Souter, J., concurring in part and dissenting in part) ("placement in Title 18 was not meant to render the statute more restricted than its terms"); Traverse 7–8 & n.3. And as referenced above, *see supra* at 5 n.6, the internment camps that helped motivate the Non-Detention Act's passage were a wartime measure ordered by the military, and the Act's legislative history shows that Congress understood the statute to cover military as well as civil detentions.[8]

The government additionally argues that if this Court concludes that a clear congressional statement authorizing the military detention of U.S. citizen members of ISIS is required, *Hamdi* dictates that the 2001 and 2002 AUMFs provide the requisite statement. Resp. 14. But that is not so; the *Hamdi* plurality found only that the 2001 AUMF authorized the detention of individuals "who

---

(2004).

[8] *See Padilla*, 352 F.3d at 718–19 ("Both the sponsor of the Act and its primary opponent repeatedly confirmed that the Act applies to detention by the President during war and other times of national crisis. . . . This context convinces us that military detentions were intended to be covered."); *Hamdi*, 542 U.S. at 598 n.2 (Souter, J., concurring in part and dissenting in part) ("Nor is it possible to distinguish between civilian and military authority to detain based on the congressional object of avoiding another *Korematsu v. United States* . . . . Although a civilian agency authorized by Executive order ran the detention camps, the relocation and detention of American citizens was ordered by the military under authority of the President as Commander in Chief. The World War II internment was thus ordered under the same Presidential power invoked [in *Hamdi*] and the intent to bar a repetition goes to the action taken and authority claimed here." (citations omitted)).

5

fought against the United States in Afghanistan as part of the Taliban, an organization known to have supported the al Qaeda terrorist network responsible for those attacks." 542 U.S. at 518.

Because detention was necessarily included in the authorization to use "all necessary and appropriate force," the relevant question for the plurality was *not* whether the AUMF "clearly and unmistakably" authorized the detention of U.S. citizens. *See id.* at 519. It was whether Congress had clearly authorized the use of force against alleged Taliban fighters like Hamdi. *Id.* at 518. Finding that "[t]here can be no doubt" that individuals such as Hamdi "are individuals Congress sought to target in passing the AUMF," *id.*, the plurality concluded that Congress had clearly and unmistakably authorized the use of force against—and therefore, the detention of—such individuals. *Id.* at 519. Here, by contrast, the same is not true with respect to U.S. citizen members of ISIS.

The government's theory is that both AUMFs "clearly and unmistakably" cover ISIS even though ISIS had nothing to do with the 9/11 attacks, did not exist at the time of the attacks, and has nothing to do with the Saddam Hussein regime, *see* Traverse 29–33. Especially given the pains the *Hamdi* plurality took to cabin its ruling to the "narrow circumstances" presented, 542 U.S. at 519, the government has pointed to nothing in that case suggesting that the Supreme Court's already-fractured outcome would have been the same had the Court been considering the detention of an alleged member of a group unrelated to the 9/11 attacks. Nor can the government properly rely on the 2012 NDAA to bolster its argument: far from clearly and unmistakably authorizing the detention of U.S. citizens, the statute expressly disavows having any effect on the "existing law or authorities relating to the detention of United States citizens." National Defense Authorization Act for Fiscal Year 2012 § 1021(e), Pub. L. No. 112-81, 125 Stat. 1298 (2012) ("2012 NDAA"); *see also* Traverse 34 (other funding and oversight provisions cited by the government fail to mention detention at all).

In a last-ditch effort to avoid the clear-statement requirement, the government argues that "the President's authority to detain U.S. citizen enemy combatants" cannot be "less than coextensive

6

with the AUMFs' authorizations of force." Resp. 15 n.19. But the Non-Detention Act and the Constitution both dictate a different rule for U.S. citizens, and the 2012 NDAA's express terms, at a minimum, contemplate the possibility of the same. Moreover, because the *Hamdi* plurality found that the detention of U.S. citizen members of the Taliban captured on a battlefield under the 2001 AUMF satisfied the clear-statement rule, 542 U.S. at 519, whatever the *Hamdi* plurality said about detention being an "incident to war," *id.* at 518, it did not have occasion to apply that principle when it conflicted with the rights of U.S. citizens, as it does here. And importantly, finding that the executive lacks authority to detain Petitioner under the AUMFs would not leave the military "without recourse when confronted with a U.S. citizen fighting against it on a battlefield," Resp. 15 n.19; the executive retains authority to capture and prosecute such citizens, *see* Traverse 35–36.

