# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOHN DOE,<br><br>*Petitioner*,<br><br>v.<br><br>GEN. JAMES N. MATTIS,<br> in his official capacity as SECRETARY OF<br> DEFENSE,<br><br>*Respondent*. | No. 17-cv-2069 (TSC) |

## <u>PETITIONER'S NOTICE OF FILING PUBLIC REDACTED VERSION OF ECF 81</u>

NOTICE is hereby given that attached are redacted versions, suitable for public filing, of the document filed on April 18, 2018, as ECF No. 81, and all attachments thereto.

Dated:  April 18, 2018

Respectfully submitted,

/s/ *Jonathan Hafetz*

| | |
|---|---|
| Arthur B. Spitzer (D.C. Bar No. 235960)<br>American Civil Liberties Union<br>  of the District of Columbia<br>915 15th Street, NW, 2nd Floor<br>Washington, DC 20005<br>Tel: 202-457-0800<br>Fax: 202-457-0805<br>aspitzer@acludc.org | Jonathan Hafetz (D.C. Bar No. NY0251)<br>Brett Max Kaufman (D.C. Bar No. NY0224)<br>Hina Shamsi (D.C. Bar No. MI0071)<br>Dror Ladin (*pro hac vice*)<br>Anna Diakun<br>American Civil Liberties Union Foundation<br>125 Broad Street—18th Floor<br>New York, New York 10004<br>Tel: 212-549-2500<br>Fax: 212-549-2654<br>jhafetz@aclu.org<br>bkaufman@aclu.org<br>hshamsi@aclu.org<br>dladin@aclu.org<br>adiakun@aclu.org |

*Counsel for Petitioner*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOHN DOE,

    *Petitioner*,

    v.           No. 17-cv-2069 (TSC)

GEN. JAMES N. MATTIS,
 in his official capacity as SECRETARY OF
 DEFENSE,

    *Respondent*.

# ECF 81

# REDACTED VERSION FOR PUBLIC FILING

~~UNDER SEAL~~

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN DOE,

*Petitioner*,

v.

GEN. JAMES N. MATTIS,
  in his official capacity as SECRETARY OF
  DEFENSE,

*Respondent*.

No. 17-cv-2069 (TSC)

## APPLICATION FOR A TEMPORARY RESTRAINING ORDER
## AND MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65.1, Petitioner John Doe

hereby applies for the issuance of a temporary restraining order and moves for a preliminary

injunction prohibiting Respondent (along with his respective successors in office, officers,

agents, servants, employees, and anyone acting in concert with him) from, *inter alia*, transferring

Petitioner from U.S. custody to the custody of █████████████████ until such time that

the government has demonstrated to the Court positive legal authority for the transfer.

This motion is based on the memorandum of points and authorities submitted herewith,

as well as all declarations, pleadings, and other filings submitted in this action. The grounds for

this application are that a forcible transfer to ████████ custody would violate Petitioner's

constitutional and statutory rights. Respondent should not be allowed to pretermit Petitioner's

habeas action seeking his release from unlawful detention by forcibly transferring him to █████

███████ without positive legal authority for the transfer. Additionally, Petitioner will suffer

irreparable injury if Respondent is not enjoined, and the harms Petitioner will suffer absent an

injunction far outweigh the harms to Respondent if a temporary restraining order or preliminary injunction issues. Finally, the public interest favors the issuance of a temporary restraining order or preliminary injunction.

Dated:  April 18, 2018                                     Respectfully submitted,

                                                          /s/ Jonathan Hafetz

Arthur B. Spitzer (D.C. Bar No. 235960)          Jonathan Hafetz (D.C. Bar No. NY0251)
American Civil Liberties Union                   Brett Max Kaufman (D.C. Bar No. NY0224)
  of the District of Columbia                    Hina Shamsi (D.C. Bar No. MI0071)
915 15th Street, NW, 2nd Floor                   Dror Ladin (*pro hac vice*)
Washington, DC 20005                             Anna Diakun
Tel: 202-457-0800                                American Civil Liberties Union Foundation
Fax: 202-457-0805                                125 Broad Street—18th Floor
aspitzer@acludc.org                              New York, New York 10004
                                                 Tel: 212-549-2500
                                                 Fax: 212-549-2654
                                                 jhafetz@aclu.org
                                                 bkaufman@aclu.org
                                                 hshamsi@aclu.org
                                                 dladin@aclu.org
                                                 adiakun@aclu.org

*Counsel for Petitioner*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOHN DOE,

                *Petitioner*,

          v.

GEN. JAMES N. MATTIS,
  in his official capacity as SECRETARY OF
  DEFENSE,

                *Respondent*.

No. 17-cv-2069 (TSC)

# ECF 81-1

# REDACTED VERSION FOR PUBLIC FILING

UNDER SEAL

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN DOE,<br><br>               *Petitioner*,<br><br>               v.<br><br>GEN. JAMES N. MATTIS,<br>  in his official capacity as SECRETARY OF<br>  DEFENSE,<br><br>               *Respondent*. | No. 17-cv-2069 (TSC) |

**PETITIONER'S MEMORANDUM IN SUPPORT OF HIS**
**APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND**
**MOTION FOR A PRELIMINARY INJUNCTION**

~~UNDER SEAL~~

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND .................................................................................... 3

   1.  The government's military detention of Petitioner and the habeas petition filed on his behalf. ............................................................................................................. 3

   2.  The government's repeated efforts to block this habeas challenge; this Court's order permitting counsel access. ..................................................................... 4

   3.  This Court's order requiring 72 hours' notice before transfer of Petitioner. .................... 5

   4.  The government's appeal. ............................................................................ 6

   5.  The government's notice of intent to transfer. ................................................. 7

ARGUMENT ..................................................................................................... 8

   I.  Petitioner is likely to succeed on the merits of his claim that his forcible transfer to ▮▮▮▮▮▮▮ would be unlawful. ....................................................................... 8

      A.  The executive does not have the prerogative to transfer U.S. citizens to foreign jurisdictions without positive legal authority. .......................................... 10

      B.  Neither Supreme Court nor D.C. Circuit precedent supports the government's position. ........................................................................................... 14

         1.  The Supreme Court's decision in *Munaf* is far narrower than the government suggests and does not provide the government with any legal authority to transfer Petitioner to ▮▮▮▮▮▮. ................................................................ 14

         2.  *Kiyemba II* does not provide any legal authority for the government to transfer Petitioner to ▮▮▮▮▮▮. ................................................................ 21

   II.  Petitioner will suffer irreparable injury unless Respondent is enjoined from transferring Petitioner to ▮▮▮▮▮▮. ...................................................................... 23

   III.  The balance of harms strongly favors Petitioner. .............................................. 25

   IV.  A temporary restraining order or preliminary injunction serves the public interest. ......... 29

CONCLUSION .................................................................................................. 30

~~UNDER SEAL~~

## TABLE OF AUTHORITIES

**Cases**

*Boumediene v. Bush*,
    553 U.S. 723 (2008)..................................................................................... 15, 34

*Bowen v. Johnston*,
    306 U.S. 19 (1939)........................................................................................... 33

*Cornejo-Barreto v. Siefert*,
    379 F.3d 1075 (9th Cir. 2004), *vacated on reh'g as moot*, 389 F.3d 1307 (9th Cir. 2004)...... 32

*Council v. Clemmer*,
    165 F.2d 249 (D.C. Cir. 1947)......................................................................... 28

*Davenport v. Int'l Brotherhood of Teamsters*,
    166 F.3d 356 (D.C. Cir. 1999)........................................................................... 8

*Dhiab v. Trump*,
    852 F.3d 1087 (D.C. Cir. 2017)....................................................................... 28

*Doe v. Mattis*,
    No. 18-5032 (D.C. Cir. filed Feb. 2, 2018)......................................................... 7

*Factor v. Laubenheimer*,
    290 U.S. 276 (1933)........................................................................................ 12

*Giovani Carandola, Ltd. v. Bason*,
    303 F.3d 507 (4th Cir. 2002) .......................................................................... 31

*Gouveia v. Vokes*,
    800 F. Supp. 241 (E.D. Pa. 1992) ............................................................... 12, 33

*\*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004)................................................................................. passim

*In re Kaine*,
    55 U.S. (14 How.) 103 (1852) ......................................................................... 12

*In re Navy Chaplaincy*,
    697 F.3d 1171 (D.C. Cir. 2012) ...................................................................... 30

*In re Territo*,
    156 F.2d 142 (9th Cir. 1946) .......................................................................... 15

*Kiyemba v. Obama* (*Kiyemba II*),
    561 F.3d 509 (D.C. Cir. 2009) .................................................................. passim

UNDER SEAL

*Los Angeles v. Lyons,*
461 U.S. 95 (1983) ................................................................................................ 27

*Matter of Extradition of Liuksila,*
74 F. Supp. 3d 4 (D.D.C. 2014) .......................................................................... 32

*Matter of Extradition of Santos,*
228 F. Supp. 3d 1034 (C.D. Cal. 2017) .......................................................... 12, 33

*Munaf v. Geren,*
553 U.S. 674 (2008) ...................................................................................... passim

