```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


    JOHN DOE,                       .
                                    .
              Petitioner,           .   CA No. 17-2069 (TSC)
                                    .
         v.                         .
                                    .
    JAMES N. MATTIS,                .   Washington, D.C.
                                    .   Friday, June 8, 2018
              Respondent.           .   9:08 a.m.
    . . . . . . . . . . . . . . . .
```

```
                TRANSCRIPT OF STATUS HEARING
          BEFORE THE HONORABLE TANYA S. CHUTKAN
                UNITED STATES DISTRICT JUDGE
```

<u>APPEARANCES</u>:

```
For the Petitioner:      JONATHAN HAFETZ, ESQ.
                         DROR LADIN, ESQ.
                         HINA SHAMSI ESQ.
                         American Civil Liberties Union Foundation
                         125 Broad Street
                         18th Floor
                         New York, NY 10004
                         (212) 549-2500


For the Respondent:      JAMES M. BURNHAM, ESQ.
                         TERRY M. HENRY, ESQ.
                         KATHRYN L. WYER, ESQ.
                         OLIVIA HUSSEY SCOTT, ESQ.
                         U.S. Department of Justice
                         Federal Programs Branch
                         20 Massachusetts Avenue, NW
                         Washington, DC 20530
                         (202) 514-4107


Court Reporter:          BRYAN A. WAYNE, RPR, CRR
                         U.S. Courthouse, Room 4704-A
                         333 Constitution Avenue, NW
                         Washington, DC 20001
                         (202) 354-3186
```

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

PROCEEDINGS

THE DEPUTY CLERK:  Your Honor, we have Civil Action 17-2016, John Doe versus James Mattis.  I would ask that lead counsel please approach the lectern, identify yourself and those at your respective tables, starting with the plaintiff. Thank you.

MR. HAFETZ:  Good morning, Your Honor. Jonathan Hafetz from the ACLU.  I'm joined by Dror Ladin and Hina Shamsi, also from the ACLU.

THE COURT:  Good morning.

MR. BURNHAM:  Good morning, Your Honor.  James Burnham from the Justice Department, joined by Terry Henry, Kathy Wyer, and Olivia Scott Hussey, also from the Justice Department.

THE COURT:  Good morning.  Thank you all.  Obviously, we're operating on very tight schedules here.

Okay.  I'd like to conduct as much of this in open court as I can.  Obviously, there may be points at which we'll have to close for matters that are under seal, but I'd like to go as far as I can in open court.

Let's just -- the document 94, the notice that was filed, that was not filed under seal, correct, Mr. Burnham?

MR. BURNHAM:  That's correct, Your Honor.

THE COURT:  So it is a public matter that the Department of Defense intends to release the petitioner in Syria.

1          MR. BURNHAM:  Yes, Your Honor.

2          THE COURT:  The details of that, that's under seal.

3    That's being treated as classified; is that right?

4          MR. BURNHAM:  We have filed a redacted version of

5    the Mitchell Declaration, so a lot of it is public, Your Honor.

6          THE COURT:  Can I see -- I don't have the redacted.

7    I just have the unredacted version, if you could hand one up.

8          MR. BURNHAM:  Certainly.

9          THE COURT:  Thank you.

10       (Document tendered to the Court.)

11          MR. BURNHAM:  Essentially, Your Honor, it's the

12    location --

13          THE COURT:  No, I don't --

14          MR. BURNHAM:  Okay.

15          THE COURT:  Okay, this is -- sorry.

16          MR. BURNHAM:  I was just describing what is still

17    sealed.  It's basically the location, things that would reveal

18    the location and the time.

19          THE COURT:  All right.

20          MR. BURNHAM:  And that's for petitioner's safety as

21    much as our own.

22          THE COURT:  I agree.  Okay.  So I have a number of

23    questions.  As with everything in this case, we are in uncharted

24    territory, and apart from *Kiyemba* and *Munaf*, it's not lost on

25    this Court that the parties haven't cited a plethora of cases

because there aren't any.

The first question that I have for you, Mr. Burnham, is what is the urgency of this case?  I mean, you want to release the petitioner within 72 hours, and I'm not understanding why it has to happen within 72 hours.  But I did review your reply, and -- hold a second.  Hold on.  I had some questions up here.

Towards the end of your opposition on page 11, I guess it's your -- yeah, document No. 99, you request in the alternative that the Court set an abbreviated schedule for further proceedings with respondent providing further support for its determination regarding petitioner's release on or before Thursday, June 4, 2018; petitioner providing the response on or before Tuesday, June 19.  In light of this, are you proposing that I hold my decision on the petitioner's TRO application in abeyance until after further briefing?

