IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | |
| in his official capacity as SECRETARY | ) | |
| OF DEFENSE, | ) | |
| | ) | |
| Respondent. | ) | |

## **RESPONDENT'S NOTICE OF FILING PUBLIC VERSIONS OF SEALED FILINGS**

NOTICE is hereby given that attached are redacted versions, suitable for public filing, of the documents previously filed under seal as ECF Nos. 99 and 101. The redactions in these filings protect specific details regarding the noticed release of Petitioner and the identities of certain declarants. Counsel for Respondent has also conferred with counsel for Petitioner regarding the redaction of information relating to Petitioner's identity and medical history, and the redaction of such information in ECF No. 101 is in accord with counsel for Petitioner's requests.

June 22, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
JESSIE K. LIU
United States Attorney
TERRY M. HENRY
Assistant Director, Federal Programs Branch

/s/ Kathryn L. Wyer
JAMES M. BURNHAM
Senior Counsel
KATHRYN L. WYER

Senior Trial Counsel, Federal Programs
OLIVIA HUSSEY SCOTT
Trial Attorney, Federal Programs
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, N.W.
Washington, DC   20530
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Respondent*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| | ) | |
| v. | ) | |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | |
| in his official capacity as SECRETARY | ) | |
| OF DEFENSE, | ) | |
| | ) | |
| Respondent. | ) | |

# ECF 99

# REDACTED FOR PUBLIC FILING

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | |
| in his official capacity as SECRETARY OF DEFENSE, | ) | ███████████ |
| | ) | |
| Respondent. | ) | |

**<u>RESPONDENT'S MEMORANDUM IN OPPOSITION TO PETITIONER'S
APPLICATION FOR A TEMPORARY RESTRAINING ORDER</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

STANDARD OF REVIEW ................................................................................................... 4

ARGUMENT .......................................................................................................................... 4

    I.      PETITIONER IS UNLIKELY TO SUCCEED ON THE MERITS ...................... 4

          A.     The Department's Proposed Release Is Safe and Comports with All Applicable Obligations ............................................................................. 5

          B.     Petitioner Fails to Undermine the Department's Determination .............. 6

    II.     THE OTHER FACTORS DO NOT FAVOR A TEMPORARY RESTRAINING ORDER ..................................................................................... 9

    III.    IN ANY EVENT, THE COURT SHOULD NOT TAKE THE EXTRAORDINARY STEP OF ENJOINING PETITIONER'S RELEASE BASED SOLELY ON PETITIONER'S UNSUPPORTED CONTENTIONS ... 10

CONCLUSION........................................................................................................................ 12

## **INTRODUCTION**

On June 6, 2018, Respondent provided notice to Petitioner's counsel and this Court that the Government intends to release Petitioner ███████, ████████████████████ ████████████████████████ where, in September 2017, Petitioner was taken into custody by Syrian Democratic Forces ("SDF"), a United States partner in the fight against the Islamic State, or ISIL, a terrorist organization, during SDF's campaign to clear the region of ISIL occupation. Nearly nine months later, SDF ██████████████ and the surrounding area, which the Department of Defense ("Department") now views as stable and calm. The Department thus determined that Petitioner's release ████████ would be consistent with its obligation, under the law of war, to ensure Petitioner's safe release. The Department's belief that Petitioner joined or substantially supported one of the most violent terror organizations in the world—which is well supported by extensive evidence that has been filed in this Court—has not changed.   What *has* changed is that the Department has determined it is not a good use of scarce Department and military resources to continue holding Petitioner in military detention.   Hence it seeks to release him immediately, as the notice explained.

Petitioner's emergency request to halt that release and continue his detention should be rejected. There is no question that the Department has the authority to release Petitioner as long as it does so in a safe location.   Nor is there any question that—as the parties and this Court have recognized at previous hearings—Petitioner does not have the right to military transportation back to the United States from the area to which he voluntarily traveled.   Moreover, the Department is mindful of its obligations and would not seek to release Petitioner in a location that it did not regard as safe. Petitioner attempts to raise a purely factual challenge on the question of Petitioner's safety. But the Department, with its ongoing on-the-ground familiarity with the specific area at issue, is

far better able to judge the conditions █████████, and to determine that Petitioner will face no likely prospect of harm upon his release there.

Petitioner's factual assertions to the contrary rely on mischaracterizations that should be rejected by the Court in light of the Department's well-founded determination regarding the safety of the specific area today. First, Petitioner cites statements by Respondent explaining that Petitioner was taken into custody on an "active battlefield" as evidence that ██████ is dangerous. But Respondent never called ██████ an active battlefield. Rather, in September 2017, the SDF was engaged in a military offensive heading ███████████, towards Dayr az Zur, a town controlled by ISIL, and it was there, at an SDF checkpoint set up to prevent ISIL fighters from fleeing northward, that Petitioner was captured. Moreover, ████████████████████████ ██████████████████████████████████████████████████████████████ █████████████████████████████████████████████████

Second, Petitioner claims the SDF mistreated him in the past. But those claims are contradicted by the observations of Department medical personnel who examined and questioned him about his prior treatment at the time he was taken into Department custody. Indeed, the Department's medical intake form for Petitioner disproves his assertion that he had an observable head injury at that time. Moreover, there is no reason to think Petitioner will be taken into custody by SDF when he is released ███████. After all, his previous capture occurred when he was fleeing SDF air strikes in ISIL territory during an SDF military campaign, not when he was merely present in a stable city with no active hostilities in the vicinity.

Third, Petitioner cites general travel advisories and determinations by other agencies, but the general determination by the State Department or the Department of Homeland Security that

Syria remains a volatile country, as a whole, in no way undermines the Department's specific determination, informed by its first-hand knowledge of the region, that it can safely release Petitioner ███████. Moreover, Petitioner himself apparently did not credit such advisories or determinations by other agencies when he chose to cross the Turkish border into Syria in the first place.

Petitioner otherwise cites his lack of identification documents as another ground for enjoining his release. However, Petitioner had no identification documents in his possession at the time he came into the Department's custody. The lack of such identification is not unusual in an area where many have arrived after fleeing ISIL and ████████████████████████ ████████, and there is no reason to expect Petitioner will face a risk of harm simply because he has no identification document in his possession.

In sum, Petitioner's unfounded allegations and mischaracterizations do not undermine Respondent's factual determination that it can safely release Petitioner ███████ Petitioner's application for a temporary restraining order therefore should be denied. In the alternative, Respondent should be granted leave to provide additional information before the Court issues a decision on Petitioner's application.

Finally, the Court should vacate the hearing presently scheduled for June 20, 2018, on the Department of Defense's legal authority to detain Petitioner until the end of hostilities. Given that the Department is trying to immediately end its detention of Petitioner, there is no reason to litigate the question of whether it could continue that detention. Petitioner does not, of course, have a right to force the Department to continue detaining him so he can continue challenging that detention.

**STANDARD OF REVIEW**

An emergency injunction is an "extraordinary remedy . . . [that] may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Such relief requires a plaintiff to establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20. The Court of Appeals has emphasized that the "first and most important factor" is whether the moving party has "established a likelihood of success on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). "[W]hen a plaintiff has not shown a likelihood of success on the merits, [the Court] need not consider the other factors." *Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1088 (D.C. Cir. 2011).

**ARGUMENT**

**I.     PETITIONER IS UNLIKELY TO SUCCEED ON THE MERITS**

Petitioner seeks to challenge his release as unsafe, in violation not only of the Department's obligations under the law of war, but also of his substantive due process rights under the Fifth Amendment. He thus seeks a remedy in habeas to enjoin his release and require the Department to continue to detain him for an indefinite period of time until it can identify another disposition option that the Court will approve. Petitioner previously objected to—and obtained an injunction forbidding—his transfer to a different safe location.   At the present time, the Department has determined that Petitioner can be safely released ▮▮▮▮▮▮ and has determined that his continued detention by U.S. forces is not a good use of Defense Department resources. Petitioner fails to undermine the Department's determination, nor does he demonstrate that the Department's

4

planned and prompt release would violate any applicable obligation.

**A.     The Department's Proposed Release Is Safe and Comports with All Applicable Obligations**

The Department does not dispute that it must ensure that any release of Petitioner is safe and consistent with its obligations under the law of war. *See* Mitchell Decl. ¶ 4. To the contrary, the Department has assured the Court that it "has taken all necessary and feasible precautions to ensure the safe release of Petitioner." *Id.* The Department's declarant has detailed those precautions. First, the Department has identified a ██████████████████████ where Petitioner can be safely released. *Id.* ¶ 5. As described by the Department, ████████████ is

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████. *Id.* ████

████████████████████████████████████████████████████

██████████████████████████████████████. *Id.* ████████████

██████████████████████████ *Id.* ██████████████████████████

████████████████████████████████████████████████████

████████  *See id.* ¶ 5 & n.2.

