IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | |
| in his official capacity as SECRETARY | ) | |
| OF DEFENSE, | ) | |
| | ) | |
| Respondent. | ) | |

**RESPONDENT'S NOTICE OF FILING PUBLIC VERSION OF SEALED FILING**

NOTICE is hereby given that attached is a redacted version, suitable for public filing, of the documents previously filed under seal as ECF No. 108. The redactions in the attached version protect specific details regarding the noticed release of Petitioner and the identities of certain declarants. Counsel for Respondent has also confirmed with counsel for Petitioner that there were no redactions needed relating to Petitioner's identity and medical history.

July 11, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
JESSIE K. LIU
United States Attorney
TERRY M. HENRY
Assistant Director, Federal Programs Branch

*/s/ Olivia Hussey Scott*
JAMES M. BURNHAM
Senior Counsel
KATHRYN L. WYER
Senior Trial Counsel, Federal Programs
OLIVIA HUSSEY SCOTT
Trial Attorney, Federal Programs
U.S. Department of Justice, Civil Division

20 Massachusetts Avenue, N.W.
Washington, DC   20530
Tel. (202) 616-8491 / Fax (202) 616-8470
Olivia.Hussey.Scott@usdoj.gov
*Attorneys for Respondent*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| | ) | |
| v. | ) | |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | |
| in his official capacity as SECRETARY | ) | |
| OF DEFENSE, | ) | |
| | ) | |
| Respondent. | ) | |

# ECF 108

# REDACTED FOR PUBLIC FILING

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| | ) | |
| v. | ) | |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | |
| in his official capacity as SECRETARY | ) | |
| OF DEFENSE, | ) | |
| | ) | |
| Respondent. | ) | |

# ECF 108

# ~~FILED UNDER SEAL~~

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | |
| in his official capacity as SECRETARY | ) | █████████ |
| OF DEFENSE, | ) | |
| | ) | |
| Respondent. | ) | |

## RESPONDENT'S MEMORANDUM IN OPPOSITION TO PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION ............................................................................................ 1

STANDARD OF REVIEW ................................................................................ 3

ARGUMENT .................................................................................................. 4

    I.    PETITIONER IS UNLIKELY TO SUCCEED ON THE MERITS ...................... 4

        A.    The Department Has Satisfied Its Obligation To Ensure a Safe Release .. 4

        B.    Petitioner's Evidentiary Submission Does Not Overcome the
            Department's Well-Founded Judgment ...................................... 5

        C.    Petitioner's Implausible Claim of Prior SDF Abuse Fails To Undermine
            the Department's Determination That His Release Will Be Safe............. 11

        D.    There Is No Other Basis in Habeas to Enjoin Petitioner's Release ......... 13

            1.    The Department's Release of Petitioner in Syria Is Not a
                Transfer, So the Department Need Not Establish Its
                Authority to Detain Petitioner Indefinitely .................................. 14

            2.    To the Extent Positive Legal Authority Is Required for
                Petitioner's Release, the Department Has the Authority To
                Detain Petitioner Pending a Safe and Orderly Release and
                To Effectuate a Safe Release When It Is Possible To Do So ....... 17

            3.    Substantive Due Process Does Not Provide an Independent
                Basis To Enjoin Petitioner's Release ........................................... 20

    II.    PETITIONER WILL NOT SUFFER IRREPARABLE HARM ABSENT A
        PRELIMINARY INJUNCTION ...................................................... 24

    III.    THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST WEIGH
        AGAINST INJUNCTIVE RELIEF ................................................... 26

CONCLUSION............................................................................................ 27

# TABLE OF AUTHORITIES

**Cases**

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014)................................................................. 4, 14

*Butera v. Dist. of Columbia*, 235 F.3d 637 (D.C. Cir. 2001) ........................................... 21, 22, 24

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ..................... 24

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) ................................................................. 21

*Doe v Mattis*, 889 F.3d 745 (D.C. Cir. 2018) ..................................................... 15, 17, 18, 19, 20

*Estate of Phillips  v. District of Columbia*, 455 F.3d 397 (D.C. Cir. 2006) ................................ 21

*Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078 (D.C. Cir. 2011).............. 4

*Hamdan v. Rumsfeld*, 415 F.3d 33 (D.C. Cir. 2005) ...................................................................... 9

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) ................................................................................... 9

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ............................................................................... 18, 19

*In re Navy Chaplaincy*, 534 F.3d 756 (D.C. Cir. 2008) .............................................................. 24

*Kiyemba v. Obama*, ("*Kiyemba II*"), 561 F.3d 509 (D.C. Cir. 2009) ........................... 5, 8, 22, 23

*Munaf v. Geren*, 553 U.S. 674 (2008)................................................ 15, 16, 17, 21, 22, 23, 25, 26

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................................ 26

*Omar v. Harvey*, 479 F.3d 1 (D.C. Cir. 2007) ("*Omar I*"),
    *vacated by Munaf*, 553 U.S. 674 (2008) ....................................................................... 15, 16, 20

*Omar v. McHugh*, 646 F.3d 13 (D.C. Cir. 2011)................................................................... 22, 23

*People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17 (D.C. Cir. 1999) ............. 26

*Preiser v. Rodriguez*, 411 U.S. 475 (1973) ................................................................................. 15

*Pursuing Am.'s Greatness v. Fed. Elec. Comm'n*, 831 F.3d 500 (D.C. Cir. 2016) ..................... 26

*Stoddard v. Wynn*, 68 F. Supp. 3d 104, 113 (D.D.C. 2014) ........................................................ 21

*United States v. Hamidullin*, 888 F.3d 62 (4th. Cir. 2018) ......................................................... 9

*Valentine v. United States ex rel. Neidecker*, 299 U.S. 5 (1936) ................................................... 20

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................................................... 3, 24, 26

*Wis. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) (per curiam) .................................... 25, 26

**Statutes**

2015 National Defense Authorization Act ("NDAA"),
    Pub. L. No. 113-291, § 1209(e)(1), 128 Stat. 3292, 3542-43 (2014) ............................... 7

**Administrative Materials**

DoDD 2310.01E ........................................................................................................... 13, 19

Department of Defense Law of War Manual § 8.14.3.2 (June 2015, Updated Dec. 2016),
    *available at* http://ogc.osd.mil/images/ law_war_manual_december_16.pdf ........... 13, 19

White House, Report on the Legal and Policy Frameworks Guiding the United States' Use of
    Military Force and Related National Security Operations 12-13 (Dec. 2016), *available at*
    https://obamawhitehouse.archives.gov/sites/whitehouse.gov/files/documents/Legal_
    Policy_Report.pdf ................................................................................................................ 2

**Other Materials**

Deborah N. Pearlstein, *How Wartime Detention Ends*, 36 Cardozo L. Rev. 625 (2014) ............ 20

## **INTRODUCTION**

After nine months' detention in a U.S. military facility in Iraq, during which Petitioner claimed that the only remedy he desired was a simple release, Petitioner now seeks to enjoin his release ███████████████████████████ in an area that the Department of Defense ("Department") deems safe, under the control of the Syrian Democratic Forces ("SDF"), a U.S. partner in the fight against the Islamic State, or ISIL. In his latest filing, Petitioner claims to have evidence undermining the Department's determination that it can safely release Petitioner ████████. But Petitioner is unlikely to succeed in his attempt to establish that the Department's proposed release ██████████████████████ is unlawful.

