### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

JOHN DOE,

      *Petitioner*,

      v.

GEN. JAMES N. MATTIS,
  in his official capacity as SECRETARY OF
  DEFENSE,

      *Respondent*.

No. 17-cv-2069 (TSC)

## PETITIONER'S NOTICE OF FILING PUBLIC REDACTED VERSION OF ECF 111

NOTICE is hereby given that attached is a redacted version, suitable for public filing, of

Petitioner's Reply in Support of His Motion for a Preliminary Injunction, filed on July 6, 2018,

as ECF No. 111.

Dated: July 13, 2018

      Respectfully submitted,

      */s/ Jonathan Hafetz*

| | |
|---|---|
| Arthur B. Spitzer (D.C. Bar No. 235960) | Jonathan Hafetz (D.C. Bar No. NY0251) |
| American Civil Liberties Union | Anna Diakun |
|   of the District of Columbia | Brett Max Kaufman (D.C. Bar No. NY0224) |
| 915 15th Street, NW, 2nd Floor | Dror Ladin (*pro hac vice*) |
| Washington, DC 20005 | Hina Shamsi (D.C. Bar No. MI0071) |
| Tel: 202-457-0800 | American Civil Liberties Union Foundation |
| Fax: 202-457-0805 | 125 Broad Street—18th Floor |
| aspitzer@acludc.org | New York, New York 10004 |
| | Tel: 212-549-2500 |
| | Fax: 212-549-2654 |
| | jhafetz@aclu.org |
| | adiakun@aclu.org |
| | bkaufman@aclu.org |
| | dladin@aclu.org |
| | hshamsi@aclu.org |

*Counsel for Petitioner*

~~UNDER SEAL~~

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN DOE,

     *Petitioner*,

     v.          No. 17-cv-2069 (TSC)

GEN. JAMES N. MATTIS,    ~~UNDER SEAL~~
 in his official capacity as SECRETARY OF
 DEFENSE,

     *Respondent*.

## PETITIONER'S REPLY MEMORANDUM OF LAW IN SUPPORT OF
## HIS MOTION FOR A PRELIMINARY INJUNCTION

~~UNDER SEAL~~

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................. 1

   I.   PETITIONER IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIM
      THAT THE GOVERNMENT CANNOT TRANSFER HIM INTO SYRIA
      AGAINST HIS WILL AND STRAND HIM THERE. ...................................................... 1

      A.  The government's planned transfer and "release" of Petitioner would not be safe. ...... 1

      B.  The government's proposed forcible transfer and release of Petitioner in Syria
          would violate the Constitution and the AUMF. ............................................................ 8

         1.  The government's proposal shocks the conscience. ............................................. 8

         2.  The government's proposal violates the AUMF. .................................................. 11

         3.  The government lacks the necessary positive legal authority to forcibly
            transfer and "release" Petitioner into Syria. .................................................... 13

  II.  PETITIONER IS LIKELY TO BE IRREPARABLY HARMED IN THE ABSENCE
      OF AN INJUNCTION. ................................................................................................. 16

 III.  THE BALANCE OF HARMS AND THE PUBLIC INTEREST STRONGLY
      FAVOR PETITIONER. ................................................................................................ 18

CONCLUSION .............................................................................................................. 19

## TABLE OF AUTHORITIES

### Cases

*Armstrong v. Squadrito*,
152 F.3d 564 (7th Cir. 1998).........................................................................................8

*\*Butera v. District of Columbia*,
235 F.3d 637 (D.C. Cir. 2001) ......................................................................................8

*Cty. of Sacramento v. Lewis*,
523 U.S. 833 (1998) ..................................................................................................8, 11

*\*Doe v. Mattis*,
889 F.3d 745 (D.C. Cir. 2018) ...............................................................13, 16, 17, 18

*Fikre v. FBI*,
23 F. Supp. 3d 1268 (D. Or. 2014)...............................................................................10

*\*Hamdi v. Rumsfeld*,
542 U.S. 507 (2004) .................................................................................................7, 12

*Hedges v. Obama*,
Nos. 12-3176, 12-3644, 2012 WL 680052 (2d Cir. Dec. 20, 2012) ...........................12

*In Re: Guantánamo Bay Detainees Litig.*,
Misc. No. 08-442 (TFH) (D.D.C. Mar. 13, 2009).......................................................11

*Mohamed v. Holder*,
995 F. Supp. 2d 520 (E.D. Va. 2014)...........................................................................10

*Munaf v. Geren*,
553 U.S. 674 (2008) ...............................................................................................passim

*United States v. Hamidullin*,
888 F.3d 62 (4th Cir. 2018).........................................................................................12

*\*Valentine v. United States ex rel. Neidecker*,
299 U.S. 5 (1936) ........................................................................................................13

### Other Authorities

Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949,
6 U.S.T. 3316 ...............................................................................................................13

███ CENTCOM Press Release; ████████████████████████
███, Dep't of Def., ██████████ ('█ CENTCOM Press Release")..........................2, 3

~~UNDER SEAL~~

Michelle Kosinski & Zachary Cohen, *Trump Privately Floats Plan to Make a Deal With Putin on Syria*, CNN, June 28, 2018 ........................................................................................... 4

