**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOHN DOE,

<em>Petitioner</em>,

v.

LLOYD AUSTIN,
 in his official capacity as
 SECRETARY OF DEFENSE,

<em>Respondent</em>.

No. 17-cv-2069 (TSC)

# ECF 97-1

# REDACTED VERSION FOR PUBLIC FILING

UNDER SEAL

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE, | |
| *Petitioner*, | |
| v. | No. 17-cv-2069 (TSC) |
| GEN. JAMES N. MATTIS, in his official capacity as SECRETARY OF DEFENSE, | ~~UNDER SEAL~~ |
| *Respondent*. | |

## PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF HIS APPLICATION FOR A TEMPORARY RESTRAINING ORDER

UNDER SEAL

## TABLE OF CONTENTS

FACTUAL BACKGROUND ................................................................................................ 2

    The perilous situation in Syria ................................................................................. 2

    The SDF's previous abuse of and threats against Petitioner .................................... 3

ARGUMENT ....................................................................................................................... 5

    I.  Petitioner is likely to succeed in showing that the government may not strand him in a dangerous and unstable region dominated by an armed group that has already shot at, beaten, and threatened him with death ................................................................... 6

        A.  Applicable law and Department of Defense policies absolutely prohibit the unsafe release of all military prisoners, and the Constitution likewise absolutely prohibits the unsafe release of U.S. citizens ................................................. 6

        B.  Stranding Petitioner without identification in a dangerous and unstable region dominated by an armed group that has already shot at, beaten, and threatened him with death is not safe release ............................................................ 11

    II.  Petitioner is likely to be irreparably harmed in the absence of an injunction ................... 17

    III. The balance of harms strongly favors Petitioner ............................................................ 17

    IV. A temporary restraining order serves the public interest .................................................. 19

CONCLUSION .................................................................................................................... 19

UNDER SEAL

# TABLE OF AUTHORITIES

## Cases

*Al Warafi v. Obama*,
No. 11-5276 (D.C. Cir. Feb. 12, 2012) ...................................................................... 8

*Boumediene v. Bush*,
553 U.S. 723 (2008) .................................................................................................. 11

*Butera v. District of Columbia*,
235 F.3d 637 (D.C. Cir. 2001) ....................................................................... 9, 10, 15

*Cty. of Sacramento v. Lewis*,
523 U.S. 833 (1998) ............................................................................................. 9, 10

*Davenport v. International Brotherhood of Teamsters*,
166 F.3d 356 (D.C. Cir. 1999) ................................................................................... 6

*Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*,
675 F.3d 849 (5th Cir. 2012) .................................................................................... 16

*Doe v. Mattis*,
889 F.3d 745 (D.C. Cir. 2018) ........................................................................... passim

*Fraternal Order of Police Dep't of Corr. Labor Comm. v. Williams*,
375 F.3d 1141 (D.C. Cir. 2004) ............................................................................... 10

*Gherebi v. Obama*,
609 F. Supp. 2d 43 (D.D.C. 2009) .............................................................................. 7

*Hamdi v. Rumsfeld*,
542 U.S. 507 (2004) ......................................................................................... 8, 9, 19

*In re Navy Chaplaincy*,
697 F.3d 1171 (D.C. Cir. 2012) ............................................................................... 17

*In Re: Guantánamo Bay Detainees Litig.*,
Misc. No. 08-442 (TFH) (D.D.C. Mar. 13, 2009) ..................................................... 8

*Johnson v. Eisentrager*,
339 U.S. 763 (1950) .................................................................................................... 9

*Jones v. Cunningham*,
371 U.S. 236 (1963) .................................................................................................. 10

*Los Angeles v. Lyons*,
461 U.S. 95 (1983) .................................................................................................... 17

*Monfils v. Taylor*,
165 F.3d 511 (7th Cir. 1998) ...................................................................................... 9

*Paine v. Cason*,
  678 F.3d 500 (7th Cir. 2012) ................................................................. 10

*Schlup v. Delo*,
  513 U.S. 298 (1995) .............................................................................. 10

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) ................................................................. 6

*Singh v. Carter*,
  168 F. Supp. 3d 216 (D.D.C. 2016) ......................................................... 6

*Valentine v. United States ex rel. Neidecker*,
  299 U.S. 5 (1936) .................................................................................... 9

*Wilson v. Grp. Hospitalization & Med. Servs., Inc.*,
  791 F. Supp. 309 (D.D.C. 1992) ............................................................. 17

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7, 20 (2008) ........................................................................ 6, 17

*Wood v. Ostrander*,
  879 F.2d 583 (9th Cir. 1989) ................................................................. 10

**Statutes**

2001 Authorization for Use of Military Force, Pub. L. No. 107-40,
  115 Stat. 224 ("AUMF") ......................................................................... 8

**Other Authorities**

Anne Barnard, *Death Toll from War in Syria Now 470,000, Group Finds*, N.Y. Times,
  Feb. 11, 2016 .......................................................................................... 2

