**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| JOHN DOE,<br><br>             *Petitioner*,<br><br>           v.<br><br>LLOYD AUSTIN,<br>  in his official capacity as<br>  SECRETARY OF DEFENSE,<br><br>             *Respondent*. |

No. 17-cv-2069 (TSC)

# ECF 101

# REDACTED VERSION FOR PUBLIC FILING

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| | ) | |
| v. | ) | |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | |
| in his official capacity as SECRETARY | ) | |
| OF DEFENSE, | ) | |
| | ) | |
| Respondent. | ) | |

# ECF 101

███████████████████

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:17-cv-2069 (TSC) |
| | ) | |
| GEN. JAMES N. MATTIS, | ) | |
| in his official capacity as SECRETARY OF DEFENSE, | ) | ███████ |
| | ) | |
| Respondent. | ) | |

**RESPONDENT'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO
PETITIONER'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

ARGUMENT ...................................................................................................................... 8

    I.      THE DEPARTMENT HAS SATISFIED ITS LEGAL OBLIGATION TO ENSURE A SAFE RELEASE ................................................................. 8

        A.    The Department Will Comply With Law of War Requirements to Ensure a Safe Release ................................................................. 9

        B.    The Department Has Filed Ample Evidence in Support of Its Determination that Release        Would Be Safe .......................... 14

        C.    Petitioner's New Allegations About SDF Abuse Are Not Credible Because They Contradict His Own Prior Statements and Conflict With His Medical Records ..............................................16

CONCLUSION.................................................................................................................. 19

**Attached hereto:**

Declaration of Karin King ("State Decl.")

Declaration of Department of Defense Facility Physician ("Physician Decl.")
      Exhibit 1: Intake form
      Exhibit 2: Photographs

Declaration of Department of Defense Facility Medic ("Medic Decl.")
      Exhibit 1: Record of examination

Declaration of Major General Chad P. Franks ("Franks Decl.")

# TABLE OF AUTHORITIES

## Cases

*al-Bihani v. Obama*, 590 F.3d 866 (D.C. Cir. 2010) ....................................................................10

*Hamlily v. Obama*, 616 F. Supp. 2d 63 (D.D.C. 2009),
    *adopted sub nom. Anam v. Obama*, 653 F. Supp. 2d 62 (D.D.C. 2009) ..........................10

*Kiyemba v. Obama*, ("*Kiyemba II*"), 561 F.3d 509 (D.C. Cir. 2009) ......................................... 11

*Munaf v. Geren*, 553 U.S. 674 (2008)................................................................................... 10, 11

*United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936) ..........................................10

## Statutes

2015 National Defense Authorization Act ("NDAA"),
    Pub. L. No. 113-291, § 1209(e)(1), 128 Stat. 3292, 3542-43 (2014) ............................... 7

## **INTRODUCTION**

Below are additional details regarding the proposed release of Petitioner by the Department of Defense (the "Department" or "DoD"). The Department has determined that Petitioner's release in the northeastern Syrian ███████████ will be safe and is, moreover, willing to take additional steps on Petitioner's behalf based on requests he has made through his counsel, including at the June 8, 2018 hearing in this Court. ██████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████. The Department is also willing to provide Petitioner with an identification card containing his photo, his status as a citizen of the United States and Saudi Arabia, and other identifying information, ██████████████████████████████ ████████████████████████████████████

The Department's specific determination regarding the safety and stability of ████████ is well founded and should be credited by this Court in accordance with longstanding principles of deference in the military and foreign affairs arenas. The Department has on-the-ground familiarity with ████████ and the surrounding area because U.S. forces regularly travel there in the course of providing support to SDF forces in the area. Based on this familiarity, the responsible Department officials have exercised their professional military judgment and concluded that this part of Syria is stable and calm. Petitioner's arguments, including his references to the State Department's Travel Advisory and the Department of Homeland Security's ("DHS") extension of Temporary Protected Status for Syria, have not undermined that determination. To the contrary, as the attached State Department declaration explains, the State Department does not view the Travel Advisory as substituting for DoD's more particularized judgment regarding the release, based on its direct

knowledge of the area. As the State Department explains: "DOD has the authority and competence to make its own assessment of the area proposed for release and to determine whether release in that area would be both safe and consistent with its policies and obligations"; on this issue, the State Department "defers to DOD's determination." Declaration of Karin King ("State Decl.," attached hereto) ¶ 4. As for DHS, its determination by its own description focuses primarily on the actions of the central Syrian government in Damascus; it does not address the specific conditions in the SDF-controlled area where the Department proposes to release Petitioner.