III. **Respondent has not established that ISIS was "part of" or an "associated force" of al Qaeda at the time of Petitioner's capture in September 2017.**

By failing to contest the D.C. Circuit case law that establishes that the relevant time period for purposes of Petitioner's detention under the 2001 AUMF is the time of his capture in September 2017, *see* Traverse 15–17, 24–25, the government has conceded it. As a result, the government's new assertions concerning al Qaeda's relationship with ISIS many years *prior to* Petitioner's capture, *see* Resp. 2–3 & Appendix, are irrelevant. As to whether ISIS was "part of" or an "associated force" of al Qaeda at the time of Petitioner's capture, the government's argument remains unpersuasive.

First, the government continues to find relevant the fact that "the split between" the groups "resulted in part from ISIL's claim that *it*—and not al-Qaida's current leadership—is the true executor of bin Laden's legacy." Resp. 3; Return ¶ 28. But Petitioner has already explained why that claim does not render Petitioner detainable under the 2001 AUMF. *See* Traverse 14–17. The government's Response does not cite or confront a single case Petitioner cited on that point. *See, e.g.*, Traverse 24–25 (citing, *inter alia*, *Hamlily v. Obama*, 616 F. Supp. 2d 63, 75 n.17 (D.D.C. 2009)); *Al*

7

*Ginco v. Obama*, 626 F. Supp. 2d 123, 128–29 (D.D.C. 2009)).[9] And the government's argument is inconsistent with a different argument offered by the government: that "the intent of an opposing force" cannot bear on the "scope of an authorization for use of military force." Resp. 10 n.11.[10]

Second, the only additional evidence the government offers in its Response concerning the organizations' relationship at the relevant time period undercuts it. The government argues that a recent U.N. report supports the idea that "[o]perationally, the two organizations remain engaged to achieve common goals through hostilities against the United States and its coalition partners." Resp. 3. But the report merely states that certain "Member States" have "highlighted that some *members* of both organizations have been willing and able to support each other in the preparation of attacks," such that there is a "*potential convergence* of both networks" as "a *potential new* threat."[11] And elsewhere, the government has acknowledged the critical difference between concluding that individuals belong to two groups and that two groups are one and the same. *See* Traverse 14 n.6.

Third, the government argues that Petitioner relies on an "improper, narrowly circumscribed definition of 'associated force' under the AUMF." Resp. 10 n.10. But Petitioner's argument is based

---

[9] Respondent for the first time describes the relationship between ISIS and al Qaeda as a "formal merger." Resp. 2, 3 n.4. But while the government weakly supports that conclusion by referencing leaders' "pledges of loyalty," Resp. 2, and status as "associate[s] of Osama bin Laden *before* 9/11," Resp. 3 n.3 (emphasis added), Respondent has not even attempted to allege anything close to the kind of evidence the D.C. Circuit has required before finding that a group has a sufficient relationship to al Qaeda or the Taliban to qualify as an "associated force" under the 2001 AUMF. *See* Traverse 25. Nor has Respondent ever alleged that ISIS, or any group the government has deemed a clear predecessor to it, knew about or was involved in the September 11 attacks. *See* Traverse 9–13.

[10] To be clear, Petitioner did *not* "suggest[] that the Court must strike down the President's determination [concerning ISIS's relationship with al Qaeda] *unless* Respondent can demonstrate . . . 'gamesmanship' aimed at manipulating the scope of the AUMFs," Resp. 10 n.11. Rather, the government argued that ISIS was "part of" or an "associated force" of al Qaeda in September 2017 because "[a] contrary interpretation . . . would allow an enemy force to manipulate the scope of the 2001 AUMF by splintering into rival factions while continuing to prosecute the same conflict against the United States." Return ¶ 28; Resp. 10 (worrying over "a shell game that enemies can exploit"). Petitioner merely pointed out that no such concern applied here. *See* Traverse 26 n.13.

[11] United Nations Sec. Council, *Twenty-First Report of the Analytical Support and Sanctions Monitoring Team*, S/2018/14/Rev.1, at 5 (Jan. 26, 2018) (emphases added).

8

on D.C. Circuit law. *See* Traverse 21–22. Contrary to the government's argument, *Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008), clearly addressed the term "associated forces," *id.* at 844. Further, while Petitioner does not dispute that the D.C. Circuit considers whether groups qualify as associated forces under a "commonsense, functional standard," Resp. 10 n.10, he has explained that ISIS is nothing like the groups the appellate court has found to meet that standard. *See* Traverse 21–22.