*Newsom ex rel. Newsom v. Albemarle Cty. School Bd.,*
354 F.3d 249 (4th Cir. 2003) ............................................................................... 31

*\*Omar v. McHugh,*
646 F.3d 13 (D.C. Cir. 2011) .......................................................... 1, 11, 14, 17

*Preiser v. Rodriguez,*
411 U.S. 475 (1973) .............................................................................................. 28

*Qassim v. Bush,*
466 F.3d 1073 (D.C. Cir. 2006) .......................................................................... 29

*Rasul v. Bush,*
542 U.S. 466 (2004) .............................................................................................. 15

*Reid v. Covert,*
354 U.S. 1 (1954) .................................................................................................. 14

*Republic of France v. Moghadam,*
617 F. Supp. 777 (N.D. Cal. 1992) .................................................................. 12, 33

*Sherley v. Sebelius,*
644 F.3d 388 (D.C. Cir. 2011) ............................................................................... 8

*Singh v. Carter,*
168 F. Supp. 3d 216 (D.D.C. 2016) ....................................................................... 8

████████████████████████
████████████████ .......................................................................................... 19

*Tuan Anh Nguyen v. INS,*
533 U.S. 53 (2001) ................................................................................................ 22

*United States v. Doherty,*
786 F.2d 491 (2d Cir. 1986) ................................................................................ 33

iv

~~UNDER SEAL~~

*Valentine v. United States ex rel. Neidecker*,
   299 U.S. 5 (1936)..........................................................................................passim

*Wilson v. Girard*,
   354 U.S. 524 (1957).............................................................................9, 18, 22

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)...........................................................................................passim

*Worthy v. United States*,
   328 F.2d 386 (5th Cir. 1964) ....................................................................... 23

## Statutes

18 U.S.C. § 3181 ............................................................................................... 10

18 U.S.C. § 3184 ............................................................................................... 28

28 U.S.C. § 2241 ............................................................................................... 12

## Other Authorities

Charlie Savage, Eric Schmitt & Adam Goldman, *Officials Weigh Sending American
   Detainee to Saudi Arabia*, N.Y. Times, Dec. 20, 2017, https://nyti.ms/2De9Yqh..................... 4

Dana Priest, Devlin Barrett & Matt Zapotsky, *Case of Suspected American ISIS Fighter
   Captured in Syria Vexes U.S.*, Wash. Post, Oct. 29, 2017, http://wapo.st/2towMmr................. 4

████████████████████████████████████████████████
   98th Cong. ████ (1983) ........................................................................ 11

M. Cherif Bassiouni, *International Extradition: United States Law and Practice*
   (6th ed. 2014) ................................................................................................ 10

Restatement (Fourth) of Foreign Relations Law of the United States—Jurisdiction
   (Am. Law Inst. Draft No. 1, 2016) .................................................... 17, 18

U.S. Dep't of State, *Country Reports on Human Rights Practices for 2016:* ████
   ████ (2016).................................................................................................. 11

U.S. Dep't of State, The Global Coalition to Defeat ISIS: Partners,
   https://www.state.gov/s/seci/c72810.htm .................................................. 16

<u>**UNDER SEAL**</u>

**PRELIMINARY STATEMENT**

Petitioner John Doe, a United States citizen, seeks a temporary restraining order ("TRO")

or a preliminary injunction to prohibit the United States government from forcibly and

involuntarily transferring him to the custody of ████████████████. This Court has

already issued an injunction requiring the government to provide 72 hours' notice before forcibly

transferring Petitioner to another country. *See* ECF Nos. 51 & 52. The government provided such

notice on the evening of April 16, 2018, informing the Court and Petitioner's counsel that "the

United States intends to relinquish custody of Petitioner John Doe . . . to ████████████

████ no sooner than 72 hours hence." *See* ECF No. 77 (sealed).

For effectively the same reasons that the Court entered its 72-hour notice injunction in

January, the Court should now enjoin Petitioner's transfer to ████████. In January, the

question before the Court was whether there was a likelihood of success on the merits of

Petitioner's claim that he could not be involuntarily transferred to another country absent judicial

review and absent positive legal authority. The Court answered that question in the affirmative,

finding that Respondent had not "present[ed] 'positive legal authority' for his transfer." ECF No.

51 at 4 (quoting *Omar v. McHugh*, 646 F.3d 13, 24 (D.C. Cir. 2011)). Now, the question before

the Court is whether there is a likelihood of success on the merits of Petitioner's claim that he

cannot be involuntarily transferred to ████████ absent positive legal authority. Because

Respondent has still not pointed to *any* positive legal authority for Petitioner's transfer (to any

country, including ████████), the Court should answer in the affirmative once again, and

thereby allow Petitioner to continue to seek his release from unlawful detention through habeas.

Indeed, in the nearly three months since the Court issued its 72-hour injunction, nothing

concerning the government's showing on the required positive legal authority to transfer

Petitioner has changed. As it did months ago, the government again submits only a declaration

asserting that ██████████ has a "strong interest" in Petitioner. Decl. of ██████████████

("████████ Decl.") ¶ 3 (attached to ECF No. 77 (sealed)). But as this Court already found, a

foreign government's interest in an American citizen cannot substitute for the positive legal

authority required by the Supreme Court and the D.C. Circuit Court of Appeals. *See* ECF No. 51

at 4 (explaining that "classified information provided by" the government "does not present

positive legal authority," and "[n]either does" the government's "assertion that international

relations with the receiving country would be harmed should the court prohibit his transfer at this

time"). Nor has anything changed regarding the legality of Petitioner's detention: his legal

traverse to the government's Return remains pending and unadjudicated, and—by the

government's agreement—his factual traverse will be filed if his legal traverse is rejected.

For that reason, and for the reasons that follow, the Court should enter the requested

injunction. Further, if this application and motion still remain under consideration 72 hours after

Respondent's filing of its Notice Pursuant to the Court's January 23, 2018 Order, ECF No. 77,

Petitioner respectfully requests that the Court enter an interim order enjoining Petitioner's

transfer to ██████████ until the Court issues a decision. And further, Petitioner respectfully

requests that, should the Court deny Petitioner's motion, the Court enjoin his transfer pending a

decision by the D.C. Circuit in the government's expedited appeal of this Court's 72-hour notice

injunction, as the D.C. Circuit is presently considering substantially the same question now

before this Court—specifically, whether the government can transfer Petitioner to ██████████

without positive legal authority.

~~UNDER SEAL~~

## FACTUAL BACKGROUND

1.     **The government's military detention of Petitioner and the habeas petition filed on his behalf.**

Petitioner is a U.S. citizen who has been detained by the Department of Defense at a U.S. military facility in Iraq for more than seven months. ECF No. 29 at 2. For half of this time, the government denied Petitioner access to a court or an attorney. ECF No. 29 at 1–2.

On or about September 12, 2017, Petitioner surrendered to Syrian Democratic Forces at a checkpoint near the Syrian border with Turkey. ECF No. 29 at 2. After Petitioner informed them that he was a U.S. citizen and requested to speak with U.S. personnel, ECF No. 66-1 at 33, 20, Syrian Democratic Forces transferred him to the custody of the U.S. military, ECF No. 66-1 at 2. The Defense Department then transferred Petitioner from Syria to a military facility in Iraq. *See* Transcript of Jan. 22, 2018 Status Hearing at 70–71, ECF No. 55. The United States subsequently concluded that Petitioner is an "enemy combatant" based on his alleged membership in the Islamic State of Iraq and Syria, or "ISIS," at the time of his capture. ECF No. 66-1 at 56.

Petitioner denies that he was an enemy combatant. As he informed U.S. forces, he traveled to Syria to understand firsthand and report about the conflict there, ECF No. 66-1 ¶ 86; was kidnapped and imprisoned by ISIS, ECF No. 66-1 ¶ 71; and tried numerous times to escape, ECF No. 66-1, TIR 03 at 3. The government has not alleged that he ever took up arms against the United States or anyone else.

After various media outlets publicly reported Petitioner's detention in mid-September 2017, counsel for the American Civil Liberties Union Foundation ("ACLUF"), as Petitioner's next friend, filed a petition for a writ of habeas corpus in this Court. ECF No. 4 at 13. As relief, the petition asked this Court to "Order Respondent to charge [Petitioner] with a federal criminal

UNDER SEAL

offense in an Article III court or release him." ECF No. 4 at 13. Shortly thereafter, the ACLUF

filed an emergency motion seeking counsel access to Petitioner—either by the ACLUF or a

court-appointed lawyer—to advise Petitioner of his legal rights as a U.S. citizen and to afford

him the opportunity to challenge his unlawful detention. ECF No. 7.

2.    **The government's repeated efforts to block this habeas challenge and this Court's order permitting counsel access.**

On October 30, 2017, the government moved to dismiss the habeas petition, arguing that

the ACLUF lacked next-friend standing because it had no prior relationship to Petitioner and

could not demonstrate that Petitioner wished to challenge his detention, while also arguing that

this Court lacked power to take any steps to ascertain Petitioner's wishes on the matter. ECF No.