MR. BURNHAM:  So, obviously, our preference, Your Honor, is that you just deny it today.  If the Court is not inclined to deny it today, then, yes, we would prefer --

THE COURT:  Yes.  I would prefer that.  And I want to go forward with this hearing, but I think -- you know, haste makes reversal, and I -- these are very, very serious issues. And the petitioner's right that if he's released to a place where he faces certain death or a very strong likelihood of being killed, there's nothing this Court can do once he's released.  So I think given what's at stake and the decisions

1    that I have to make and the information I'm going to need, I

2    think it makes sense to do that.  But I want to go forward with

3    this hearing.

4         MR. BURNHAM:  The one request I would make, then,

5    Your Honor, is that we vacate the currently set June 20th

6    hearing on the legal authority question while we litigate the --

7         THE COURT:  I understand.  I -- look.  I'm already in

8    a merger hearing, having to deal with this.  I'm happy to not

9    have to prepare for the June 20th hearing, but I want to hear

10   from Mr. Hafetz regarding that.  And then if I want to vacate

11   it, maybe postpone it -- Mr. Hafetz, what's your position on

12   both the request to extend the briefing and argument in this

13   case and also to vacate the hearing date in the habeas case?

14        MR. HAFETZ:  Your Honor, we think the June 20th

15   date -- we think the TRO should be granted.  We think that the

16   government should be enjoined from releasing the petitioner --

17        THE COURT:  Right.

18        MR. HAFETZ:  -- into Syria, and that the June 20th

19   hearing date should remain.

20        THE COURT:  I understand, but what I'm saying to

21   you is that I think that the government has made what I think

22   is a reasonable offer to give me additional time to gather the

23   facts and information I need and do the research I need before

24   deciding whether to grant your petition for a TRO.

25        Do you have any objection to that?

1          MR. HAFETZ:  As long as the petitioner is -- the

2    government commits not to transferring petitioner in the interim.

3    And if Your Honor is inclined to adopt the government's proposed

4    schedule and postpone the June 20th merits hearing, we would

5    request that a hearing on the preliminary injunction be

6    conducted on June 20th, for that date, right?

7          THE COURT:  Wait.  Oh, I see what you mean.  Yeah,

8    that makes sense, Mr. Burnham.

9          MR. BURNHAM:  Your Honor, I think the government's --

10   if Your Honor adopted the schedule we proposed where I believe

11   their reply comes in on 19 and is inclined to have the hearing

12   the next day, we have no problem with that.

13         THE COURT:  Okay.  I think that is a reasonable

14   proposal --

15         MR. BURNHAM:  Thank you, Your Honor.

16         THE COURT:  -- and I appreciate your proposing that.

17         MR. BURNHAM:  We're the government, and we're here to

18   help, Your Honor.

19        (Laughter)

20         THE COURT:  Well, petitioner apparently takes a

21   different view of that.

22        (Laughter)

23         MR. HAFETZ:  Your Honor, if Your Honor is inclined, as

24   Your Honor appears to be, to go that direction, we would request

25   that the merits hearing be scheduled promptly thereafter.

1          THE COURT:  Okay, yes.  Well, obviously, that depends

2    on what happens.  I'm not saying it's not going to happen, but

3    obviously let's not put the cart before the horse.

4          So, okay.  Then I think that's agreeable, Mr. Burnham, and

5    again, I do appreciate that, given how fast everything is

6    happening.  So here's the schedule for further proceedings:

7          Respondent is to provide further support for its

8    determination regarding petitioner's release on or before

9    Thursday, June 14.  Petitioner should provide a response on or

10   before Tuesday, June 19.

11         Instead of having the hearing on the habeas petition on

12   June 20th, we will have a hearing on the petitioner's motion for

13   a temporary restraining order or preliminary injunction on the

14   20th.  After the Court has ruled on that and the government's

15   notice, we will determine whether a hearing needs to be held on

16   the motion for habeas.

17         I have to say this is unusual.  You know, the government's

18   saying we don't want to keep him, release him, and the

19   petitioner's saying, no, no, we must have our day in court.

20   This is not usually how these matters go, but this case has

21   never been typical.

22         But while we're here, I do have some questions, and I have

23   a merger hearing that I'm in that I'm going to start soon, but I

24   have some questions of the parties that will inform my decision.