Second, the Department has also determined that Petitioner faces no prospect of harm from SDF—a partner in the United States' effort to defeat ISIL. *See id.* ¶ 6. Under the 2015 National Defense Authorization Act, Pub. L. No. 113-291, § 1209(e)(1), 128 Stat. 3292 (2014), the Department's assistance to SDF is contingent on SDF's commitment to respect for human rights and law of war standards. Unless the Department has "appropriately vetted" SDF's commitment to those principles, it would not be allowed to maintain its support for SDF operations. Mitchell

Decl. ¶ 6. The Department has also determined that "[t]here was no evidence" found, during the standard medical screening that Petitioner underwent when he was taken into DoD custody, "that he had been physically harmed by SDF, and when asked at that time, Petitioner denied that he had been abused or injured." *Id.* At any rate, the Department will make clear to SDF, before Petitioner is released ███████, that in the event Petitioner is identified when traveling through SDF checkpoints, "the United States is not seeking or requesting that Petitioner be detained." *Id.*

Third, the Department intends to provide Petitioner with $4,210, the same amount of money that he had in his possession when he was captured, as well as a cellular phone, food and water, and clothing. *Id.* ¶ 8. Release with that amount of money, a phone, and ████████ ██████████████████████—an area where no hostilities are underway—will put Petitioner in at least as good a position as the one he found himself in after traveling to Syria of his own accord. The Department's planned release is safe, appropriate, and consistent with its obligations.

### B.      Petitioner Fails to Undermine the Department's Determination

Petitioner's attempt to dispute the Department's determination should be rejected. Petitioner emphasizes his substantive due process rights, but he fails to show any violation of those rights. "To state a substantive due process claim, a plaintiff must assert that a government official was so 'deliberately indifferent' to his constitutional rights that the official's conduct 'shocks the conscience.'" *Stoddard v. Wynn*, 68 F. Supp. 3d 104, 113 (D.D.C. 2014) (quoting *Estate of Phillips v. District of Columbia*, 455 F.3d 397, 403–04 (D.C. Cir. 2006)). Only behavior that is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience" can conceivably meet this high bar. *See Phillips*, 455 F.3d at 403 (quoting *County of Sacramento v.*

*Lewis*, 523 U.S. 833, 847 n.8 (1998)).

Petitioner relies on *Butera v. District of Columbia*, 235 F.3d 637 (D.C. Cir. 2001), as support for his substantive due process claim here, arguing that the government owes an "elevated duty" to him because he is now in the Department's custody. Pl. Mem. at 9-10. However, *Butera* cited a state's duty toward an individual while the individual is in state custody, in a situation where he is "unable to care for himself." *Butera*, 235 F.3d at 651. *Butera* similarly involved a police department's use of an undercover informant in an operation that the department had designed for its own purposes, while allegedly failing to ensure the informant's safety. *Butera*, 235 F.3d at 652. Here, the Department seeks not to continue Petitioner's custody or use him for its own purposes, but to *release* him from custody, in the country where he most recently traveled of his own volition, and in accordance with its obligations under the law of war to ensure a safe release.

In any event, however, the Department "has taken all necessary and feasible precautions to ensure the safe release of Petitioner," and has determined that Petitioner's release ███████ is consistent with its law of war obligations. Mitchell Decl. ¶ 4. This determination is not so egregious as to shock the conscience. Indeed, the Department's determination is entitled to the same level of deference that the Supreme Court mandated in *Munaf v. Geren*, 553 U.S. 674 (2008), when accepting the Government's determination that, although it "remain[ed] concerned about torture among some sectors of the Iraqi Government," the specific department that would take custody of the petitioners in that case had "generally met internationally accepted standards for basic prisoner needs." *Id.* at 702. The Court recognized that "[t]he Judiciary is not suited to second-guess such determinations" by the political branches, which "are well situated to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of an ally, and

7

what to do about it if there is." *Id.* The Court also emphasized that there was no basis to assume that "the political branches are oblivious to these concerns." *Id.* The D.C. Circuit in *Kiyemba v. Obama* ("*Kiyemba II*"), 561 F.3d 509 (D.C. Cir. 2009), similarly concluded that "the Government does everything in its power to determine whether a particular country is likely to torture a particular detainee" and that, as a result, "detainees are not liable to be cast abroad willy-nilly without regard to their likely treatment in any country that will take them." *Id.* at 514.

Significantly, although this Court has distinguished *Munaf* and *Kiyemba II* in the past when considering Respondent's authority to transfer Petitioner to the custody of another country, those decisions are directly applicable to the issue now presented, which calls for the Court to recognize the deference owed to the Department's analysis of conditions in another country such that a detainee can be safely transferred there—or safely released. Indeed, this Court emphasized in its prior decisions that Petitioner had *not* "argue[d] fear of . . . torture in another country" when challenging his transfer. *E.g.*, Mem. Op. of Jan. 23, 2018, at 5. Yet Petitioner is asserting that very argument now when challenging his release. The Court therefore should apply the applicable principles of *Munaf* and *Kiyemba II* when assessing the Department's determination regarding Petitioner's safe release.

Furthermore, the Court should take into account the insubstantiality of Petitioner's assertions. Petitioner attempts to construct an admission out of Respondent's prior statement that Petitioner was captured in an area of active hostilities. But that is a bald mischaracterization that ignores the time that has passed since SDF engaged in the military offensive that resulted in Petitioner's capture, and the fact that ██████████████████████████████████ ████████████████████████████████████████████████████████████████████

8

███████. Petitioner also provides a narrative, through the declaration of his counsel, that he was shot at, beaten, and abused by the SDF when he was in its custody. But those allegations—which Petitioner raises now for the first time—are belied by Department records that show Petitioner denied any such abuse, nor was there evidence that he had been injured, at the time the Department took custody of him. Petitioner otherwise points to alleged contradictions in the positions of the Departments of State and Homeland Security. But those positions focus on country-wide assessments and do not purport to characterize the stability ███████ at all, much less contradict the Department's view. While Petitioner claims that he can provide more evidence, he has provided no valid basis to turn the Department's notice of an intended release, which in its well-informed view is consistent with its obligations, into a forum for outside experts to dispute the safety of a particular ██ in Syria, especially in light of the deference due the Department's assessment under the governing principles in *Munaf* and *Kiyemba II*. The Court should hold that Petitioner is unlikely to succeed on the merits of his claim and deny his requested temporary restraining order on that basis alone.

## II.   THE OTHER FACTORS DO NOT FAVOR A TEMPORARY RESTRAINING ORDER

Petitioner's application—and particularly his claim of irreparable harm—relies on the notion that, absent an injunction, he would face imminent danger upon his release ████████ That contention is misplaced. Certainly, Respondent has no intention of creating or contributing to any such danger. To the contrary, Respondent has carefully considered the issue of Petitioner's safety and determined that his release ████████ will be safe and comport with all its applicable obligations. Respondent has made every effort to reach a resolution of this matter, negotiating with other countries and with Petitioner's counsel in an attempt to end Petitioner's detention without

compromising the United States' interests or going beyond practical and diplomatic constraints. Respondent will be significantly harmed, and left without a clear alternative—other than to proceed to litigate Petitioner's habeas petition in order to continue Petitioner's detention despite Respondent's desire to end the detention Petitioner contests—if it is once again thwarted in this latest attempt to identify an appropriate solution. The balance of hardships and public interest therefore weigh in Respondent's favor. Indeed, the public benefits when the Government is not forced to expend resources to detain an individual that it no longer wishes to detain, and when courts allow the Executive Branch to carry out its duties within the Executive's constitutional sphere of responsibility, which includes the duty to determine, consistent with the law of war, an appropriate disposition for a detainee in its custody in a foreign country, implicating its authority both to conduct military functions (such as detaining enemy combatants during hostilities), and to engage in foreign relations. *See Munaf*, 553 U.S. at 699-700, 702-03; *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 23 (D.C. Cir. 1999) ("[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch."). Judicial inquiry or oversight into executive decisions regarding release or transfer of wartime detainees impairs the Executive Branch's ability to carry out these essential functions.

III.    **IN ANY EVENT, THE COURT SHOULD NOT TAKE THE EXTRAORDINARY STEP OF ENJOINING PETITIONER'S RELEASE BASED SOLELY ON PETITIONER'S UNSUPPORTED CONTENTIONS**

Even if the Court does not deny Petitioner's application, it should not grant the application without allowing Respondent to present more details regarding the basis for its determination, and holding Petitioner to a heavy burden in contesting that determination. Petitioner has insisted throughout the proceedings until now that his goal in this habeas case is to secure his release. *E.g.*,

Tr. Jan. 22, 2018 4:19-5:1 ("release is simply to allow him to go free . . . what he's asking this Court for is to allow him to – open the doors, allow him to go free."); 7:6-9 ("He's asking for release, and release . . . in common parlance and as a legal matter, is a release or a relinquishment of government custody."); 21:19-20 ("open the doors, and he would carry on with his life."); Tr. Apr. 19, 2018 9:17-18 (asserting Petitioner's "right to . . . pursue his habeas petition to obtain the remedy of release"); 12:1-2 ("He is seeking his release. He is fighting for his freedom."). The Department has now determined that it wishes to release him in a manner that restores him to a safe location in Syria near where he previously was, with resources available to him such that Petitioner will be able to "carry on with his life."

Petitioner has reacted to the Department's efforts with suspicion, now accusing the Department of "abandon[ing]" him in "one of the most dangerous countries in the world" in a bad faith disregard for his life and safety (ignoring that his original presence in Syria was a result of his own decision to travel there). Pl. Mem. at 11. However, even if the Court does not accord the Department significant deference at the outset, the dispute that Petitioner raises is essentially a factual one. As such, the Court should not overturn the Department's decision without a significant evidentiary basis for doing so. Respondent therefore requests, in the alternative, that the Court set an abbreviated schedule for further proceedings, with Respondent providing further support for its determination on or before Thursday, June 14, 2018; and Petitioner providing a response on or before Tuesday, June 19, 2018.