First, the Department's determination that the release will be safe is well founded and should be credited by this Court. The Department has emphasized that it is committed to the law of war requirement that it take necessary measures to ensure the safe release of those in its custody, and its proposed release complies with that obligation here. The Department's familiarity with conditions in ████████████ and its ongoing relationship with the SDF provide an ample basis for the responsible military officials to conclude that Petitioner's release will be safe. Petitioner's attempt to submit competing evidence does not undermine that conclusion. Petitioner cites Department press releases that discuss targeted strikes against ISIL, but those strikes did not occur in ████████████; they occurred outside of SDF-controlled territory, on the other side of the front line, in an area Petitioner can easily avoid. Although Petitioner has two declarants who claim to have anecdotal information on conditions in ██████████ Syria, one of these declarants has visited ██████████ once, and a second one has visited the general region (but not ██████████) seven times in the past two and a half years. Their assertions are no legitimate substitute for the Department's regular, on-the-ground experience. Petitioner's shifting claim of past SDF abuse is

not credible and thus lends no support to the notion that the SDF would violate the commitments

that the group has already provided to respect human rights and the rule of law[1] or ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████. The Court should decline Petitioner's invitation to overturn the military's

operational decision to release him in a safe location ████████████████ and to second-guess

its professional judgment about conditions in ████████████████, where U.S. military

commanders have on-the-ground experience and familiarity.

Second, Petitioner's claim that his release is actually a transfer is wrong, calling into

question the Court's jurisdiction to enter an injunction here and, at the very least, making clear that

prior rulings imposing barriers to transfer have no application. The Supreme Court and the D.C.

Circuit have consistently and carefully distinguished between a release—the quintessential remedy

for a habeas claim—and transfer to the custody of a foreign authority. Moreover, the implications

of Petitioner's argument are staggering. Under Petitioner's theory, because the Department

removed Petitioner from the battlefield in Syria following Petitioner's decision to travel there

voluntarily, it now cannot release him in a █████ location, *even if the release is safe*, unless the

Department also takes one of two additional steps. According to Petitioner, he cannot be released

unless either the Department first establishes its authority to continue detaining him (i.e., to *not*

release him), or the Department finds a way to ensure that after his release, Petitioner will be able

---

[1] Under applicable statutes governing assistance to the SDF, the United States has vetted the SDF and obtained such commitments. *See* White House, Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations 12-13 (Dec. 2016), *available at* https://obamawhitehouse.archives.gov/sites/ whitehouse.gov/files/documents/Legal_Policy_Report.pdf .

to travel freely and ultimately to return to the United States. But for the Court to impose either of these alternative obligations on the Department as a condition of *allowing* it to release Petitioner—the relief he has purported to seek since filing his Petition—would run far afield of any remedy previously fashioned by a habeas court. Indeed, such obligations are entirely inconsistent with the traditional habeas remedy of release.

The Department has the authority to release Petitioner as long as it ensures that the release will be safe. And that authority is not undermined by the Court of Appeals' decision in this case prohibiting Petitioner's transfer to foreign custody, or by controlling authority on the scope of substantive due process in this context. Any other conclusion would create the absurd result that the Court could exercise its habeas power to require detention rather than release, and the Department could be prevented from providing the very remedy that Petitioner ostensibly seeks through this action. Because Petitioner is unlikely to succeed on this claim, the Court should deny Petitioner's motion and allow the Department's proposed release to proceed.

The other preliminary injunction factors also weigh against emergency relief here. The proposed release would not cause Petitioner irreparable harm when the harms that Petitioner identifies are speculative, and release itself is the ultimate relief that is available through this action. The balance of hardships and public interest weigh in favor of allowing the Department to effectuate the proposed release.

## STANDARD OF REVIEW

An emergency injunction is an "extraordinary remedy . . . [that] may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he

is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id*. at 20. The Court of Appeals has emphasized that the "first and most important factor" is whether the moving party has "established a likelihood of success on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). "[W]hen a plaintiff has not shown a likelihood of success on the merits, [the Court] need not consider the other factors." *Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1088 (D.C. Cir. 2011).

## ARGUMENT

## I.     PETITIONER IS UNLIKELY TO SUCCEED ON THE MERITS

### A.     The Department Has Satisfied Its Obligation To Ensure a Safe Release



The Department has explained its determination that Petitioner's release in ███████ ███████ will be safe and in compliance with the Department's law of war obligations. Two Department officials whose areas of responsibility require familiarity with conditions on the ground in Syria have attested that ███████ and the surrounding area are stable and calm, that SDF forces will not pose any particular threat to Petitioner, and that the Department's proposed release comports with traditional military practice and with the law of war requirement to take necessary measures to ensure a safe release. *See* Declaration of Major General Chad P. Franks ("Franks Decl.") [ECF 101-4] ¶¶ 3-8; Declaration of Mark E. Mitchell ("First Mitchell Decl.") [ECF 95] ¶¶ 4-6. Major General Franks has also explained that the Department ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████. Franks Decl. ¶ 8. The Department will also

provide Petitioner not only with the same amount of money that he had when he was captured



, a new cell phone,

. Franks Decl. ¶ 8; First Mitchell Decl. ¶ 8. In addition,

.

*Id.* ¶ 5. Thus, once Petitioner is released ▉▉▉▉▉ he will be able to provide for his immediate

needs and pursue longer-term plans, whatever those may be.

> ### B.  Petitioner's Evidentiary Submission Does Not Overcome the Department's Well-Founded Judgment

Petitioner has submitted his own evidence in an attempt to contradict the Department's

conclusion that Petitioner's release in ▉▉▉▉▉ will be safe. Petitioner thereby invites

the Court to weigh competing opinions on the safety and stability of ▉▉ in a foreign country

nearly six thousand miles away, where the U.S. military has experience due to the support it has

provided to the SDF in the fight against ISIL. The Court is ill-equipped to conduct fact-finding on

such an issue, and any attempt to do so would essentially amount to substituting the Court's

judgment for the professional military judgment of Department officials, who have relied on the

assessments of responsible military commanders on the ground in accordance with Department

policies and the law of war. Respondent has previously explained the deference due the

Department on such matters. Respondent's Supp. Mem. in Opp. to Pet'r App. for TRO ("Govt.