Notice of Extension of the Designation of Syria for Temporary Protected Status, 83 Fed. Reg. 9329 (Mar. 5, 2018) ......................................................................................................... 17

Press Release, U.S. Cent. Command, █████████████████████████
█████ (█████████) (" ████ CENTCOM Press Release") ............................................. 2, 3

Press Release, U.S. Cent. Command, █████████████████████████
█████ (█████████) (" ████ CENTCOM Press Release") ............................................. 2

Press Release, U.S. Cent. Command, █████████████████████████
█████ (█████████) (" ████ CENTCOM Press Release") ......................................... 2, 3

Ryan Browne & Barbara Starr, *Trump Says US Will Withdraw from Syria 'Very Soon'*, CNN, Mar. 29, 2018.................................................................................................................... 4

U.S. Dep't of State—Bureau of Consular Aff., Syria Travel Advisory (Jan. 10, 2018) ("DOS Syria Advisory") ........................................................................................................... 6, 17

U.S. Dep't of State—Bureau of Consular Aff., Syria: Safety and Security (last updated Feb. 20, 2018)................................................................................................................... 4

UNHCR, Syria Regional Refugee Response (last updated June 28, 2018)..................................... 5

UNHCR, Syria: Our Field Offices (last visited July 6, 2018) ......................................................... 5

UNHCR, █████████████████████████████████ (2018)................................. 5

~~UNDER SEAL~~

## INTRODUCTION

Despite overwhelming evidence to the contrary—including its own—the government asks this Court to defer to its assessment of the safety of the situation into which it plans to force Petitioner. It is within this Court's habeas power to reject the government's plan to drop Petitioner ███████████████████████████████████████ ██████ ISIS, the same group that Petitioner was fleeing when he entered U.S. custody last September. That plan clearly violates the safe release requirement: it would place Petitioner in immediate danger and trap him in a war-torn country without a lawful means of escape. Moreover, that plan lacks positive legal authority, violates the AUMF, and shocks the conscience. The government's latest attempt to rid itself of a U.S. citizen without regard for his constitutional rights is as flawed as its previous efforts to lawlessly render Petitioner into foreign custody. This Court should once again refuse to accept the government's extraordinary position and should grant Petitioner the preliminary relief he seeks.

## ARGUMENT

I. **PETITIONER IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIM THAT THE GOVERNMENT CANNOT TRANSFER HIM INTO SYRIA AGAINST HIS WILL AND STRAND HIM THERE.**

A. **The government's planned transfer and "release" of Petitioner would not be safe.**

By the Department of Defense's own account, the area in which it plans to "release" Petitioner is near ISIS ██████████████████████. In the days since Petitioner filed his motion for a preliminary injunction on June 22, 2018, the Department of Defense ████████████ ███████████████████████████████████████████████████████ █████████:

- ████████████████████████████████
  ████████████████████████████████
  (█████████), ███████████ (" ████ CENTCOM Press
  Release").

- ████████████████████████████████
  ████████████████████████████████ (
  █████), ███████████ (" ████ CENTCOM Press Release").

- ████████████████████████████████
  ████ *Id.*

- ████████████████████████████████ *Id.*

- ████████████████████████████████
  ████ *Id.*

These and ██████ other recent strikes that took place █████████████

██████████████████. *Id.*; *see* ████ CENTCOM Press Release; ██████

██████████████, Dep't of Def., █████████, █████████████████

(" ████ CENTCOM Press Release"); Press Release, U.S. Cent. Command, ██████████

█████████████████ (█████████), ███████████████ (" ████

CENTCOM Press Release"). The government itself says its strikes █████████████

████████████████████████████████

████████████████████████

█████████████████████. *See* ████ CENTCOM Press

Release; ████ CENTCOM Press Release; ████ CENTCOM Press Release; ████

CENTCOM Press Release. The government also █████████████████████

████████████████████. *See* ████

CENTCOM Press Release; ██████ CENTCOM Press Release; ██████ CENTCOM Press Release; ██████ CENTCOM Press Release. And, as the U.S. Central Command makes clear in each of its press releases, ████████████████████████.

Despite the overwhelming evidence that this area is not safe, the Department of Defense tries to reassure the Court and Petitioner that these strikes ████████████ were not actually *near* ██████. It emphasizes that the strikes occurred "on the other side of a front line," "outside of SDF-controlled territory." Respondent's Mem. in Opp. to Pet.'s Mot. for P.I. ("Gov't PI Opp.") 6 (June 29, 2018), ECF No. 108. And, the government says, the front line with ISIS is an entire ████████████████████████████, Gov't PI Opp. 6 (citing Second Declaration of Mark E. Mitchell ("Second Mitchell Decl.") ¶ 3 (June 29, 2018), ECF No. 108-1), and ████████ is "██████," Declaration of Mark E. Mitchell ("First Mitchell Decl.") ¶ 5 (June 6, 2018), ECF No. 95; Declaration of Major General Chad P. Franks ¶ 6 (June 14, 2018), ECF No. 101.