Army Judge Advoc. Gen.'s Sch., Int'l & Operational Law Dep't, *Operational Law Handbook* (2017) .................................................................................... 7

Dep't of Defense, Off. of Gen. Counsel, Department of Defense Law of War Manual
  (June 2015) ........................................................................................ 7, 13

Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949,
  6 U.S.T 3316 ........................................................................................ 12

Lizzie Dearden, *Syrian Civil War: More Than Five Million Refugees Flee Conflict as Global Support for Resettlement Wanes*, Independent, Mar. 30, 2017 ....................... 2

**UNDER SEAL**

Message from the President Transmitting Protocol II to the U.S. Senate,
*reprinted in* S. Treaty Doc. 100-2 (1987)....................................................................... 8

Notice of Extension of the Designation of Syria for Temporary Protected Status,
83 Fed. Reg. 9329 (Mar. 5, 2018) ......................................................................... 3, 13

Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the
Protection of Victims of Non-International Armed Conflicts (Protocol II),
June 8, 1977, 1125 U.N.T.S. 609 ................................................................................ 7

U.S. Dep't of State—Bureau of Consular Aff., Syria Travel Advisory (Jan. 10,
2018) ("DOS Syria Advisory") ................................................................. 2, 11, 12, 19

U.S. Dep't of State—Bureau of Consular Aff., Syria: Safety and Security (last updated
Feb. 20, 2018) ("DOS Syria Information")............................................... 3, 12, 14, 17

UNDER SEAL

## INTRODUCTION

For almost nine months, the United States has detained Petitioner, an American citizen, without charge in Iraq. For the first three of those months, the government denied Petitioner access to a lawyer and a court. Then, after this Court ordered that he be allowed access to counsel to file a habeas petition, the government sought to forcibly render Petitioner to the custody of a foreign government without notice to the Court or to counsel and without legal authority. Now, after this Court and the D.C. Circuit rejected the government's effort to lawlessly render Petitioner—and on the cusp of a hearing to address the legality of Petitioner's detention—the government has suddenly decided to "release" Petitioner. But rather than the restoration of liberty that Petitioner seeks through this habeas action, the government seeks to transfer Petitioner to and release him into an area that the government itself has repeatedly described as unsafe, and that is controlled by the same forces who have already demonstrated their hostility to Petitioner by shooting at him, beating him, and threatening him with death.

Petitioner *does not* oppose his release from U.S. custody. To the contrary, he is urgently seeking the restoration of his liberty. What he opposes is "release" into an area of certain danger and possible death.

For the reasons set forth below, this Court should enjoin the government's impending release of Petitioner in Syria. Petitioner is not asking the Court to specify where he must be released from custody and restored to liberty. He is asking only that the Court enforce the bedrock obligation that his release be safe. And if the government either cannot or will not identify any safe alternative, the Court plainly has the authority to order Petitioner's release in the United States if he establishes, as he urgently seeks to do, that his detention is unlawful.

## FACTUAL BACKGROUND

The United States government intends to bring Petitioner to a war-torn area in Syria that the government itself has repeatedly described as an active battlefield (from which, it represented, it initially removed Petitioner for his safety); that official government sources continue to describe as exceedingly dangerous; and that is controlled by an alliance of militias called the Syrian Democratic Forces ("SDF"), the same forces who have already demonstrated their hostility to Petitioner by detaining him, shooting at him, beating him, and threatening him with death. The government plans to leave Petitioner in this area without any identification, without any official document authorizing his travel, and without any official statement from the U.S. government that Petitioner poses no threat. Declaration of Jonathan Hafetz ("Hafetz Decl.") ¶ 22. The government has also refused to secure any assurance from the SDF that Petitioner will not be targeted and will be permitted safe passage through and out of Syria. *Id.* ¶ 22.

### The perilous situation in Syria

Syria remains among the most dangerous places on Earth. The war in Syria has caused at least 470,000 deaths, *see* Anne Barnard, *Death Toll from War in Syria Now 470,000, Group Finds*, N.Y. Times, Feb. 11, 2016, https://nyti.ms/1mvfgnn, and has forced more than five million people to flee the country and seek refuge, *see* Lizzie Dearden, *Syrian Civil War: More Than Five Million Refugees Flee Conflict as Global Support for Resettlement Wanes*, Independent, Mar. 30, 2017, https://ind.pn/2kV5qxi.