The Department has also carefully reviewed Petitioner's allegations regarding past abuse by SDF forces and does not deem those allegations credible. Petitioner was evaluated by both an Army medic and a Department physician in two separate examinations in the immediate period after Petitioner's capture when the Department first met with Petitioner and then took him into custody, and the reports of those examinations include thirty-four high-resolution photographs of his physical condition (filed herewith). Nothing in those records or the sworn declarations of the medical personnel who conducted the examinations provides any indication that Petitioner had been abused or was suffering from any injury—much less the significant head injury and bruising on his body that Petitioner claimed, via his counsel's declaration, he would attest to under penalty of perjury. Moreover, far from complaining of abuse to U.S. personnel at the time of his capture, as he has alleged, Petitioner specifically and repeatedly denied any abuse or mistreatment, as the attached declarations from the Army medic and Department physician explain. Petitioner's tale of SDF abuse has no support other than his own statements made for the first time in this litigation and is directly contrary to the evidence. Petitioner's primary basis for resisting his planned release is thus verifiably untrue and should not be credited.

2

The Department has offered extensive evidence that the planned release is safe and complies with applicable legal requirements, its determination to that effect is entitled to great deference, and Petitioner's allegations of SDF abuse are not credible. The Court should deny Petitioner's application for a temporary restraining order and decline to intervene in the Department's planned release.

## **BACKGROUND**

By Petitioner's own account, he traveled to Gaziantep, Turkey in 2015 with the intention of entering Syria illegally, and he paid someone $300 to smuggle him across the Turkish-Syrian border in Syria. TIR01 [ECF 46-1], at 4. By Petitioner's own account, when he was captured by SDF forces in September 2017, during their offensive southward toward ISIL-held territory, he was heading northward toward the Turkish-Syrian border with the intention of crossing the border again and traveling back to Turkey. Hafetz Decl. ¶ 4. At the time of his capture, Petitioner had no passport, or any other official identification document, in his possession. *See* Declaration of ██████████ ("██ Decl.," ECF 46-3) ¶ 58 (listing Petitioner's possessions at the time of capture).

Petitioner was captured by SDF forces on or about September 11, 2017, *id.* ¶ 54, was taken into the Department's custody soon thereafter, and arrived at the Department's facility in Iraq on September 12, 2017. Declaration of Department of Defense Facility Physician ("Physician Decl.," attached hereto) ¶ 4. While Petitioner was still in SDF custody in Syria on September 11, 2017, an Army medic conducted a preliminary medical screening to assess whether Petitioner was medically cleared to be transferred to U.S. custody. Declaration of Department of Defense Facility Medic ("Medic Decl.," attached hereto) ¶¶ 4-5. During this screening, the medic examined

Petitioner for injuries or medical issues and asked him about any medical concerns or prior abuse. *Id.* ¶¶ 6-7. As the medic explains, he is required to report any allegations or indications of abuse to appropriate Department authorities and to document any observed injuries. *Id.* ¶ 8. In response to the medic's inquiry, Petitioner did not report any abuse. *Id.* ¶ 9. While Petitioner claimed that he bumped his head during his detention with SDF, he did not describe this as a significant injury, nor one that was inflicted on him intentionally by the SDF. *Id.* The medic also did not observe any injuries that would have been consistent with abuse or maltreatment. *Id.* ¶ 12. Consistent with the medic's testimony, the record of the medic's examination does not document any recent significant injury or signs of abuse. *See id.* ex.1.