Finally, the government defends its interpretation of its detention authority on policy grounds. Perhaps having realized that its prior concessions that ISIS and al Qaeda "split" by at the latest 2014 and have since been "entirely independent" from one another, Return ¶ 18 & n.23, are fatal to its argument concerning the reach of the 2001 AUMF under D.C. Circuit law, *see* Traverse 15–18, 20–28, the government now claims that Petitioner is "oversimplif[ying] . . . ISIL's history," Resp. 9. But here, Petitioner has accepted *Respondent's* history, which acknowledges the "split between ISIL and al-Qaida." Resp. 9. The government argues that the "need to respond to unforeseen developments like the split . . . is *why* the Executive has broad discretion to determine who to target under the AUMFs." Resp. 9–10. But in passing the 2001 AUMF, Congress specifically rejected the executive's request for this kind of elastic and open-ended authority. *See* Traverse 10–13.[12] Should the executive believe that such broader and more flexible authority is necessary, "[n]othing prevents [it] from returning to Congress to seek" it, *Hamdan v. Rumsfeld*, 548 U.S. 557, 636 (2006) (Breyer, J., concurring). *See* Traverse 28 n.15 (Congress elsewhere enacted measures to allow the executive "to address newly developed terrorist threats.").

---

[12] Congress did not grant the executive the authority to "battle"—indefinitely and at its own discretion—"two [or more] heads of a modern day Lernaean Hydra." Resp. 10; *see Hydra*, Britannica.com, https://www.britannica.com/topic/Hydra-Greek-mythology (nine-headed Hydra of Greek mythology regenerated heads "as soon as one head was cut off"). Not even the government argues that al Qaeda and ISIS have a common origin. *See, e.g.*, Resp. 3 n.3 (among 31 aliases for ISIS, "al Qaeda" is not one of them). Rather, the government's theory is that—at some point after the 2001 AUMF's passage—a predecessor organization of ISIS became associated with al Qaeda. Thus, even if the 2001 AUMF *does* authorize the executive to battle two heads of the same beast, al Qaeda and ISIS are two different beasts that only temporarily aligned.

9

## IV. The president lacks "inherent authority" to detain Petitioner.

The government continues to press the radical proposition that the president has "inherent authority" to detain indefinitely U.S. citizens allegedly captured on a battlefield. Resp. 11 n.12. But the government does not cite a single decision upholding the detention of a U.S. citizen on this basis, and it ignores the fact that the prior administration abandoned this position. *See Gherebi v. Obama*, 609 F. Supp. 2d 43, 53 & n.4 (D.D.C. 2009); *Hamlily*, 616 F. Supp. 2d at 66 n.1. As explained previously, *see* Traverse 36–40, this Court should reject the government's effort to resurrect this extraordinarily dangerous claim of executive power.

Petitioner agrees with Respondent that this case does *not* present the question whether the President may rely on his Article II authority to "defend the Nation when it is attacked" or "deploy troops in Iraq, Syria, or elsewhere." Resp. 11 n.12. This case presents only the narrow question whether, once the U.S. government has taken custody of a U.S. citizen, it may continue to detain him indefinitely as an "enemy combatant." Whatever "inherent authority" the president might have to seize a U.S. citizen on a battlefield, he possesses no such authority to extend that detention indefinitely at his discretion. *Cf. Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 127 (1866) ("As necessity creates the rule, so it limits its duration."). The requirement of congressional authorization to detain a citizen is not satisfied by a mere procedural opportunity to assert a habeas claim, *see* Resp. 11 n.12; a valid suspension of the writ is the sole means by which a President can indefinitely detain a citizen without positive congressional authorization for that detention, *see* Traverse 39–40; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).

\* \* \*

For the foregoing reasons, and for those stated previously, the Court should grant the Petition for a Writ of Habeas Corpus and order the Petitioner's release from unlawful U.S. custody.

Dated:  March 14, 2018                              Respectfully submitted,

                                                    */s/ Jonathan Hafetz*

Arthur B. Spitzer (D.C. Bar No. 235960)             Jonathan Hafetz (D.C. Bar No. NY0251)
American Civil Liberties Union                      Brett Max Kaufman (D.C. Bar No. NY0224)
  of the District of Columbia                       Hina Shamsi (D.C. Bar No. MI0071)
915 15th Street, NW, 2nd Floor                      Dror Ladin (*pro hac vice*)
Washington, DC 20005                                Anna Diakun
Tel: 202-457-0800                                   American Civil Liberties Union Foundation
Fax: 202-457-0805                                   125 Broad Street—18th Floor
aspitzer@acludc.org                                 New York, NY 10004
                                                    Tel: 212-549-2500
Hope R. Metcalf (*pro hac vice*)                    Fax: 212-549-2654
127 Wall Street                                     jhafetz@aclu.org
New Haven, CT 06511                                 bkaufman@aclu.org
Tel: 203-432-9404                                   hshamsi@aclu.org
Fax: 203-432-8260                                   dladin@aclu.org
hope.metcalf@yale.edu                               adiakun@aclu.org

*Counsel for Petitioner*

11