11 at 10–13, 16–21; *see* ECF No. 22 at 36 (transcript of hearing) (arguing that this Court lacked

"supervisory power over . . . U.S. military operations regarding detainees in foreign countries").

While the counsel-access motion was pending, the *Washington Post* reported that at some

point during the government's interrogations of Petitioner, Petitioner "refused to talk to the

interrogation team and demanded a lawyer" and then, after FBI agents read Petitioner his

*Miranda* rights, "he again refused to cooperate and repeated his demand for a lawyer." ECF No.

13 at 1–2 (quoting Dana Priest, Devlin Barrett & Matt Zapotsky, *Case of Suspected American

ISIS Fighter Captured in Syria Vexes U.S.*, Wash. Post, Oct. 29, 2017, http://wapo.st/2towMmr).

The government dismissed that report as "anonymous hearsay" and continued to argue that this

Court did not have the authority to inquire whether Petitioner wished to access counsel or

challenge his detention through habeas corpus. ECF No. 15 at 5. When the Court ordered the

government to confirm whether Petitioner had asked for counsel, the government conceded that

Petitioner had, in fact, invoked his constitutional right to an attorney—*two months prior*, on

September 25, less than two weeks after the United States took custody of him. ECF No. 18. The

UNDER SEAL

government nevertheless continued to argue that there was no evidence that Petitioner might want to "invoke American court relief," ECF No. 22 at 29, and that this Court remained powerless to take any steps to determine whether Petitioner wished to access counsel or seek habeas relief, ECF No. 24 at 4–8.

As this Court considered the counsel-access motion, on December 20, the *New York Times* reported that senior government officials were "embracing a proposal" to transfer Petitioner to Saudi Arabia. *See* Charlie Savage, Eric Schmitt & Adam Goldman, *Officials Weigh Sending American Detainee to Saudi Arabia*, N.Y. Times, Dec. 20, 2017, https://nyti.ms/2De9Yqh. The ACLUF called the Court's attention to that publication, urging that the reported "proposal underscore[d] the urgency of the relief requested in Petitioner's pending motion for counsel access." ECF No. 27 at 1.

Two days later, this Court denied the government's motion to dismiss the habeas petition and ordered the Defense Department to "provide the ACLUF with temporary, immediate and unmonitored access to the detainee so that it may inquire as to whether he wishe[d] to have the ACLUF or court-appointed counsel continue this action on his behalf." ECF No. 29 at 2. The Court further ordered the government, in the interim, "to refrain from transferring the detainee until the ACLUF inform[ed] the court of the detainee's wishes." ECF No. 29 at 2.

3.      **This Court's order requiring 72 hours' notice before transfer of Petitioner.**

After meeting with Petitioner by secure videoconference on January 3, 2018, counsel for the ACLUF informed the Court that Petitioner wished to pursue this habeas action and to have the ACLUF represent him in it. *See* ECF No. 31 at 1. On Petitioner's behalf, the ACLUF also requested that the Court order the government to file promptly a habeas return justifying Petitioner's detention, and it sought an extension, during the pendency of the habeas action, of

the court-ordered temporary interim relief restraining the government from involuntarily

transferring Petitioner. *See* ECF No. 31 at 2. The government opposed "any judicial restriction"

on its power to transfer Petitioner, ECF No. 33 at 8, and told the Court "it's not our burden to tell

you what country he's going to," Transcript of Jan. 22, 2018 Status Hearing at 18, ECF No. 55.

On January 23, after receiving briefs and supporting declarations (partially under seal)

from both parties and holding two hearings, this Court ordered the government to provide the

Court and Petitioner's counsel 72 hours' notice prior to transferring Petitioner, at which time

Petitioner would be able to file an emergency motion contesting his impending transfer, if

necessary. ECF No. 52. In a Memorandum Opinion, the Court analyzed Petitioner's motion for

continuing interim relief as a motion for a preliminary injunction. The Court found that

Petitioner had shown a likelihood of success on the merits of his claim. ECF No. 51 at 4.

Specifically, the Court explained that the government had failed to identify any "positive legal

authority" for any contemplated transfer, and that the government's claim that a 72-hour notice

requirement would harm "international relations" was insufficient to render such a requirement

unlawful. ECF No. 51 at 4. Turning to irreparable injury, the Court noted that the Defense

Department did not even "argue that Petitioner will not be irreparably harmed absent some

relief." ECF No. 51 at 6. Next, the Court found that the balance of equities weighed in

Petitioner's favor. ECF No. 51 at 7 (quoting *Hamdi v. Rumsfeld*, 542 U.S. 507, 509 (2004)).

Finally, the Court found that the public interest favored the relief it ordered. ECF No. 51 at 7–8.

4.     **The government's appeal.**

On February 2, 2018, the government filed a notice of appeal from this Court's January

23, 2018 order requiring Respondent to provide the Court and Petitioner's counsel with seventy-

two hours' notice prior to transferring Petitioner. ECF No. 56. In its principal appellate brief, the

government argued that it possessed blanket and unreviewable authority to transfer Petitioner to

any country that the government determined had a "legitimate sovereign interest" in him. Br. for

Respondent–Appellant at 27, *Doe v. Mattis*, No. 18-5032 (D.C. Cir. Feb. 16, 2018) ("Gov't

Appeal Br.") ("[I]t would be inappropriate for the judiciary to second-guess the Government's

determination and bar petitioner's transfer to [a country] absent advance judicial notice and

review."). In its reply brief, however, the government "expressly limit[ed] its appeal to challenge

the district court's Order as applied to" two countries, ███████████. Reply Br. for

Respondent–Appellant at 2 n.1, *Doe v. Mattis*, No. 18-5032 (D.C. Cir. Mar. 16, 2018). The

parties completed briefing on March 16, 2018, and the Court of Appeals (Henderson, Srinivasan,

and Wilkins, JJ.) heard oral argument on April 5, 2018. The D.C. Circuit has not yet issued a

ruling on this matter.

**5.      The government's notice of intent to transfer.**

        At approximately 8:00 p.m. on Monday, April 16, the government filed under seal a

notice of its intent "to relinquish custody of Petitioner John Doe and ███████████

███████████ no sooner than 72 hours hence." ECF No. 77 at 1 (sealed) (Apr. 17,

2018). In an attached declaration, the government's declarant explained that following

Petitioner's transfer against his will to ███████████████████████

███████████████████."[1] ████████ Decl. ¶ 2, 4.

---

[1] Petitioner is dismayed that in its declaration, the government revealed to the Court and the
public details of confidential settlement negotiations by disclosing that the government had
attempted to gain Petitioner's consent to the transfer to ███████████, and that
Petitioner had refused. ████████ Decl. ¶ 2. As evidenced by Petitioner's refusal, the terms of
the proposed transfer were unacceptable to him. Petitioner maintains that he is being unlawfully
held, and no charges are pending against him in any country. Given this, Petitioner continues to
demand, as he has since he first spoke with counsel, that the government either charge him with
a crime or release him from custody as a free man. It is shocking that the government continues
to equate forced rendition to a ████████████ with a restoration of liberty.

UNDER SEAL

## ARGUMENT

To obtain a preliminary injunction or temporary restraining order, a plaintiff must establish: (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Singh v. Carter*, 168 F. Supp. 3d 216, 223 (D.D.C. 2016). Courts in this Circuit have traditionally applied these factors on a "sliding scale," where a stronger showing on some factors can compensate for a weaker showing on others. *See, e.g.*, *Davenport v. Int'l Brotherhood of Teamsters*, 166 F.3d 356, 360 (D.C. Cir. 1999). It has been suggested, but not decided, that a likelihood of success on the merits may be required. *See Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (citing *Winter*, 555 U.S. at 20–22). Under either approach, Petitioner makes the necessary showings here.

## I.   Petitioner is likely to succeed on the merits of his claim that his forcible transfer to ▮▮▮▮▮▮▮▮ would be unlawful.

The Court should once again find a likelihood of success on Petitioner's claim that his forcible transfer to another country—here, ▮▮▮▮▮▮—in the absence of positive legal authority is unlawful. The government's argument that it possesses unfettered authority to transfer Petitioner to ▮▮▮▮▮ because that country has a "sovereign interest" in him fails for the following reasons.

First, the executive does not have the prerogative to dispose of the liberty of an American citizen who is outside the borders of the United States based on its unilateral determination that another country has a "legitimate interest" in him, Gov't Appeal Br. 38.[2] In *Valentine v. United*

---

[2] The government's sealed notice does not offer any legal argument concerning the legality of its proposed transfer of Petitioner to ▮▮▮▮▮. In order to assist the Court in deciding

*States ex rel. Neidecker*, 299 U.S. 5 (1936), the Supreme Court upheld the core constitutional

principle that the executive cannot forcibly transfer a citizen to another country without

affirmative legal authority. That principle does not stop at the shores of the United States but

necessarily extends to American citizens in U.S. custody abroad, and it therefore may be

enforced through habeas. *See, e.g.*, *Wilson v. Girard*, 354 U.S. 524, 530 (1957) (approving

transfer of U.S. servicemember to Japan to face murder charges after finding affirmative

authority for the transfer under administrative agreement grounded in a U.S.-Japan security

treaty).