25         Mr. Hafetz, I remember very distinctly you being before me

1    saying, when you were arguing for your temporary restraining

2    order to block the transfer of the petitioner, and you

3    repeatedly said we just want -- we're not asking --  you know,

4    we want the door of the jail to be open; we're not asking for --

5    because at the one point, Mr. Burnham or Ms. Wyer, I can't

6    remember which one, said they want us to put petitioner on a

7    plane and bring him back to the United States.

8         And you, as I recall, said we're not asking for that, and

9    it does appear that you now are.  Is that one of the requests

10   for relief that you're asking, that petitioner be put on a plane

11   and be brought back to the United States?

12        MR. HAFETZ:  Absolutely not, Your Honor.

13        THE COURT:  Okay.

14        MR. HAFETZ:  We're not seeking to litigate the merits.

15   We're seeking for the client to be released, but to be released

16   into a safe place.  And so the jailhouse doors we were talking

17   about are not in Syria.  And in seven hearings I think in this

18   case, in this court and the court of appeals, no one has

19   suggested what is truly shocking, I mean truly shocking: to take

20   a U.S. citizen and put him in Syria, which is in the middle of a

21   civil war --

22        THE COURT:  That's where he was.  He was in Syria.

23   Didn't he voluntarily take himself to Syria?

24        MR. HAFETZ:  Yes, Your Honor, but he was fleeing

25   Syria, trying to leave Syria, and the United States now wants to

1   put him back.  And not only that, they want to now put him back,

2   after nine months of detention, after they've branded him an

3   enemy combatant.  They're not saying they maintain he poses a

4   threat.  They do not deny he's an enemy combatant.  There's no

5   assurance of his safety.  He's been abused in Syria by the same

6   forces into whose territory he's being put.

7        THE COURT:  And there appears to be some discrepancy.

8   I read your pleadings, and you do allege that he was beaten and

9   tortured while in the custody of forces but that -- what you

10   said was he was asked.  What was tellingly omitted from your

11   declaration was that he never said he was beaten.

12        What you said was he was asked whether he was injured, and

13   it appears that he told U.S. authorities that he was not beaten.

14   So I have -- again, these are factual discrepancies in the

15   record that I am not anxious to have to delve into, but there

16   are discrepancies in the record.

17        I mean, you say in your declaration that he was asked --

18   that he was asked about whether he was hit in the head, I

19   believe, but you don't say in your declaration that he told the

20   government that he had been beaten or that he had been tortured

21   in any way.  Are you saying that he did tell them?

22        MR. HAFETZ:  Your Honor, I think if you -- yes.

23   The first paragraph, the first line says, "Petitioner described

24   his abuse by SDF solders to U.S. officials."  So it was just an

25   example of that that he described it, and, in fact, not only

that, but a medical official who examined him saw the evidence
and asked him.  So it's not just he told -- it's he told him
plus.

THE COURT:  Paragraph 20 says, "Asked if he had been
beaten on the back of his head."  Did he tell them he had been
beaten on the back of his head?

MR. HAFETZ:  Yes.  He told them beaten on the back of
his head.  He told them he he'd been shot at.  He told them of
the abuse that he suffered, which is described and which we are
prepared to submit a declaration from petitioner himself in the
time -- assuming it's feasible.

THE COURT:  Okay.  Because he was taken into custody
in Syria where he traveled voluntarily.  Even assuming for
purposes of argument that he was now fleeing, is it unreasonable
for them to release him to a place where he had taken himself
voluntarily?

MR. HAFETZ:  If it's not safe, it is illegal.  I mean,
this is a bedrock requirement of the laws of war, that you can't
release a prisoner, an alleged enemy prisoner, into an unsafe
situation.

THE COURT:  Okay.  The Defense Department -- and
again, obviously, you all can further brief this and present
whatever evidence you want to, but the Defense Department has
determined that the petitioner's release in Syria complies with
the law of war.  Now, what authority do I have to second guess

1      that determination that he can safely be released in Syria?

2                MR. HAFETZ:  Well, Your Honor, this is not a

3      government position.  This is a litigation position adopted

4      for this case.  The United States Department of State describes

5      Syria as among the most dangerous places on earth.  It warns

6      any person from going there.  It's as if you were to go to

7      Syria, you should basically make out your will, literally, is

8      what it says.  It describes it as among the most dangerous

9      places on earth, a no-go zone, a place where you take your life

10     in your hands.