## **CONCLUSION**

For the foregoing reasons, Petitioner's application for a temporary restraining order should be denied. In the alternative, Respondent requests that the Court set a further schedule for

Respondent to submit additional evidence by June 14, 2018, and Petitioner to submit a reply by

June 19, 2018. If Respondent's proposed schedule is adopted, it will agree not to release Petitioner

until June 21, 2018.

June 8, 2018                                Respectfully submitted,

                                           CHAD A. READLER
                                           Acting Assistant Attorney General
                                           JESSIE K. LIU
                                           United States Attorney
                                           TERRY M. HENRY
                                           Assistant Director, Federal Programs Branch

                                           */s/ Kathryn L. Wyer*          
                                           JAMES M. BURNHAM
                                           Senior Counsel
                                           KATHRYN L. WYER
                                           Senior Trial Counsel, Federal Programs
                                           OLIVIA HUSSEY SCOTT
                                           Trial Attorney, Federal Programs
                                           U.S. Department of Justice, Civil Division
                                           20 Massachusetts Avenue, N.W
                                           Washington, DC   20530
                                           Tel. (202) 616-8475 / Fax (202) 616-8470
                                           kathryn.wyer@usdoj.gov
                                           *Attorneys for Respondent*

## CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that the foregoing document will be served upon
Petitioner's counsel today by e-mail immediately following this filing.

/s/ Kathryn L. Wyer

12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| v. | ) | |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | |
| in his official capacity as SECRETARY | ) | |
| OF DEFENSE, | ) | |
| | ) | |
| Respondent. | ) | |

## [PROPOSED] ORDER

Upon consideration of Petitioner's Application for a Temporary Restraining Order and Respondent's Opposition thereto, it is hereby:

**ORDERED** that Petitioner's Application for a Temporary Restraining Order is DENIED.

**SO ORDERED.**

_____
Tanya S. Chutkan
United States District Judge

DATED: June __, 2018

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| | ) | |
| v. | ) | |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | |
| in his official capacity as SECRETARY | ) | |
| OF DEFENSE, | ) | |
| | ) | |
| Respondent. | ) | |

# ECF 101

# REDACTED FOR PUBLIC FILING

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | |
| in his official capacity as SECRETARY | ) | ███████████ |
| OF DEFENSE, | ) | |
| | ) | |
| Respondent. | ) | |

## RESPONDENT'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PETITIONER'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 3

ARGUMENT ................................................................................................................. 8

     I.     THE DEPARTMENT HAS SATISFIED ITS LEGAL OBLIGATION TO
          ENSURE A SAFE RELEASE .......................................................................... 8

          A.     The Department Will Comply With Law of War Requirements to
                  Ensure a Safe Release ........................................................................ 9

          B.     The Department Has Filed Ample Evidence in Support of Its
                  Determination that Release ████████ Would Be Safe ......................... 14

          C.     Petitioner's New Allegations About SDF Abuse Are Not Credible
                  Because They Contradict His Own Prior Statements and Conflict With
                  His Medical Records ........................................................................16

CONCLUSION ............................................................................................................. 19

**<u>Attached hereto:</u>**

Declaration of Karin King ("State Decl.")

Declaration of Department of Defense Facility Physician ("Physician Decl.")
        Exhibit 1: Intake form
        Exhibit 2: Photographs

Declaration of Department of Defense Facility Medic ("Medic Decl.")
        Exhibit 1: Record of examination

Declaration of Major General Chad P. Franks ("Franks Decl.")

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*al-Bihani v. Obama*, 590 F.3d 866 (D.C. Cir. 2010) ....................................................................10

*Hamlily v. Obama*, 616 F. Supp. 2d 63 (D.D.C. 2009),
    *adopted sub nom. Anam v. Obama*, 653 F. Supp. 2d 62 (D.D.C. 2009) ..........................10

*Kiyemba v. Obama*, ("*Kiyemba II*"), 561 F.3d 509 (D.C. Cir. 2009) .......................................... 11

*Munaf v. Geren*, 553 U.S. 674 (2008).................................................................................... 10, 11

*United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936) ..........................................10

**<u>Statutes</u>**

2015 National Defense Authorization Act ("NDAA"),
    Pub. L. No. 113-291, § 1209(e)(1), 128 Stat. 3292, 3542-43 (2014) ............................... 7

## **INTRODUCTION**

Below are additional details regarding the proposed release of Petitioner by the Department of Defense (the "Department" or "DoD"). The Department has determined that Petitioner's release ███████████████████████████████ will be safe and is, moreover, willing to take additional steps on Petitioner's behalf based on requests he has made through his counsel, including at the June 8, 2018 hearing in this Court. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

The Department's specific determination regarding the safety and stability of ███████ is well founded and should be credited by this Court in accordance with longstanding principles of deference in the military and foreign affairs arenas. The Department has on-the-ground familiarity with ███████ and the surrounding area because U.S. forces regularly travel there in the course of providing support to SDF forces in the area. Based on this familiarity, the responsible Department officials have exercised their professional military judgment and concluded that this part of Syria is stable and calm. Petitioner's arguments, including his references to the State Department's Travel Advisory and the Department of Homeland Security's ("DHS") extension of Temporary Protected Status for Syria, have not undermined that determination. To the contrary, as the attached State Department declaration explains, the State Department does not view the Travel Advisory as substituting for DoD's more particularized judgment regarding the release, based on its direct

knowledge of the area. As the State Department explains: "DOD has the authority and competence to make its own assessment of the area proposed for release and to determine whether release in that area would be both safe and consistent with its policies and obligations"; on this issue, the State Department "defers to DOD's determination." Declaration of Karin King ("State Decl.," attached hereto) ¶ 4. As for DHS, its determination by its own description focuses primarily on the actions of the central Syrian government in Damascus; it does not address the specific conditions in the SDF-controlled area where the Department proposes to release Petitioner.

The Department has also carefully reviewed Petitioner's allegations regarding past abuse by SDF forces and does not deem those allegations credible. Petitioner was evaluated by both an Army medic and a Department physician in two separate examinations in the immediate period after Petitioner's capture when the Department first met with Petitioner and then took him into custody, and the reports of those examinations include thirty-four high-resolution photographs of his physical condition (filed herewith). Nothing in those records or the sworn declarations of the medical personnel who conducted the examinations provides any indication that Petitioner had been abused or was suffering from any injury—much less the significant head injury and bruising on his body that Petitioner claimed, via his counsel's declaration, he would attest to under penalty of perjury. Moreover, far from complaining of abuse to U.S. personnel at the time of his capture, as he has alleged, Petitioner specifically and repeatedly denied any abuse or mistreatment, as the attached declarations from the Army medic and Department physician explain. Petitioner's tale of SDF abuse has no support other than his own statements made for the first time in this litigation and is directly contrary to the evidence. Petitioner's primary basis for resisting his planned release is thus verifiably untrue and should not be credited.

The Department has offered extensive evidence that the planned release is safe and complies with applicable legal requirements, its determination to that effect is entitled to great deference, and Petitioner's allegations of SDF abuse are not credible. The Court should deny Petitioner's application for a temporary restraining order and decline to intervene in the Department's planned release.

## **BACKGROUND**

By Petitioner's own account, he traveled to Gaziantep, Turkey in 2015 with the intention of entering Syria illegally, and he paid someone $300 to smuggle him across the Turkish-Syrian border in Syria. TIR01 [ECF 46-1], at 4. By Petitioner's own account, when he was captured by SDF forces in September 2017, during their offensive southward toward ISIL-held territory, he was heading northward toward the Turkish-Syrian border with the intention of crossing the border again and traveling back to Turkey. Hafetz Decl. ¶ 4. At the time of his capture, Petitioner had no passport, or any other official identification document, in his possession. *See* Declaration of ████████████ ("███ Decl.," ECF 46-3) ¶ 58 (listing Petitioner's possessions at the time of capture).

Petitioner was captured by SDF forces on or about September 11, 2017, *id.* ¶ 54, was taken into the Department's custody soon thereafter, and arrived at the Department's facility in Iraq on September 12, 2017. Declaration of Department of Defense Facility Physician ("Physician Decl.," attached hereto) ¶ 4. While Petitioner was still in SDF custody in Syria on September 11, 2017, an Army medic conducted a preliminary medical screening to assess whether Petitioner was medically cleared to be transferred to U.S. custody. Declaration of Department of Defense Facility Medic ("Medic Decl.," attached hereto) ¶¶ 4-5. During this screening, the medic examined

3

Petitioner for injuries or medical issues and asked him about any medical concerns or prior abuse. *Id.* ¶¶ 6-7. As the medic explains, he is required to report any allegations or indications of abuse to appropriate Department authorities and to document any observed injuries. *Id.* ¶ 8. In response to the medic's inquiry, Petitioner did not report any abuse. *Id.* ¶ 9. While Petitioner claimed that he bumped his head during his detention with SDF, he did not describe this as a significant injury, nor one that was inflicted on him intentionally by the SDF. *Id.* The medic also did not observe any injuries that would have been consistent with abuse or maltreatment. *Id.* ¶ 12. Consistent with the medic's testimony, the record of the medic's examination does not document any recent significant injury or signs of abuse. *See id.* ex.1.