Supp. TRO Opp.") [ECF 101] at 10-11. In his concurring opinion in *Kiyemba v. Obama*,

("*Kiyemba II*"), 561 F.3d 509 (D.C. Cir. 2009), Judge Kavanaugh recognized the "predictive,

expert judgments about conditions in a foreign country" that the Executive made when deciding

when or where to transfer or release wartime detainees. *Id.* at 520 (Kavanaugh, J., concurring).

The Court therefore should exercise considerable caution in assessing a purported evidentiary submission that seeks to contradict those predictive, expert judgments.

Such caution is certainly warranted here because the only evidence that Petitioner submits consists of ██████████████████████████ along with three declarations, only two of which purport to be based on actual knowledge of conditions ████████ (albeit only one of the declarants claims ever to have visited █████, and only did so one time). Petitioner argues the press releases describe "a multitude of combat operations near ████████." Pl. Mem.at 3. However, as explained by the Department, the targeted strikes against ISIL described █████ ██████ all occurred outside of SDF-controlled territory, on the other side of a front line that itself is ██████████████████████. Second Declaration of Mark E. Mitchell ("Second Mitchell Decl.," attached hereto) ¶ 3. Major General Franks was well aware of those operations and considered them in his assessment, and he nevertheless was able to conclude tha ████████ ████████ and the surrounding SDF-controlled area are stable and calm. *See id.*

Petitioner's declarations similarly fail to counter the Department's well-founded judgment. Although Mr. Guter served in the Navy, he retired from the Navy sixteen years ago. *See* Declaration of Donald J. Guter ("Guter Decl.") [ECF 106-4] ¶¶ 2-3. In addition, although Mr. Guter purports to consider "the totality of the circumstances," he cites no prior experience with detention operations, and his asserted judgment about the reasonableness and lawfulness of the proposed release is based only on generalities regarding military policies and regulations, vague hypotheticals, and publicly available information, *see id.* ¶¶ 4-14, and thus is not as well-informed as the Department's judgment, which is based on the assessment of commanders on the ground.

By their own descriptions, Mr. Bonsey and Ms. Kayyali have no professional military

experience at all. Declaration of Noah Bonsey ("Bonsey Decl.") [ECF 106-5] ¶ 1; Declaration of

Sara Kayyali ("Kayyali Decl.") [ECF 106-6] ¶ 1. The declarations of Mr. Bonsey and Ms. Kayyali

explain that they have been able to travel as foreign civilians through SDF-controlled areas in

Syria. *See* Bonsey Decl. ¶ 4; Kayyali Decl. ¶ 3. Mr. Bonsey describes SDF-held areas as "more

secure than other parts of the country," and his description of "security incidents" does not suggest

that civilians unaffiliated with the SDF have been targeted, nor does he indicate that anyone was

killed or injured in those incidents. Bonsey Decl. ¶ 7. Although both declarants speculate that

conditions in the area may change in the future, Bonsey Decl. ¶ 7; Kayyali ¶ 9, neither declarant

reports any threat to their own safety while traveling in this area during the past six months.

Although Mr. Bonsey states that the "area around ██████████ is considered more dangerous"

than other SDF-held territory, *id.* ¶ 8, he does not identify who holds that view (again, he does not

suggest he has ever been there), nor does he provide any concrete information that suggests that

civilians in ██████ are unable to go about their normal lives. Ms. Kayyali states that SDF-held

areas are "unstable and volatile," but she cites no concrete information to support her assertion

other than a passing reference to unspecified "risks from both ISIS 'sleeper cells' and the presence

of improvised explosive devices." Kayyali Decl. ¶ 9. Nor does she suggest that the day-to-day

lives of civilians ██████ are being disrupted by the purported risks that she describes.

Petitioner's declarants also fail to take into account the Department's description of its

planned release. Mr. Bonsey states his opinion that the SDF itself would pose a threat to Petitioner.

Bonsey Decl. ¶¶ 10-11. However, the Department has explained previously that it has

"appropriately vetted" the SDF in accordance with the requirements of the 2015 National Defense

Authorization Act ("NDAA"), Pub. L. No. 113-291, § 1209(e)(1), 128 Stat. 3292, 3542-43 (2014),

and has concluded that the SDF "is committed to respecting human rights and the rule of law, including the law of armed conflict." Franks Decl. ¶ 8; *see also* First Mitchell Decl. ¶ 6. Mr. Bonsey provides no basis to second-guess the Department's conclusion on that point, nor does he identify any basis to doubt the Department's stated view ████████████████████████████ ███████████████████████████████████████████████████████████████████████████████████ ████ . As Judge Kavanaugh stated, the Department has access to relevant information on such matters that others do not. *See Kiyemba II*, 561 F.3d at 520 (Kavanaugh, J., concurring) (recognizing that the Government's transfer and release decisions "rest[] . . . on confidential information, promises, and negotiations"). Indeed, Mr. Bonsey fails to acknowledge the Department's ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ . Ms. Kayyali similarly describes at length her assessment of conditions ████████████████████ ██████████████████████████ . However, the Department plans to release Petitioner in ██████████████████████████ . First Mitchell Decl. ¶ 5. Any decision to ██████████ ████████████ is entirely up to Petitioner. At most, Ms. Kayyali's description suggests that Petitioner may █████████████████████████ if █████████████ ███████████████████ ██████████████████ . Kayyali Decl. ¶ 11. It does not provide a basis to find that the Department's proposed release of Petitioner is unsafe.

Petitioner's declarants also state their opinions that Petitioner may face considerable difficulty if he attempts to leave the area of ███████████ Syria under SDF control. As discussed in greater detail below, the issue of how Petitioner might leave Syria is separate and distinct from the

question of whether Petitioner's release ████████████ is safe.[2] In addition, Petitioner's

declarants essentially speculate on what Petitioner will do if he is released in ████████, and what

he would face if he attempted to cross Syria's border illegally. They claim no experience or

knowledge directly relevant to Petitioner's situation, and they fail to explain why their point of

comparison should be, for example, Syrian asylum seekers, *see* Kayyali Decl. ¶¶ 14-15. After all,

Petitioner's situation is different from that of a typical asylum seeker. He is a U.S. citizen who has

relatives in other countries, he claims to be a journalist, and he also has attorneys in the United

States who have already made contact with at least two organizations—Human Rights Watch and