This is akin to saying that ████████ is "████████" when ████████ ██████ operations against an enemy are ongoing at ████████████████████ ██████. It would be unreasonable to describe a town in the United States as "safe" if it were just ██████ away from ██████ bombardment and enemy forces. That the government describes a town in this situation as "safe" because it is in Syria underscores the cynicism of its proposal to strand Petitioner there.

Moreover, even if the Court considered the ██████ buffer between the town and the front line against ISIS sufficient to render a release in ██████ safe at this moment in time, that does not mean that the conditions there will continue to hold. The State Department and independent experts agree that the situation in ██████ Syria is "unpredictable," Declaration of

Noah Bonsey ("Bonsey Decl.") ¶ 6 (June 22, 2018), ECF No. 106-4, and "highly precarious,"

Declaration of Sara Kayyali ("Kayyali Decl.") ¶ 8 (June 22, 2018), ECF No. 106-5, and that "no

part of Syria should be considered immune from violence," U.S. Dep't of State—Bureau of

Consular Aff., Syria: Safety and Security, https://perma.cc/PWH9-CNDS (last updated Feb. 20,

2018). *See* Pet.'s Mem. of Law in Supp. of His Application for a P.I. & Response to

Respondent's Suppl. Mem. ("Pet. PI Br.") 9–10 (June 22, 2018), ECF No. 106-1. In this area,

"[c]onditions can rapidly change, and it is impossible to predict what the conditions will be like

even six months from now." Kayyali Decl. ¶ 9.

As an independent expert previously explained, this situation is made even more

precarious by the possibility that U.S. forces will withdraw from Syria, which "would remove

the security umbrella that currently deters external attack on SDF-held areas." Bonsey Decl. ¶ 7;

*see also* Ryan Browne & Barbara Starr, *Trump Says US Will Withdraw from Syria 'Very Soon'*,

CNN, Mar. 29, 2018, https://cnn.it/2MS0kOi; Michelle Kosinski & Zachary Cohen, *Trump*

*Privately Floats Plan to Make a Deal With Putin on Syria*, CNN, June 28, 2018,

https://cnn.it/2MQ1vNX. Notably, the Department of Defense does not contest that possibility or

the impact it would have. The Second Mitchell Declaration states neither that the United States

intends to remain in Syria nor that the situation in ████████ would continue to be stable, even

as the government defines the term, if U.S. forces withdrew from the area. Instead, both the

declaration and the Department of Defense's opposition are silent on this issue.

Similarly, the Department of Defense does not contest that Petitioner's only option to

escape the war-ravaged country is to illegally cross a border without a passport. Nor does it

seriously contest the idea that such a border crossing would be extremely dangerous and even

life-threatening. Rather than address the substance of Petitioner's experts' declarations, the

government attempts to brush them aside by asserting that Petitioner is not "a typical asylum

seeker," Gov't PI Opp. 9, seeming to suggest that he, unlike the 5.6 million Syrians who have

fled for their lives out of the country to date, would somehow not want to leave. *See* UNHCR,

Syria Regional Refugee Response, https://perma.cc/S7B4-M44C (last updated June 28, 2018). In

attempting to shift the Court's focus from the dire situation into which it proposes to place

Petitioner, the government does not even attempt to explain why Petitioner is less likely to be

shot at during an illegal border crossing than a "typical asylum seeker." Instead, the government

imagines a "range of options" Petitioner might pursue upon "release" in Syria, such as making

contact "with a media organization that could provide him with assistance or even hire him," or

traveling ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ through unstable territory to the United Nations High

Commissioner for Refugees ("UNHCR") field office in Qamishli.[1] Gov't PI Opp. 10 n.3. But

while these "options" are *certainly* speculative (and, in the case of travel to Qamishli,

dangerous), that Petitioner would try to flee to Turkey is anything but speculative, because he

was trying to do just that when he was apprehended in the first place. Declaration of Jonathan

Hafetz ("Hafetz Decl.") ¶ 4 (June 7, 2018), ECF No. 98-2.[2] And moreover, fleeing Syria to

---

[1] The Department of Defense cites the UNHCR website for the fact that there are "field offices in
Qamishli and Hasakah, cities that are, respectively approximately ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮." Gov't PI Opp. 10 n.3. Yet despite its asserted expertise on the region, the Department
of Defense seems to have mistaken the single UNHCR field office in Qamishli, which is ▮
▮▮▮▮▮▮▮▮ and within the *governorate* of Hasakah, for two separate field offices in the
*cities* of Qamishli and Hasakah. *See* UNHCR, Syria: Our Field Offices, http://www.unhcr.org/sy/
our-field-offices (last visited July 6, 2018). Moreover, whether Petitioner would be able to safely
reach the field office in Qamishli is highly questionable, given that the UNHCR reported that ▮

▮▮▮▮▮▮▮▮▮. *See* UNHCR,
▮(2018)▮

[2] The government continues to ignore the uncontested facts that Petitioner has already been shot
at, threatened, and imprisoned by SDF soldiers. *See* Pet. PI Br. 12. Petitioner remains willing to
testify under penalty of perjury about his previous treatment by this militia, including the abuse

~~UNDER SEAL~~

access consular services in a neighboring country is precisely what the State Department advises

Americans in Syria to do. *See* U.S. Dep't of State—Bureau of Consular Aff., Syria Travel

Advisory (Jan. 10, 2018), https://perma.cc/E5BC-5MLX ("DOS Syria Advisory") ("U.S. citizens

in Syria who seek consular services should try to quickly and safely leave the country and

contact a U.S. embassy or consulate in a neighboring country, if at all possible.").