According to the Department of State, "No part of Syria is safe from violence." U.S. Dep't of State—Bureau of Consular Aff., Syria Travel Advisory (Jan. 10, 2018), https://perma.cc/E5BC-5MLX ("DOS Syria Advisory"). Those U.S. citizens who nonetheless remain in Syria, according to the State Department, should "[d]raft a will," and inform loved

**UNDER SEAL**

ones of "funeral wishes, etc." *Id.* Even U.S. citizens who possess identification documents face "dangers traveling within the country and when trying to leave Syria via land borders, given the diminishing availability of commercial air travel out of Syria." U.S. Dep't of State—Bureau of Consular Aff., Syria: Safety and Security, https://perma.cc/PWH9-CNDS (last updated Feb. 20, 2018) ("DOS Syria Information"). Borders controlled by the SDF and other armed groups, according to the government, "should not be considered safe" and border areas "are frequent targets of shelling and other attacks and are crowded because of internally-displaced refugees." *Id.*

Similarly, the Department of Homeland Security has determined that Syria is so unsafe that Syrian nationals present in the United States must not be forcibly returned to their home country. In January 2018, the Secretary of Homeland Security published in the Federal Register the determination that "requiring the return of Syrian nationals (or aliens having no nationality who last habitually resided in Syria) to Syria would pose a serious threat to their personal safety." Notice of Extension of the Designation of Syria for Temporary Protected Status, 83 Fed. Reg. 9329, 9332 (Mar. 5, 2018). The Department of Homeland Security maintains that "Syria is engulfed in an ongoing civil war marked by brutal violence against civilians, egregious human rights violations and abuses, and a humanitarian disaster on a devastating scale across the country." *Id.* at 9331. Accordingly, the Department of Homeland Security extended the "Temporary Protected Status" designation to Syria through September 30, 2019. *Id.*

**The SDF's previous abuse of and threats against Petitioner**

The government seeks to return Petitioner to the same area from which he previously fled danger and violence. In early September 2017, Petitioner was seized by the SDF at a military checkpoint near Abu Khashab, while fleeing the violence in Syria en route to the American

embassy in Turkey. Hafetz Decl. ¶ 4. Even though Petitioner was unarmed, was traveling with other civilians, and was seeking refuge from violence, the SDF shot at Petitioner multiple times. *Id.* ¶ 5. After taking Petitioner into custody, the SDF accused Petitioner of being a member of ISIS. *Id.* Petitioner repeatedly denied this allegation and explained that he was fleeing Syria and seeking his safety. *Id.* ¶ 6.

Petitioner also told the SDF that he was an American citizen and asked to speak to representatives of the U.S. government who could assist him. *Id*. ¶ 7. The SDF refused Petitioner's pleas for help. *Id.* ¶ 8. Instead, members of the SDF repeatedly beat and threatened Petitioner. *Id*. Members of the SDF hit Petitioner in the head, back, and stomach. *Id.* As a result, Petitioner suffered severe bruising and dizziness. *Id*. One SDF soldier threatened to "put a bullet between [Petitioner's] eyes." *Id*.

After holding Petitioner in a cell in Abu Khashab for several hours, the SDF took Petitioner to ██████████████████████████████████████████████. *Id.* ¶ 9. ████████████████████████████████████████ *Id*. Petitioner was blindfolded and his hands were tied when he was transported to ████████. *Id.* ¶ 10.

The SDF held Petitioner in ████████ for between 24 and 36 hours. *Id.* ¶ 11. While there, the SDF again threatened Petitioner with death. *Id.* The SDF said to Petitioner, "You should be executed. We should kill you." *Id*. From ████████, the SDF brought Petitioner to a prison in a city he believes was Qamishli, near ████████. *Id.* ¶ 12. Once again, Petitioner was blindfolded and his hands were tied when he was transported to Qamishli. *Id*.

In Qamishli, the SDF continued to physically abuse and threaten Petitioner. *Id.* ¶ 13. Members of the SDF repeatedly punched Petitioner in the stomach. *Id*. On one occasion, a member of the SDF grabbed Petitioner around the throat, held him up against a wall, and

UNDER SEAL

threatened to break his neck. The SDF held Petitioner in Qamishli for approximately two days. *Id.*

Petitioner continued to tell the SDF he was an American citizen and wanted to speak to U.S. government officials. *Id*. ¶ 14. The SDF refused to believe Petitioner and said he did not look like an American. *Id*. Petitioner told the SDF that "not all Americans [were] white or [had] blue eyes." *Id*. The SDF also said there were no Americans around to help him. *Id*.

Finally, Petitioner persuaded the SDF that he was an American citizen by providing his social security number. *Id.* ¶ 15. The SDF then notified U.S. forces that he was in SDF custody. *Id*. U.S. forces took custody of Petitioner from the SDF in Qamishli and brought him to a safe house nearby, where U.S. agents interrogated him almost continuously for two days. *Id.* ¶ 16. U.S. forces then transported Petitioner, blindfolded and shackled, by helicopter to the detention facility in Iraq, where Petitioner remains today. *Id.* ¶ 17.

During multiple interrogations by the United States, Petitioner denied that he was an ISIS fighter, explained he was fleeing Syria for his safety, and pleaded for the assistance of his government. *Id.* ¶ 18. Petitioner told U.S. officials that he was fleeing Syria to travel to the U.S. embassy in Istanbul. *Id.* ¶ 19. Petitioner also described his abuse by SDF soldiers to U.S. officials, and the injuries inflicted on him by the SDF remained visible to U.S. medical personnel while he was in U.S. custody. *Id.* ¶ 20. For example, a U.S. medical official who examined Petitioner saw evidence of a head injury and asked Petitioner if he had been beaten on the back of his head. *Id*.