The next day, September 12, 2017, upon Petitioner's arrival at the facility in Iraq, a Department physician gave him a medical examination in order to document his condition at the time of his detention. Physician Decl. ¶ 4 & ex.1 (intake form). That examination identified no current medical conditions or injuries, including any head injuries. *Id.* ¶ 18. The detailed photographs that were taken of Petitioner at the time of this intake examination also do not show bruising or any indications of injury. *Id.* ex.2. In addition, when Petitioner was specifically asked if he had suffered any abuse or maltreatment prior to arriving at the Department facility, he denied that he had suffered any abuse and said that he was not suffering from any current significant medical conditions or injuries. *Id.* ¶ 18.

The American Civil Liberties Union Foundation ("ACLUF") filed a habeas petition regarding Petitioner on October 5, 2017. In its filings seeking dismissal of the petition, the Department repeatedly explained that it was in the process of determining what to do with Petitioner. *See, e.g.*, Declaration of Steven W. Dalbey [ECF 11-1] ¶ 5 (indicating Petitioner was

being detained "pending appropriate and expeditious consideration of various disposition options"); Resp. Response to Pet'r Proposed Relief [ECF 20], at 3 (indicating that the Government was "diligently working to make a determination regarding this detainee's future status"); Resp. Supp. Br. [ECF 24], at 1 (indicating that the options under consideration by the Government included continued detention in military custody, criminal prosecution, transfer to another country with an interest in the detainee, or release).

Meanwhile, Petitioner has repeatedly emphasized that his sole goal in this habeas case is to secure his immediate, unconditional release from U.S. custody. *E.g.*, Tr. Jan. 22, 2018 4:19-5:1 ("release is simply to allow him to go free . . . what he's asking this Court for is to allow him to – open the doors, allow him to go free."); 7:6-9 ("He's asking for release, and release . . . in common parlance and as a legal matter, is a release or a relinquishment of government custody."); 21:19-20 ("open the doors, and he would carry on with his life."); Tr. Apr. 19, 2018 9:17-18 (asserting Petitioner's "right to . . . pursue his habeas petition to obtain the remedy of release"); 12:1-2 ("He is seeking his release. He is fighting for his freedom.").

On April 16, 2018, Respondent filed a notice of its intent to transfer Petitioner to Saudi Arabia, where he is a citizen. *See* Notice of Transfer [ECF 77]. Respondent's filing indicated that the Kingdom of Saudi Arabia would place Petitioner in a government-run rehabilitation program. *Id.* ██████████████████████████████. But despite extended discussions with Petitioner about this option, Petitioner ultimately opposed the transfer, *see* Declaration of State Department Declarant (ECF 77-1) ¶ 2, and the D.C. Circuit affirmed this Court's injunction prohibiting the transfer without his consent.

On June 6, 2018, again following discussions with Petitioner, Respondent filed a notice of

its intent to release Petitioner in the northeastern Syrian ████████████ *See* Notice [ECF 94]; Declaration of Mark E. Mitchell ("Mitchell Decl.," ECF 95) ¶ 5. Petitioner again opposes Respondent's proposal and seeks an injunction forbidding the Department from releasing him as planned and thus requiring the Department to continue holding him in custody.

The Department has explained that its typical practice, when seeking to release an individual from Department custody, is to do so "at or near the location where the person was originally detained, as operationally feasible." Declaration of Major General Chad P. Franks ("Franks Decl.," attached hereto) ¶ 3. But before the Department releases an individual, it must assess whether the contemplated release comports with the requirements set forth in the DoD Law of War Manual, which include the requirement that any release be safe. *Id.* ¶ 4. In order to make that determination, the Department considers all "available information, taking into account all circumstances (including humanitarian, operational, and security considerations)." *Id.* In particular, the Department may not release a detainee "into a situation in which he would be attacked upon release." *Id.* In conducting these assessments in the past, in regard to other individuals originally detained in Syria, the Department has concluded that the ████████████ was a safe location for release. *Id.* The Department has previously released ████ individuals near ████████ and is unaware of any safety or security concerns with respect to those individuals. *See id.* ████████████████████████████ *See* Mitchell Decl. ¶ 5. Applying the same criteria, the Department has determined that Petitioner's release ████████ will also be safe. *Id.* ¶¶ 4-5.