Second, the two cases on which the government chiefly has relied throughout this

litigation—*Munaf v. Geren*, 553 U.S. 674 (2008), and *Kiyemba v. Obama* (*Kiyemba II*), 561 F.3d

509 (D.C. Cir. 2009)—do not support its claim of unreviewable executive prerogative to transfer

Petitioner without demonstrating that it has positive legal authority to do so. *Munaf* rested on the

black-letter principle that a sovereign possesses exclusive and absolute jurisdiction over crimes

committed by individuals who voluntarily travel to its territory, commit crimes there, and are

detained on its soil—a principle that is inapplicable here. Further, in *Munaf*, the Supreme Court

reviewed the lawfulness of the petitioners' transfer and approved the transfer only after finding

positive legal authority for it. *Kiyemba II* is equally inapposite here, as it rested on the

executive's wartime authority to transfer *non-citizens* who had no remaining rights to enforce in

habeas because federal courts could not order their release into the United States or anywhere

else. *Kiyemba II* neither eliminates the requirement of legal authority to transfer American

citizens to another country nor alters the power of a habeas court to grant the remedy of release

to an American citizen, if necessary by ordering his release into the United States.

---

Petitioner's motion, Petitioner includes references to Respondent's arguments in its briefs on
appeal of the Court's January notice injunction.

A.    **The executive does not have the prerogative to transfer U.S. citizens to foreign jurisdictions without positive legal authority.**

In this litigation, the government has made the remarkable claim that it has unfettered power to render Petitioner—a U.S. citizen—to any foreign government with a "legitimate sovereign interest" in him, and that at least in some circumstances, the judiciary cannot review whether any particular exercise of that power is lawful. Now, the executive claims it has the authority to transfer Petitioner to ███████ based on that country's supposed "strong interest" in him, even in the absence of positive legal authority for the transfer. ███████ Decl. ¶ 3. To Petitioner's knowledge, no court in U.S. history has held that the executive possesses such unilateral authority to render an American citizen to a foreign government.

As this Court previously concluded, before any transfer of a U.S. citizen, the government must "present 'positive legal authority' for [Petitioner's] transfer." ECF No. 51 at 4 (quoting *Omar*, 646 F.3d at 24). At no point in this litigation has the government articulated any affirmative legal authority, such as a statute or treaty, as a basis for forcibly transferring Petitioner to another country, including ███████. The government does not allege that Petitioner has been charged with a crime in that country or that he is the subject of any extradition request, nor does it identify any legal instrument pursuant to which Petitioner could (or will) be handed over to its government. In these circumstances, permitting a transfer would offend the Constitution.

The requirement of legal authority to transfer is rooted in the Constitution's separation of powers and guarantee of due process. As the Supreme Court made clear in *Valentine*:

> [T]he Constitution creates no executive prerogative to dispose of the liberty of the individual. . . . There is no executive discretion to surrender [a citizen] to a foreign government, unless that discretion is granted by law. It necessarily follows that as the legal authority does not exist save as it is given by act of Congress or by the terms of treaty, it is not enough that statute or treaty does not

deny the power to surrender. It must be found that statute or treaty confers the
power.

299 U.S. at 9; *see Factor v. Laubenheimer*, 290 U.S. 276, 287 (1933) ("[T]he legal right to

demand [a person's] extradition and the correlative duty to surrender him to the demanding

country exist only when created by treaty."); *In re Kaine*, 55 U.S. (14 How.) 103, 113 (1852)

("[A]n extradition without an unbiased hearing before an independent judiciary [is] highly

dangerous to liberty, and ought never to be allowed in this country."); M. Cherif Bassiouni,

*International Extradition: United States Law and Practice* 9 (6th ed. 2014) (extradition requires

a treaty). Consistent with this requirement, Congress has expressly denied the executive the

power to extradite citizens in the absence of a treaty. *See* 18 U.S.C. § 3181(b). Moreover, even

where the executive does possess positive legal authority to extradite, its decision to extradite a

particular individual remains subject to judicial review. *See, e.g.*, *Matter of Extradition of Santos*,

228 F. Supp. 3d 1034 (C.D. Cal. 2017); *Gouveia v. Vokes*, 800 F. Supp. 241 (E.D. Pa. 1992);

*Republic of France v. Moghadam*, 617 F. Supp. 777 (N.D. Cal. 1992).

The United States does not ███████████████████████████,[3] and the

government has not identified any other positive legal authority to transfer Petitioner there. *See*

_____

[3] Ample reasons exist for ███████████████████████████████ that would
expose U.S. citizens to forcible transfer to that country, including fundamental fairness
differences between the two legal systems and widespread human rights violations there. *See,
e.g.*, ████████████████████████████████████████████████
████████████████████████████████████████ 98th Cong.
(1983) (statement of ████████████
████████████████ ("Basic differences between the U.S. and Saudi legal systems present
major obstacles to negotiating such a treaty."); U.S. Dep't of State, *Country Reports on Human
Rights Practices for 2016:* ███████████ § ████ (2016) (abuse and torture of prisoners and failure
of prisons and detention centers to meet international standards); *id.* § ████ (denial of due
process); *id.* § ████ (denial of fair trials).

     Thus, the United States would have no legal authority to involuntarily transfer Petitioner
by ████████████████████████████████████████████. That

~~UNDER SEAL~~

ECF No. 51 at 4. In the absence of such authority, the government may not forcibly transfer him

to ███████. That is because *Valentine*'s essential requirements—legal authority and judicial

review—apply to American citizens facing forcible transfer from U.S. custody, wherever that

American may be detained by the government.

     In *Valentine*, the Supreme Court articulated fundamental constraints on the executive's

freedom "to dispose of the liberty" of a citizen. 299 U.S. at 9. Nothing in the Court's reasoning

suggests that these constraints were limited by the happenstance of a citizen's location, or that

they evaporated as soon as a citizen traveled abroad. Rather, *Valentine*'s requirement that the

executive demonstrate affirmative legal authority before rendering a citizen to another

government is rooted in bedrock constitutional guarantees that apply even when the government

"acts against citizens abroad." *Reid v. Covert*, 354 U.S. 1, 5 (1954); *see id.* at 5–6 ("The United

States is entirely a creature of the Constitution. Its power and authority have no other source. It

can only act in accordance with all the limitations imposed by the Constitution."); *see also*

*Valentine*, 299 U.S. at 9 (explaining that the Court's holding rested on "the fundamental

consideration that the Constitution creates no executive prerogative to dispose of the liberty of

the individual"). Indeed, even during wartime, and even when the prisoner is held overseas, the

United States may not transfer American citizens to the custody of foreign sovereigns "at will,

without any review of the positive legal authority" for the transfer. *Omar*, 646 F.3d at 24; *id.* at

26 (Griffith, J., concurring) (court may review on habeas whether executive has "positive legal

authority" to transfer a citizen, even when he is held abroad).

     The *Valentine* requirement—that the executive must have affirmative legal authority to

transfer a citizen to another jurisdiction—thus necessarily applies wherever the United States

---

Petitioner has not been charged with a crime in that country (or anywhere else) makes the
government's claim for executive prerogative to transfer that much weaker.

exercises control over a citizen's liberty. And that requirement may necessarily be enforced by a court through its habeas jurisdiction by virtue of its control over the jailor. *See* 28 U.S.C. § 2241(c)(1) (writ of habeas corpus extends to prisoner "in custody under or by color of authority of the United States"); *Rasul v. Bush*, 542 U.S. 466, 481–82 (2004) (explaining that "[a]t common law, courts exercised habeas jurisdiction over" all "persons detained" in all "dominions under the sovereign's control" (footnotes omitted)); *cf. Boumediene v. Bush*, 553 U.S. 723, 739 (2008) ("The Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom.").

At no point in this litigation has the government pointed to the 2001 or 2002 AUMFs as "positive legal authority" to transfer Petitioner. But even assuming that argument was available—and it is not clear that it is—the government could obviously not rely on either statute to transfer Petitioner *before* this Court determined that Petitioner was lawfully detained under one statute or the other. *Cf. In re Territo*, 156 F.2d 142, 144 (9th Cir. 1946) (explaining the district court's finding that an American citizen, properly detained as a prisoner of war for serving in the Italian army during World War II, could be repatriated to Italy because the Geneva Convention affirmatively authorized such transfer). That is the very issue now pending before this Court. *See* ECF Nos. 46, 59, 74 & 76. Accepting the government's position here would effectively render this core element of habeas and due process a dead letter, for it would mean that the government could do by transfer exactly what the Supreme Court held it could not do through detention: restrict the liberty of a U.S. citizen on its own say-so. *See Hamdi*, 542 U.S. at 536–37 ("[I]t would turn our system of checks and balances on its head to suggest that a citizen

could not make his way to court with a challenge to the factual basis for his detention by the

Government, simply because the Executive opposes making available such challenge.").