11               THE COURT:  But it was that dangerous -- in fact,

12     it's arguably less dangerous than when the petitioner went

13     there.  Isn't it?

14               MR. HAFETZ:  Well, Your Honor, for him it's certainly

15     more dangerous because --

16               THE COURT:  By virtue of the fact that he's been held

17     all this time?

18               MR. HAFETZ:  By virtue of the fact that he's been

19     held, that he's been labeled an enemy combatant, that he's been

20     given no assurance of his way out, that he's not -- they're not

21     telling the SDF that he's not a threat; they're not telling them

22     to give him safe passage.  It's like if it were the Vietnam War,

23     the United States could not release a North Vietnamese soldier

24     in Saigon.  I mean, that's essentially what they're doing here.

25     It doesn't matter -- under the laws of war, it doesn't matter

1   what he was doing there or why --

2          THE COURT:  It's an interesting confession you're

3   making, Mr. Hafetz.  He's denied being an enemy combatant.

4          MR. HAFETZ:  Well, I'm saying they could -- I'm not

5   conceding he's an enemy combatant.  I'm saying they couldn't

6   even -- to clarify, they couldn't even release a suspected North

7   Vietnamese soldier in Saigon.  Right?  So they couldn't release

8   an admitted North Vietnamese soldier in Saigon --

9          THE COURT:  Right.

10          MR. HAFETZ:  -- I'm for sure they couldn't release a

11   suspected North Vietnamese soldier in Saigon.

12          THE COURT:  I guess -- you know, the question is you

13   have maintained throughout this litigation that you are seeking

14   the release of a petitioner, and it seems like it's one of those

15   situations where, be careful what you ask for, because now they

16   are seeking to release him.  And I understand your position,

17   which is the release they're seeking to effectuate is tantamount

18   to execution or torture, because that's what will happen to him.

19          But my question is, how much -- I mean, how much power do

20   I have to sort of sit here and decide where he goes?  You know,

21   according to the government, they gave the petitioner two

22   options for release.  He rejected both of them.  At what point

23   does he get to say, okay, you know -- and I don't mean to be

24   facetious in any way -- Switzerland sounds good?  I mean, how

25   much say does he or you or I have over where the Defense

1  Department wants to release him?

2          MR. HAFETZ:  All that's before Your Honor now, is

3  whether you can block his transfer to Syria.  Your Honor doesn't

4  have the authority to have him be released anywhere else except

5  within the United States, but we're not -- but the government is

6  free to release him in some other place.

7          It's funny, Your Honor, that the first time now, after

8  nine months of detention, where they've branded him an enemy

9  combatant to the world, just days before or a week before,

10  whatever it is, they then say, oh, now we're going to release

11  him, but the only place that they're going to release him is to

12  the middle of a war zone where two coordinates of the

13  government, the State Department and the Homeland Security, say

14  is utterly dangerous.  It's like they're releasing him into a

15  burning building.  So they have -- he doesn't have a right to be

16  released into the United States unless there's no other

17  alternative and the Court orders it.  But they could do that.

18          THE COURT:  Is it your position that nowhere in Syria

19  would be safe for him?

20          MR. HAFETZ:  Nowhere in Syria would be safe for him,

21  Your Honor.  And, moreover, I would add that the United States

22  -- nowhere in Syria will be safe.  Syria is categorically

23  unsafe, but the United States government is not even doing any

24  additional things to help mitigate the risk.

25          Providing him with an identity document.  He doesn't have

1    any ID.  They're dropping him in a war zone without an ID.  It's

2    dangerous to go if you haven't been branded an enemy combatant

3    and you have a passport.  He's being dropped there, after being

4    targeted as an enemy combatant in Syria, without any ID.  And

5    there's no government there.  There's no consular services.

6    There's no embassy.  There's no way for him to even recover his

7    passport.

8         If he were, on the other hand, released in Iraq, which is

9    one we were talking about when we asked that the jail doors be

10   opened, with some assurance at least that he was not there

11   illegally, he could at least go to the U.S. embassy or the U.S.

12   consulate and obtain a U.S. passport.  There are parts of Iraq

13   that are not war zones.

14        So when we were talking about opening the doors there,

15   there are conditions there where they could release him.  We've

16   proposed over and over again alternatives to the government to

17   try to resolve this, to try to find a place if they want to

18   release him, a safe way to release him, and they've refused at

19   every turn.

20        So their only response is to take this American and drop

21   him in a place where the State Department tells every America

22   citizen don't go, where we're not even sending noncitizens back.