The next day, September 12, 2017, upon Petitioner's arrival at the facility in Iraq, a Department physician gave him a medical examination in order to document his condition at the time of his detention. Physician Decl. ¶ 4 & ex.1 (intake form). That examination identified no current medical conditions or injuries, including any head injuries. *Id.* ¶ 18. The detailed photographs that were taken of Petitioner at the time of this intake examination also do not show bruising or any indications of injury. *Id.* ex.2. In addition, when Petitioner was specifically asked if he had suffered any abuse or maltreatment prior to arriving at the Department facility, he denied that he had suffered any abuse and said that he was not suffering from any current significant medical conditions or injuries. *Id.* ¶ 18.

The American Civil Liberties Union Foundation ("ACLUF") filed a habeas petition regarding Petitioner on October 5, 2017. In its filings seeking dismissal of the petition, the Department repeatedly explained that it was in the process of determining what to do with Petitioner. *See, e.g.*, Declaration of Steven W. Dalbey [ECF 11-1] ¶ 5 (indicating Petitioner was

being detained "pending appropriate and expeditious consideration of various disposition options"); Resp. Response to Pet'r Proposed Relief [ECF 20], at 3 (indicating that the Government was "diligently working to make a determination regarding this detainee's future status"); Resp. Supp. Br. [ECF 24], at 1 (indicating that the options under consideration by the Government included continued detention in military custody, criminal prosecution, transfer to another country with an interest in the detainee, or release).

Meanwhile, Petitioner has repeatedly emphasized that his sole goal in this habeas case is to secure his immediate, unconditional release from U.S. custody. *E.g.*, Tr. Jan. 22, 2018 4:19-5:1 ("release is simply to allow him to go free . . . what he's asking this Court for is to allow him to – open the doors, allow him to go free."); 7:6-9 ("He's asking for release, and release . . . in common parlance and as a legal matter, is a release or a relinquishment of government custody."); 21:19-20 ("open the doors, and he would carry on with his life."); Tr. Apr. 19, 2018 9:17-18 (asserting Petitioner's "right to . . . pursue his habeas petition to obtain the remedy of release"); 12:1-2 ("He is seeking his release. He is fighting for his freedom.").

On April 16, 2018, Respondent filed a notice of its intent to transfer Petitioner to ███████ ████████████████████. *See* Notice of Transfer [ECF 77]. Respondent's filing indicated that ████████████████████████████████████████████████████████████████████████ *Id.* ██████████████████████████████. But despite extended discussions with Petitioner about this option, Petitioner ultimately opposed the transfer, *see* Declaration of State Department Declarant (ECF 77-1) ¶ 2, and the D.C. Circuit affirmed this Court's injunction prohibiting the transfer without his consent.

On June 6, 2018, again following discussions with Petitioner, Respondent filed a notice of

its intent to release Petitioner ██████████████████████████████. *See* Notice [ECF 94]; Declaration of Mark E. Mitchell ("Mitchell Decl.," ECF 95) ¶ 5. Petitioner again opposes Respondent's proposal and seeks an injunction forbidding the Department from releasing him as planned and thus requiring the Department to continue holding him in custody.

The Department has explained that its typical practice, when seeking to release an individual from Department custody, is to do so "at or near the location where the person was originally detained, as operationally feasible." Declaration of Major General Chad P. Franks ("Franks Decl.," attached hereto) ¶ 3. But before the Department releases an individual, it must assess whether the contemplated release comports with the requirements set forth in the DoD Law of War Manual, which include the requirement that any release be safe. *Id.* ¶ 4. In order to make that determination, the Department considers all "available information, taking into account all circumstances (including humanitarian, operational, and security considerations)." *Id.* In particular, the Department may not release a detainee "into a situation in which he would be attacked upon release." *Id.* ████████████████████████████████████████ ████████████████████████████ the Department has concluded that the ██████████████ was a safe location for release. *Id.* ████████████████████████████████████ ███████████████████████████████████████████████████████████ *See id.* ████████████████████████████████████████. *See* Mitchell Decl. ¶ 5. ██████████████ ██████ the Department has determined that Petitioner's release ██████████ will also be safe. *Id.* ¶¶ 4-5.

The ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Mitchell Decl. ¶ 5. ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ *Id.* ████████████

████████████████████████████████████████████████████████

███████████████████████████, *id.*, and █████████████████

██████████████████ Frank Decl. ¶ 6 ██████████████████████

████████████████████████████████████████████████████████

███████████ *Id.* ███████████████████████████████████████

███████████████████████████████████████████ *Id.*

The Department has on-the-ground familiarity with current conditions ████████████

██████ as well as with the SDF, which is a partner force in the fight against ISIL. *See* Mitchell Decl.

¶ 6. █████████ is currently under the control of SDF forces and has been free of any ISIL presence

████████████████████████████████ *Id.* ¶ 5. In the course of providing support to the SDF,

████████████████████████████████████████████████████████

████████████████████████████████████ Franks Decl. ¶ 5. In accordance with

the requirements of the 2015 National Defense Authorization Act ("NDAA"), Pub. L. No. 113-

291, § 1209(e)(1), 128 Stat. 3292, 3542-43 (2014), the Department has "appropriately vetted" the

SDF, including its senior leadership, and has concluded that the SDF "is committed to respecting

human rights and the rule of law, including the law of armed conflict." Franks Decl. ¶ 8; *see also*

Mitchell Decl. ¶ 6.

In the Department's assessment, Petitioner's release ████████████ will be safe and,

consistent with its commitments, the SDF will treat Petitioner humanely in compliance with the

law of war. Mitchell Decl. ¶¶ 5-6; Franks Decl. ¶¶ 6, 8. 

. Franks Decl. ¶ 6. Moreover, Petitioner has

resided in Syria since 2015, so he is presumably familiar with local culture.

*Id.* ¶ 8.

*Id.*

*Id.*

## ARGUMENT

## I.    THE DEPARTMENT HAS SATISFIED ITS LEGAL OBLIGATION TO ENSURE A SAFE RELEASE

In its original memorandum opposing Petitioner's TRO application, the Department of

Defense explained that the Department is extremely mindful of the requirement to ensure any

release of Petitioner is safe, and that the Department has determined that the release of Petitioner

comports with that requirement. The Department has now provided additional

information that further supports this determination. The attached declarations explain further the

Department's close familiarity with the on-the-ground conditions        and the firm basis

of the Department's determination that Petitioner's release there will be safe. And the

Department's medical records regarding Petitioner, together with the sworn declarations of a medic who examined him while he was in SDF custody and of the doctor who examined him when he first came into the Department's custody, confirm that Petitioner has no credible basis to now accuse SDF forces of abuse.

### A.     The Department Will Comply With Law of War Requirements to Ensure a Safe Release

When the Department notified the Court of its intent to release Petitioner ████████, it also provided a declaration assuring the Court that the Department "has taken all necessary and feasible precautions to ensure the safe release of Petitioner." Mitchell Decl. ¶ 4. The Department does not take that assurance lightly. The Department's Law of War Manual, which reflects its understanding of U.S. obligations under the law of war, including the 1949 Geneva Conventions and customary international law, provides that the Department shall take "necessary measures" to ensure the safety of detainees when deciding where and how to release them. DoD Law of War Manual § 8.14.3.2 (June 2015, Updated Dec. 2016), *available at* https://www.defense.gov/News/Publications. In light of these general principles, it follows that "detainees should not be released into a situation in which the detainee would be attacked by hostile elements upon release." *Id*. The Manual further states that, if "operational necessities" and "logistical constraints" make it difficult to release a detainee at the time the Department determines that release is an appropriate disposition, "[c]ontinued detention in order to facilitate a safe and orderly release may be necessary." *Id.*

To comply with these requirements, the Department considers a variety of factors in order to evaluate whether a release will be safe. These include the stability of the area, the resources available to the individual who will be released, and whether the individual is likely to be attacked

9

upon release. Franks Decl. ¶¶ 4-6. In assessing those factors in this instance, the Department

determined that Petitioner's release ████████ will be safe. *Id.* ¶ 6; Mitchell Decl. ¶ 4.

The Department's determination on this issue is entitled to considerable deference. When

the Department concludes that a detainee's release overseas will be safe in compliance with U.S.

law of war obligations, which are reflected in its Law of War Manual, that determination is infused

with national security and foreign relations considerations and is grounded in the professional

military judgment of Department decisionmakers. Wide deference is due to the Department's

assessment of the on-the-ground conditions in a foreign country where the Department has a

presence and is conducting operations, particularly its assessment of the military situation. As the

Supreme Court has unanimously explained, "it is for the political branches, not the judiciary, to

assess practices in foreign countries and to determine national policy in light of those assessments."