---

[2] To the extent Petitioner seeks to argue that the Department is in violation of international law of war requirements other than the requirement to ensure a safe release, he mischaracterizes the applicability of those requirements. Petitioner argues that release would increase the difficulty of repatriation and would therefore be inconsistent with provisions of the Third and Fourth Geneva Conventions of 1949. The provisions of the Third and Fourth Geneva Conventions cited, however, are inapplicable in this context. The cited provisions of the 1949 Geneva Conventions apply to "international" armed conflicts between States, whereas Petitioner was captured as part of the "non-international" armed conflict against ISIL, a non-State terrorist group. Under the "fundamental logic of the Convention's provisions on its application," *Hamdan v. Rumsfeld*, 415 F.3d 33, 44 (D.C. Cir. 2005) (Williams, J., concurring), only Common Article 3 of the 1949 Geneva Conventions applies to non-international armed conflicts. *See, e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557, 630-31 (2006); *United States v. Hamidullin*, 888 F.3d 62, 70-71, 75 (4th. Cir. 2018) (explaining that provisions of the Third Geneva Convention apart from Article 3 do not apply in non-international conflicts). Moreover, even assuming the applicability of the entirety of the Geneva Conventions, Petitioner is not a prisoner of war as defined in Article 4 of the Third Geneva Convention, as he does not belong to an enemy State's armed forces or a militia group belonging an enemy State that complies with the law of war. GC III art. 4 (defining categories of persons who are prisoners of war "in the sense of the present Convention").   Petitioner also, as a U.S. citizen, is clearly not a protected person under the Fourth Geneva Convention, which applies to persons who "find themselves, in case of a conflict or occupation, in the hands of a Party to the conflict or Occupying Power *of which they are not nationals*." GC IV Article 4 (emphasis added). Moreover, Article 46 of the Third Geneva Convention and Article 127 of the Fourth Geneva Convention impose requirements with respect to the "transfer" of prisoners of war or protected persons, not release, and these requirements are to be applied based on the Detaining Power's good faith assessment of "political, military and practical exigencies." II-B Final Record of the Diplomatic Conference of Geneva of 1949, p. 289.

the International Crisis Group—that have provided declarations on his behalf. When he is released,

he will have ███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████. Franks Decl. ¶ 8. Although any

course of action would ultimately be up to Petitioner to pursue, it seems that he would be well

positioned to make contact with an aid organization operating in the region, or with a media

organization that could provide him with assistance or even hire him.[3]  The opinions of Mr. Bonsey

and Ms. Kayyali ignore the range of options that Petitioner might pursue, and their conclusions

about what Petitioner might face, at some future point in time after his release, are therefore

irrelevant speculation.

Again, the Department takes seriously the requirement to ensure Petitioner's safe release,

and it would not propose Petitioner's release ███████████ if the relevant military officials had not

carefully assessed the situation, in accordance with Department policies including policies that

require compliance with the law of war, and reached the conclusion that Petitioner's release ███████

███████ would be safe. Petitioner's attempt to offer contrary evidence does not undermine the

Department's conclusion. As the Department's declarants have explained, their familiarity with

██████████████████ and the surrounding area goes well beyond Mr. Bonsey's seven visits to the

entire █████████ Syrian region (none of which, apparently, included a visit to ███████) since 2015,

Bonsey Decl. ¶ 4, or Ms. Kayyali's single visit last May, Kayyali Decl. ¶ 3. U.S. military personnel

visit ██████████ regularly in the course of providing ongoing support to the SDF in the fight against

---

[3] For example, there are United Nations High Commissioner for Refugees  ("UNHCR") field
offices in Qamishli and Hasakah, cities that are, respectively approximately ████████████████
████████████████. *See* http://www.unhcr.org/sy/our-field-offices.

ISIL. Franks Decl. ¶ 5. And because the Department's mission in the region is to help combat ISIL,

Department personnel closely monitor the security situation overall. The Department also

maintains awareness of the stability and safety of the area because it has had to consider ███████

█████████████████████████████████████████████████████████████████████████████████

███████████████████████████. *See id.* ¶ 4; First Mitchell Decl. ¶ 5. The Department's

conclusion that ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████, Franks

Decl. ¶ 6, is perhaps the most telling detail and is uncontradicted by anything Petitioner has

offered. The Court therefore should acknowledge the Department's expertise on this issue and

defer to its judgment that Petitioner's release in ██████ is safe.

### C.      Petitioner's Implausible Claim of Prior SDF Abuse Fails To Undermine the Department's Determination That His Release Will Be Safe

When the Department originally provided notice of its intent to release Petitioner in

██████, Petitioner immediately raised an allegation—which he had not asserted previously—

that he had been "repeatedly beat[en]" and "hit … in his head, back, and stomach" so violently

that he "suffered severe bruising and dizziness." Declaration of Jonathan Hafetz ("Hafetz Decl.")

[ECF 99-2] ¶¶ 8, 11. He also claimed that he "described his abuse by SDF soldiers to U.S.

officials," and that his injuries were so severe that U.S. medical personnel specifically asked about

them after he was taken into Department custody. *Id.* ¶ 20. In particular, he stated that a U.S.

medical official who examined him "saw evidence of a head injury and asked Petitioner if he had

been beaten on the back of his head." *Id.*

In response to those allegations, the Department consulted with the medical personnel who

examined him at the time he was taken into U.S. military custody. Both the medic and the physician

who performed separate examination of Petitioner at that time—the medic on September 11, 2017, while in Syria, and the physician on September 12, 2017, when Petitioner arrived at the Department's facility in Iraq—indicated that Petitioner had raised no allegation of abuse and had affirmatively denied abuse when asked, and that they saw no evidence of severe beating, including any injury to Petitioner's head, which was palpated as part of the medical examination conduct in Iraq. Declaration of Department of Defense Facility Medic ("Medic Decl.") [ECF 101-3] ¶¶ 9, 12; Declaration of Department of Defense Facility Physician ("Physician Decl.") [ECF 101-2] ¶¶ 9, 11, 16-18. The contemporaneous medical records that these medical personnel completed at the time are consistent with their descriptions and with each other, and the photographs that were taken of Petitioner upon his arrival at the Department facility in Iraq show no sign of injury or abuse—including no severe bruising on Petitioner's head, back, or stomach. Physician Decl. exs. 1 & 2; Medic Decl. ex. 1.

Now, in light of the evidence submitted by Respondent, Petitioner has changed his story. *See* Supplemental Declaration of Jonathan Hafetz ("Hafetz Supp. Decl.") [ECF 106-3] ¶¶ 4-5. According to Petitioner's latest version, the medic who examined him "noticed a bruise on the back of his head" that "would [not] have been visible in a photograph" but was underneath Petitioner's hair. *Id.*

The change in Petitioner's story from "severe bruising" in multiple places on his body to one bruise that was invisible under his hair does not support the plausibility of his allegation, which continues to be contradicted by the reports of Department medical staff. In addition, as the medic and physician both note, they would have been required to report any allegation or evidence of abuse at the time, but no such report was made. Medic Decl. ¶ 8; Physician Decl. ¶ 8.

In contrast to Petitioner's shifting narrative, the accounts of the medic and physician regarding their examinations of Petitioner, together with the contemporaneous records and photographs, all support a single conclusion—that no abuse occurred. *See* Medic Decl. ex.1; Physician Decl. ex.1 & 2. Petitioner's claim of abuse by SDF forces thus is not credible. Moreover, Petitioner provides no reason to question the Department's stated belief ███████████████ ██████████████████████████████████████. The Department's determination that Petitioner's release will be safe took into account its familiarity with SDF forces. Its assessment that the SDF is unlikely to harm Petitioner—particularly now that Petitioner's U.S. citizenship is established ████████████████████████████ ██████████████████████████████████████—should be credited over Petitioner's unsubstantiated allegation of prior abuse.