     In spite of all the contrary evidence, the Department of Defense asks the Court to defer to

its assessment that Petitioner will be "safe" if he is transferred to Syria and released in ███

███. It argues that the Court is "ill-equipped to conduct fact-finding on such an issue," and

that "[t]he Court therefore should exercise considerable caution in assessing a purported

evidentiary submission that seeks to contradict [the Department of Defense's] predictive, expert

judgments." Gov't PI Opp. 5–6. But whatever deference might otherwise be due to the

Department of Defense, it cannot be accorded here, because the Department's self-serving

litigation position directly conflicts with the "predictive, expert judgments" issued by multiple

executive agencies. Nor should the Court give deference to Department of Defense litigation

statements that are in tension with its own public statements about extensive fighting nearby—

facts it omitted entirely from its initial declarations. And while the Department of Defense points

to *Munaf v. Geren*, 553 U.S. 674 (2008), to argue that the district court should not engage in fact-

finding, *see* Gov't PI Opp. 22–23, even it does not argue that the Department of Defense is

entitled to total deference here, *see* Gov't PI Opp. 5 (citing Respondent's Suppl. Mem. in Opp. to

Pet.'s Application for a T.R.O. 10–11 (June 14, 2018), ECF No. 101). It is well within the

district court's purview to credit Petitioner's countervailing evidence from the Department of

---

he suffered in custody. *See* Supplemental Declaration of Jonathan Hafetz ¶ 7 (June 22, 2018),
ECF No. 106-2. As described above, however, the threats to physical safety for individuals
trapped in Syria go far beyond SDF abuse.

State, the Department of Homeland Security, and independent experts that clearly shows that the contemplated release would not be safe. Likewise, the district court can also properly take into account the fact that although the government's declarant attests that he knew about and considered the ███ combat operations occurring ████████ when he assessed that ████████ and the surrounding area were safe, *see* Second Mitchell Decl. ¶ 3, neither he nor the Department of Defense bothered to apprise the Court of that relevant information. *Cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 537 (2004) (plurality op.) ("Any process in which the Executive's factual assertions go wholly unchallenged or are simply presumed correct . . . falls constitutionally short.").

Because the Department of Defense has failed to show that the proposed transfer and release of Petitioner in Syria will be safe, the Court should reject its proposal and enjoin Petitioner's release there.[3]

---

[3] Unable to confront or challenge the substance of Petitioner's experts' declarations, the Department of Defense tries—and fails—to undermine those experts in two main ways. First, it attacks each expert's credentials. But Petitioner's experts clearly have the knowledge, expertise, and ample relevant experience to opine on the conditions in ███ Syria, as Mr. Bonsey and Ms. Kayyali do, and military policy and practice, as Admiral Guter does. *See* Bonsey Decl. ¶¶ 1–4; Kayyali Decl. ¶¶ 1–3; Declaration of Donald J. Guter ¶¶ 1–3 (June 22, 2018), ECF No. 106-3. Even putting their individual credentials aside, one significant fact bears repeating: these expert opinions about the danger of the area and the impropriety of a release there are not outliers—they are entirely consistent with the safety assessments of the Departments of State and Homeland Security. *See* Pet. PI Br. 5–7.

Second, the Department of Defense attacks Petitioner's experts for not "tak[ing] into account the Department's description of its planned release," including the ████████████████. Gov't PI Opp. 7–8. But this argument misses the point. *Even if* the Department of Defense ████████████████████████████████████████ the dangers inherent in being dropped off in a country in the midst of a volatile civil war, ████████ from the front line.

**B.** **The government's proposed forcible transfer and release of Petitioner in Syria would violate the Constitution and the AUMF.**

**1.** **The government's proposal shocks the conscience.**

As Petitioner has explained, the government's plan to forcibly transfer and release him into the same war-torn country from which he was fleeing when he sought U.S. protection almost ten months ago, without any safe or legal means of escape, violates the Fifth Amendment's Due Process Clause. *See* Pet. PI Br. 15–18. The government argues that "Petitioner seeks to use this claim as an attempt to impose responsibilities on the [government] that extend far beyond his detention, and even beyond the immediate circumstances of his proposed release." Gov't PI Opp. 20. But there is no rule that the government need ensure only that a citizen's "immediate" needs are met, especially when the natural result of its actions is both short- and long-term danger. The government could not, consistent with the Constitution, release a prisoner in the middle of a hurricane merely because it provided him with an umbrella. The Fifth Amendment's guarantee is clear: where deliberate government treatment of a citizen in its custody "shock[s] the contemporary conscience," it is unconstitutional. *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). Under the totality of the circumstances, the government's plan violates this test.[4]

The government seeks to avoid this conclusion by casting Petitioner's claim as one about the government's generalized "failure to protect." Gov't PI Opp. 21. It is not. As Petitioner has explained, he does not claim that he had a free-floating constitutional right to government protection at the time he was fleeing ISIS in September 2017, before the United States took

---

[4] *See, e.g.*, *Armstrong v. Squadrito*, 152 F.3d 564, 570 (7th Cir. 1998) (citing *Lewis*, 523 U.S. at 850) ("[A]n investigation into substantive due process involves an appraisal of the totality of the circumstances rather than a formalistic examination of fixed elements.").