## ARGUMENT

To obtain a temporary restraining order, a plaintiff must establish: (1) "that he is likely to succeed on the merits"; (2) "that he is likely to suffer irreparable harm in the absence of

**UNDER SEAL**

preliminary relief"; (3) "that the balance of equities tips in his favor"; and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Singh v. Carter*, 168 F. Supp. 3d 216, 223 (D.D.C. 2016). Courts in this Circuit have traditionally applied these factors on a "sliding scale," where a stronger showing on some factors can compensate for a weaker showing on others. *See, e.g.*, *Davenport v. International Brotherhood of Teamsters*, 166 F.3d 356, 360–61 (D.C. Cir. 1999). It has been suggested, but not decided, that a likelihood of success on the merits may be required. *See Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (citing *Winter*, 555 U.S. at 20–22). For the reasons set forth below, under either approach, Petitioner makes the necessary showings here.

**I.      Petitioner is likely to succeed in showing that the government may not strand him in a dangerous and unstable region dominated by an armed group that has already shot at, beaten, and threatened him with death.**

   **A.      Applicable law and Department of Defense policies absolutely prohibit the unsafe release of all military prisoners, and the Constitution likewise absolutely prohibits the unsafe release of U.S. citizens.**

When the U.S. military takes an individual into custody, no matter the circumstances, it may not turn around and deliver the prisoner into harm's way. And when the government takes a U.S. citizen into custody, it has an independent duty under the Constitution to ensure his safety.

This bedrock legal obligation exists under both domestic and international law, and is recognized in the Department of Defense's own internal policies. As the government concedes, there is no question that when the military decides to release a prisoner, it must provide for his or her *safe* release. Declaration of Mark E. Mitchell ("Mitchell Decl.") ¶ 4. This obligation applies to noncitizens who have been found by courts to be enemy combatants; and it certainly applies to a U.S. citizen who is contesting the lawfulness of his detention through the writ of habeas corpus.

**UNDER SEAL**

As the Department of Defense itself recognizes, "there are no 'law-free zones' in which detainees are outside the protection of the law." Dep't of Defense, Off. of Gen. Counsel, Department of Defense Law of War Manual § 8.1.1 (June 2015), https://www.defense.gov/ Portals/1/Documents/law_war_manual15.pdf ("Law of War Manual"). Thus, certain "baseline rules" apply to all individuals detained by the Department of Defense, whether or not such individuals formally qualify as Prisoners of War or Protected Persons under the Geneva Conventions. *Id.* Among these non-derogable baseline rules, such as the absolute prohibition on torturing prisoners, is the requirement that the Department of Defense take measures to ensure the safety of prisoners it is releasing from custody. *Id.* § 8.14.3.2. The Department of Defense's policies likewise recognize an "obligation to release detainees in a safe and orderly manner." *Id.* Thus, they instruct that "detainees should not be released into a situation in which the detainee would be attacked by hostile elements upon release." *Id.*

The requirement of safe release is codified in Article 5(4) of the Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), June 8, 1977, 1125 U.N.T.S. 609 ("If it is decided to release persons deprived of their liberty, necessary measures to ensure their safety shall be taken by those so deciding."). Although the United States has not ratified this Protocol, it has signed it, and it formally recognizes that the treaty constitutes customary international law binding on the United States. *See, e.g.*, Army Judge Advoc. Gen.'s Sch., Int'l & Operational Law Dep't, *Operational Law Handbook* 14 (2017); *Gherebi v. Obama*, 609 F. Supp. 2d 43, 57 n.10 (D.D.C. 2009), *abrogated on other grounds by Uthman v. Obama*, 637 F.3d 400 (D.C. Cir. 2011); *see also* Message from the President Transmitting Protocol II to the U.S. Senate, *reprinted in* S. Treaty Doc. 100-2, at VIII (1987) ("With the above caveats, the obligations contained in

Protocol II are no more than a restatement of the rules of conduct with which U.S. military forces would almost certainly comply as a matter of national policy, constitutional and legal protections, and common decency.").

If Petitioner had already been found to be an enemy combatant, this law-of-war requirement would plainly apply. The government maintains that Petitioner's detention is governed by the 2001 Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 ("AUMF"). The Supreme Court made clear in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), that the AUMF must be interpreted "based on longstanding law-of-war principles." *Id.* at 521. And the government has repeatedly asserted that the AUMF is "informed by the laws of war," which include the 1949 Geneva Conventions and other sources of customary international law. *See, e.g.*, Redacted Return ¶ 32, ECF No. 66-1 ("Under the 2001 AUMF, as informed by the law of armed conflict, detention is generally authorized until the end of hostilities."); Brief of Respondents–Appellees at 24–25, *Al Warafi v. Obama*, No. 11-5276 (D.C. Cir. Feb. 12, 2012); Resp.'s Mem. Regarding Gov't Detention Authority Relative to Detainees at Guantánamo Bay 1, *In Re: Guantánamo Bay Detainees Litig.*, Misc. No. 08-442 (TFH) (D.D.C. Mar. 13, 2009), *available at* https://www.justice.gov/sites/default/files/opa/legacy/2009/03/13/memo-re-det-auth.pdf ("Principles derived from law-of-war rules governing international armed conflicts . . . must inform the interpretation of the detention authority Congress has authorized for the current armed conflict.").