The ████████████ ████████████████████████████████████████████ Mitchell Decl. ¶ 5. ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████ *Id.* ████

██████████████████████████████████████████████████

██████████████████████████████, *id.*, and ██████████

███████████ Frank Decl. ¶ 6 ████████████████████████

██████████████████████████████████████████████████

████████ *Id.* ████████████████████████████████████

██████████████████████████████████ *Id.*

The Department has on-the-ground familiarity with current conditions ████████

███ as well as with the SDF, which is a partner force in the fight against ISIL. *See* Mitchell Decl.

¶ 6. ██████ is currently under the control of SDF forces and has been free of any ISIL presence

████████████████████████ *Id.* ¶ 5. In the course of providing support to the SDF,

U.S. forces visit ██████ regularly and are "familiar with the area, including the security situation,

and the workings and practices of SDF forces in the area." Franks Decl. ¶ 5. In accordance with

the requirements of the 2015 National Defense Authorization Act ("NDAA"), Pub. L. No. 113-

291, § 1209(e)(1), 128 Stat. 3292, 3542-43 (2014), the Department has "appropriately vetted" the

SDF, including its senior leadership, and has concluded that the SDF "is committed to respecting

human rights and the rule of law, including the law of armed conflict." Franks Decl. ¶ 8; *see also*

Mitchell Decl. ¶ 6.

In the Department's assessment, Petitioner's release ██████ will be safe and,

consistent with its commitments, the SDF will treat Petitioner humanely in compliance with the

law of war. Mitchell Decl. ¶¶ 5-6; Franks Decl. ¶¶ 6, 8. ██████████████████

██████████████████████████   ██████████████████████████

██████████████████████. Franks Decl. ¶ 6. Moreover, Petitioner has

resided in Syria since 2015, so he is presumably familiar with local culture.



████████████ *Id.* The Department will also supply Petitioner with an identification card bearing

his photograph and identifying him as a citizen of the United States and Saudi Arabia, █████████

████████████████████████████████████████████████████████████████

█████████████████ *Id.*

## ARGUMENT

### I.   THE DEPARTMENT HAS SATISFIED ITS LEGAL OBLIGATION TO ENSURE A SAFE RELEASE

In its original memorandum opposing Petitioner's TRO application, the Department of

Defense explained that the Department is extremely mindful of the requirement to ensure any

release of Petitioner is safe, and that the Department has determined that the release of Petitioner

████████████ comports with that requirement. The Department has now provided additional

information that further supports this determination. The attached declarations explain further the

Department's close familiarity with the on-the-ground conditions ████████ and the firm basis

of the Department's determination that Petitioner's release there will be safe. And the

8

Department's medical records regarding Petitioner, together with the sworn declarations of a medic who examined him while he was in SDF custody and of the doctor who examined him when he first came into the Department's custody, confirm that Petitioner has no credible basis to now accuse SDF forces of abuse.

### A.  The Department Will Comply With Law of War Requirements to Ensure a Safe Release

When the Department notified the Court of its intent to release Petitioner ████████, it also provided a declaration assuring the Court that the Department "has taken all necessary and feasible precautions to ensure the safe release of Petitioner." Mitchell Decl. ¶ 4. The Department does not take that assurance lightly. The Department's Law of War Manual, which reflects its understanding of U.S. obligations under the law of war, including the 1949 Geneva Conventions and customary international law, provides that the Department shall take "necessary measures" to ensure the safety of detainees when deciding where and how to release them. DoD Law of War Manual § 8.14.3.2 (June 2015, Updated Dec. 2016), *available at* https://www.defense.gov/News/Publications. In light of these general principles, it follows that "detainees should not be released into a situation in which the detainee would be attacked by hostile elements upon release." *Id*. The Manual further states that, if "operational necessities" and "logistical constraints" make it difficult to release a detainee at the time the Department determines that release is an appropriate disposition, "[c]ontinued detention in order to facilitate a safe and orderly release may be necessary." *Id.*

To comply with these requirements, the Department considers a variety of factors in order to evaluate whether a release will be safe. These include the stability of the area, the resources available to the individual who will be released, and whether the individual is likely to be attacked

upon release. Franks Decl. ¶¶ 4-6. In assessing those factors in this instance, the Department

determined that Petitioner's release ████████████ will be safe. *Id.* ¶ 6; Mitchell Decl. ¶ 4.