If the executive could pretermit any habeas petition by forcibly transferring a U.S. citizen

to a foreign country of the government's choosing, nothing would prevent the government from

defeating meaningful review of the detention of the "errant tourist, embedded journalist, or local

aid worker" about whom the Supreme Court expressed concern in *Hamdi*, 542 U.S. at 534. In

other words, the government's position requires accepting that government agents may forcibly

apprehend a U.S. citizen anywhere abroad, detain him, unilaterally declare him an "enemy

combatant," and then transfer him to the custody of any country that the executive decides has a

"sovereign interest" in him. This Court should reject this sweeping claim of executive

prerogative.

**B.    Neither Supreme Court nor D.C. Circuit precedent supports the
       government's position.**

**1.    The Supreme Court's decision in *Munaf* is far narrower than the
        government suggests and does not provide the government with any
        legal authority to transfer Petitioner to ███████████.**

As this Court previously held, the government does not possess the same legal authority

here that the Supreme Court found to justify the petitioners' transfers in *Munaf*. ECF No. 51 at

5–6. The government's reliance on *Munaf* is misplaced for the following four reasons.

First, the Supreme Court in *Munaf* did not permit the transfer of a U.S. citizen without

first finding affirmative legal authority for that transfer, even when that transfer was within the

same country. Second, *Munaf* does not support any claim of legal authority for Petitioner's

transfer based on the government's novel and nebulous claim of "strong interest," because *Munaf*

hinged on the long-established—and distinct—principle that a sovereign has an absolute right to

punish crimes committed by individuals already present within its borders. Third, the traditional

~~UNDER SEAL~~

habeas remedy of release, which was not available to the petitioners in *Munaf*, remains available to Petitioner. And fourth, the passages from *Munaf* addressing sensitive separation-of-powers and foreign-policy concerns relate solely to a court's limited ability to second-guess the government's determination about a risk of torture in the receiving country *after* the government had established affirmative legal authority for the transfer.

*   *   *

As this Court previously recognized, the Supreme Court's decision in *Munaf* does not support any claim of legal authority for Petitioner's transfer in this case. ECF No. 51 at 5. The government radically recasts *Munaf* as an endorsement of a free-wheeling executive prerogative to transfer citizens based on another country's purported "legitimate sovereign interest" in them. Gov't Appeal Br. 25–26. But nothing in *Munaf* supports the government's assertion of such a sweeping power.

To begin, the Supreme Court in *Munaf* did not permit the transfer of a U.S. citizen without first finding legal authority for that transfer. In *Munaf*, the Supreme Court exercised habeas review over the lawfulness of the proposed transfer of two American citizens from U.S. custody to Iraqi custody within Iraq. 553 U.S. at 689. And in exercising that review, as the government has conceded, the Court approved the transfer *only after* finding affirmative legal authority for the transfer. Gov't Appeal Br. 30 ("This Court recognized that *Munaf* 'determined that the Executive Branch had the affirmative authority to transfer' the detainees at issue." (quoting *Omar*, 646 F.3d at 24 (citing *Munaf*, 553 U.S. at 704))); *accord Wilson*, 354 U.S. at 527–530 (rooting source of authority to transfer in bilateral security treaty). Thus, *Munaf* underscores that even in the case of an American citizen's transfer from U.S. to foreign custody

15

*within the same* foreign jurisdiction, the government must provide affirmative authority for the transfer *and* a habeas court is empowered to review that transfer to ensure its legality.

Second, none of the circumstances critical to the Supreme Court's holding in *Munaf* is present here. *Munaf* was explicit about the question it addressed: "whether United States district courts may exercise their habeas jurisdiction to enjoin our Armed Forces from transferring individuals [1] detained within another sovereign's territory [2] to *that sovereign's* government [3] for criminal prosecution." 553 U.S. at 689 (emphasis added). And despite the government's attempts to paint *Munaf*'s holding with a broad brush, the Court repeatedly emphasized that its conclusion hinged on Iraq's territorial jurisdiction over the petitioners and its "sovereign right to prosecute [the petitioners] for crimes committed on its soil," to which they had voluntarily traveled and from which they had not departed. *Id.* at 694; *see also, e.g., id.* at 692, 701. Additionally, the Court noted that the petitioners were being held by the U.S. military "at the behest of the Iraqi Government pending their prosecution in Iraqi courts," functioning "in essence, as its jailer." *Id.* at 698. Notably, unlike the transfer the government seeks to effect here, the transfers in *Munaf* were not transfers across jurisdictions; they were effectively transfers from one jail to another within a single nation to ensure detention pending resolution of criminal prosecutions—and that nation had the "absolute" right to punish the alleged crimes because they occurred within its territory. *Id.* at 694.

The government's attempts to draw parallels with, or explain away the differences between, the facts in *Munaf* and a transfer of Petitioner to ███████ fail. The government's April 16, 2018 declaration states only that ████████ "has a strong interest in ████████ ████████ who are captured and detained abroad. ████████ Decl. ¶ 3. Before the Court of Appeals, the government made additional arguments about the nature of ████████'s

~~UNDER SEAL~~

"legitimate sovereign interest" in Petitioner. For example, the government claimed that ███████

███ has such an interest because it is an ally of the United States in the "armed conflict

against ISIL." Gov't Appeal Br. 26. But *Munaf* did not rest on Iraq's participation in a

multinational coalition with the United States; it rested on Iraq's absolute right to punish crimes

committed within its territory.[4] In yet another effort to shoehorn Petitioner into *Munaf*'s holding,

the government argued that "[i]n *Munaf*, . . . at least one petitioner's connection to Iraq was far

less significant" than Petitioner's ██████████████████████████

████████. Gov't Appeal Br. 27. But the fact that ███████████ in *Munaf* ████████

████████████ did not even enter into the Supreme Court's analysis.[5]

The government has also argued that ██████████'s "'sovereign right' over Petitioner

carries the same weight—and is implicated equally"—as that in *Munaf*, "whether or not" that

country "initiates a criminal investigation of petitioner before receiving him." Gov't Appeal Br.

25. But critical to the Supreme Court's decision in *Munaf* was the fact that Iraq was actively

prosecuting the petitioners. *See* 553 U.S. at 698–99 ("To allow United States courts to intervene

in an ongoing foreign criminal proceeding and pass judgment on its legitimacy seems at least as

great an intrusion as the plainly barred collateral review of foreign convictions."). That is not

true here. *See* ██████████ Decl." ¶ 3.

---

[4] To the extent that ██████████'s participation in the coalition against ISIS informs the basis of
its "legitimate interest" in Petitioner, the same would be true of the 73 other countries that
participate in that coalition with the United States. *See* U.S. Dep't of State, The Global Coalition
to Defeat ISIS: Partners, https://www.state.gov/s/seci/c72810.htm.

[5] Of course, ████████████████████████ does nothing to reduce or impinge upon
the rights inherent in possessing U.S. citizenship, *see, e.g.,* ██████████████████████
██████████████████, and a U.S. citizen's ██████████████ does not, on
its own, allow the government to subject ████████████████████████████████
████ in the absence of positive legal authority.

<u>**UNDER SEAL**</u>

In another effort to liken the "legitimate sovereign interest" that the government identifies

here for ███████████ to the basis for the Supreme Court's holding in *Munaf*, the government has

asserted a spurious international-law justification. On appeal, the government argued that the

"territorial control" in *Munaf* is just one of "multiple bases for a country to exercise jurisdiction"

under international law and that "███████ and certain conduct outside a sovereign's borders

provide others." Gov't Appeal Br. 25. The government argued that "customary international law

generally recognizes a state's right to exercise prescriptive jurisdiction over an individual with a

'genuine connection' to the state, even when the individual is located outside the state's

territory." Gov't Appeal Br. 23 (citing Restatement (Fourth) of Foreign Relations Law of the

United States—Jurisdiction § 211 (Am. Law Inst. Draft No. 1, 2016) ("Restatement (Fourth)")).

To be sure, both "conduct occurring on the state's territory" (as in *Munaf*) and ███████

(as here) may indeed permit states to exercise prescriptive jurisdiction. Restatement (Fourth) §

211. But the Supreme Court did not base its conclusion in *Munaf* on prescriptive jurisdiction—

or, at least, not prescriptive jurisdiction alone. Rather, the Court's holding explicitly rested on a

state's "jurisdiction to punish offenses against its laws committed within its borders," 553 U.S. at

697–98 (citation omitted)—a sovereign right that encompasses not merely prescriptive, but also

adjudicative and enforcement jurisdiction, both of which are necessarily present and absolute for

crimes committed within a sovereign's territory. *See* Restatement (Fourth) § 211 cmt. a

("[J]urisdiction to adjudicate . . . concerns the authority of a state to subject particular persons or

things to its judicial process."); *id.* ("[J]urisdiction to enforce . . . concerns the authority of a state

to exercise its power to compel compliance with law.").

In short, the circumstances here are wholly different from those in *Munaf*. The

government's argument grossly distorts and radically expands the Supreme Court's ruling, which

was based on Iraq's absolute sovereign right to prosecute the petitioners, who voluntarily

traveled to, committed crimes in, were apprehended in, and were detained in Iraq.