23             THE COURT:  You're going to have to slow down a little

24   bit for my court reporter.  Thank you.

25             MR. HAFETZ:  I mean, Your Honor, this is truly

1    shocking.  No one's even raised this proposition before, because

2    no one even thought it was even imaginable that they would

3    return a citizen who they have an obligation, having had custody

4    over him for nine months, to ensure his safety and dump him in a

5    war zone with money, which now, incidentally, since it's public,

6    puts another target over his head.

7         THE COURT:  All right.  Thank you, Mr. Hafetz.

8         Mr. Burnham, I have some questions for you.  Given that

9    everyone agrees that the petitioner is a United States citizen,

10   first of all, why -- Mr. Hafetz makes a good point, which is

11   this is a country that the U.S. government has advised all U.S.

12   citizen to either leave, or if they're determined to stay, to

13   make a will and funeral arrangements.

14        Why is the government going to release this man to a place

15   where he faces, according to your own government, to our own

16   government, a very strong likelihood of being killed?

17        MR. BURNHAM:  So certainly, I think, Your Honor, we

18   would reject the premise of the question.  The State Department

19   has a countrywide advisory that they've issued that talks about

20   the parts that are controlled by the central government, the

21   parts that are controlled by ISIS, the parts that are controlled

22   -- I mean, it's the whole country.  The Defense Department has

23   made a much more particularized determination about the specific

24   location where we're planning to release the petitioner.

25        THE COURT:  But let's put aside that particularized

1    determination.  The State Department has said that no part of

2    Syria is safe from violence.  Is that correct?

3              MR. BURNHAM:  That is correct, as a general matter.

4              THE COURT:  As a general matter.  So your position

5    is, notwithstanding that general description, the Department of

6    Defense has done a more detailed assessment and said that this

7    particular area is free from conflict and safe enough to release

8    him.  But this is not an area where -- we have two parts of

9    government speaking.

10       If I, as a U.S. citizen, went to the State Department and

11   said I want to travel to this area where you're proposing to

12   release the petitioner, State Department officials would say,

13   We strongly suggest you don't, and if you do, you better have a

14   will and funeral plans.

15             MR. BURNHAM:  So I actually need to look into the

16   will part.  I have not had a chance to review that --

17             THE COURT:  That's rhetorical.

18             MR. BURNHAM:  I believe that particular advice is for

19   people who are planning to go fight in the war.

20             THE COURT:  I think it's for people who are planning

21   to stay.

22             MR. BURNHAM:  I don't want to -- it doesn't matter.

23             THE COURT:  It really doesn't.  The State Department

24   has asserted that it is dangerous, and the whole country is not

25   free from violence.  And if I were to go to the State

Department and say, I'm considering traveling to Syria, the

State Department would say, We strongly advise against it.

MR. BURNHAM:  Right.  So I think the standard for

the State Department's advice about where you should, you know,

go on a vacation --

THE COURT:  No, no.  It's not --

MR. BURNHAM:  -- is different from -- no, but,

Your Honor, I think this is a serious point.  So I think the

State Department would say that we don't advise going to Syria

generally, but I don't think they would say that we've studied

the conditions in this part of a country and have made a

determination that this is not a safe place in the country to be.

THE COURT:  Well, I think the State Department would

say we don't think anywhere in Syria is safe, and then a Defense

Department official may say, but this particular part isn't as

dangerous as other parts.  I'll grant you that.

Let's say for purposes of the argument that the location

where you propose to release the petitioner is not as dangerous

as other parts of Syria.  That doesn't make it safe, does it?

That makes it relatively less dangerous.

MR. BURNHAM:  You know, I think we're talking about

the a spectrum, and I think what the initial declaration that we

filed tells the Court is that this part of the country is safe.

THE COURT:  Why Syria?