*Munaf v. Geren,* 553 U.S. 674, 700-01 (2008); *see also, e.g.*, *Hamlily v. Obama*, 616 F. Supp. 2d

63, 68–69 (D.D.C. 2009) (recognizing "the singular role of the Executive in matters of foreign

affairs and the deference that he is customarily given by courts when resolving matters in that

realm"), *adopted sub nom. Anam v. Obama*, 653 F. Supp. 2d 62 (D.D.C. 2009). That is why, for

example, the courts have consistently deferred to the Executive on its assessment of whether

hostilities are ongoing in a particular place. *See, e.g.*, *United States v. Curtiss-Wright Export Corp.*,

299 U.S. 304, 320 (1936) (the President "has the better opportunity of knowing the conditions

which prevail in foreign countries, and especially is this true in time of war"); *al-Bihani v. Obama*,

590 F.3d 866, 874-75 (D.C. Cir. 2010) (explaining in the Guantanamo habeas context that "[t]he

determination of when hostilities have ceased is a political decision, and we defer to the

Executive's opinion on the matter, at least in the absence of an authoritative congressional

declaration purporting to terminate the war," and invoking "the wide deference the judiciary is obliged to give to the democratic branches with regard to questions concerning national security").

The present context is, indeed, directly analogous to the possibility-of-torture allegations the Supreme Court and D.C. Circuit have held cannot be factually reviewed by U.S. courts. The Supreme Court recognized in *Munaf* that "[t]he Judiciary is not suited to second-guess" the Government's conclusions that a country taking custody of a detainee is not likely to torture the detainee, explaining that the political branches are best left in control of such "sensitive foreign policy issues." *Munaf*, 553 U.S. at 702. The Court recognized that the Executive was sensitive to its obligations and should be trusted to adhere to them, explaining that there was no basis to think "the political branches are oblivious to these concerns." *See id.* The D.C. Circuit was even more categorical, holding that "the district court may not question the Government's determination that a potential recipient country is not likely to torture a detainee," and explaining that the Executive Branch should not be assumed to "cast" detainees "abroad willy-nilly without regard to their likely treatment in any country that will take them." *Kiyemba v. Obama* ("*Kiyemba II*"), 561 F.3d 509, 514 (D.C. Cir. 2009).

Here, moreover, the Department's conclusion is specific to the SDF-controlled area where it intends to release Petitioner. The Court in *Munaf* recognized both that the Executive legitimately *could* make distinctions between different areas or authorities within a country and that the Executive was *best able* to draw such distinctions, accepting the Government's assessment that the specific department that would take custody of the petitioners in that case had "generally met internationally accepted standards for basic prisoner needs," even though there were concerns about torture among other sectors of the Iraqi Government. *Munaf*, 553 U.S. at 702. Similarly here,

the Department is relying on its specific familiarity with ████ and the surrounding area, and with the SDF forces who control the region and work with U.S. forces. Franks Decl. ¶¶ 5-6, 8; Mitchell Decl. ¶¶ 4-5.

The broad deference courts have long afforded the Executive on factual assessments of country conditions abroad, including assessments of the military situation on the ground, makes sense, as domestic courts are not equipped to conduct fact-finding and preside over trials about country conditions overseas, particularly in the law-of-war and military context. The Department's current assessment is based on its expertise in military matters—including the extent to which particular areas are under the control of friendly forces and whether or not those areas are safe for release of detainees—as well as its intimate familiarity with the area where it intends to release Petitioner. While this Court is certainly equipped to make *legal* determinations about the scope of the Government's authority to take particular actions, here it is undisputed that the Executive has the legal authority to release Petitioner—indeed release simpliciter is precisely what he has been demanding since this proceeding began. The Court is not equipped, however, to second-guess the considered *factual* assessments of the Department based on the direct observations and experiences of Department personnel who are on the ground in Syria and operating in the area at issue on a regular basis. In this context, where the Department's general legal authority to release Petitioner is undisputed and the Government has proffered detailed evidence in support of the Department's determination that the planned release will be safe and in compliance with U.S. obligations under the law of war, deference is appropriate and there is no basis for this Court to intervene.

Petitioner has attempted to undermine the deference owed to the Department's factual determination by pointing to certain determinations of other Executive Branch agencies that, at

first glance, may seem inconsistent with that of the Department. But no other agency has purported

to pass judgment on the Department's determination regarding Petitioner's safe release. The

Department of State's Travel Advisory on Syria warns U.S. citizens of potential risks of traveling

to Syria and particularly warns U.S. citizens against "traveling to Syria to engage in armed

conflict" because those who undertake armed conflict "face extreme personal risks, including

kidnapping, injury, or death." *See* Syria Travel Advisory, *available at*

https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/syria-travel-

advisory.html. But as attested by a State Department official, the State Department's Travel

Advisory "is not a specific assessment of whether the planned release of petitioner is safe or

consistent with the obligations of the Department of Defense." State Decl. ¶ 4. The official further

explains that "DOD has the authority and competence to make its own assessment of the area

proposed for release and to determine whether release in that area would be both safe and

consistent with its policies and obligations" and clarifies that the State Department "defers to

DOD's determination on this issue." *Id.* There is accordingly no basis for the Court to withhold

deference on the grounds Petitioner suggests.[1]

---

[1] Petitioner has also cited the Notice issued by the Department of Homeland Security
("DHS"), extending the designation of Syria for Temporary Protected Status ("TPS"), 83 Fed. Reg.
9329 (Mar. 5, 2018). *See* Pet'r TRO Mem. at 3. But as explained in the Notice, DHS initially
designated Syria for TPS due to actions of President Bashar al-Assad's regime, specifically, its
"violent suppression of opposition . . . that prevented Syrian nationals from safely returning to
Syria." 83 Fed. Reg. at 9330. In deciding to extend the designation, DHS notes that the al-Assad
regime, also known as the Syrian Arab Republic Government, continues to violently suppress its
citizens. *See id.* at 9331. The Notice specifically identifies Eastern Ghouta, near Damascus; the
northwestern Idlib province; and Aleppo as areas facing humanitarian crises. *Id.* Nothing in DHS's
Notice specifically addresses conditions ████████ or, indeed, anywhere within SDF-controlled
territory. Thus, the Notice cannot be deemed to undermine the Department's specific assessment
regarding Petitioner's safe release.

The Executive Branch's official view is thus that the planned release of Petitioner is safe and compliant with the laws of war. Against that, Petitioner does not cite any judicial decision, doctrine from the laws of war, or other legal principle that entitles him to demand a release somewhere other than the country where he voluntarily traveled and where he was captured—so long as the immediate area of the detainee's release is safe and will not expose the detainee to an unreasonable risk of danger. The Department has determined that the planned release satisfies that requirement, and this Court should defer to that considered factual assessment.

### B. The Department Has Filed Ample Evidence in Support of Its Determination That Release ███████ Would Be Safe

The Department has carefully evaluated the conditions ████████ and has determined that Petitioner's release ████████ will be safe. As described above and in the two declarations submitted by the Department, including the declaration, attached hereto, of Major General Franks, the Deputy Commander for Operations and Intelligence for the Combined Joint Task Force who is responsible for overseeing all joint and coalition operations in the fight against ISIL, this determination is based on the Department's specific knowledge and direct familiarity with ████████ as well as with the SDF, which controls ████████ the surrounding area. Franks Decl. ¶¶ 5-6, 8; Mitchell Decl. ¶¶ 5-6. The Department has explained that U.S. forces have regularly visited ████████ and the surrounding area over the past ████████ since it came under SDF control. Franks Decl. ¶ 5. Moreover, the Department has vetted the SDF as a partner force, to whom the United States provides support in the fight against ISIL. *Id*. ¶ 8; Mitchell Decl. ¶ 6. The Department has a firm basis to conclude that SDF will "comply with the law of armed conflict in all operations," and indeed "SDF leadership has repeatedly affirmed their commitment to respect human rights and the rule of law," and has acted consistently with that commitment. Franks Decl.

14

¶ 6.

███████████████████████████████████████████████

██████████████████████████████████████████. *Id.*

¶¶ 4-5. ████████████████████████

███████████████████ *Id.* ¶ 4.

The Department also has specific knowledge regarding the conditions civilians face █

█████████ and the surrounding area. The civilians living ████████ now ██████████

█████████████████████████ Franks Decl. ¶ 6.

███████████████████████████████ Mitchell Decl. ¶ 5.

████████████ *Id.* ████████████████████

████████████████████████ Franks Decl. ¶ 6.