### D.    There Is No Other Basis in Habeas to Enjoin Petitioner's Release

Petitioner argues that even if his release in ████████ is safe, the Department cannot go forward with the release because it lacks positive legal authority to do so. But the Department's authority to release Petitioner is clear. The Department may release Petitioner because it has determined that it no longer wishes to detain him. Once the Department makes that determination, it also has affirmative authority to detain Petitioner as long as necessary "to ensure a safe and orderly release."[4] Because the Department has determined that Petitioner's release in ███████ will be safe, Petitioner's pursuit of an injunction through this habeas action currently stands as the

---

[4] *See* DoDD 2310.01e(3)(f), *available at* http://www.esd.whs.mil/Portals/54/Documents/DD/ issuances/dodd/231001e.pdf; ); *see also* Department of Defense Law of War Manual § 8.14.3.2 (June 2015, Updated Dec. 2016), *available at* http://ogc.osd.mil/images/ law_war_manual_december_16.pdf

only basis for delaying Petitioner's release and continuing his detention.[5] However, Petitioner cites no authority for the notion that he can use this habeas proceeding to challenge a *release—* which is the traditional *remedy* available in habeas. While courts have held that a habeas petitioner may challenge the "fact" and "form" of detention, *cf. Aamer*, 742 F.3d at 1033, there is no precedent for allowing a habeas petitioner to challenge his release, and an injunction *barring* release goes beyond any remedy that habeas could logically provide. *See id.* at 1035 (explaining that habeas jurisdiction lies when a form of relief "may be reframed to comport with the writ's more traditional remedy of outright release," by "simply order[ing] the prisoner released unless the unlawful conditions are rectified"). And even aside from this jurisdictional bar, as explained below, Petitioner's efforts to impose additional requirements on the Department beyond ensuring his safe release are inconsistent with Supreme Court and D.C. Circuit precedent and should be rejected.

**1.     The Department's Release of Petitioner in Syria Is Not a Transfer, So the Department Need Not Establish Its Authority to Detain Petitioner Indefinitely**

Petitioner calls his release in Syria a "transfer." He uses this terminology in order to invoke the Court of Appeals' prior ruling in this case. When considering the Department's proposed transfer of Petitioner to █████████, which Petitioner opposed, the Court of Appeals held that

---

[5] Despite the Department's determination that it wishes to release Petitioner in ████, if this Court prohibits the Department from effectuating that release, the Department reserves the right to reevaluate the options for Petitioner's disposition, which include the possibility that the Department may seek to continue to detain him under the law of war. If the Department decides to continue to detain him, it will be prepared to defend the legality of Petitioner's continuing detention through this habeas proceeding. However, it would make no sense to require the Department to defend Petitioner's continuing detention as a prerequisite to allowing Petitioner's release from custody.

14

the Department must first establish its legal and factual authority for his continued detention. *Doe v Mattis*, 889 F.3d 745, 758 (D.C. Cir. 2018). Petitioner urges that this ruling applies equally to Petitioner's proposed release in Syria. Pl. Mem. at 19-20. However, the Department plans to *release* Petitioner, not transfer him to the custody of another authority, and Petitioner cites no support for his characterization of the Department's proposal as a "transfer."

This Court previously emphasized that "[r]elease from custody and involuntary transfer to the authorities of another country are not interchangeable concepts," and found any suggestion that a transfer to the custody of another country was equivalent to a release "disingenuous." Mem. Op. of Apr. 19, 2018 [ECF 87], at 5; *see also Doe*, 889 F.3d at 766 (concluding that it "cannot be correct" that a "transfer . . . is . . . tantamount to release"). By the same token, a release, in which a detainee leaves the custody of the United States, but is not handed over to the custody of another authority, is not a transfer. The Supreme Court has described "release"—in which the United States simply relinquishes custody of a detained individual—as "[t]he typical remedy" of habeas. *Munaf v. Geren*, 553 U.S. 674, 693 (2008) (citing *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973)).

In *Munaf*, the Court recognized that the petitioners' "simple release" from United States custody in Iraq was the remedy that habeas would provide even though, in the circumstances of that case, such a release would have allowed Iraqi authorities to immediately apprehend the petitioners. *See id.* Indeed, release remained "the quintessential habeas remedy" even if the United States affirmatively alerted Iraq about the planned release, which would have inevitably facilitated the petitioners' apprehension. *See id.* at 697. Along the same lines, in *Omar v. Harvey*, 479 F.3d 1 (D.C. Cir. 2007), the Court of Appeals recognized that Omar, one of the habeas petitioners whose claims were addressed in *Munaf, could not* "seek an injunction barring his outright release"—and

15

that this was so "even if the military releases him inside Iraq," where he was almost certain to be arrested; the Court thus construed the district court's injunction as applying only to transfers to the custody of Iraqi authorities. *See id.* at 11-12; *see Munaf*, 553 U.S. at 682-83 (discussing Court of Appeals' recognition in *Omar* "that the writ of habeas corpus could not be used to enjoin release").

And it was at least in part because the petitioners in *Munaf* were *not* seeking the traditional habeas remedy of "release" that the Court concluded that they were seeking a remedy that habeas could not appropriately provide. *Id.* at 693, 697. The Court rejected the idea that, as part of a habeas remedy, a court could require the United States to "smuggle" a detainee out of a country, or "keep an unsuspecting nation in the dark" when it planned to release an individual within its borders. *See id.* at 697. As the Court recognized, imposing such requirements on the United States would go far beyond the habeas remedy of release.

Petitioner's theory appears to be that the Department's proposed release in ▮▮▮▮▮▮ amounts to a trap, and thus constitutes a transfer. *See* Pl. Mem. at 20 (asserting that once Petitioner is in Syria, he "may not legally . . . leave" because he lost his passport prior to his capture). But under Petitioner's theory, Omar's release in Iraq would truly have been a trap, due to the near-certainty that Iraqi authorities would immediately take Omar into custody. Yet the Court of Appeals and the Supreme Court both recognized that Omar's release in Iraq would have been a simple release, not a transfer, and thus was beyond a habeas court's power to enjoin. Under those courts' decisions, a release that does not involve transfer to the custody of a foreign authority is not a transfer. It is a simple release. The Department's proposed release of Petitioner, then, is a simple release—which a habeas proceeding "c[an]not be used to enjoin." *See Munaf*, 553 U.S. at 682-83.