~~UNDER SEAL~~

custody of him. It was only once the Department of Defense decided to continue to detain him

that the government assumed greater constitutional duties. *See* Pet. PI Br. 18 n.3; *see* Gov't PI

Opp. 21 (acknowledging that "where the government exerts some form of control" over a citizen,

that control may "confer[] an obligation upon it to take affirmative protective action"). Those

duties include a restraint on disposing of Petitioner's liberty through an unsafe release, or

through a release that would effectively trap him in a war-torn country with no lawful means of

escape. This is particularly true because the government presently has other options to ensure

Petitioner's safe release, *see* Pet. PI Br. 27. Moreover, Petitioner is not arguing that the

government "could continue to be held responsible for possible subsequent dangers that

[Petitioner] might encounter," Gov't PI Opp. 22. Instead, he is arguing that the government is

responsible for its own decisions *right now*.

  The government argues that the Supreme Court's holding in *Munaf* "precludes any [due

process] claim here" because the Court relied on the rule of non-inquiry to restrict a court's

ability to review the possibility of torture by a receiving country after a custodial transfer of a

citizen. *See* Gov't PI Opp. 23. But the relevant holding in *Munaf* was based on a constellation of

factors related to international diplomacy not remotely present here—a sister foreign sovereign's

exclusive jurisdiction to punish offenses against its laws occurring in its territory; the

government's diplomatic relationship with a recognized foreign government; and the need to

avoid review of the inner workings of "foreign justice systems." 553 U.S. at 702. By contrast,

here the Court need only determine that it will not improvidently defer to the government's

claims of safety, which are fatally undermined by the government's own public statements and

actions. *See supra* Part I.A. The issue before this Court is how the U.S. government is treating

one of its own citizens, not how another sovereign government might treat him. Far from

UNDER SEAL

undermining the government's "ability to speak with one voice in this area"—one of the

rationales for deference given in *Munaf*, 553 U.S. at 702—this Court's intervention would

instead merely prevent the government from ignoring its own public statements and deviating

from its own security assessments simply because that would be convenient for the purposes of

this litigation. Although the Supreme Court held that claims involving the justice systems of

other sovereigns would ordinarily not be reviewed based on the rule of non-inquiry, it did not

make the very different holding that the rule *bars entirely* Fifth Amendment claims regarding the

government's proposed disposition of citizen detainees in every case. Additionally, even in the

non-inquiry context (which is not the context here), the Court in *Munaf* still left open the

possibility that a court could exercise its review authority under certain circumstances. *See id.*

(explaining that judicial review would be available in "an extreme case in which the Executive

has determined that a detainee is likely to be tortured but decides to transfer him anyway.").

 Finally, the government attempts to dismiss Petitioner's due-process argument by

claiming that considerations like his lack of a passport and his right to return to the United States

are irrelevant in this context. *See* Gov't PI Opp. 23. But the burdens the government proposes to

impose on Petitioner's right of return are far beyond those any court has upheld. *See, e.g.*, *Fikre

v. FBI*, 23 F. Supp. 3d 1268, 1282 (D. Or. 2014) (plaintiff offered "viable means of returning to

the United States" because he had "the option of making arrangements to return to the United

States through the [U.S.] embassy"); *Mohamed v. Holder*, 995 F. Supp. 2d 520, 536–37 (E.D.

Va. 2014) (noting that a citizen's right to return "extend[s] to restrictions that may prevent or

impede his ability to reach a U.S. port of entry" and approving airport screening measures that

caused a four- to five-day travel delay). And to simply ignore those burdens, as the government

urges the Court to do, is an unsustainable view of the law. Petitioner's claim requires "an exact

~~UNDER SEAL~~

analysis of [his] circumstances," *Lewis*, 523 U.S. at 850, not a blinkered focus on his "immediate

needs" or on whether the government's proposal would render him entirely "helpless," Gov't PI

Opp. 23. Indeed, the suggestion that those are the only considerations owed to Petitioner

demonstrates why the government's proposal is so unconscionable to begin with.[5]

### 2. The government's proposal violates the AUMF.

The government argues that it may ignore the law-of-war restrictions against increasing

prisoners' difficulty of repatriation because "only Common Article 3 of the 1949 Geneva

Conventions applies to non-international armed conflicts." Gov't PI Opp. 9 n.2. But the

government conflates the direct application of the Geneva Conventions with the law-of-war rules

incorporated in the AUMF itself.