If the law-of-war principles embedded in the AUMF would regulate Petitioner's detention, as well as his transfer to the custody of a foreign sovereign, *see Doe v. Mattis*, 889 F.3d 745, 761–62 (D.C. Cir. 2018), they would necessarily regulate the conditions surrounding his safe release at the end of his detention. And the same must be true of Petitioner's release

**UNDER SEAL**

during the pendency of his habeas petition. Any other result would mean that the military's safe-release obligation applies to individuals the courts conclude are lawfully detained as enemy combatants, but not to those who dispute the legality of their detention, including "the errant tourist, embedded journalist, or local aid worker" detained by mistake. *Hamdi*, 542 U.S. at 534 (plurality op.). That outcome would flout both international law and human decency, and it cannot be correct.

In the case of U.S. citizens, the law-of-war requirement of safe release is independently guaranteed by the U.S. Constitution. "Citizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar. The years have not destroyed nor diminished the importance of citizenship nor have they sapped the vitality of a citizen's claims upon his government for protection." *Johnson v. Eisentrager*, 339 U.S. 763, 769 (1950); *see Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 9 (1936) (reiterating "the fundamental consideration that the Constitution creates no executive prerogative to dispose of the liberty of the individual" citizen); *Doe*, 889 F.3d at 768 ("follow[ing]" the Supreme Court's guidance in *Hamdi* that it is "'vital' [to] 'not give short shrift to the values that this country holds dear or to the privilege that is American citizenship'" (quoting 542 U.S. at 532)).

The Fifth Amendment prohibits state officials from acting in a manner that affirmatively creates or increases an individual's risk of harm. *See, e.g.*, *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001); *Monfils v. Taylor*, 165 F.3d 511, 517 (7th Cir. 1998). While each case requires "an exact analysis of circumstances," *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998), the government violates the Constitution when its conduct "shock[s] the contemporary conscience." *Butera*, 235 F.3d at 651 (quoting *Lewis*, 523 U.S. at 847 n.8). As the D.C. Circuit has explained, "where the State has a heightened obligation toward [an] individual,"

**UNDER SEAL**

the government's conduct can shock the conscience through either "'recklessness or gross negligence.'" *Id.* (quoting *Lewis*, 523 U.S. at 849); *see Fraternal Order of Police Dep't of Corr. Labor Comm. v. Williams*, 375 F.3d 1141, 1144 (D.C. Cir. 2004). That kind of elevated duty arises when, for example, "the State has taken a person into custody" and government "officials have 'the luxury . . . of . . . time to make unhurried judgments, upon the chance for repeated reflection.'" *Butera*, 235 F.3d at 651–52 (quoting *Lewis*, 523 U.S. at 853) (alterations in original). The government owes a similar duty when its agents create or increase the danger to an individual not in its custody, especially "where 'actual deliberation is practical.'" *Id.* at 652 (quoting *Lewis*, 523 U.S. at 851). Courts have found these kinds of constitutional violations in a variety of situations, including when police released an individual in a dangerous neighborhood without taking steps to mitigate the risk of harm, *see Paine v. Cason*, 678 F.3d 500, 509–10 (7th Cir. 2012), and when police stranded a car's passenger at night in a high-crime area, *see Wood v. Ostrander*, 879 F.2d 583, 590 (9th Cir. 1989).

Having taken Petitioner into military custody, the Defense Department is obligated to ensure his safety upon release. Through his habeas petition, Petitioner seeks the restoration of his liberty through safe release from U.S. custody. The government has now detained Petitioner for almost nine months without charge, and seems to suggest that Petitioner's release into Syria—where he would be at immediate risk of bodily harm—would provide all the relief to which Petitioner is entitled under habeas. But the Great Writ "is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose—the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty." *Jones v. Cunningham*, 371 U.S. 236, 243 (1963); *Schlup v. Delo*, 513 U.S. 298, 299 (1995) ("[H]abeas corpus is, at its core, an equitable remedy."); *Boumediene v. Bush*, 553 U.S. 723, 779

10

(2008) ("[C]ommon-law habeas corpus was, above all, an adaptable remedy. Its precise application and scope changed depending upon the circumstances."). The "remedy" the government proposes—abandoning Petitioner, without any identification or assurance of safe passage, in an unstable zone with no functioning government and which is occupied by forces that will perceive him as an enemy—does not effectuate the relief habeas corpus promises, but rather makes a mockery of it. *Cf. Doe*, 889 F.3d at 766 (rejecting the government's argument that disposing of an individual so that he is "no longer . . . in U.S. custody" is necessarily "tantamount to" the type of release guaranteed by habeas). In short, trapping Petitioner in the dangerous country he was attempting to flee, with no access to any U.S. consular services and no guarantee of entry to even an IDP camp, *see* Mitchell. Decl. ¶ 5 n.2, is not equitable.