The Department's determination on this issue is entitled to considerable deference. When

the Department concludes that a detainee's release overseas will be safe in compliance with U.S.

law of war obligations, which are reflected in its Law of War Manual, that determination is infused

with national security and foreign relations considerations and is grounded in the professional

military judgment of Department decisionmakers. Wide deference is due to the Department's

assessment of the on-the-ground conditions in a foreign country where the Department has a

presence and is conducting operations, particularly its assessment of the military situation. As the

Supreme Court has unanimously explained, "it is for the political branches, not the judiciary, to

assess practices in foreign countries and to determine national policy in light of those assessments."

*Munaf v. Geren,* 553 U.S. 674, 700-01 (2008); *see also, e.g., Hamlily v. Obama*, 616 F. Supp. 2d

63, 68–69 (D.D.C. 2009) (recognizing "the singular role of the Executive in matters of foreign

affairs and the deference that he is customarily given by courts when resolving matters in that

realm"), *adopted sub nom. Anam v. Obama*, 653 F. Supp. 2d 62 (D.D.C. 2009). That is why, for

example, the courts have consistently deferred to the Executive on its assessment of whether

hostilities are ongoing in a particular place. *See, e.g., United States v. Curtiss-Wright Export Corp.*,

299 U.S. 304, 320 (1936) (the President "has the better opportunity of knowing the conditions

which prevail in foreign countries, and especially is this true in time of war"); *al-Bihani v. Obama*,

590 F.3d 866, 874-75 (D.C. Cir. 2010) (explaining in the Guantanamo habeas context that "[t]he

determination of when hostilities have ceased is a political decision, and we defer to the

Executive's opinion on the matter, at least in the absence of an authoritative congressional

declaration purporting to terminate the war," and invoking "the wide deference the judiciary is obliged to give to the democratic branches with regard to questions concerning national security").

The present context is, indeed, directly analogous to the possibility-of-torture allegations the Supreme Court and D.C. Circuit have held cannot be factually reviewed by U.S. courts. The Supreme Court recognized in *Munaf* that "[t]he Judiciary is not suited to second-guess" the Government's conclusions that a country taking custody of a detainee is not likely to torture the detainee, explaining that the political branches are best left in control of such "sensitive foreign policy issues." *Munaf*, 553 U.S. at 702. The Court recognized that the Executive was sensitive to its obligations and should be trusted to adhere to them, explaining that there was no basis to think "the political branches are oblivious to these concerns." *See id.* The D.C. Circuit was even more categorical, holding that "the district court may not question the Government's determination that a potential recipient country is not likely to torture a detainee," and explaining that the Executive Branch should not be assumed to "cast" detainees "abroad willy-nilly without regard to their likely treatment in any country that will take them." *Kiyemba v. Obama* ("*Kiyemba II*"), 561 F.3d 509, 514 (D.C. Cir. 2009).

Here, moreover, the Department's conclusion is specific to the SDF-controlled area where it intends to release Petitioner. The Court in *Munaf* recognized both that the Executive legitimately *could* make distinctions between different areas or authorities within a country and that the Executive was *best able* to draw such distinctions, accepting the Government's assessment that the specific department that would take custody of the petitioners in that case had "generally met internationally accepted standards for basic prisoner needs," even though there were concerns about torture among other sectors of the Iraqi Government. *Munaf*, 553 U.S. at 702. Similarly here,

11

the Department is relying on its specific familiarity with ████ and the surrounding area, and with the SDF forces who control the region and work with U.S. forces. Franks Decl. ¶¶ 5-6, 8; Mitchell Decl. ¶¶ 4-5.