Third, *Munaf*'s reasoning is inapplicable because "the nature of the relief sought" in that

case demonstrated that the traditional habeas remedy of release was "not appropriate," 553 U.S.

at 693. Specifically, in *Munaf*, "what petitioners [were] really after [was] a court order requiring

the United States to shelter them from the sovereign government seeking to have them answer

for alleged crimes committed within that sovereign's borders." *Id.* at 694. The Supreme Court,

accordingly, could not grant the petitioners relief because, in those specific circumstances, any

habeas remedy necessarily "would interfere with Iraq's sovereign right to 'punish offenses

against its laws committed within its borders.'" 553 U.S. at 692 (quoting *Wilson*, 354 U.S. at

529); *see also id.* at 695; *Kiyemba II*, 561 F.3d at 526 (Griffith, J., concurring in part and

dissenting in part) ("Critical to *Munaf*'s holding was the need to protect Iraq's right as a foreign

sovereign to prosecute the petitioners . . . . for crimes committed on its soil." (quotation marks

and citation omitted)).

That is not the case here, because Petitioner *can* obtain the traditional remedy of relief

pursuant to his habeas action. So far as the government has alleged, no charges are pending

against him ███, where he is being held. Petitioner's release from U.S. custody therefore

would not, unlike in *Munaf*, *see* 553 U.S. at 693, subject him to immediate apprehension by any

authorities for criminal prosecution.

And even if, as the government has speculated, it would be impracticable to simply

release Petitioner ███, *see* Gov't Appeal Br. 29, Petitioner's release could be effectuated by an

order of this Court to release him in the United States. As a U.S. citizen, Petitioner has an

affirmative right to return to and remain in this country. *See, e.g., Tuan Anh Nguyen v. INS*, 533

U.S. 53, 67 (2001) (citizens have "the absolute right to enter" the United States); *Worthy v. United States*, 328 F.2d 386, 394 (5th Cir. 1964) ("It is inherent in the concept of citizenship that the citizen, when absent from the country to which he owes allegiance, has a right to return, again to set foot on its soil. It is not to be wondered that the occasions for declaring this principle have been few."). This Court, in short, has the equitable power to fashion appropriate habeas relief to fit the circumstances.

Fourth, and finally, the government has quoted passages from *Munaf* to argue that "the separation-of-powers principles underlying *Munaf* are broader than the district court acknowledged" because "[t]he Supreme Court reaffirmed in *Munaf* that the courts are 'not suited to second-guess' political determinations on 'sensitive foreign policy issues,' and that '[o]ur constitutional framework' likewise requires that the courts be 'scrupulous not to interfere with legitimate [military] matters.'" Gov't Appeal Br. 28 (quoting *Munaf*, 553 U.S. at 700, 702). But although the government invoked these passages to argue that the courts should not review the executive's decision to transfer a U.S. citizen to a foreign country, the passages do *not* relate to the authority of courts to enjoin a forcible transfer generally. Instead, in one of the quoted passages, the Court was merely reaffirming the principle that "[t]hose who commit crimes within a sovereign's territory may be transferred to that sovereign's government for prosecution," with "hardly an exception to that rule . . . ." *Munaf*, 553 U.S. at 700. In the other passage, having already decided that a specific transfer of American citizens was authorized, the Supreme Court considered whether the judiciary could "second-guess" the Executive's determination concerning "whether there is a serious prospect of *torture* at the hands of an ally, and what to do about it if there is." *Id.* at 702 (emphasis added). There, the Court was merely showing deference to the executive's factual determination regarding the likelihood of torture in the receiving country, not

to the government's legal conclusion that it had positive legal authority to transfer the petitioners in the first place.

> **2.** ***Kiyemba II* does not provide any legal authority for the government to transfer Petitioner to ███████.**

The government has also relied on the D.C. Circuit's decision in *Kiyemba II* to argue that this Court cannot prohibit a transfer of Petitioner to ███████. But *Kiyemba II* stands for the much more limited proposition that where a court cannot enjoin a petitioner's transfer on any ground, that petitioner is not entitled to pre-transfer notice. The government's reliance on *Kiyemba II* is misplaced for two main reasons. First, Petitioner is challenging the government's lack of positive legal authority to transfer him, not (as in *Kiyemba II*) the executive's assessment of a risk of torture in the receiving country. Whereas the former is a basis for granting Petitioner injunctive relief here, the latter provided no such basis there. Second, the traditional habeas remedy of release from custody is still available to Petitioner, as a U.S. citizen, but was not available to the detainees in *Kiyemba II.*

*Kiyemba II* concerned non-citizen wartime detainees being held at Guantánamo Bay. Although the government had cleared each of the petitioners for release, they had no right to enter the United States and could not return to their home country because of the likelihood of torture there. 561 F.3d at 519 & n.5. The petitioners requested 30 days' notice before transfer to a third country based on their fears that they would be "transferred to a country where they might be tortured or further detained." *Id.* at 511; *see id.* at 520 (Kavanaugh, J., concurring) (the "fundamental issue" in *Kiyemba II* was "whether the Constitution's Due Process Clause (or the Foreign Affairs Reform and Restructuring Act) requires judicial reassessment of the Executive's determination that a detainee is not likely to be tortured by a foreign nation—and whether, in order to ensure such a judicial inquiry, the Government must notify the district court before

transfer"). The court held that to the extent the detainees' habeas claims were based on the

concern that the executive would wrongly assess expected conditions in the receiving country

following transfer—including the likelihood of torture, or the expectation of prosecution or

detention—the detainees were not entitled to relief. *See id.* at 514–15 (majority op.); *id.* at 514

(explaining that, like in *Munaf*, the "record show[ed that] . . . the Government does everything in

its power to determine whether a particular country is likely to torture a particular detainee," and

"the district court may not question the Government's determination that a potential recipient

country is not likely to torture a detainee").

Here, however, as explained above, Petitioner does not challenge a transfer based on

conditions in a receiving country. Instead, Petitioner maintains that the government lacks

positive legal authority to transfer him to ███████. By contrast, the *Kiyemba II* petitioners

did not squarely present a challenge based on the absence of legal authority. Although the

majority in *Kiyemba II* simply assumed that the government had the authority to transfer the

petitioners, the concurrence did address the issue. *See id.* at 519 (Kavanaugh, J., concurring).

Critical to Judge Kavanaugh's conclusion that the government possessed transfer authority was

the fact that the petitioners were non-citizen detainees who had the same status as "inadmissible

aliens at the border of a U.S. port of entry [who] have no constitutional right to enter the United

States." *Id.* In both cases, Judge Kavanaugh said, "the United States has a very strong interest in

returning the aliens to their home countries or safe third countries so that they will not be

detained indefinitely in facilities run by the United States." *Id.* Judge Kavanaugh further

emphasized that "transfer[s] of wartime alien detainees . . . are a traditional and lawful aspect of

U.S. war efforts." *Id.* "[W]hen the United States determines during an ongoing war that an alien

no longer needs to be detained or has been mistakenly detained—for example, if he is a non-

~~UNDER SEAL~~

combatant and not otherwise subject to confinement—the United States attempts to promptly

transfer or release that detainee to his home country or a safe third country." *Id.*[6]

These arguments do not apply to Petitioner for the simple reason that he is a U.S. citizen

with a constitutional right to enter the United States and therefore to the essential habeas remedy

of release. Unlike in the case of non-citizen detainees held at Guantánamo, then, neither

analogies to the immigration context nor the United States' "history or modern practice"

concerning "alien wartime detainees" can justify his transfer. But, as explained above, the Court

may order Petitioner's release into the United States, if necessary to effectuate the writ.

\* \* \*

In sum, neither *Munaf* nor *Kiyemba II* supports the government's argument that Petitioner

may be forcibly transferred to ██████████.

## II.     Petitioner will suffer irreparable injury unless Respondent is enjoined from transferring Petitioner to ██████████.

A movant seeking a preliminary injunction must "demonstrate that irreparable injury

is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (citing *Los Angeles v.*

*Lyons*, 461 U.S. 95, 103 (1983)). If Petitioner is transferred to ██████████, he will be

irreparably harmed because a forcible transfer would deprive him of his right to seek his freedom

through habeas. As it did in January, *see* ECF No. 51 at 5–6, the Court should reject the

---

[6] To be sure, the majority did "assume arguendo these alien detainees have the same constitutional rights with respect to their proposed transfer as did the U.S. citizens facing transfer in *Munaf*." *Kiyemba II*, 561 F.3d at 514 n.4. But that assumption went to the question of whether the detainees could ask a court to second-guess executive-branch conclusions as to the risk of torture. *See id.* at 511. The court was clear that, because the prisoners were non-citizens with no right to enter the United States, there was no question of whether outright release (under the traditional habeas remedy) was possible. Similarly, as explained above, *Munaf* is also a case in which release was not a possible habeas remedy. *See* 553 U.S. 693–94.

government's argument that forcible transfer to ███████████ is equivalent to all of the habeas

relief Petitioner seeks because it constitutes a "release from custody," ECF No. 33 at 1–2.