MR. BURNHAM:  Well, that's where he went.  So when we

```
 1    were in the last round of all of this and we were talking about
 2    a transfer, they had suggested at various times that --
 3              THE COURT:  By "they" you mean --
 4              MR. BURNHAM:  The petitioner had suggested at various
 5    times that the only place he had voluntarily gone was Syria, and
 6    so everywhere else would have been a transfer and therefore
 7    would have required some additional authority.
 8              THE COURT:  Wait.  I don't --
 9         (Simultaneous speaking.)
10              MR. BURNHAM:  -- from the release.  So it's
11    complicated, because they did concede -- I agree with Your
12    Honor, as you suggested previously, that a release in the
13    country he's in would be complete relief.
14              THE COURT:  Right.
15              MR. BURNHAM:  But there had been at least some
16    suggestion that maybe that wouldn't -- it doesn't matter.
17    The point is, he went to Syria initially and was captured on
18    the battlefield in Syria, fleeing as an ISIS fighter from ISIS-
19    controlled territory.
20              THE COURT:  Well, that has not been decided.  The
21    government can't have it both ways.  They can't use facts to
22    allege that he's an enemy combatant --
23              MR. BURNHAM:  Right.
24              THE COURT:  -- when they've never had --
25              MR. BURNHAM:  Sorry.  Your Honor --
```

1      THE COURT:  -- never been charged.

2      MR. BURNHAM:  Just to be clear, I'm not relying on the

3  fact that we believe he was an ISIS fighter for purposes of my

4  argument.  I'm just making the point that what he does not

5  dispute to be true, which is that he did voluntary go to Syria,

6  and that the place we are proposing to release him is much

7  better and certainly much safer than where he was when he was

8  detained, which is to say -- you know, they conflate all of it.

9  So they try to suggest that we are releasing him on a

10  battlefield, that he's going to be shot at or subject to, you

11  know, hostile war --

12      THE COURT:  Okay.  But is there any other strategic

13  or other -- again, if you can't say this in open court, we can

14  close the court, but is there any other reason, beyond the fact

15  that he was captured there, why he should be released there and

16  not somewhere else that's not in the middle of a civil war?

17      MR. BURNHAM:  As the Court knows, we had an

18  arrangement for him to go to a different place.

19      THE COURT:  That was not a release.

20      MR. BURNHAM:  No, I understand that it was a transfer,

21  but I'm saying that we have tried -- we're trying to find

22  something that is safe and that is reasonable --

23      THE COURT:  Well, Mr. Hafetz --

24      MR. BURNHAM:  -- for this individual.

25      THE COURT:  -- says he's made a number of -- and I

1    don't know the details.

2            MR. BURNHAM:  I don't think we should get into the

3    details.

4            THE COURT:  I don't want to get into the details.

5    That's not my role.  It is a difficult situation for the

6    government, I grant you that, but it should not be that --

7    it doesn't seem to this Court that the petitioner's alternative

8    should be detention in a facility or a very large chance of

9    being killed or tortured.  And that brings to my other point:

10   Why no identification papers?

11           MR. BURNHAM:  So in order to -- so just, again, we

12   seriously dispute, and have filed evidence to the contrary, that

13   he is at a serious risk of torture, death, violence, any of the

14   things that my friends over here have suggested will happen.

15   We vigorously dispute that.

16           THE COURT:  Okay.  So let's set the stage for a moment.

17           MR. BURNHAM:  Certainly.

18           THE COURT:  You're proposing to release a man who --

19   without naming names, but there's been a tremendous amount of

20   publicity about, with publicly declared funds, where the

21   government has publicly declared its belief that he was an ISIS

22   fighter.  You're proposing releasing him to a country which is

23   in the middle of a civil war and where suspected ISIS fighters

24   have been executed or tortured, and you propose doing that with

25   a U.S. citizen who has no way of proving that he's a U.S.

1     citizen, no identification whatsoever.

2           MR. BURNHAM:  To be clear, Your Honor, they have filed

3     no evidence that the Syrian Democratic Forces torture people or

4     execute people.  That is just a complete -- that is something

5     they have asserted without any basis for that.

6           THE COURT:  But why is it, given how hard it was for

7     him to reach U.S. custody -- he told his captors that he was a

8     U.S. citizen, and they didn't believe him.  Whatever.  The point

9     is, I don't understand what harm it would do the government to

10    give this man some identification.

11          MR. BURNHAM:  Right.  Sorry.  To answer the

12    identification question, so in order to obtain a passport, he

13    would have to apply for a passport, and there's a lot of rules

14    and regulations at the State Department --

15          THE COURT:  There are other documents that he could

16    have.  It doesn't have to be a passport.  I mean, maybe that's

17    what the petitioners are saying, but I'm asking you, why does he

18    have no identification at all to show that he's a citizen?