███████████████████████████████████

██████████. *Id.*

In light of these circumstances, the Department has ample basis for its determination that

Petitioner's release ████████ will be safe. ███████████████████

████████████████████████████ and at the June 8,

2018 hearing, ██████████████████████

███████████. █████████████████████

████████████████████████████████

████████████████████████████████

██████████████████ Franks Decl. ¶ 8. ████

████████████████████████████████

15



**C.**      **Petitioner's New Allegations About SDF Abuse Are Not Credible Because They Contradict His Own Prior Statements and Conflict with His Medical Records.**

Petitioner, through counsel, has indicated a fear that he will not be safe if released in Syria because Petitioner claims that he was held for several days by SDF forces and was beaten so badly that he suffered "severe bruising and dizziness." Declaration of Jonathan Hafetz ("Hafetz Decl.," ECF 99-2) ¶¶ 8, 11. He also claims that he "described his abuse by SDF soldiers to U.S. officials," and that his injuries were so severe that U.S. medical personnel specifically asked about them after he was taken into Department custody. *Id.* ¶ 20. In particular, he states that a U.S. medical official who examined him "saw evidence of a head injury and asked Petitioner if he had been beaten on the back of his head."   *Id.*

In order to assess Petitioner's stated concerns, the Department has contacted the medic and physician who conducted medical evaluations of Petitioner immediately before and after he was taken into Department custody, and has examined the corresponding medical records documenting those examinations. As described above, both the medic and the physician have provided declarations, attached hereto. Petitioner was initially examined by a medic in Syria on September 11, 2017, while he was still in SDF custody. Medic Decl. ¶ 4. The Department physician then conducted a medical examination of Petitioner after the Petitioner was brought to the Department facility in Iraq on the evening of September 12, 2017. Physician Decl. ¶ 4. Both examiners

16

concluded that Petitioner showed no signs of significant injury or of having been abused. Medic Decl. ¶ 12; Physician Decl. ¶¶ 16-17. Both asked Petitioner about any medical conditions, injuries, or abuse because Department protocol requires that such examinations document a detainee's condition at the point he comes into Department custody. Medic Decl. ¶¶ 5, 7; Physician Decl. ¶¶ 6, 8. The medic reports that Petitioner did "claim to have bumped his head during detention by the SDF," but that "it was not described to [him] as intentional or abusive." Medic Decl. ¶ 9. Nor did Petitioner report any abuse when specifically asked. *Id.* If there had been any signs of abuse, the medic would have been required to report it to appropriate Department authorities. *Id.* ¶ 8.

The physician states that he observed no signs of immediate injuries or medical concerns, and "no visible bruises, abrasions or contusions anywhere on [Petitioner's] head or body." Physician Decl. ¶¶ 9, 16. In particular, the physician did not observe any acute trauma or injuries to Petitioner's head. *Id.* ¶ 11; *see also id.* ¶ 18 (again stating that no head injury was observed). The physician notes that Petitioner did complain of mild tenderness in his ███████████ and ███████████, but there was no obvious bruising or other physical signs of injury in those locations. *Id.* ¶ 17. The physician also states that, in accord with standard intake procedure, Petitioner was specifically asked "whether he was subject to any abuse or maltreatment prior to arriving at the DoD Facility," but that Petitioner "denied any injuries or abuse"—including any abuse by SDF or DoD soldiers—"and denied that he was suffering from any current medical conditions or injuries." *Id.* ¶ 18.

The same physician provided medical services to Petitioner until the physician left the DoD facility in October 2017. *Id.* ¶ 20. Petitioner did not raise any allegations of abuse during the remainder of that physician's time at the facility. *Id.*

The accounts of the medic and physician regarding their examinations of Petitioner are consistent with each other and are corroborated by the records they filled out at the time. *See* Medic Decl. ex.1; Physician Decl. ex.1. Moreover, as part of the physician's intake examination, thirty-four high resolution photographs were taken to document Petitioner's physical condition in detail. Physician Decl. ¶ 5. Those photographs, attached to the physician's declaration, show *no* signs of Petitioner having been beaten or abused—let alone having been "repeatedly beat[en]" and "hit … in his head, back, and stomach" so violently that he "suffered severe bruising and dizziness," Hafetz Decl. ¶ 8—or otherwise supporting the account that Petitioner told this Court via his counsel he would swear to under penalty of perjury. *Id.* ex.2.

Given the directly contrary objective evidence and sworn testimony, Petitioner's allegations regarding SDF abuse are not credible, and the Court should disregard them. But even if there were any reason to credit Petitioner's allegations of abuse by SDF forces nine months ago—at a time when, according to Petitioner, they did not believe he was a U.S. citizen—the Court should nonetheless decline to intervene in the Department's planned release. Since that time, Petitioner's U.S. citizenship has been established, ███████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████. ████████████████████████████████████████████ ███████████████████████████████████████there is simply no basis to conclude that the SDF poses any current risk to Petitioner's safety. The Court should reject Petitioner's

arguments to the contrary.

## **CONCLUSION**

Petitioner has cited no legal authority for this Court to intervene in the Department's planned release of a battlefield detainee to a safe location proximate to where he himself voluntarily traveled. Nor has Petitioner cited any legal or factual basis for this Court to countermand the Department's considered factual determination about the safety of its planned release. The Court should accordingly decline to intervene in the Department's planned overseas release and should decline to require Petitioner's continued confinement pending the development of some other plan for granting him the release he has been seeking. Petitioner's application for a temporary restraining order should be denied.


June 14, 2018                                         Respectfully submitted,

                                                     CHAD A. READLER
                                                     Acting Assistant Attorney General
                                                     JESSIE K. LIU
                                                     United States Attorney
                                                     TERRY M. HENRY
                                                     Assistant Director, Federal Programs Branch

                                                     */s/ Kathryn L. Wyer*
                                                     JAMES M. BURNHAM
                                                     Senior Counsel
                                                     KATHRYN L. WYER
                                                     Senior Trial Counsel, Federal Programs
                                                     OLIVIA HUSSEY SCOTT
                                                     Trial Attorney, Federal Programs
                                                     U.S. Department of Justice, Civil Division
                                                     20 Massachusetts Avenue, N.W
                                                     Washington, DC   20530
                                                     Tel. (202) 616-8475 / Fax (202) 616-8470
                                                     kathryn.wyer@usdoj.gov
                                                     *Attorneys for Respondent*

19

## **CERTIFICATE OF SERVICE**

I hereby certify that this document has been served today by email on counsel for Petitioner.

/s/ Kathryn L. Wyer

United States Department of State

*Washington, D.C. 20520*

Declaration of Karin King

I, Karin King, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1. I have been the Deputy Assistant Secretary of State for Overseas Citizens Services in the Bureau of Consular Affairs since May, 2018.  Previously I served as Managing Director of Visa Services, also in the Bureau of Consular Affairs.  The Bureau of Consular Affairs (CA) oversees the Consular Information Program (CIP), which develops and disseminates Travel Advisories.  The Directorate of Overseas Citizens Services has primary responsibility for the CIP within CA.

2. In January 2018, CA launched a new Travel Advisory system under which each country has a Travel Advisory with accompanying Levels 1-4.  A Travel Advisory is a risk-based analysis intended to inform private U.S. citizens and nationals who are considering travel about potential threats to their health or safety abroad, and includes information about limited availability of consular services when staffing levels within the country are reduced, so that individuals can make informed decisions about their own safety and actions within a country.  A Level 4 Travel Advisory is the highest advisory level.

3. Syria has been at a Level 4 Travel Advisory since the advisory system was introduced in January 2018, and had previously been the subject of a similarly worded Travel Warning after the U.S. Embassy suspended operations in 2012.

4. The Travel Advisory is not a specific assessment of whether the planned release of petitioner is safe or consistent with the obligations of the Department of Defense (DOD). DOD has the authority and competence to make its own assessment of the area proposed for release and to determine whether release in that area would be both safe and consistent with its policies and obligations. The State Department defers to DOD's determination on this issue.

I declare under the penalty of perjury that the foregoing is true and correct

Executed on June 14, 2018

_____

Karin King

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. |
| | ) | Case 1:17-cv-2069 (TSC) |
| v. | ) | |
| | ) | DECLARATION OF |
| GENERAL JAMES N. MATTIS, | ) | Department of Defense Facility Physician |
| In his official capacity as SECRETARY | ) | |
| OF DEFENSE, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

Pursuant to 28 U.S.C. § 1746, I, a former Department of Defense Facility Physician[1], hereby declare:

1. I currently serve as the Emergency Physician at a military hospital in the United States. During the time frame of ███████████, I was a military physician assigned to the Department of Defense (DoD) Facility (the "DoD Facility") at which Petitioner was detained. One of my duties during this assignment was to conduct medical screening of detainees during intake processing in order to ascertain detainees' physical status upon entering the DoD Facility. ████████████████████████████████ ██████

2. I graduated from medical school in 2011. I completed my internship in Emergency Medicine during 2011-2012, and completed my residency in 2014. I am board certified in emergency medicine. I served as an emergency room physician from completion of my residency until deployment to the DoD detention facility in May of 2017. I joined the U.S. Army Medical Service Corps as a military officer in 2006, and will be leaving that status effective July 1, 2018.

3. This declaration is provided for use in the above-captioned habeas corpus litigation brought by a U.S. citizen currently detained by the DoD in Iraq. The statements made below are

---

[1] My name is not being used in this declaration in order to protect my identity. Given the sensitivity of the position in which I previously served relative to the topic addressed in this declaration and potential threats to the safety of myself and my family that may result from my service in that position, either presently or in the future, it is the policy of the Department of Defense that my name not be used or disclosed in litigation-related or other public filings.

based on my personal knowledge and information resulting from the performance of my official duties as described in Paragraph 1.

4. I performed the medical evaluation of Petitioner when he was in-processed into the DoD facility on the evening of September 12, 2017. Petitioner was cooperative during the evaluation. Consistent with the standard practice for such evaluations, I annotated the results of my interview with and medical examination of Petitioner on a "medical in/out processing form" and a Standard Form 600. Those two forms attached to this declaration are true and accurate copies of the forms I completed as part of the medical evaluation described above.

5. Photographs were taken of Petitioner's head and body at the conclusion of my examination. The 36 photographs attached to this declaration accurately represent the physical condition of Petitioner when I examined him on September 12. 2017.

6. The purpose of this screening examination is to determine whether the individual is medically cleared to be placed in detention. This requires a determination of whether Petitioner has any pre-existing or acute conditions which require medical treatment. This is accomplished by asking the individual questions about their prior medical history and performing a physical examination.