The fact that the Department proposes to move Petitioner from Iraq to Syria before releasing him does not change that conclusion. Petitioner attempts to coin a new phrase—"non-custodial transfer"—to describe this situation, thus intentionally muddying the distinction between a transfer, as that term is understood in *Munaf* and other habeas cases, and a release. Pl. Mem. at 21. However, there is no concept of "non-custodial transfer" in habeas law. The Court of Appeals and this Court have been clear—as was the Supreme Court in *Munaf*—that a "transfer," for purposes of a habeas analysis, is a transfer *from* United States custody *to* the custody of a foreign authority. *See Doe,* 889 F.3d at 765 (addressing the Executive's "transfer of [Petitioner] *to the custody of another country*" (emphasis added)). Although Petitioner selectively quotes instances where the Court of Appeals' opinion uses the word "transfer" without specifying that it means transfer to the custody of another country, *see, e.g*., Pl. Mem. at 21 (quoting *Doe*, 889 F.3d at 755, as using the phrase "forcible transfer to any country"), there is no doubt that that is how the Court of Appeals intended the term to be understood.

Petitioner cites nothing suggesting that the Department is barred from returning Petitioner to the same country to which he had originally traveled, and where he was when he was taken into custody, in order to release him, or that doing so has the legal effect of transforming a release into a "transfer" within the meaning of *Munaf* and the Court of Appeals' decision in this case. Petitioner has not challenged the Department's decision to take Petitioner from Syria to Iraq as an unlawful transfer, nor could he. That move, which occurred *after* the SDF transferred Petitioner to U.S. military custody, clearly did not qualify as a transfer because the move across the border did not involve a transfer from U.S. custody to the custody of a foreign authority. By the same reasoning, the reverse move, from Iraq back to Syria, is also not a transfer. Accordingly, the Court of Appeals'

17

decision does not apply, and the Department need not engage in the counterintuitive exercise of establishing its authority to detain Petitioner indefinitely as a prerequisite to releasing him in a safe location near the place where he was captured.

> **2.** **To the Extent Positive Legal Authority Is Required for Petitioner's Release, the Department Has the Authority To Detain Petitioner Pending a Safe and Orderly Release and To Effectuate a Safe Release When It Is Possible To Do So**

The Court of Appeals has explained that, under *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (plurality opinion), due process generally requires that a U.S. citizen be allowed to contest the legal and factual basis for his detention, but that "temporary detention without process" is permissible at the time of "initial capture" because, after all, "a citizen can be released if there ends up being an insufficient factual basis to continue detention." *Doe*, 889 F.3d at 764. The implication there, consistent with common sense, is that release requires no process and instead is always permissible, as long as it comports with the law of war requirement that it be safe.

Petitioner ignores the underlying reasoning of the *Doe* Court of Appeals in that regard and instead focuses on the Court's statement that the Department could no longer rely on "battlefield judgment" in order to justify a transfer to the custody of another country several months after Petitioner's capture. *See* Pl. Mem. at 19 (citing *Doe*, 889 F.3d at 764). Although Petitioner concedes that the Department could have released him in Syria (if it had been safe to do so) soon after his initial capture, he argues that because nine months have passed, because the Department has complied with its obligation to remove Petitioner from the point of capture, which was then— in September 2017—an active battlefield, and because the Department has "fil[ed] a factual and legal return justifying his indefinite detention," the Department has somehow lost the authority that it previously had, to release Petitioner in a safe area ████████████████████. Instead,

Petitioner suggests that, once the initial period of "battlefield judgment" ends, the Department may no longer release a detained U.S. citizen unless it first allows the citizen the same process that *Hamdi* required to justify continuing detention—the ability to challenge the legal and factual basis for his detention.

Petitioner's argument is contrary to the Court of Appeals' reasoning and leads to a Catch-22. The Court of Appeals relied on the notion that release was the quintessential habeas remedy when it acknowledged that the Department had initial authority to detain based solely on "battlefield judgment." *Doe*, 889 F.3d at 764. Under Petitioner's theory, now that this initial period has ended, because he is a U.S. citizen and *Hamdi*'s requirement of due process applies, the Department may not release him unless it allows him to challenge the legal and factual basis for his detention. Yet if Petitioner prevailed in that challenge, the remedy would be release—the very thing that Petitioner claims is impermissible. Nothing in the Court of Appeals' decision requires this absurd result. Rather, when the Court of Appeals concluded that this initial "battlefield judgment" period had ended, it did not suggest that the remedy of release was no longer available, nor did it suggest that the Department faced any additional requirements in order to effectuate a release.

Because the Department does not currently seek to continue Petitioner's detention, but instead seeks to release him, the only authority that the Department requires derives from law of war requirements, which allow for release provided that it is safe. Indeed, the requirement that a release be safe also confers the authority to continue detaining an individual "pending efforts to ensure a safe and orderly release." DoDD 2310.01E(3)(f); *see also* Department of Defense Law of War Manual § 8.14.3.2. The Department is currently acting within the scope of that authority

19

because it seeks to release Petitioner, and has determined that its planned release will be safe, but is waiting for this Court's ruling on Petitioner's motion before proceeding with the release.[6]

### 3. Substantive Due Process Does Not Provide an Independent Basis To Enjoin Petitioner's Release

Petitioner again invokes substantive due process as a separate basis for challenging his release. Pl. Mem. at 15. Petitioner seeks to use this claim as an attempt to impose responsibilities on the Department that extend far beyond his detention, and even beyond the immediate circumstance of his proposed release. Indeed, Petitioner seeks to require the Department to find solutions and provide guarantees regarding difficulties that he asserts he may face at some unspecified point after his release in ███████. Petitioner's claim is not consistent either with general authority regarding substantive due process or with the analysis of substantive due process in *Munaf*.

---

[6] Petitioner suggests that "a treaty with allies in an armed conflict" could serve as "positive legal authority" allowing his release in Syria. Pl. Mem. at 21 n.4. He thereby seeks to invoke the other aspect of the Court of Appeals' decision—that under *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5 (1936), a treaty or statute could authorize the transfer of a U.S. citizen to the custody of another country. *See Doe*, 889 F.3d at 754-55. However, as explained above, the Court of Appeals' decision is limited to transfers to foreign custody and does not apply to the release proposed here. In addition, as Judge Henderson noted in dissent, "[t]he phrase 'positive legal authority' does not appear in *Valentine*," and the Court of Appeals' use of the phrase in *Omar* was "as *obiter* as *dictum* can be." *Doe*, 889 F.3d at n.11 (Henderson, J., dissenting). And as discussed above, *Omar* expressly excluded release from its discussion. *Omar*, 479 F.3d at 11-12. Again, the notion that the Department must invoke a treaty or statute in order to provide Petitioner with the quintessential habeas remedy of release is without support. Even the law review article Petitioner cites makes no suggestion that the Executive requires a treaty or statue to release an individual ███████████████████████████, in a country to which he had voluntarily traveled, in an area controlled by its partner force. Rather, the article focuses solely on repatriation of prisoners of war back to the former enemy country. *Cf.* Deborah N. Pearlstein, *How Wartime Detention Ends*, 36 Cardozo L. Rev. 625, 638 (2014). To be sure, as a practical matter, the Department may be unable to release an individual in an area where the controlling party opposes the release, but that is not the case here. Rather, the Department believes ████████████████████████████████

"To state a substantive due process claim, a plaintiff must assert that a government official was so 'deliberately indifferent' to his constitutional rights that the official's conduct 'shocks the conscience.'" *Stoddard v. Wynn*, 68 F. Supp. 3d 104, 113 (D.D.C. 2014) (quoting *Estate of Phillips v. District of Columbia*, 455 F.3d 397, 403–04 (D.C. Cir. 2006)). Only behavior that is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience" can conceivably meet this high bar. *See Phillips*, 455 F.3d at 403 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).