As the government has repeatedly conceded, well-established restrictions governing

detention in international armed conflicts, such as those set forth in the Geneva Conventions, are

incorporated into the AUMF itself. *See, e.g.*, Respondent's Mem. Regarding Gov't Detention

Authority Relative to Detainees at Guantánamo Bay at 1, *In Re: Guantánamo Bay Detainees

Litig.*, Misc. No. 08-442 (TFH) (D.D.C. Mar. 13, 2009), *available at* https://www.justice.gov/

sites/default/files/opa/legacy/2009/03/13/memo-re-det-auth.pdf ("Principles derived from law-

---

[5] If the government has a reason why it refuses to permit Petitioner to, at the very least, apply to replace his lost passport today—rather than after illegally smuggling himself, at great personal risk, to Turkey or Iraq (where he is, right now, as the government's prisoner)—it has thus far refused to provide it to Petitioner or this Court. That the government refuses to take even this simple step belies its claims that it has done all that is "feasible" to guarantee Petitioner's safety. First Mitchell Decl. ¶ 4.

To be clear, Petitioner is not asking this Court to order the government to provide him a replacement passport, or even to order it to allow him to apply for one. But if the government is determined to transfer a U.S. citizen to one of the few countries on the planet without U.S. consular services and strand him there, the totality of circumstances the Court considers should include whether the government is also depriving the citizen of any opportunity to acquire travel documents, particularly where, as here, the country's lack of security and stability makes it extraordinarily difficult—and dangerous—to escape and reach a safe location.

of-war rules governing international armed conflicts . . . must inform the interpretation of the

detention authority Congress has authorized for the current armed conflict."); *see also Hamdi*,

542 U.S. at 521 (AUMF must be interpreted "based on longstanding law-of-war principles.").

Therefore, although provisions of the Geneva Conventions beyond Common Article 3

necessarily apply "by analogy," rather than directly, the government itself acknowledges that

they control AUMF detention authority in non-international armed conflicts. *See, e.g.*, Reply Br.

of Defs.–Appellants at *10–11, *Hedges v. Obama*, Nos. 12-3176, 12-3644, 2012 WL 680052 (2d

Cir. Dec. 20, 2012) ("*Hedges* Brief") ("Law-of-war treaties applicable to international armed

conflicts . . . guide the scope of the Executive's detention authority in this armed conflict," even

though "they must in many circumstances apply by analogy.").[6]

     For the same reason, the government's citation of *United States v. Hamidullin*, 888 F.3d

62, 70–71, 75 (4th Cir. 2018) (cited at Gov't PI Opp. 9 n.2), is inapt. *Hamidullin* is a criminal

case that does not interpret the AUMF; it concerns only the direct application of the Geneva

Conventions in a non-international armed conflict—specifically whether an individual may claim

combatant immunity under the Third Geneva Convention in such a conflict. *Hamidullin*

therefore has no bearing on the question of which aspects of the Geneva Conventions "apply by

analogy" and "guide the scope of the Executive's detention authority" under the AUMF. *Hedges*

Brief at *10–11.

---

[6] Because the Geneva Conventions apply here "by analogy," it is irrelevant that the Fourth
Geneva Convention defines protected persons as those held by a party to the conflict of which
they are not nationals. *See* Gov't PI Opp. 9 n.2. The Geneva Conventions do not envision that, in
an international armed conflict, a state might hold one of its own citizens as a military prisoner
while simultaneously denying the citizen any prisoner-of-war or security-internee protections.
Because the government has nonetheless claimed the authority to hold Petitioner in military
detention without charging him with any crime, the restrictions that apply to prisoners ordinarily
subject to AUMF detention should protect Petitioner as well.

~~UNDER SEAL~~

In any event, even assuming the government were to ignore the entirety of the Geneva Conventions beyond Common Article 3, the government's decision to abandon any prisoner, let alone one of its own citizens, ████████ from an active and fluid war zone—with no travel documents and no way of legally and safely returning home—violates the bedrock requirement of "humane treatment" that Common Article 3 imposes. Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, art. 3, 6 U.S.T. 3316 (prisoners "shall in all circumstances be treated humanely").

### 3. The government lacks the necessary positive legal authority to forcibly transfer and "release" Petitioner into Syria.

The government seeks to avoid the logic of the D.C. Circuit's decision in *Doe v. Mattis*, 889 F.3d 745 (D.C. Cir. 2018), and the Supreme Court's decision in *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5 (1936), by accusing Petitioner of manipulating "terminology," Gov't PI Opp. 14—but it is the government that is playing word games. Astoundingly, the government argues that its proposed transfer of Petitioner from U.S. custody in Iraq across an international border and into Syria is the kind of "simple release" that satisfies the promise of the Great Writ. It is not.

By invoking this Court's previous ruling on forcible transfer, the government effectively concedes that its own argument that voluntary release and forcible transfer are equivalent was "disingenuous." Gov't PI Opp. 15 (quoting Mem. Op. 5 (Apr. 19, 2018), ECF No. 87). And yet it now asks the Court to ignore the implications of *Doe* as it once again falsely equates what it seeks to do here with a genuine safe release. But just as before, the Court should not accept the government's illogical contention that moving a citizen from one country to another is not a "transfer."