> **B.    Stranding Petitioner without identification in a dangerous and unstable region dominated by an armed group that has already shot at, beaten, and threatened him with death is not safe release.**

The government proposes to abandon Petitioner in an unstable area with no recognized government in what is, according to the government itself, one of the most dangerous countries in the world. The government's own official warnings undermine any argument or assertion by it that the proposal constitutes safe release. *See* Mitchell Decl. ¶¶ 4–5. According to the government's own official assessments, all U.S. citizens in Syria should leave the country immediately, and Syrian nationals must not be deported to their home country due to the dangers they would face there. Yet the government's proposal here is not merely to abandon Petitioner in Syria, but to specifically leave him at the mercy of an armed group that has already abused him. The government's proposal comes nowhere close to meeting the obligation of "safe release."

For every single U.S. citizen, the government's safety assessment is categorical: "No part of Syria is safe from violence." DOS Syria Advisory. Due to "violent, volatile conditions in

Syria and the ongoing civil war," the government "strongly recommends that U.S. citizens remaining in Syria depart immediately." DOS Syria Information. Those U.S. citizens who nonetheless remain in Syria, according to the State Department, should "[d]raft a will," and inform loved ones of "funeral wishes, etc." DOS Syria Advisory.

In this very case, the government has previously and repeatedly argued that the same region to which it now proposes to return Petitioner is "an active battlefield," *see, e.g.*, Appellant Reply Br. 6, 11, 13, *Doe v. Mattis* (D.C. Cir. Mar. 16, 2018), ECF No. 1722698, and is so dangerous that the military was *required* to remove Petitioner from there to Iraq, *see* Appellant Br. 26, *Doe v. Mattis* (D.C. Cir. Feb. 16, 2018), ECF No. 1718454 (citing Geneva Convention Relative to the Treatment of Prisoners of War art. 19, Aug. 12, 1949, 6 U.S.T 3316 (requiring evacuation of prisoners to "an area far enough from the combat zone for them to be out of danger")). As recently as April 5, government counsel represented to the D.C. Circuit that Petitioner "was turned over to the U.S. military during active hostilities, was being held by the military in that theater of combat," and that there are "ongoing hostilities in the region." Tr. of Oral Argument 19:1–7, *Doe v. Mattis* (D.C. Cir. Apr. 5, 2018), ECF No. 1726413, https://www.aclu.org/legal-document/doe-v-mattis-april-5-2018-oral-argument-transcript-dc-circuit.

Although—as set forth above—the government advises all U.S. citizens to immediately leave Syria, Petitioner has little chance of escaping the dangerous situation in which the government proposes to abandon him. According to the government, even citizens who (unlike Petitioner) possess valid identification and travel documents have faced "dangers traveling within the country and when trying to leave Syria via land borders, given the diminishing availability of commercial air travel out of Syria." DOS Syria Information. Borders controlled by

**UNDER SEAL**

Kurdish and other armed groups, according to the government, "should not be considered safe" and border areas "are frequent targets of shelling and other attacks and are crowded because of internally-displaced refugees." *Id.*

In fact, the government will not even send *Syrian nationals* to Syria because it recognizes the grave danger to all persons there. The Department of Homeland Security has determined that Syria is so unsafe that Syrian nationals present in the United States must not be returned to their home country. In January 2018, the Secretary of Homeland Security published in the Federal Register the determination that "requiring the return of Syrian nationals (or aliens having no nationality who last habitually resided in Syria) to Syria would pose *a serious threat to their personal safety*." Notice of Extension of the Designation of Syria for TPS, 83 Fed. Reg. at 9332 (emphasis added). The Department of Homeland Security's January assessment states that "Syria is engulfed in an ongoing civil war marked by brutal violence against civilians, egregious human rights violations and abuses, and a humanitarian disaster on a devastating scale across the country." *Id.* at 9331. Accordingly, the Department of Homeland Security extended "Temporary Protected Status" designation to Syria through September 30, 2019. *Id.*

Compounding the dangers the government's own assessments identify—that Syria is categorically unsafe for all persons—the Department of Defense proposes to release Petitioner in a region controlled by an armed group that has already demonstrated its violent intent towards Petitioner specifically. SDF forces have shot at Petitioner, beaten him, and threatened him with death. Hafetz Decl. ¶¶ 5, 8, 11–13. The Department of Defense has been aware of this danger from the beginning of Petitioner's nearly nine-month–long detention: Contrary to assertions made in the Mitchell Declaration, Petitioner informed a U.S. military doctor about his abuse at the hands of the SDF, and the doctor observed marks of abuse still visible on Petitioner's body

13

UNDER SEAL

when he was first examined in U.S. custody. *Id.* ¶ 20. The government's own statement of the laws of war specifically precludes releasing prisoners "into a situation in which the detainee would be attacked by hostile elements upon release." Law of War Manual § 8.14.3.2. But that is precisely what the government proposes to do here.