The broad deference courts have long afforded the Executive on factual assessments of country conditions abroad, including assessments of the military situation on the ground, makes sense, as domestic courts are not equipped to conduct fact-finding and preside over trials about country conditions overseas, particularly in the law-of-war and military context. The Department's current assessment is based on its expertise in military matters—including the extent to which particular areas are under the control of friendly forces and whether or not those areas are safe for release of detainees—as well as its intimate familiarity with the area where it intends to release Petitioner. While this Court is certainly equipped to make *legal* determinations about the scope of the Government's authority to take particular actions, here it is undisputed that the Executive has the legal authority to release Petitioner—indeed release simpliciter is precisely what he has been demanding since this proceeding began. The Court is not equipped, however, to second-guess the considered *factual* assessments of the Department based on the direct observations and experiences of Department personnel who are on the ground in Syria and operating in the area at issue on a regular basis. In this context, where the Department's general legal authority to release Petitioner is undisputed and the Government has proffered detailed evidence in support of the Department's determination that the planned release will be safe and in compliance with U.S. obligations under the law of war, deference is appropriate and there is no basis for this Court to intervene.

Petitioner has attempted to undermine the deference owed to the Department's factual determination by pointing to certain determinations of other Executive Branch agencies that, at

12

first glance, may seem inconsistent with that of the Department. But no other agency has purported to pass judgment on the Department's determination regarding Petitioner's safe release. The Department of State's Travel Advisory on Syria warns U.S. citizens of potential risks of traveling to Syria and particularly warns U.S. citizens against "traveling to Syria to engage in armed conflict" because those who undertake armed conflict "face extreme personal risks, including kidnapping, injury, or death." *See* Syria Travel Advisory, *available at* https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/syria-travel-advisory.html. But as attested by a State Department official, the State Department's Travel Advisory "is not a specific assessment of whether the planned release of petitioner is safe or consistent with the obligations of the Department of Defense." State Decl. ¶ 4. The official further explains that "DOD has the authority and competence to make its own assessment of the area proposed for release and to determine whether release in that area would be both safe and consistent with its policies and obligations" and clarifies that the State Department "defers to DOD's determination on this issue." *Id.* There is accordingly no basis for the Court to withhold deference on the grounds Petitioner suggests.[1]

---

[1] Petitioner has also cited the Notice issued by the Department of Homeland Security ("DHS"), extending the designation of Syria for Temporary Protected Status ("TPS"), 83 Fed. Reg. 9329 (Mar. 5, 2018). *See* Pet'r TRO Mem. at 3. But as explained in the Notice, DHS initially designated Syria for TPS due to actions of President Bashar al-Assad's regime, specifically, its "violent suppression of opposition . . . that prevented Syrian nationals from safely returning to Syria." 83 Fed. Reg. at 9330. In deciding to extend the designation, DHS notes that the al-Assad regime, also known as the Syrian Arab Republic Government, continues to violently suppress its citizens. *See id.* at 9331. The Notice specifically identifies Eastern Ghouta, near Damascus; the northwestern Idlib province; and Aleppo as areas facing humanitarian crises. *Id.* Nothing in DHS's Notice specifically addresses conditions ███████ or, indeed, anywhere within SDF-controlled territory. Thus, the Notice cannot be deemed to undermine the Department's specific assessment regarding Petitioner's safe release.

The Executive Branch's official view is thus that the planned release of Petitioner is safe and compliant with the laws of war. Against that, Petitioner does not cite any judicial decision, doctrine from the laws of war, or other legal principle that entitles him to demand a release somewhere other than the country where he voluntarily traveled and where he was captured—so long as the immediate area of the detainee's release is safe and will not expose the detainee to an unreasonable risk of danger. The Department has determined that the planned release satisfies that requirement, and this Court should defer to that considered factual assessment.