Petitioner's habeas petition is clear about his requested relief: that the government either

"charge [Petitioner] with a federal criminal offense in an Article III court or release him." ECF

No. 4 at 13. The government has thus far declined to charge Petitioner, and instead claims that by

forcibly transferring him to ███████, it is providing the relief Petitioner seeks by "releasing"

him. Gov't Appeal Br. 32–33 (contending that a forcible transfer "would provide [Petitioner]

with all the relief to which he would be entitled under habeas"). Thus, the government contends,

Petitioner cannot be irreparably injured by such a transfer. *See* Gov't Appeal Br. 33.

This position would be laughable were it not such a serious distortion of the Constitution.

In practical terms, the government is suggesting that forcibly transferring Petitioner to the

custody of another country (likely shackled, possibly blindfolded), where he will be confined

indefinitely to a █████████████████████████████████████████████

████████████████████████████████████████████████████, is not

a deprivation of Petitioner's liberty that would cause irreparable harm. Rather than granting

Petitioner the relief he seeks, it would deprive him of the very opportunity to ever obtain the

*actual* relief that the writ of habeas corpus has provided for centuries: liberty. *See, e.g.*, *Preiser v.

Rodriguez*, 411 U.S. 475, 484 (1973) ("[T]he traditional function of the writ is to secure release

from illegal custody."); *Dhiab v. Trump*, 852 F.3d 1087, 1092 n.8 (D.C. Cir. 2017) ("[T]he writ

of habeas corpus is a 'civil remedy for the enforcement of the right to personal liberty' . . . ."

(citation omitted)); *Council v. Clemmer*, 165 F.2d 249, 250 (D.C. Cir. 1947) ("[T]he function of

the writ of habeas corpus, which is of ancient origin in the common law and is given high

sanction by our Constitution, is to afford a petitioner therefor a speedy and effective method of

~~UNDER SEAL~~

securing release when illegally restrained of his liberty."); *see* ECF No. 55 at 6. As a U.S.

citizen, Petitioner has a right "to challenge his classification as an enemy combatant" in order to

obtain release. *Hamdi*, 542 U.S. at 533. Forcibly transferring Petitioner to the hands of another

sovereign would in no way vindicate his habeas right to have his personal liberty restored

through release. Instead, it would irreparably harm Petitioner by subjecting him to the force of

the U.S. government against his will and rendering him into the custody of another government

for continued confinement.

The government has provided no authority that supports its extreme position. The

government has cited *Qassim v. Bush*, 466 F.3d 1073 (D.C. Cir. 2006) (per curiam)—but *Qassim*

in fact undermines its argument. There, the "release" was effectuated through the *voluntary*

transfer of the Guantánamo detainees. *See id.* at 1076. Petitioner does not dispute that a voluntary

transfer would be equivalent to the habeas remedy of release, but that is not the basis of the

authority the government claims here. For similar reasons, the government's arguments that

Petitioner's habeas action seeks to "prolong" his unlawful detention and amount to a bid to stay

in U.S. custody also fail. *See* Gov't Appeal Br. 31–34. Petitioner does not, of course, seek to

remain in custody indefinitely. Rather, he seeks only to prevent an unlawful and involuntary

transfer that would strip him of his right to regain his liberty. The government's arguments

therefore have no merit, and Petitioner would be irreparably harmed if the government were

permitted to transfer him now.

**III.     The balance of harms strongly favors Petitioner.**

Under *Winter*, courts must "balance the competing claims of injury [to] consider the

effect on each party of the granting or withholding of the requested relief." 555 U.S. at 24. Of

course, Petitioner need not show that the government would suffer *no* harm to any of its interests

if an injunction were issued. Rather, *Winter* requires that courts *weigh* the potential harms at stake and consider whether the "balance of equities tips in [Petitioner's] favor." *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012) (quoting *Winter*, 555 U.S. at 20). Here, any potential injury to diplomatic relations that could occur if the Court preliminarily enjoined a transfer pales in comparison to the absolute, irreparable harm Petitioner would suffer if he were subject to a forcible transfer, which the courts of the United States would have no power to reverse. *See* ECF No. 51 at 7.

The government claims that "it is imperative that the transfer occur quickly and smoothly" because otherwise the United States' "credibility with an important foreign partner" would be "undermine[d]." ████ Decl." ¶ 8; *see id.* ("A delay due to litigation could lead ████ to reconsider its position to accept ████ or could adversely affect its willingness to engage with the United States on some future detainee transfers."). But as the government further acknowledges, the government of ████ is well aware that this Court may ultimately bar a transfer there. *See id.* ¶ 9 (acknowledging that ████ "agree[d] to the transfer despite the prospect of litigation that could delay or even prohibit the transfer," and that ████ "understands that delays may occur"). The government also argues that "[f]ailure . . . to follow through promptly on ████ transfer could cause harm to [the government's] ongoing bilateral cooperation, including on future detainee transfers." *Id.* ¶ 10. The government, however, cannot have a legitimate interest in *unlawfully* transferring an American citizen to another country by entering into an agreement that it has no authority to enter into in the first place because it is not grounded in any positive source of law. *Cf. Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (A party cannot be "harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be

found unconstitutional. If anything, the system is improved by such an injunction." (citations

omitted)); *Newsom ex rel. Newsom v. Albemarle Cty. School Bd.*, 354 F.3d 249, 261 (4th Cir.

2003) (A party is "in no way harmed by issuance of a preliminary injunction which prevents it

from enforcing a regulation . . . [which] is likely to be found unconstitutional."). And it certainly

cannot have an interest in such a transfer that outweighs the harm that Petitioner would suffer if

he is relinquished into ███████ custody.

    As was the case in January, nothing in the government's new declaration makes a

"showing that the government—for international relations reasons or otherwise—needs to

transfer Petitioner *now*," ECF No. 51 at 7. And critically, the government's credibility

concerning its claimed harms if the Court intervenes in Petitioner's transfer has suffered

immensely. In January, the government told this Court that a notice requirement "would hinder"

the government's "ability to engage constructively with ███████████████ on

this matter." ECF No. 65 ¶ 4. The government also warned the Court that any injunction would

"damage ongoing bilateral cooperation with ██████, including on future detainee

transfers." *Id.* Yet now, it has apparently been able to secure diplomatic agreement to conclude

an agreement for Petitioner's transfer, even though ██████ is well aware that this Court

might ultimately prohibit that transfer as unlawful. To the extent that the negotiations were in

some way "hindered," as the government speculated they would be in January, the government's

ability to reach an agreement with ██████ makes one thing clear: the potential harms to

Petitioner vastly outweigh any claimed government inconvenience.

    That the government and ██████ were able to reach an agreement despite the

uncertainty of the legality of the transfer is unsurprising, given that the government's stated

harms in this context arise equally in the extradition context. "Extradition is quintessentially a

matter of foreign policy; it occurs only pursuant to an international agreement and is invoked by a foreign government." *Cornejo-Barreto v. Siefert*, 379 F.3d 1075, 1088–89 (9th Cir. 2004), *vacated on reh'g as moot*, 389 F.3d 1307 (9th Cir. 2004). But even in that context, federal courts have the authority to determine whether an alleged fugitive falls within and satisfies the terms of the extradition treaty—that is, courts determine whether there is legal authority for the transfer. *See* 18 U.S.C. § 3184 (explaining that a court may order the arrest of an individual sought by extradition only where it "deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention"); *Matter of Extradition of Liuksila*, 74 F. Supp. 3d 4, 8 (D.D.C. 2014). If the individual falls outside the terms of the treaty, courts decline to certify the request. *See Matter of Extradition of Liuksila*, 74 F. Supp. 3d at 8. Further, if an alleged fugitive is determined to be extraditable, he or she may seek relief through a writ of habeas corpus. *See United States v. Doherty*, 786 F.2d 491, 495–96 (2d Cir. 1986).

These safeguards reflect a balancing of the government's interests in foreign affairs against the accused individual's liberty—and, by definition, contemplate that courts, which routinely review formal extradition requests from foreign governments, may block a citizen's transfer that lacks positive legal authority notwithstanding the impact on those government interests.[7] Here, the government argues that Petitioner—who has *not* been charged with a crime and who is ▮▮▮▮▮▮▮▮▮▮▮▮▮—merits not only fewer safeguards than fugitives from justice, but in fact no safeguards from illegal transfer at all. This cannot be the law.

---

[7] *See, e.g.*, *Gouveia*, 800 F. Supp. 259–60 (holding that a U.S citizen could not be transferred to Portugal because the statute granting the executive the power to transfer U.S. citizens was not passed until after the date the Portuguese court sentenced him *in absentia*); *Moghadam*, 617 F. Supp. at 788 (blocking an extradition request because the government had not shown probable cause and the principle of "dual criminality"—required under the U.S. extradition treaty with France—was not met); *Matter of Extradition of Santos*, 228 F. Supp. 3d at 1055–56 (blocking extradition of a U.S. legal permanent resident because the government failed to show probable cause that petitioner had actually participated in the crimes he was accused of).

UNDER SEAL

For these reasons, the balance of equities weighs in favor of Petitioner.