19          MR. BURNHAM:  So we've given him what he had when we

20    obtained him --

21          THE COURT:  I know.  Well --

22          MR. BURNHAM:  He did not have his passport when he

23    came into our custody.  He says it was lost.  Obviously, there's

24    a factual dispute about what happened to his passport, and so --

25    okay.  But I understand Your Honor not to be saying we should

1   give him a passport --

2           THE COURT:  Right.

3           MR. BURNHAM:  We can look into whether we can give him

4   like a letter --

5           THE COURT:  A travel paper or --

6           MR. BURNHAM:  -- saying that he's an American --

7           THE COURT:  I don't want a -- I'm not a --

8           MR. BURNHAM:  There's a limited number of -- very

9   limited number under U.S. law of travel papers, which I think

10  I would consider to be a passport, or something akin to a

11  passport.  We are happy to explore whether we could give him

12  something that just says his name, which is sealed.

13          THE COURT:  And he is a United States citizen.

14          MR. BURNHAM:  Yeah, no, no.  Yes.  And that he's a

15  U.S. citizen, and maybe even that we're not asking anyone to

16  hold him.  I mean, I can look into that.

17          THE COURT:  Yes.

18          MR. BURNHAM:  We can report back to you in our paper

19  that we're filing next week.

20          THE COURT:  Yes.

21          MR. BURNHAM:  Absolutely.  I do want to say, though,

22  the Syrian Democratic Forces is a trusted local partner that the

23  United States military is very familiar with and that Sec. 1209

24  of the 2015 National Defense Authorization Act requires that we

25  vet for compliance with the law of war humanitarian treatment

1    and the like before we're able to coordinate and cooperate

2    with them.  This is a very reliable, modern military force,

3    and I strongly resist the suggestion that they did anything

4    inappropriate with this petitioner, with anybody else, and that

5    they would harm him if he is released --

6           THE COURT:  Is it your assertion, Mr. Burnham, that --

7    do you dispute petitioner's allegations that he was beaten while

8    in custody of the SDF?

9           MR. BURNHAM:  Yeah.  We can prove that they're false.

10   I mean, we have his medical re -- so there's some -- obviously,

11   as the Court knows, there are rules about medical records.  So

12   we have not gotten -- the people at the Defense Department who

13   are authorized, we are certain, to access the records, have

14   reviewed the records and spoken with the physician that he

15   claims he told all this to, and that's just not true.

16          THE COURT:  All right.

17          MR. BURNHAM:  And we're happy to -- we'll figure this

18   out and file something more substantive than what I just said

19   with Your Honor.

20          THE COURT:  All right.  I think -- all right.  That's

21   all the questions I have, Mr. Burnham.

22          MR. BURNHAM:  Thank you, Your Honor.

23          THE COURT:  Mr. Hafetz.

24          MR. HAFETZ:  Your Honor, on the question of the

25   factual dispute, in addition to the statements by the two

coordinated branches of the government -- and the State
Department, by the way, does say if you travel to Syria, make
out your will.  It's in black and white.

The government declarant is not saying the government
itself concedes the situation there is fluid, can change with
little warning, there's no way out, the borders are closed.
We've reviewed -- there's no ID documents that he has.  There's
no way of him getting the documents.

And it would be unsafe for you, for me, for Mr. Burnham, to
travel to Syria.  It's completely unsafe for petitioner, because
the United States has said, again today, they still consider him
an ISIS fighter, they're denying him the chance to disprove it,
and so they're releasing him in territory that they just said is
controlled by a trusted partner in the fight against ISIS.  This
is -- so they're sending him back to a place where on their
description of him he is viewed as part of a hostile force.

THE COURT:  But haven't they stated in their notice
that they would inform the SDF that he is not somebody who
should be detained?

MR. HAFETZ:  Well, all they've said at this point is
they've represented that they would ask -- say to the SDF, we're
not asking, we're not with requesting that you detain him.

That is hardly an assurance.  That is not assurance that
they won't detain him.  And, in fact, the inference is, if
you've been holding this person as an enemy combatant for nine

1    months, your own citizen, you're dumping him in our territory,

2    what are you asking us to do with him?  I mean, I think it's

3    very, very troubling.  That does not ameliorate the danger in

4    any significant way.

5        Also, again, I want to resist this notion, both under the

6    laws of war which the government claims they're complying with,

7    and under the Constitution, that having once been in danger, it

8    means the United States can just put you back into a dangerous

9    situation.  It can't do that.  That's what --

10        THE COURT:  What they're saying now is it may have

11    been dangerous then, but it's not dangerous now.  I understand

12    there may be some disagreement on that.  But I think they're

13    saying, when we took him into custody, it was dangerous, but now

14    it's not dangerous.  We've determined it's not dangerous, we've

15    made our specific assessment, and we think it won't be dangerous

16    for him to return to that particular point.  I have questions as

17    to why there, but their position is that's where he started, so

18    that's where he goes back.