7. During intake processing, all detainees have their vital signs checked, receive a physical examination for injuries or medical issues, and are interviewed regarding past medical history and any recent injuries or allegations of abuse or maltreatment.

8. Part of any intake into the DoD Facility is to ask the detainee about any abuse or maltreatment by capturing forces. This is a standard question asked of all incoming detainees to ensure that U.S. and partnered forces are in compliance with DoD policy and any applicable laws regarding humane treatment of detainees. If a detainee reports to me that he has been abused by either Syrian Democratic Forces (SDF) or DoD personnel, I am required to report this to appropriate authorities within the DoD. I was also required to observe and document all injuries, scars, or other markings in the detainee's medical records. All such injuries would have been photographed, and those photographs would be added to the detainee's medical record.

9. During the intake processing, I personally interviewed and examined Petitioner. I found Petitioner to be a well-appearing thin male, who did not indicate or exhibit any immediate injuries or medical concerns.

10. Petitioner disclosed two past medical issues. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ from "years ago," that still causes him occasional pain, and ▮▮▮▮▮▮▮▮▮▮▮▮ diagnosed approximately five years prior to my examination.

2

11. During the physical examination of Petitioner, I found the following. His general affect was not in acute distress. He appeared alert, appropriately responsive, and cooperative during the course of the examination. I noted no acute trauma or injuries to his head which I palpated as part of the examination, or throat. His eyes and ears appeared normal. The extraocular muscles were intact, meaning that Petitioner had no difficulty following movement with his eyes, his mouth and throat oropharynx were normal, and I noted no significant dental caries (e.g., no cavities, normal dentition).

12. I checked his vital signs, including blood pressure, pulse, respiration rate, and oxygen saturation. In Petitioner's case, all of these measurements were within normal limits.

13. Petitioner was measured at ▮ inches tall, and weighed ▮ pounds, with a Body Mass Index (BMI) of ▮ This BMI is within normal limits

14. I noted no focal neuro deficits, cranial nerves II – XII were grossly intact (generally indicating no neurologic deficits in his face), and his gait and strength were normal. His pupils were equal and reactive in response to stimuli.

15. Petitioner's cardiovascular rate and rhythm were regular, with no murmurs, rubs, or gallops. I noted no respiratory distress during the physical examination.

16. During the physical examination of Petitioner, I noted no visible bruises, abrasions or contusions anywhere on his head or body.

17. I did note two minor issues in the medical record. Petitioner complained of mild tenderness ▮ however, I found no obvious bruising or other physical signs of injury in that location. Petitioner also indicated mild tenderness ▮ but there was no obvious bruising or other physical signs of injury in that location.

18. As is standard, Petitioner was asked whether he was subject to any abuse or maltreatment prior to arriving at the DoD Facility. Petitioner denied any injuries or abuse, and denied that he was suffering from any current medical conditions or injuries. Petitioner did not describe any abuse by SDF or DoD soldiers, and I did not observe any significant findings or trauma that would have been consistent with abuse or maltreatment. I did not observe any head injury, and, if I had, it would have been documented as part of the physical examination.

19. Upon completion of my examination, I found Petitioner medically cleared to enter the DoD Facility.

20. I continued to provide medical services to Petitioner until I left the DoD Facility in October 2017. He did not raise any allegations of abuse with me prior to my departure.

3

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 13, 2018.

4

**EXHIBIT 1**

MEDICAL IN / OUT PROCESSING FORM

**Injuries / Abuse:** abrasions



Impression/Plan:

☑ Clear for detention

☐ Not Clear for detention

Note: _____

Provider #: ▮▮▮▮▮

**MED OUT PROCESSING USE ONLY:**

Initial Wt: ▮▮▮ lbs

Current Wt: _____ lbs

Weight loss/gain: _____ lbs

Provider #:

Legend
T = Tattoo
\\\ = Abrasions
X = Contusion
⬭ = Laceration

NAME: ▮▮▮▮▮
CAP/ISN #: ▮▮▮▮▮
DATE/TIME: 12SEPT2017 / 2010

AGE: ▮▮▮
BIRTHDAY: ▮▮▮

| HEALTH RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION *(Sign each entry)* | | | | | | | |
| 12/07/17 | ██ **Medical In-processing** | | | | | | | |
| ██ *surgeon* | Ht: | Wt: | BMI: | BP: | P: | R: | T: | O2Sat: |

**PHYSICAL EXAM:** Please see attached medical in-processing physical form.

well appearing NAD, thin

benign G design on exam

& current medical conditions.

& dyspnea - will monitor.

HB neg

medically stable for D-T.

██ *physician* ██

PATIENT'S IDENTIFICATION (*Use this space for Mechanical Imprint*)

██████

| RECORDS MAINTAINED AT: | ██████ | | |
|---|---|---|---|
| PATIENT'S NAME ( *Last, First, Middle initial* ) | | | SEX |
| RELATIONSHIP TO SPONSOR: N/A | STATUS N/A | | RANK/GRADE N/A |
| SPONSOR'S NAME N/A | | ORGANIZATION N/A | |
| DEPART./SERVICE N/A | CAPTURE TAG NUMBER | | DATE OF BIRTH |

CHRONOLOGICAL RECORD OF MEDICAL CARE          STANDARD FORM 600 (EF)

# TUBERCULOSIS QUESTIONNAIRE

فورم تحقیقات مرض سل ( توبرکلوس)

| | | اسمی شخص |
|---|---|---|
| تاریخ امروز **120717** | | |
| **3. TODAY'S DATE** | **2. ID NUMBER** | |
| تاریخ مثبت بودن تست مرض سل در جلد | آخرین بار گرفتن عکس سینه و نتایج آن | قعه |
| **6. POSTIVE TB SKIN TEST (PPD) DATE** | **5. LAST CHEST X-RAY DATE AND RESULTS** | **4. UNIT** |
| داشتن الرژی با حساسیت ( شامل گزیدگی حشرات، غذا ، دوا ) | | استفاده دارو ها در این هربار: |
| | | ∅ |
| **8. ALLERGIES** (include insect bites/stings, foods, medicines) | | **7. CURRENT MEDICATIONS** |

| در این جریون آیا شما صحت خوب دارید ؟ | نی‌ | | |
|---|---|---|---|
| **9. ARE YOU CURRENTLY IN GOOD HEALTH?** | YES  NO | | |

| **INDICATE IF YOU ARE HAVING OR HAD ANY OF THE FOLLOWING PROBLEMS FOR TWO OR MORE WEEKS:** | YES | NO | گزارش بدهد اگر مشکلات از این امراض قبل دارید به مدت دو هفته ویا زیادتر آن |
|---|---|---|---|
| 10 a.  Chronic cough | ○ | ∅ | الف. سرفه شدید |
| b.  Production of sputum | ○ | ∅ | ب. تشخص خلط سینه |
| c.  Blood-streaked sputum | ○ | ∅ | ث. خون ریزی |
| d.  Unexplained weight loss | ○ | ∅ | د. وزن کم کردن بدون فهمیدن |
| e.  Fever | ○ | ∅ | ف. تب کردن |
| f.  Fatigue or tiredness | ○ | ∅ | ف. خسته گی و ماندگی |
| g.  Night sweats | ○ | ∅ | ج. عرق شب |
| h.  Shortness of breath | ○ | ∅ | خ. کوتاهی نفس |

| **11. SCREENER'S SUMMARY OF ALL PERTINENT DATA** | تایج تحقیقات واضحه به تاریخ است |
|---|---|
| a. COMMENTS | موضح ، |
| | فری |

≠ s/sx c/o active TB.

| **EVIDENCE OF PULMONARY TUBERCULOSIS OR CONTAGIUM?** | بنی‌ YES | سنی‌ NO | آیا گواهی به داشتند مرض سل یا توبرکلوز  ویا مکروب میدهید ؟ |
|---|---|---|---|

| | | امضای داکتر / تحقق کننده | تاریخ |
|---|---|---|---|
| *[signature]* | اسم و خلاص داکتر / تحقق ک | | **120717** |
| **b. NAME AND TITLE OF PHYSICIAN/SCREENER** | | **c. SIGNATURE OF PHYSICIAN/SCREENER** | **d. DATE** |

Page 1 of 1 Page

**EXHIBIT 2**



































CT #





































IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| Petitioner, | ) Civil Action No. |
| | ) Case 1:17-cv-2069 (TSC) |
| v. | ) |
| | ) DECLARATION OF |
| GENERAL JAMES N. MATTIS, | ) Department of Defense Facility Medic |
| In his official capacity as SECRETARY | ) |
| OF DEFENSE, | ) |
| | ) |
| Respondent. | ) |
| | ) |
| | ) |

Pursuant to 28 U.S.C. § 1746, I, Department of Defense Facility Medic[1], hereby declare:

1. I am currently assigned to a unit located within the United States. During the timeframe of
   I was assigned to the unit that initially made contact with the Syrian
   Democratic Forces (SDF) before transferring Petitioner to the Department of Defense (DoD)
   Facility at which he was detained.