Petitioner relies heavily on *Butera v. Dist. of Columbia*, 235 F.3d 637, 647 (D.C. Cir. 2001), for the argument that his release in ████ would violate his substantive due process rights. The Court of Appeals in *Butera* recognized the general principle that due process is not implicated by the government's failure to protect. *Id.* at 647. In other words, the Due Process Clause places a "limitation on the State's power to act," but it does not provide "a guarantee of certain minimal levels of safety and security." *Id.* (internal quotation omitted). The two narrow exceptions to this rule identified in *Butera* both involve situations where the government exerts some form of control that, as a result, confers an obligation upon it to take affirmative protective action. First, where the government holds someone in custody, it may have an affirmative duty to ensure that the conditions of custody meet certain minimal standards and protect those in custody from each other. *See id.* at 648. Second, a substantive due process claim may lie where the government "affirmatively act[s] to increase or create the danger that ultimately results in the individual's harm." *Id.* at 651. In *Butera*, the Court of Appeals acknowledged the possibility that the plaintiff might show that officers planning an undercover operation had acted with such deliberate indifference to the safety of their undercover agent that it shocked the conscience. *See*

21

*id.* at 652 (ultimately dismissing claim because asserted right was not clearly established).

As described in *Butera*, a substantive due process concern may arise when the Government affirmatively exposes someone to danger at a time when the Government exerts control over that person—either by having physical custody of the person or effectively creating the immediate dangerous circumstances. Significantly, *Butera* makes clear that the focus of substantive due process is the individual's safety. Here, however, the Department has determined that Petitioner's release will be safe, and it has also determined that ████████████████████████████ — providing Petitioner with ███████████ cell phone, ████████████████████████ ███████████████████. In addition, nothing in *Butera* suggests that the Government could continue to be held responsible for possible subsequent dangers that an individual might encounter beyond the immediate circumstance that the Government created.

The Supreme Court in *Munaf* recognized a similar limitation on substantive due process when it held that U.S. citizens cannot assert due process claims in connection with conditions in another country, even when the Government plans to transfer them to the custody of the other country. *See Omar v. McHugh*, 646 F.3d 13, 20 (D.C. Cir. 2011) ("[T]he Supreme Court unanimously ruled in *Munaf* that transferees such as Omar (indeed, Omar himself) do not possess a habeas or due process right to judicial review of conditions in the receiving country."); *see also Kiyemba II*, 561 F.3d at 517-18 (discussing *Munaf*'s rejection of due process claim asserting likelihood of torture after transfer to the custody of another country). The Court in *Omar* concluded that this restriction applies with regard to both substantive and procedural due process claims. *Omar*, 646 F.3d at 21. And as recognized in *Kiyemba II*, the Court's ruling in *Munaf* was reinforced by its hesitation to second-guess Executive decisions that are "inevitably entangled in the conduct

of our international relations" and "arise in the context of ongoing military operations." *Munaf*, 553 U.S. at 688; *see Kiyemba II*, 561 F.3d at 518 ("with respect to international transfers of individuals in U.S. custody, *Munaf* and the extradition cases have already struck the due process balance between the competing interests of the individual and the Government"). The fact that habeas petitioners were not permitted to raise substantive due process claims regarding their treatment by a foreign authority when the Government sought to transfer them to the custody of that authority precludes any such claim here, where the Government simply proposes to release Petitioner rather than transfer him to foreign custody.

Moreover, even if a substantive due process claim were viable as a theoretical matter, it should fail under the circumstances here. Petitioner has not established that the Department's proposed release in ███████ is an act of such deliberate indifference to his safety that it shocks the conscience. To be sure, Petitioner attempts to confuse matters by discussing his lack of a U.S. passport and his right, as a U.S. citizen, to return to the United States. But Petitioner's undisputed right of return has no bearing on whether the Department may safely release him in ██████ in accordance with the law of war and its own policies and procedures, as the Department has determined it may. Petitioner has not shown that his lack of a passport—which by his account is due to its loss at some point before his capture—will make his release unsafe, █████████ ████████████████████████████████████████████████████████ ████████████████████████. As explained above, Petitioner's release in ████████ would not render him helpless. He would be able to take care of his immediate needs and make future plans, and he could enlist others' help in doing so. The situation here therefore does not parallel the examples described in *Butera* where the Government had taken affirmative action to

place an individual in immediate danger that he could do nothing to escape. Petitioner is thus

unlikely to succeed on the merits of his substantive due process claim.[7]

## II.     PETITIONER WILL NOT SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

As discussed above, Petitioner asks the Court to issue a preliminary injunction here based

on his speculative fears that the proposed release is unsafe, a claim that is misplaced and contrary

to the considered judgment of the Department of Defense. Petitioner's speculation is also

insufficient to demonstrate, as he is required to do, "that irreparable injury is *likely* in the absence

of an injunction." *Winter*, 555 U.S. at 22. As the Supreme Court emphasized in *Winter*, "[i]ssuing

a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our

characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a

clear showing that plaintiff is entitled to such relief." *Id.* (citation omitted).

The D.C. Circuit "has set a high standard for irreparable injury." *In re Navy Chaplaincy*,

534 F.3d 756, 766 (D.C. Cir. 2008) (citing *Chaplaincy of Full Gospel Churches v. England*, 454

F.3d 290, 297 (D.C. Cir. 2006)). To qualify as irreparable, in injury must be "certain and great,

actual and not theoretical, beyond remediation, and also of such imminence that there is a clear

and present need for equitable relief to prevent irreparable harm." *Id.* (quotation omitted).

Petitioner's speculative fears, therefore, cannot constitute an irreparable injury sufficient to obtain

injunctive relief. *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (It

---

[7] Petitioner again attempts to invoke a parade of horribles that he previously warned could ensue if his transfer to ███████████ had been permitted. Thus, Petitioner suggests that, if the Court allows his release in Syria, an "errant tourist, embedded journalist, or local aid worker" might face the same fate as he. Pl. Mem. at 22. However, it is unclear why the prospect of the Department's safe release of a tourist, journalist, or aid worker back in a country to which that individual had voluntarily traveled to begin with would be unreasonable.

is a "well known and indisputable principle[]" that "[i]njunctive relief will not be granted against something merely feared as liable to occur at some indefinite time." (quotation omitted)). "The movant must provide proof . . . indicating that the harm *is certain to occur in the near future* . . . [and] that the alleged *harm will directly result from* the action which the movant seeks to enjoin." *Id.* (emphasis added).