13

~~UNDER SEAL~~

The government relies heavily on *Munaf* in arguing that "simple release" is a simple concept, *see* Gov't PI Opp. 15–16, but in so doing, it fails to acknowledge a key aspect of that decision. In *Munaf*, release was flat-out unavailable as a remedy—not because there was no possible means to find a suitably safe release for the petitioners in Iraq or elsewhere, including the United States, but because permitting any release at all would have directly interfered with Iraqi sovereignty. *See* 553 U.S. at 689, 692, 694. The Supreme Court made clear in *Munaf* that "habeas is not a means of compelling the United States to harbor fugitives from the criminal justice system of a sovereign with undoubted authority to prosecute them." *Id.* at 697. But here, Petitioner is not seeking the government's assistance in avoiding justice; indeed, even over the almost ten months the United States has detained him, it has steadfastly refused to prosecute him. Moreover, unlike in *Munaf*, Petitioner is not asking the government to "keep an unsuspecting nation in the dark" about his release or "smuggle" him "out of a country"—factors that the government acknowledges were critical to that case. Gov't PI Opp. 16 (quoting *Munaf*, 553 U.S. at 698). Indeed, unlike in *Munaf*, where criminal proceedings had been initiated against both petitioners before their habeas actions were filed, *see Munaf*, 553 U.S. at 699, 704, no nation has initiated any such proceedings against Petitioner.

Petitioner's "theory" is not, as the government suggests, that the government's proposed disposition of him "amounts to a trap, and thus constitutes a transfer." Gov't PI Opp. 16. Rather, it is that, consistent with *Hamdi*, once the government assumes custody of a citizen detainee and determines to hold him long-term, the due process rights recognized under *Valentine* and *Doe* ripen, and the government cannot simply move him across international borders and release him wherever it pleases, including to the place it originally seized him. Petitioner's argument is entirely consistent with *Munaf*. The government argues to the contrary, suggesting that because

the Supreme Court and the D.C. Circuit understood the *Munaf* petitioners' requested relief to be

"simple release, not a transfer," Gov't PI Opp. 16, Petitioner's argument must fail. But the

government's point—that the "release" of Petitioner into Syria is like the "simple release" of the

*Munaf* petitioners into Iraq—falters on basic geography and common sense. Like the *Munaf*

petitioners, *Petitioner is inside Iraq*, and he has made clear that he would accept a voluntary

release in that country, which has American consular services that he could access in an effort to

resume his life.

 The government correctly notes that Petitioner "has not challenged" its "decision to take

Petitioner from Syria to Iraq as an unlawful transfer." Gov't PI Opp. 17. But the government is

wrong when it suggests "[t]hat move . . . did not qualify as a transfer" only because "the move

across the border did not involve a transfer from U.S. custody to the custody of a foreign

authority." Gov't PI Opp. 17. Rather, the move was not a "transfer" under *Doe* for at least three

reasons. First, the government has the authority to determine, at least where consistent with the

laws of war, the appropriate locus of detention within a particular theater of conflict for a

detainee in its custody. Second, the government's move of Petitioner from U.S. detention in one

location to U.S. detention in another location did not change his status. Critically, the proposed

"transfers" Petitioner has challenged—to the custody of ███████ and to Syria—have both

involved the attempted forcible and irreparable disposition of his liberty. And third, the move

took place *before* Petitioner's rights under *Hamdi* (and *Valentine*, and *Doe*) had matured. *See*

Pet. PI Br. 19–20. Thus, it makes perfect sense that an option the government had prior to that

moment—"to release Petitioner in a safe area near the point of his initial capture," Gov't PI Opp.

18—is no longer available to it under the Constitution. It may be true that some kinds of release

"require[] no process," Gov't PI Opp. 18, but this is not one of them. The government's attempt

to play "gotcha"—*see* Gov't PI Opp. 17 ("By the same reasoning, the reverse move, from Iraq

back to Syria, is also not a transfer.")—fails.

Finally, the government argues that Petitioner's claim presents the Court with a Catch-22,

because it means that the government "may not release him unless it allows him to challenge the

legal and factual basis for his detention," and if he is successful, he would be entitled only to the

disposition the government is now proposing for him. Gov't PI Opp. 19. Again, this assumes the

answer to the central question of whether the government's proposal is lawful as a habeas

remedy. Petitioner has explained why it is not. Further, while the government has previously

made similarly misleading claims, Petitioner's argument is *not* that he is entitled to litigate the

entirety of his habeas case. As he has made clear, he desires a safe and lawful release *now*. But as

the D.C. Circuit's decision in *Doe* makes clear, the rights of citizens "constrain the government's

ability to" dispose of an individual's liberty "more than the government would like." 889 F.3d at

768.

## II.     PETITIONER IS LIKELY TO BE IRREPARABLY HARMED IN THE ABSENCE OF AN INJUNCTION.

As Petitioner has explained, "releasing" Petitioner in war-torn Syria and stranding him

there will cause him irreparable harm. *See* Pet. PI Br. 24–26; *see supra* Part I.A.