The Department of Defense asserts that it "has taken all necessary and feasible precautions to ensure" that Petitioner's release is safe. Mitchell Decl. ¶ 4. But the government's justification for that assessment are woefully inadequate, particularly in the face of the government's various warnings concerning travel to and presence in Syria—evidence that will be supplemented by independent, expert assessments of the region in connection with a forthcoming motion for a preliminary injunction that Petitioner intends to file. The Department of Defense asserts that Petitioner's release into Syria is safe because its chosen drop point is █████████ ██████████████████████████████████████. *Id.* ¶ 5. But the Department's focus on the "████████████" that supposedly characterizes that region ███████████ is a chimera, as the Department acknowledges that it "cannot guarantee that Petitioner will be admitted to the camp" at all. *Id.* ¶ 5 & n.2. The Department also asserts that ██████████████████████ ████████████████████████████████████████████████ *Id.* ¶ 5. But while the government's declarant attempts to make life in a zone with no recognized government seem ordinary—█████████████████████████ for example—that assessment is based on the fact that these features have been █████████████████████ when the Departments of State and Homeland Security continue to treat the entire country as exceedingly dangerous in its entirety. *Id.* In fact, the region's instability is so pronounced that the government currently warns all U.S. citizens to immediately leave all parts of Syria because "[a]ttacks from the regime or other groups *could happen with little or no warning*, *no part of Syria should be considered*

UNDER SEAL

*immune from violence*, *and the potential exists throughout the country for unpredictable and hostile acts*, including kidnappings, sniper assaults, terrorist attacks, small arms fire, improvised explosives, artillery shelling, airstrikes, the use of chemical weapons, large- and small-scale bombings, as well as arbitrary arrest, detention, and torture." DOS Syria Information (emphasis added). The Mitchell Declaration does nothing to contradict this assessment—nor could it, as Syria is indisputably in the midst of a violent and fluid civil war, and lulls in fighting do not constitute an end of hostilities and danger. Thus, even the extremely limited claims of normalcy in the Mitchell Declaration do not constitute a serious assurance of safety or stability.[1]

Far from doing anything to mitigate the proven danger to Petitioner from SDF forces, the government plans to exacerbate it. *See Butera*, 235 F.3d at 651. The government proposes to strand Petitioner without identification, official travel documents, or a statement from the U.S. government that Petitioner poses no threat, in a region lacking a recognized government or U.S. consular services. Since his initial capture, the government has branded Petitioner an ISIS fighter and has publicly released a factual return that details the government's unproven allegations against him. *See* Return, ECF No. 66-1. Yet the government is not willing to secure any assurance from the SDF—his former captors and abusers—that Petitioner will not be targeted and will be permitted safe passage through and out of Syria. Hafetz Decl. ¶ 22. Without such assurance, the government's own evidence establishes that the SDF is likely to treat Petitioner as

---

[1] Petitioner expects that the Department of Defense will, once again, claim broad and unreviewable deference on whether Petitioner's release into Syria will be safe. Any claim to deference is especially weak here, in the face of coordinate executive departments' assessments at clear odds with the Department of Defense's representations. And even if some deference is due, that deference is far from absolute, and is certainly not decisive. The D.C. Circuit has already enjoined Petitioner's transfer "respectful of—and with appreciation for—the considerable deference owed to the Executive's judgments in the prosecution of a war." *Doe*, 889 F.3d at 749. "But," as that court put it, "when an alleged enemy combatant—even one seized on a foreign battlefield—is an American citizen, things are different." *Id.*

**UNDER SEAL**

a hostile threat. ██████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████ The government owes U.S. citizens like Petitioner

far more than this. *Cf. Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849,

873 (5th Cir. 2012) (Higginson, J., concurring) ("[G]overnment persons, intentionally or

recklessly or through deliberate indifference, must know they will be held blameful if they cause

a citizen to be subjected to a rights deprivation even if the 'actual violation' is inflicted by a third

person, as would be true if, for example, a sheriff released a prisoner to a vengeful lynch mob.").

In sum, the government's proposal violates the requirement that military detainees be

released to safety and not be exposed to hostile forces. And it shocks the conscience that the

government proposes to abandon a U.S. citizen with no passport, no assurances of safety, and no

means of escaping a country that his own government has assessed as categorically unsafe for all

U.S. citizens.

The government's own words are more than sufficient to establish that its proposal is the

polar opposite of "safe" release. But in support of his forthcoming motion for a preliminary

injunction, Petitioner will submit additional evidence, including assessments by one or more

experts with first-hand knowledge of the conditions in SDF-controlled territory and the certain

danger Petitioner faces there. In addition, Petitioner will submit an assessment by a retired senior

U.S. military official as to the importance of the government's safe-release obligation and the

risks posed by its apparent intention to violate that obligation now. Should the Court require

additional evidence in support of the instant motion, Petitioner is prepared to supplement the

record.