### B. The Department Has Filed Ample Evidence in Support of Its Determination That Release ▇▇▇▇▇ Would Be Safe

The Department has carefully evaluated the conditions ▇▇▇▇▇ and has determined that Petitioner's release ▇▇▇▇▇ will be safe. As described above and in the two declarations submitted by the Department, including the declaration, attached hereto, of Major General Franks, the Deputy Commander for Operations and Intelligence for the Combined Joint Task Force who is responsible for overseeing all joint and coalition operations in the fight against ISIL, this determination is based on the Department's specific knowledge and direct familiarity with ▇▇▇▇▇ as well as with the SDF, which controls ▇▇▇▇▇ the surrounding area. Franks Decl. ¶¶ 5-6, 8; Mitchell Decl. ¶¶ 5-6. The Department has explained that U.S. forces have regularly visited ▇▇▇▇▇ and the surrounding area over the past ▇▇▇▇▇ since it came under SDF control. Franks Decl. ¶ 5. Moreover, the Department has vetted the SDF as a partner force, to whom the United States provides support in the fight against ISIL. *Id.* ¶ 8; Mitchell Decl. ¶ 6. The Department has a firm basis to conclude that SDF will "comply with the law of armed conflict in all operations," and indeed "SDF leadership has repeatedly affirmed their commitment to respect human rights and the rule of law," and has acted consistently with that commitment. Franks Decl.

¶ 6.

████████████████████████████████████████████████████

█████████████████████████████████████████████████. *Id.*

¶¶ 4-5. Thus far, it has released ████ other individuals in ██████ and is unaware of any safety

or security concerns as a result. *Id.* ¶ 4.

 The Department also has specific knowledge regarding the conditions civilians face ██

██████ and the surrounding area. The civilians living ██████████ now █████████

████████████████████████ Franks Decl. ¶ 6.

████████████████████████████████ Mitchell Decl. ¶ 5.

███████████████ *Id.* ████████████████████████

███████████████████████ Franks Decl. ¶ 6.

██████████████████████████████████████████

█████████████. *Id.*

 In light of these circumstances, the Department has ample basis for its determination that

Petitioner's release ████████ will be safe. ████████████████████

████████████████████████████████████ and at the June 8,

2018 hearing, ██████████████████████████████

██████████████. 

██████████████████████████████████████

██████████████████████████████████████

████████████████████████ Franks Decl. ¶ 8. Second, the

Department will provide Petitioner with a photo identification card that identifies him and his

15

nationality. *Id.* 

*Id.*

### C.   Petitioner's New Allegations About SDF Abuse Are Not Credible Because They Contradict His Own Prior Statements and Conflict with His Medical Records.

Petitioner, through counsel, has indicated a fear that he will not be safe if released in Syria because Petitioner claims that he was held for several days by SDF forces and was beaten so badly that he suffered "severe bruising and dizziness." Declaration of Jonathan Hafetz ("Hafetz Decl.," ECF 99-2) ¶¶ 8, 11. He also claims that he "described his abuse by SDF soldiers to U.S. officials," and that his injuries were so severe that U.S. medical personnel specifically asked about them after he was taken into Department custody. *Id.* ¶ 20. In particular, he states that a U.S. medical official who examined him "saw evidence of a head injury and asked Petitioner if he had been beaten on the back of his head."   *Id.*

In order to assess Petitioner's stated concerns, the Department has contacted the medic and physician who conducted medical evaluations of Petitioner immediately before and after he was taken into Department custody, and has examined the corresponding medical records documenting those examinations. As described above, both the medic and the physician have provided declarations, attached hereto. Petitioner was initially examined by a medic in Syria on September 11, 2017, while he was still in SDF custody. Medic Decl. ¶ 4. The Department physician then conducted a medical examination of Petitioner after the Petitioner was brought to the Department facility in Iraq on the evening of September 12, 2017. Physician Decl. ¶ 4. Both examiners

16

concluded that Petitioner showed no signs of significant injury or of having been abused. Medic Decl. ¶ 12; Physician Decl. ¶¶ 16-17. Both asked Petitioner about any medical conditions, injuries, or abuse because Department protocol requires that such examinations document a detainee's condition at the point he comes into Department custody. Medic Decl. ¶¶ 5, 7; Physician Decl. ¶¶ 6, 8. The medic reports that Petitioner did "claim to have bumped his head during detention by the SDF," but that "it was not described to [him] as intentional or abusive." Medic Decl. ¶ 9. Nor did Petitioner report any abuse when specifically asked. *Id.* If there had been any signs of abuse, the medic would have been required to report it to appropriate Department authorities. *Id.* ¶ 8.