## IV. A temporary restraining order or preliminary injunction serves the public interest.

The public interest favors ensuring that American citizens are not lawlessly handed over to a foreign government, thereby depriving them of their right "to contest the lawfulness of their detentions" and seek release on habeas. ECF No. 51 at 8. Habeas remains "the precious safeguard of personal liberty and there is no higher duty than to maintain it unimpaired." *Bowen v. Johnston*, 306 U.S. 19, 26 (1939). The right to habeas corpus prevents the executive from exercising the unfettered power it claims here—the power to dispose of a citizen's liberty by its own *ipse dixit*. Contrary to the government's extreme positions in this litigation, habeas remains a vital check on executive detention, even in time of war. *Hamdi*, 542 U.S. at 536 ("[A] state of war is not a blank check for the President when it comes to the rights of the Nation's citizens.").

Maintaining this hallowed protection here serves the public interest. As Justice Kennedy stated in *Boumediene*: "Security subsists, too, in fidelity to freedom's first principles. Chief among these are freedom from arbitrary and unlawful restraint and the personal liberty that is secured by adherence to the separation of powers. It is from these principles that the judicial authority to consider petitions for habeas corpus relief derives." 553 U.S. at 797.

The executive has imprisoned Petitioner without charge for nearly seven months. It would make a mockery of the Great Writ if the executive could now strip this American citizen of his right to seek his freedom by rendering him to the custody of another country without established legal authority. In short, it violates the public interest to give the executive *carte blanche* over the liberty of American citizens based on the fiction that a forcible transfer to the custody of another government is equivalent to release from unlawful custody.

UNDER SEAL

CONCLUSION

For all of the foregoing reasons, Petitioner respectfully requests that this Court issue a

temporary restraining order or preliminary injunction prohibiting Respondent from transferring

Petitioner from U.S. custody to ████████ .


Dated:  April 18, 2018                                    Respectfully submitted,

                                                         /s/ Jonathan Hafetz
Arthur B. Spitzer (D.C. Bar No. 235960)          Jonathan Hafetz (D.C. Bar No. NY0251)
American Civil Liberties Union                   Brett Max Kaufman (D.C. Bar No. NY0224)
   of the District of Columbia                   Hina Shamsi (D.C. Bar No. MI0071)
915 15th Street, NW, 2nd Floor                   Dror Ladin (*pro hac vice*)
Washington, DC 20005                             Anna Diakun
Tel: 202-457-0800                                American Civil Liberties Union Foundation
Fax: 202-457-0805                                125 Broad Street—18th Floor
aspitzer@acludc.org                              New York, New York 10004
                                                 Tel: 212-549-2500
                                                 Fax: 212-549-2654
                                                 jhafetz@aclu.org
                                                 bkaufman@aclu.org
                                                 hshamsi@aclu.org
                                                 dladin@aclu.org
                                                 adiakun@aclu.org

*Counsel for Petitioner*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOHN DOE,

          *Petitioner*,

        v.

GEN. JAMES N. MATTIS,
  in his official capacity as SECRETARY OF
  DEFENSE,

          *Respondent*.

No. 17-cv-2069 (TSC)

# ECF 81-2

# REDACTED VERSION FOR PUBLIC FILING

<u>**UNDER SEAL**</u>

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JOHN DOE,

　　　　　　　　*Petitioner*,

　　　　　　　v.

GEN. JAMES N. MATTIS,
　in his official capacity as SECRETARY OF
　DEFENSE,

　　　　　　　　*Respondent*.

No. 17-cv-2069 (TSC)

## [PROPOSED]
## TEMPORARY RESTRAINING ORDER

Upon consideration of Petitioner's Application for a Temporary Restraining Order, and the entire record in this case;

It appears to the Court that: (1) Petitioner is likely to succeed on the merits of his challenge to Respondent's legal authority to forcibly transfer Petitioner to ▮▮▮▮▮▮; (2) if Respondent is not immediately restrained from transferring Petitioner from U.S. custody to the custody of ▮▮▮▮▮▮, Petitioner will both suffer irreparable injury in the form of permanently losing his constitutional and statutory rights to achieve his release from U.S. custody by demonstrating that his detention is unlawful, and the additional harms stemming from the severe restrictions on his liberty inherent in any forcible rendition to foreign custody; (3) to the extent that Respondent will be harmed if such an order is issued, these harms are significantly outweighed by the harm to Petitioner if an order is not issued; and (4) the public interest favors the entry of such an order. It is, therefore,

**UNDER SEAL**

ORDERED that Petitioner's Application for a Temporary Restraining Order is hereby GRANTED, and that Respondent James N. Mattis (along with his successors in office, officers, agents, servants, employees, and anyone acting in concert with him) is, for fourteen days from the date shown below, hereby temporarily restrained from transferring Petitioner from U.S. custody to the custody of ██████.

It is further ORDERED that Petitioner shall not be required to furnish security for costs.


Dated:  April 19, 2018 at _____ p.m.

_____

TANYA S. CHUTKAN
United States District Judge

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOHN DOE,

    *Petitioner*,

    v.

GEN. JAMES N. MATTIS,
 in his official capacity as SECRETARY OF
 DEFENSE,

    *Respondent*.

No. 17-cv-2069 (TSC)

# ECF 81-3

# REDACTED VERSION FOR PUBLIC FILING

<u>**UNDER SEAL**</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN DOE,

*Petitioner*,

v.

GEN. JAMES N. MATTIS,
  in his official capacity as SECRETARY OF
  DEFENSE,

*Respondent*.

No. 17-cv-2069 (TSC)

## [PROPOSED]
## PRELIMINARY INJUNCTION

Upon consideration of Petitioner's Motion for a Preliminary Injunction, and the entire record in this case;

It appears to the Court that: (1) Petitioner is likely to succeed on the merits of his challenge to Respondent's legal authority to forcibly transfer Petitioner to ███████; (2) if Respondent is not immediately restrained from transferring Petitioner from U.S. custody to the custody of ████████, Petitioner will both suffer irreparable injury in the form of permanently losing his constitutional and statutory rights to achieve his release from U.S. custody by demonstrating that his detention is unlawful, and the additional harms stemming from the severe restrictions on his liberty inherent in any forcible rendition to foreign custody; (3) to the extent that Respondent will be harmed if such an order is issued, these harms are significantly outweighed by the harm to Petitioner if an order is not issued; and (4) the public interest favors the entry of such an order. It is, therefore,

## ~~UNDER SEAL~~

ORDERED that Petitioner's Motion for a Preliminary Injunction is hereby GRANTED, and that Respondent James N. Mattis (along with his successors in office, officers, agents, servants, employees, and anyone acting in concert with him) is, until further order of this Court, hereby enjoined from transferring Petitioner from U.S. custody to the custody of ███████ .

It is further ORDERED that Petitioner shall not be required to furnish security for costs.

Dated:  April 19, 2018 at _____ p.m.        _____
                                               TANYA S. CHUTKAN
                                               United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOHN DOE,

*Petitioner*,

v.

GEN. JAMES N. MATTIS,
 in his official capacity as SECRETARY OF
 DEFENSE,

*Respondent*.

No. 17-cv-2069 (TSC)

# ECF 81-4

# REDACTED VERSION FOR PUBLIC FILING

<u>**UNDER SEAL**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOHN DOE,

          *Petitioner*,

          v.

GEN. JAMES N. MATTIS,
  in his official capacity as SECRETARY OF
  DEFENSE,

          *Respondent*.

No. 17-cv-2069 (TSC)

**CERTIFICATE OF COUNSEL REQUIRED BY LOCAL RULE 65.1(a)**

      Pursuant to Local Rule 65.1(a), the undersigned counsel for Petitioner hereby certifies as

follows:

      Copies of all pleadings and papers to be presented to the Court at the April 19, 2018

hearing on the application for a Temporary Restraining Order and Motion for Preliminary

Injunction have been delivered to Respondent by email addressed to Kathryn L. Wyer, U.S.

Department of Justice, Civil Division, 20 Massachusetts Avenue, NW, Washington, D.C. 20001

(kathryn.wyer@usdoj.gov), and Terry Marcus Henry, U.S. Department of Justice, Civil Division,

20 Massachusetts Avenue, NW, Washington, D.C. 20001 (terry.henry@usdoj.gov), at

approximately 12:00 p.m. on April 18, 2018.


Dated:  April 18, 2018                Respectfully submitted,

                             */s/ Jonathan Hafetz*_____

Arthur B. Spitzer (D.C. Bar No. 235960)     Jonathan Hafetz (D.C. Bar No. NY0251)
American Civil Liberties Union            Brett Max Kaufman (D.C. Bar No. NY0224)
  of the District of Columbia           Hina Shamsi (D.C. Bar No. MI0071)

**UNDER SEAL**

915 15th Street, NW, 2nd Floor
Washington, DC 20005
Tel: 202-457-0800
Fax: 202-457-0805
aspitzer@acludc.org

Dror Ladin (*pro hac vice*)
Anna Diakun
American Civil Liberties Union Foundation
125 Broad Street—18th Floor
New York, New York 10004
Tel: 212-549-2500
Fax: 212-549-2654
jhafetz@aclu.org
bkaufman@aclu.org
hshamsi@aclu.org
dladin@aclu.org
adiakun@aclu.org

*Counsel for Petitioner*