19        MR. HAFETZ:  And I would say that's contradicted by --

20    that litigation position in this case is contradicted by

21    statements by the U.S. government coordinate branches that apply

22    to all U.S. citizens.  They're saying it's dangerous for any

23    U.S. citizen to go to any part of Syria, and it's particularly

24    dangerous for this U.S. citizen to be released in Syria

25    including in the place --

1          THE COURT:  Would that position change if you were

2     provided some kind of travel documents or some kind of document

3     that stated that he was, you know, free to -- I don't know --

4     something more than what they were originally planning on doing

5     with him?

6          MR. HAFETZ:  Your Honor, we think Syria is inherently

7     dangerous.  However, the danger would be lessened with an

8     identity document, with a guarantee to be able to pass through

9     the territory, and assurance not just that they're not asking

10    the SDF to detain him, but that this trusted partner assures

11    they will not detain him.

12         Otherwise, they're putting him back in territory -- they

13    say, Here -- here's someone who's an enemy combatant.  We've

14    alleged he's an enemy combatant, we're saying he's an enemy

15    combatant, but we're letting him go.  We're putting him in your

16    territory.  We're not asking you to detain him on our behalf,

17    but this is someone -- this is a hostile force.

18         I mean, Syria is, again, one of the most dangerous places

19    on planet earth.  It's especially doubly dangerous for this

20    individual, in part because of what the government has done to

21    him, what they've alleged against him.  And they, at this point,

22    have done virtually nothing to try to mitigate any danger or

23    defined another alternative that we are trying to propose so

24    that he gets out of jail.

25         He doesn't want to stay in prison.  He wants to go out, but

1    he wants to go out as a free man, and he wants to go out where

2    he's not going to be at grave risk of losing his life.  It's not

3    a lot to ask for.  And if the government is not prepared to

4    defend their allegations, then he's entitled to that.

5              THE COURT:  Well, it does appear that the government's

6    willing to release him as a free man, so one of those factors is

7    met.  The question, though, is going to be how much he gets to

8    decide where he goes, and he doesn't have a blank check in that

9    regard.  You know, he doesn't get to pick where he's released.

10      I agree that there's a gulf between being released

11   somewhere where there's a very high likelihood that you're going

12   to be killed, and being released to a place of your choice, and

13   it seems to me -- and I don't understand why both these sides

14   haven't been able to come up with some agreeable alternatives.

15             MR. HAFETZ:  We are happy to find an alternative, but

16   this is the first place they've said he would be released, the

17   first time.  And lo and behold, a week before the hearing, the

18   one place they want to release him is a place that the

19   United States warns its own citizens not to go and won't even

20   send back noncitizen Syrians because it's so dangerous.  So he

21   doesn't get to pick.  And he has a right not to be released into

22   a dangerous place.

23             THE COURT:  I understand.  All right.

24             MR. BURNHAM:  Your Honor, may I make one point?

25             THE COURT:  Yes, Mr. Burnham.

1          MR. BURNHAM:  One thing that might simplify the

2    medical records issue, if the Court directs us to provide them

3    to his counsel and the Court, then my understanding is that that

4    is sort of like the magic words that gets us out of --

5          THE COURT:  I will order that the records be provided

6    subject to a protective order if you guys could give me one.

7          MR. BURNHAM:  Certainly, Your Honor.  We'll work that

8    out with --

9          THE COURT:  All right.  And I know you understand your

10   obligations, but I think it would be helpful to have them

11   subject to protective order.

12         MR. BURNHAM:  Yes, Your Honor.

13         THE COURT:  All right.  Thank you all for coming in

14   and preparing the pleadings on such a short notice.  We will

15   reconvene here on the 20th after I've reviewed your submissions.

16     I always do this:  I encourage the parties to try and reach

17   a resolution.  You know, the government is free to decide that

18   military and other resources, it's not in their interest to

19   devote further resources to this.  And that may be true, but

20   resources are going to be devoted if we have to keep litigating

21   this.  So I would encourage the parties to try and work towards

22   a mutually agreeable solution.  Thank you.

23     (Proceedings adjourned at 9:46 a.m.)

24

25

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify

that the foregoing pages are a correct transcript from the

record of proceedings in the above-entitled matter.

*Bryan A. Wayne*
BRYAN A. WAYNE