2. I initially entered military service in 2004 as an infantryman. I completed training as an
   Army medic in December of 2006, and spent the next five years in assignments as an Army
   medic. I was deployed seven times as an Army medic, and during my career I have
   performed approximately one hundred medical screenings. Beginning in 2012 I began
   primarily working in another career field; however, I have maintained my Army medic
   credentials, and have continued to perform those functions as necessary. This includes
   performing the initial medical screening of Petitioner on 11 September 2017.

3. This declaration is provided for use in the above-captioned habeas corpus litigation brought
   by a U.S. citizen currently detained by the Department of Defense (DoD) in Iraq. The
   statements made below are based on my personal knowledge and information made available
   to me in the performance of my official duties.

4. On 11 September 2017, I performed a preliminary medical screening of Petitioner in Syria,
   while he was in the custody of the Syrian Democratic Forces (SDF). Petitioner was
   cooperative during the evaluation. Consistent with the standard practice, I annotated the

---

[1] My name is not being used in this declaration in order to protect my identity. Given the sensitivity of
the position in which I previously served relative to the topic addressed in this declaration and potential
threats to the safety of myself and my family that may result from my service in that position, either
presently or in the future, it is the policy of the Department of Defense that my name not be used or
disclosed in litigation-related or other public filings.

results of my interview with and medical screening of Petitioner to be retained at the DoD Facility. Those notes attached to this declaration are a true and accurate copy of the notes I made as part of the medical screening described above.

5.  The purpose of this screening is to make a preliminary assessment as to whether the individual is medically cleared to be transferred to U.S. custody. This requires a determination of whether Petitioner has any pre-existing or acute conditions which require medical treatment. This is accomplished by asking the individual questions about their prior medical history and performing a physical examination.

6.  During this screening all detainees have their vital signs checked, receive a physical examination for injuries or medical issues, and are interviewed regarding past medical history and any recent injuries or allegations of abuse or maltreatment.

7.  Part of medical screening of detainees in SDF custody is to ask the detainee about any abuse or maltreatment by the detaining force forces. This is a standard question asked of all incoming detainees to ensure that U.S. and partnered forces are in compliance with DoD policy and any applicable laws regarding humane treatment of detainees.

8.  If a detainee reports to me that he has been abused by either Syrian Democratic Forces or Department of Defense personnel, I am required to report this to appropriate authorities with the Department of Defense. I am also required by DoD policy to report any indications or suspicions of abuse or maltreatment by partnered forces. I was required to observe and document all injuries, scars, or other markings I found during the screening. All such injuries would have been photographed, and added to the detainee's medical record.

9.  During the screening on 11 September, I personally interviewed and examined Petitioner. In response to questions regarding medical concerns or prior abuse, Petitioner described a ▮ ▮ in 1997, a ▮ in 1999, ▮ in 2009, and ▮ in 2013. Petitioner did claim to have bumped his head during detention by the SDF; however, it was not described to me as intentional or abusive. Had Petitioner complained of, or had I suspected abuse or maltreatment by the SDF, I would have documented the abuse, any corresponding injuries, and reported it through my chain of command.

10. During the 11 September screening I checked Petitioner's vital signs, including blood pressure, pulse, respiration, and oxygen saturation, all of which were within normal limits.

11. During the 11 September screening, I checked and asked Petitioner about the following: his Head, Eyes, Ears, Nose and Throat; Lymphatic system; Endocrine system; Neurological response; Respiration; Musculoskeletal complaints; and any other injuries. Petitioner complained of ▮ for approximately the previous six years; ▮ ▮ complaints of ▮ ▮ complaints of occasional ▮ pain; and complaints of ▮ for approximately the previous three weeks.

2

12. Petitioner did not describe any abuse by SDF soldiers, and I did not observe any injuries that would have been consistent with abuse or maltreatment. If he had alleged abuse by the SDF, I would have reported it. I did not observe any head injury, and if I had it would have been documented as part of the medical screening.

13. Upon completion of my medical screening, I found Petitioner suited for transfer to U.S. custody.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____14 Jun_____, 2018.

_DoD Medic_____

3

**Date:** 11 SEP 2017

**Medic:** █████████

**Patient:**

**Vitals:** █████████████

**Medical History:**

- 1999: ████████████
- 1997: ██████████████████
- 2013: ████████████
- 2009: ██████████
- Allergies:

**Current Medication:** ███████████

**HEENT:** Eyes ████ negative/no complaints

**Lymphatic:** Negative lymphadenopathy

**Endocrine**: Negative; complains of ████████ x 6 years

**Neurological:** Negative/no complaints

**Respiratory:** Clear bi-lateral x 6; no complaints

**Integumentary:** ████████████████████(photo documented)

**Musculoskeletal:** 5/5 strength in all limbs

    -complains of ████████████ no pain on palpation

    -complains of occasional ███████

    -normal gait

**GI/GU:** Complains of ██████ x 3 weeks; no other complaints

**Psych:** No complaints

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. |
| | ) | Case 1:17-cv-2069 (TSC) |
| v. | ) | |
| | ) | DECLARATION OF |
| GENERAL JAMES N. MATTIS, | ) | MAJOR GENERAL CHAD P. FRANKS |
| In his official capacity as SECRETARY | ) | |
| OF DEFENSE, | ) | ~~UNDER SEAL~~ |
| | ) | |
| Respondent. | ) | |
| | ) | |

Pursuant to 28 U.S.C. § 1746, I, Major General Chad P. Franks, hereby declare:

1. I currently serve as the Deputy Commander for Operations and Intelligence for the Combined Joint Task Force – Operation Inherent Resolve and have served in that position since 5 May 2018. As the Deputy Commander for Operations and Intelligence, my duties include oversight of all joint and coalition operations, intelligence, and plans in the fight against the Islamic State of Iraq and Syria.

2. This declaration is provided for use in the above-captioned habeas corpus litigation brought by a U.S. citizen (Petitioner) currently detained by the Department of Defense (DoD) in Iraq.[1] The statements made below are based on my personal knowledge and information made available to me in the performance of my official duties.

3. In my professional military judgment, the contemplated release of Petitioner as described in the declaration of Mark E. Mitchell, dated 6 June 2018, comports with DoD's obligations under the law of war and would not expose Petitioner to an unreasonable risk of harm. When DoD no longer wishes to detain a person—whether that person is, for example, an enemy combatant who could otherwise lawfully be detained for the duration of hostilities or a civilian internee who is being detained for his or her own safety—it is DoD's practice in the U.S. Central Command's area of responsibility to release that person at or near the location where the person was originally detained, as operationally feasible.

---

[1] The details of the intended release of Petitioner as described in this declaration must occur without advance public notification in order to safeguard the security of DoD's military operations.

1

4. In making release location decisions, including for Petitioner, the responsible commander or official considers the requirements set forth in the DoD Law of War Manual, which provides legal guidance on the law of war to DoD personnel. According to the manual, the decision-maker must take necessary measures to ensure the safety of detainees. In determining what measures to take, the decision-maker must undertake a good faith assessment of the available information, taking into account all circumstances (including humanitarian, operational, and security considerations) with due regard for the safety of the detainee. The manual expressly states that a detainee should not be released into a situation in which he would be attacked upon release.

5. DoD has decided to release detainees, including Petitioner, in ____ in part due to DoD's familiarity with the area. In the course of providing support to Syrian Democratic Forces (SDF) in the fight against ISIS, U.S. forces have visited ____ regularly. U.S. forces are thus familiar with the area, including the security situation, as well as the workings and practices of SDF forces in the area.

6. Based on this experience and familiarity, DoD can attest to the circumstances, including the security situation, in and near ____ as described in paragraph 5 of Mr. Mitchell's Declaration.

7. I am aware that the State Department has issued a travel advisory discouraging U.S. persons from traveling to or remaining in Syria. The existence of such an advisory does not change my assessment that the release of Petitioner ____ is safe. Although combat operations are occurring in Syria, Petitioner can readily avoid those areas. As described in Mr. Mitchell's declaration and in the supplemental information herein, it is my professional military judgment that the proposed plan for Petitioner's release will not unreasonably expose Petitioner to danger and is consistent with DoD obligations under the law of armed conflict.

8. Petitioner's counsel has suggested that, because Petitioner is believed to be a member of ISIS, releasing him in SDF-controlled territory will expose him to attack, reprisal, or other harm by the SDF. Any potential for hostile action by local SDF forces against Petitioner has been

considered as part of the commander's release location determination. Pursuant to Section 1209(e)(1) of the 2015 National Defense Authorization Act, U.S. Central Command has vetted the SDF, including its senior leadership, and determined that the SDF is committed to respecting human rights and the rule of law, including the law of armed conflict. In making that assessment, DoD again relies in part on its familiarity with the SDF based on having frequently interacted with SDF forces, along with traveling frequently in the area, in the course of providing support over the past two years. In my judgment, the SDF has acted consistently with its commitments, and we believe that it will continue doing so. So long as Petitioner does not engage in any hostile or criminal acts, including overtly or actively supporting ISIS after his release, it is unlikely, in my judgment, that the SDF would take any action to harm him.

Although the U.S. Government does not control the SDF and any actions the SDF takes relative to Petitioner would be within its discretion and not done on behalf of the United States.

9. Prior to being released from DoD custody, Petitioner will undergo a medical and psychological evaluation to ensure he is cleared for release. As of the date of this declaration, DoD medical personnel had no concerns with Petitioner's release.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 14, 2018.

Chad P. Franks, Major General, U.S. Air Force

3