Far from anything that could qualify as an "injury" that is "irreparable" for purposes of a preliminary injunction analysis, Petitioner's release would constitute the "quintessential remedy" to which he would be entitled if he prevailed in his habeas claim. *Munaf*, 553 U.S. at 697. This result would be "irreparable" only in the sense that he would already have received everything that he could obtain through litigation. As explained in § I(A) to (C), above, Petitioner's fears of injury or death are not at all "certain to occur in the future," nor would the harm Petitioner claims "directly result from" a release in ██████. The likely outcome here—given the Department's safety determination, as well as ████████████████████████████████████████ ████████████████████████████████—is that Petitioner will be safe upon release. Petitioner will essentially have been returned to a situation superior to his pre-capture status via release in a safe location ████████████████████████████████████████ ████████████████████████████████████████. Petitioner will be able to provide for his immediate needs, pursue longer-term plans (whatever those may be), and seek assistance in his chosen plans from his relatives in other countries, attorneys in the United States, and/or media or aid organizations that Petitioner or his relatives or attorneys might contact either in the region or elsewhere. Petitioner's argument, which ignores the range of options he might pursue after release and instead recasts his safe release in ████████ as one that exposes him

to almost inevitable injury or death, lacks merit and should be rejected. Such speculation cannot constitute a likely irreparable injury sufficient to justify a preliminary injunction. *See Wis. Gas Co.*, 758 F.2d at 674 ("Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur.")

## III.   THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST WEIGH AGAINST INJUNCTIVE RELIEF

A party seeking a preliminary injunction also must demonstrate "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Pursuing Am.'s Greatness v. Fed. Elec. Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (balance of harms and public interest merge "because the government's interest *is* the public interest" (emphasis in original)). Here, they weigh decidedly against a preliminary injunction.

The public benefits greatly when the courts allow the Executive Branch to carry out its constitutionally-conferred responsibilities to conduct military functions and to engage in foreign relations. *See Munaf*, 553 U.S. at 699-700, 702-03; *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 23 (D.C. Cir. 1999) ("[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch."). These duties include the duty to determine, consistent with the law of war, an appropriate disposition for a detainee in its custody in a foreign country. The preliminary injunction that Petitioner seeks would run directly contrary to those responsibilities and determinations of the military, and it would interfere with the Executive's determination that the proposed release in ▮▮▮▮▮ is safe and appropriate pursuant to the United States' obligations under the laws of war. Petitioner argues that the public would benefit if

26

Petitioner's challenge to his detention goes forward. Pl. Mem.at 29. But there is no benefit to wasteful litigation when the Department seeks to provide Petitioner with the very relief that is available through habeas. Petitioner also argues that the public benefits by ensuring that the U.S. government does not transfer and release a U.S. citizen into harm's way. But the government is not proposing to transfer Petitioner to the control of another country, *see* § I(D)(1), above, nor is it seeking to release Petitioner in harm's way. As stated in the declarations submitted by both Major General Franks and Mr. Mitchell, ██████ and the surrounding area are stable and calm, SDF forces do not pose any particular threat to Petitioner, and the Department's proposed release comports with traditional military practice and with the Department's obligation to ensure a safe release. Franks Decl. ¶¶ 3-8; First Mitchell Decl. ¶¶ 4-6. Moreover, the public interest is substantially served by a safe release of Petitioner that allows the Executive to stop expending resources detaining Petitioner and that places Petitioner in better circumstances than he was in pre-capture, ███████████████████████████████████████████████████ ██████████████████████████. The release proposed here fulfills that same public interest.

## CONCLUSION

For the foregoing reasons, Petitioner's motion for a preliminary injunction should be denied.

June 29, 2018                                          Respectfully submitted,

                                                       CHAD A. READLER
                                                       Acting Assistant Attorney General
                                                       JESSIE K. LIU
                                                       United States Attorney
                                                       TERRY M. HENRY
                                                       Assistant Director, Federal Programs Branch

                                                       */s/ Kathryn L. Wyer*

JAMES M. BURNHAM
Senior Counsel
KATHRYN L. WYER
Senior Trial Counsel, Federal Programs
OLIVIA HUSSEY SCOTT
Trial Attorney, Federal Programs
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, N.W
Washington, DC   20530
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Respondent*

## CERTIFICATE OF SERVICE

I hereby certify that this document has been served today by email on counsel for Petitioner.

/s/ Kathryn L. Wyer

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN DOE,                                      )
                                               )
            Petitioner,                        )    Civil Action No.
                                               )    Case 1: 17-cv-02069 (TSC)
      v.                                        )
                                               )    SECOND DECLARATION OF
GENERAL JAMES N. MATTIS,                        )    MARK E. MITCHELL
   In his official capacity as SECRETARY       )
   OF DEFENSE,                                  )    ~~UNDER SEAL~~
                                               )
            Respondent.                         )
                                               )
                                               )

Pursuant to 28 U.S.C. § 1746, I, Mark E. Mitchell, hereby declare:

1. I currently serve as the Principal Deputy Assistant Secretary of Defense for Special
   Operations/Low-Intensity Conflict (SO/LIC) within the Department of Defense (DoD).

2. This declaration supplements my previous declaration, signed on June 6, 2018.[1]  The
   statements made below are based on my personal knowledge and information made available
   to me in the performance of my official duties.

3. In reaching its conclusions that the proposed release area ▮▮▮▮▮▮ is stable and calm
   and that Petitioner's release there would be under safe conditions, the Department of Defense
   was aware of and considered the ongoing offensive operations against ISIS (also known as
   Daesh) by Coalition forces ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ each of the strikes ▮▮▮▮ carefully
   targeted ISIS, the majority using precision guided munitions, at locations ▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮ outside of the SDF-controlled territory described in my prior
   declaration and the declaration of General Franks. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[1] The details of the intended release of Petitioner as described in this declaration must occur without advance
public notification in order to safeguard the security of DoD's military operations.

███████████████████████████████████████████████

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 29, 2018.

Mark E. Mitchell

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| v. | ) | |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | |
| in his official capacity as SECRETARY | ) | |
| OF DEFENSE, | ) | |
| | ) | |
| Respondent. | ) | |

## [PROPOSED] ORDER

Upon consideration of Petitioner's Motion for Preliminary Injunction, Respondent's Opposition thereto, and the entire record herein, it is hereby:

**ORDERED** that Petitioner's Motion for Preliminary Injunction is DENIED.

**SO ORDERED.**

_____
Tanya S. Chutkan
United States District Judge

DATED: July __, 2018