The government speculates that its proposal will allow Petitioner "to provide for his

immediate needs, pursue longer-term plans (whatever those may be), and seek assistance in his

chosen plans from his relatives in other countries, attorneys in the United States, and/or media or

aid organizations that Petitioner or his relatives or attorneys might contact either in the region or

elsewhere." Gov't PI Opp. 25. At the same time, it argues that Petitioner's claim that he is likely

to suffer harm or death if the Court allows the government's plan to go forward is

"speculati[ve]," Gov't PI Opp. 26, and that irreparable harm is "[un]certain," Gov't PI Opp. 25

(quotation marks omitted). But it is hardly "uncertain" or "speculative" to say that placing someone in a country that the government itself says is "engulfed in an ongoing civil war marked by brutal violence against civilians, egregious human rights violations and abuses, and a humanitarian disaster on a devastating scale across the country" will cause irreparable harm. Notice of Extension of the Designation of Syria for Temporary Protected Status, 83 Fed. Reg. 9329, 9331 (Mar. 5, 2018). Furthermore, Petitioner's intention to cross a border and reach a U.S. embassy at which he may apply to replace his stolen passport and seek other consular services is not speculative—indeed, that is precisely what he was doing when the government found him, and what the State Department urges citizens in Syria to do. *See* Hafetz Decl. ¶ 4; DOS Syria Advisory. Nor is it speculative that any attempt to cross the border would be extremely dangerous, as he would have to cross "terrain littered with landmines" only to be shot at by Turkish border guards. Kayyali Decl. ¶ 14, 16. On the other hand, the government offers no support whatsoever for the likelihood of its own imagined courses of action for Petitioner.

Finally, the government once again argues that its planned disposition of Petitioner is tantamount to the "quintessential remedy to which he would be entitled if he prevailed in his habeas claim." Gov't PI Opp. 25 (quotation marks omitted). But in this very case, the D.C. Circuit has already rejected the notion that simply because the government's proposed disposition means Petitioner "would no longer be in U.S. custody," that disposition cannot cause him to suffer irreparable harm. *Doe*, 889 F.3d at 766. Whether or not a disposition "ends U.S. custody," that disposition itself may be—and here, is—"a harm that cannot be remedied,' *id.* Not all "releases" are equivalent—or lawful—under habeas. *See id.* Moreover, while the government argues that under its plan, Petitioner "would already have received everything that he could obtain through litigation," Gov't PI Opp. 25, that argument is circular, as it assumes the answer

to the legal questions concerning the safety and constitutionality of Petitioner's transfer and
release into Syria.

In short, the irreparable harm to Petitioner in the absence of an injunction is clear, and the
government's arguments to the contrary are unavailing.

## III.     THE BALANCE OF HARMS AND THE PUBLIC INTEREST STRONGLY FAVOR PETITIONER.

Likewise, the grave and imminent risks Petitioner will face in the absence of an
injunction vastly outweigh any harms an injunction would impose on the government. That
conclusion is buttressed by the public interest in the requested injunction, which will ensure that
the government is not permitted to wash its hands of an American citizen in its custody by
placing him into harm's way. *See* Pet. PI Br. 26–29.

The government argues that an injunction would interfere with its "duty to determine,
consistent with the law of war, an appropriate disposition for a detainee in its custody in a
foreign country." Gov't PI Opp. 26. But while that may be a "manifestly weighty" equity, it
cannot outweigh Petitioner's attempt to "vindicate his rights as an American citizen to avoid a
forcible and irrevocable transfer" and release in Syria. *Doe*, 889 F.3d at 766. The government
also argues that an injunction would "interfere with the Executive's determination that the
proposed release in ████████ is safe and appropriate." Gov't PI Opp. 26. But that is, of course,
the entire purpose of Petitioner's motion, and it cannot justify a conclusion that the balance of
harms favors the government. Finally, the government argues that an injunction will require it to
engage in "wasteful litigation" over Petitioner's underlying habeas claim and to "expend[]
resources detaining Petitioner." Gov't PI Opp. 26–27. But the government has plenty of options
to end this case lawfully and humanely, *see* Pet. PI Br. 27–28—a fact it conspicuously declines
to address.

~~UNDER SEAL~~

## CONCLUSION

For the foregoing reasons, and those in Petitioner's previous memoranda supporting his application for a temporary restraining order and motion for a preliminary injunction, this Court should enjoin the government from transferring Petitioner to Syria and releasing him there. If the Court instead denies Petitioner's motion, Petitioner respectfully requests that the Court enjoin his transfer pending review of the decision by the U.S. Court of Appeals for the D.C. Circuit.

Dated: July 6, 2018                                    Respectfully submitted,

                                                        */s/ Jonathan Hafetz*

Arthur B. Spitzer (D.C. Bar No. 235960)                Jonathan Hafetz (D.C. Bar No. NY0251)
American Civil Liberties Union                          Dror Ladin (*pro hac vice*)
  of the District of Columbia                           Anna Diakun
915 15th Street, NW, 2nd Floor                          Brett Max Kaufman (D.C. Bar No. NY0224)
Washington, DC 20005                                    Hina Shamsi (D.C. Bar No. MI0071)
Tel: 202-457-0800                                       American Civil Liberties Union Foundation
Fax: 202-457-0805                                       125 Broad Street—18th Floor
aspitzer@acludc.org                                     New York, New York 10004
                                                        Tel: 212-549-2500
                                                        Fax: 212-549-2654
                                                        jhafetz@aclu.org
                                                        dladin@aclu.org
                                                        adiakun@aclu.org
                                                        bkaufman@aclu.org
                                                        hshamsi@aclu.org

*Counsel for Petitioner*