UNDER SEAL

**II.      Petitioner is likely to be irreparably harmed in the absence of an injunction.**

The evidence here is overwhelming "that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (citing *Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983)). According to the State Department, "no part of Syria should be considered immune from violence, and the potential exists throughout the country for unpredictable and hostile acts, including kidnappings, sniper assaults, terrorist attacks, small arms fire, improvised explosives, artillery shelling, airstrikes, the use of chemical weapons, large- and small-scale bombings, as well as arbitrary arrest, detention, and torture." DOS Syria Information. These factors have "raised the risk of death or serious injury" for U.S. citizens in Syria, and "the U.S. government is unable to provide emergency services to U.S. citizens in Syria." *Id.* In short, "No part of Syria is safe from violence." *Id.* Moreover, Petitioner faces particularly stark and obvious risks in the region in which the government proposes to abandon him: the dominant armed group in this region has already shot at him and repeatedly threatened him with death, Hafetz Decl. ¶¶ 8, 11, 13; and SDF forces already profiled him as a hostile foreigner, Return ¶ 61, ECF No. 66-1. Absent an injunction, Petitioner faces grave physical danger and "nearly certain death, the ultimate irreparable injury." *Wilson v. Grp. Hospitalization & Med. Servs., Inc.*, 791 F. Supp. 309, 314 (D.D.C. 1992).

**III.      The balance of harms strongly favors Petitioner.**

Courts must "balance the competing claims of injury [to] consider the effect on each party of the granting or withholding of the requested relief," *Winter*, 555 U.S. at 24, and determine whether the "balance of equities tips in [Petitioner's] favor," *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012) (quoting *Winter*, 555 U.S. at 20). In contrast to the grave and imminent risks Petitioner faces if transferred to and released in Syria, the government has identified no harm that would be caused by maintaining the status quo.

**UNDER SEAL**

That the balance of equities weighs in favor of Petitioner now is clear when compared to the D.C. Circuit's weighing of the equities when the government attempted to forcibly transfer Petitioner to Saudi Arabia. There, the interests of the government had greater weight, yet both this Court and the D.C. Circuit ruled that the balance of the equities tipped in Petitioner's favor.

When the government previously attempted to relinquish custody of Petitioner to Saudi Arabia, the D.C. Circuit found that the government's interests were "manifestly weighty ones." *Doe*, 889 F.3d at 766. The government had asserted that at stake was the United States' "credibility with an important foreign partner," Declaration of ███████████ ¶ 8, ECF No. 77, and that any delay "could adversely affect its willingness to engage with the United States on some future detainee transfers," *id.* But even as the D.C. Circuit recognized the government's interest in "avoid[ing] undue interference" with "its conduct of foreign relations with a coalition partner" and "its military judgments in connection with ongoing hostilities," the court held that Petitioner's interests outweighed the government's, and enjoined the transfer. *Doe*, 889 F.3d at 766–67. Petitioner's interest here in avoiding grave injury or death is at least as weighty—if not more so—than Petitioner's interest in avoiding indefinite detention in Saudi Arabia.

There is no comparison between any possible injury to the government if this Court temporarily restrained it from releasing Petitioner and the absolute, irreparable harm Petitioner would suffer if he were abandoned by the United States in a war-torn country, at significant risk of bodily harm or death, and with no opportunity to escape. Indeed, the government has no legitimate interest whatsoever in releasing Petitioner into conditions so perilous. For these reasons, the balance of equities weighs in favor of Petitioner.

UNDER SEAL

**IV.    A temporary restraining order serves the public interest.**

The public interest is served by ensuring that the U.S. government does not transfer and release a U.S. citizen into harm's way. An American citizen unlawfully detained by the U.S. government has the absolute right to challenge the detention and to try to secure the right to a safe release—even in wartime. *See Hamdi*, 542 U.S. at 536. Just as a forcible transfer to the custody of another country would not have vindicated Petitioner's rights under habeas, *see Doe*, 889 F.3d at 766, neither does his release to a country in which "[n]o part . . . is safe from violence," DOS Syria Advisory.

## CONCLUSION

For the foregoing reasons, this Court should enjoin the government from transporting Petitioner to Syria and releasing him there.


Dated: June 7, 2018                                      Respectfully submitted,

                                                         /s/ Jonathan Hafetz
                                                         _____
Arthur B. Spitzer (D.C. Bar No. 235960)                  Jonathan Hafetz (D.C. Bar No. NY0251)
American Civil Liberties Union                           Dror Ladin (*pro hac vice*)
  of the District of Columbia                            Anna Diakun
915 15th Street, NW, 2nd Floor                           Brett Max Kaufman (D.C. Bar No. NY0224)
Washington, DC 20005                                     Hina Shamsi (D.C. Bar No. MI0071)
Tel: 202-457-0800                                        American Civil Liberties Union Foundation
Fax: 202-457-0805                                        125 Broad Street—18th Floor
aspitzer@acludc.org                                      New York, New York 10004
                                                         Tel: 212-549-2500
                                                         Fax: 212-549-2654
                                                         jhafetz@aclu.org
                                                         dladin@aclu.org
                                                         adiakun@aclu.org
                                                         bkaufman@aclu.org
                                                         hshamsi@aclu.org

*Counsel for Petitioner*