The physician states that he observed no signs of immediate injuries or medical concerns, and "no visible bruises, abrasions or contusions anywhere on [Petitioner's] head or body." Physician Decl. ¶¶ 9, 16. In particular, the physician did not observe any acute trauma or injuries to Petitioner's head. *Id.* ¶ 11; *see also id.* ¶ 18 (again stating that no head injury was observed). The physician notes that Petitioner did complain of mild tenderness in his ███████████ and ███████████, but there was no obvious bruising or other physical signs of injury in those locations. *Id.* ¶ 17. The physician also states that, in accord with standard intake procedure, Petitioner was specifically asked "whether he was subject to any abuse or maltreatment prior to arriving at the DoD Facility," but that Petitioner "denied any injuries or abuse"—including any abuse by SDF or DoD soldiers—"and denied that he was suffering from any current medical conditions or injuries." *Id.* ¶ 18.

The same physician provided medical services to Petitioner until the physician left the DoD facility in October 2017. *Id.* ¶ 20. Petitioner did not raise any allegations of abuse during the remainder of that physician's time at the facility. *Id.*

17

The accounts of the medic and physician regarding their examinations of Petitioner are consistent with each other and are corroborated by the records they filled out at the time. *See* Medic Decl. ex.1; Physician Decl. ex.1. Moreover, as part of the physician's intake examination, thirty-four high resolution photographs were taken to document Petitioner's physical condition in detail. Physician Decl. ¶ 5. Those photographs, attached to the physician's declaration, show *no* signs of Petitioner having been beaten or abused—let alone having been "repeatedly beat[en]" and "hit … in his head, back, and stomach" so violently that he "suffered severe bruising and dizziness," Hafetz Decl. ¶ 8—or otherwise supporting the account that Petitioner told this Court via his counsel he would swear to under penalty of perjury. *Id.* ex.2.

Given the directly contrary objective evidence and sworn testimony, Petitioner's allegations regarding SDF abuse are not credible, and the Court should disregard them. But even if there were any reason to credit Petitioner's allegations of abuse by SDF forces nine months ago—at a time when, according to Petitioner, they did not believe he was a U.S. citizen—the Court should nonetheless decline to intervene in the Department's planned release. Since that time, Petitioner's U.S. citizenship has been established, ████████████████████ ████████████████████████████████████████████████████ ████████████████ indeed, the Department is willing to provide Petitioner with an identification card ████████████████████████████████████████ ████████████████████████████████████████████████████. ████████████████████████████████████████████████████ ████████████████████████████████████ there is simply no basis to conclude that the SDF poses any current risk to Petitioner's safety. The Court should reject Petitioner's

arguments to the contrary.

## **CONCLUSION**

Petitioner has cited no legal authority for this Court to intervene in the Department's planned release of a battlefield detainee to a safe location proximate to where he himself voluntarily traveled. Nor has Petitioner cited any legal or factual basis for this Court to countermand the Department's considered factual determination about the safety of its planned release. The Court should accordingly decline to intervene in the Department's planned overseas release and should decline to require Petitioner's continued confinement pending the development of some other plan for granting him the release he has been seeking. Petitioner's application for a temporary restraining order should be denied.

June 14, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
JESSIE K. LIU
United States Attorney
TERRY M. HENRY
Assistant Director, Federal Programs Branch

*/s/ Kathryn L. Wyer*
JAMES M. BURNHAM
Senior Counsel
KATHRYN L. WYER
Senior Trial Counsel, Federal Programs
OLIVIA HUSSEY SCOTT
Trial Attorney, Federal Programs
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, N.W
Washington, DC   20530
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Respondent*

19