**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| JOHN DOE, |
| *Petitioner*, |
| v. |
| LLOYD AUSTIN,<br>   in his official capacity as<br>   SECRETARY OF DEFENSE, |
| *Respondent*. |

No. 17-cv-2069 (TSC)

# ECF 106-1

# REDACTED VERSION FOR PUBLIC FILING

**UNDER SEAL**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOHN DOE,

*Petitioner*,

v.

GEN. JAMES N. MATTIS,
  in his official capacity as SECRETARY OF
  DEFENSE,

*Respondent*.

No. 17-cv-2069 (TSC)

**UNDER SEAL**

**PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF
HIS APPLICATION FOR A PRELIMINARY INJUNCTION &
RESPONSE TO RESPONDENT'S SUPPLEMENTAL MEMORANDUM**

UNDER SEAL

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.   PETITIONER IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIM
     THAT THE GOVERNMENT'S PROPOSED INVOLUNTARY TRANSFER
     AND RELEASE OF HIM INTO SYRIA IS UNLAWFUL. ................................................... 2

     A.  The proposed transfer and release of Petitioner into Syria violates international
         law and Department of Defense policy. ................................................................. 2

         1.  The proposed transfer and release violates the government's obligation to
             safely release detainees. ................................................................................. 2

             a.  The record—including statements by the Departments of Defense, State, and
                 Homeland Security—shows that the area of proposed release is neither safe
                 nor stable. .................................................................................................. 3

             b.  As a male foreign national between the ages of 25 and 50, Petitioner would
                 face an increased risk of harm in the area of proposed release. ........................... 11

         2.  The planned release violates international law by making it effectively
             impossible for Petitioner to repatriate. ......................................................... 12

     B.  Petitioner's involuntary release into Syria would violate the Due Process Clause. ......... 15

         1.  Forcibly returning a U.S. citizen to a war-torn region and effectively trapping
             him there after nine months of detention shocks the conscience and violates the
             basic right of all citizens to return to the United States. ............................... 15

         2.  The government may not forcibly transfer and release a U.S. citizen into a foreign
             country without positive legal authority. ...................................................... 19

II.  PETITIONER IS LIKELY TO BE IRREPARABLY HARMED IN THE
     ABSENCE OF AN INJUNCTION. ............................................................................. 24

III. THE BALANCE OF HARMS STRONGLY FAVORS PETITIONER. ......................... 26

IV.  A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST. ..................... 29

CONCLUSION .................................................................................................................. 29

UNDER SEAL

# TABLE OF AUTHORITIES

## Cases

*ACLU v. CIA*,
  710 F.3d 422 (D.C. Cir. 2013) ............................................................................ 10

*\*Butera v. District of Columbia*,
  235 F.3d 637 (D.C. Cir. 2001) ...................................................................... 16, 23

*Cty. of Sacramento v. Lewis*,
  523 U.S. 833 (1998) ....................................................................................... 16, 23

*Doe v. Mattis*,
  288 F. Supp. 3d 195 (D.D.C. 2018) ...................................................................... 27

*\*Doe v. Mattis*,
  889 F.3d 745 (D.C. Cir. 2018) ..................................................................... passim

*Fikre v. FBI*,
  23 F. Supp. 3d 1268 (D. Or. 2014) ....................................................................... 17

*\*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004) .................................................................................... passim

*In re Navy Chaplaincy*,
  697 F.3d 1171 (D.C. Cir. 2012) ........................................................................... 26

*Kiyemba v. Obama*,
  561 F.3d 509 (D.C. Cir. 2009) ............................................................................... 8

*Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ................................................................................................ 24

*Mandoli v. Acheson*,
  344 U.S. 133 (1952) ................................................................................... 17, 20, 24

*Mohamed v. Holder*,
  995 F. Supp. 2d 520 (E.D. Va. 2014) ................................................................... 17

*Monfils v. Taylor*,
  165 F.3d 511 (7th Cir. 1998) ................................................................................ 16

*Munaf v. Geren*,
  553 U.S. 674 (2008) ............................................................................. 7, 8, 20, 21

**UNDER SEAL**

*Newton v. INS*,
   736 F.2d 336 (6th Cir. 1984) .................................................................. 17

*Omar v. McHugh*,
   646 F.3d 13 (D.C. Cir. 2011) .......................................................... 22, 24

*\*Valentine v. United States ex rel. Neidecker*,
   299 U.S. 5 (1936) ...................................................................... 19, 24

*Wilson v. Girard*,
   354 U.S. 524 (1957) .................................................................... 20, 21

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ....................................................................... 24, 26

*Worthy v. United States*,
   328 F.2d 386 (5th Cir. 1964) ............................................................... 17

**Other Authorities**

Deborah N. Pearlstein, *How Wartime Detention Ends*, 36 Cardozo L. Rev. 625 (2014) ............. 21

Dep't of Defense, Conduct of the Persian Gulf Conflict: Final Report to Cong.,
   102nd Cong., L-3 (1992) ................................................................... 14

Dep't of Defense, Off. of Gen. Counsel, Department of Defense Law of War Manual
   (June 2015) ("Law of War Manual") ........................................................ 14

Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949,
   6 U.S.T. 3316, T.I.A.S. No. 3364 .......................................................... 13

Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War,
   July 27, 1929, 6 U.S.T. 3516, T.I.A.S. No. 3365 ........................................... 13

Jordan J. Paust, *Judicial Power to Determine the Status and Rights of Persons Detained
   Without Trial*, 44 Harv. Int'l L.J. 503 (2003) ........................................... 13

Notice of Extension of the Designation of Syria for Temporary Protected Status
   ("TPS Notice"), 83 Fed. Reg. 9329 (Mar. 5, 2018) ........................................ 5, 6

██████████████████████████████████, Dep't of Def., ████████████,
   ("█████ DOD Article") .............................................................. 4, 5, 9, 25

**UNDER SEAL**

Press Release, U.S. Cent. Command, ███████████████████
█████ (████████), ██████████████ ("███████ CENTCOM
 Press Release") .......................................................................................................... 3, 4, 9, 25

R. R. Baxter, Asylum to Prisoners of War, 30 British Y.B. Int'l L. 489 (1953) ......................... 14

U.S. Dep't of State—Bureau of Consular Aff., Syria Travel Advisory (Jan. 10, 2018)
 ("DOS Syria Advisory") .................................................................................. 7, 25, 29

U.S. Dep't of State—Bureau of Consular Aff., Syria: Safety and Security (last updated
 Feb. 20, 2018) ("DOS Syria Information") ......................................................... 9, 25

**UNDER SEAL**

**INTRODUCTION**

To save Department of Defense "resources," the government intends to forcibly return Petitioner, a U.S. citizen, to the dangerous and war-torn country he was fleeing. After nine months of legally untested military detention, the government proposes to abandon Petitioner without a passport, in a country that lacks any American consular services and is in the midst of a four-year civil war. Even as it plans to "release" Petitioner, the government continues to insist that he is an enemy combatant. But rather than prove it, or charge him with a crime in the United States, the government now proposes to end Petitioner's detention by stranding him in an area ████████████████████████████████████████████████, near the ISIS-controlled territory he was fleeing. The government asserts this option is "safe" for Petitioner. But its own statements and evidence, apart from its new litigation position, shows this is far from the case. Moreover, the U.S. government advises its citizens to flee the country immediately— but to follow that advice, Petitioner's only option is to illegally smuggle himself across one or more international borders at great personal danger. In other words, the government's plan would force him to run a lethal gauntlet in order to reach a safe and secure location, rather than simply placing him in one in the first instance.

The government's plan violates international law, the U.S. Constitution, the fundamental duties a government owes to its own citizens—and basic human decency. This Court should enforce the Constitution by refusing to endorse this unprecedented and unconscionable "release."

If the Court instead denies Petitioner's motion, Petitioner respectfully requests that the Court enjoin his transfer pending review of the decision by the U.S. Court of Appeals for the D.C. Circuit.

UNDER SEAL

ARGUMENT

The test to obtain a preliminary injunction is laid out in Petitioner's memorandum of law

in support of his application for a temporary restraining order. *See* Pet.'s Mem. in Supp. of Appl.

for TRO ("TRO Br.") 5–6.

I.   **PETITIONER IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIM THAT THE GOVERNMENT'S PROPOSED INVOLUNTARY TRANSFER AND RELEASE OF HIM INTO SYRIA IS UNLAWFUL.**

    A.   **The proposed transfer and release of Petitioner into Syria violates international law and Department of Defense policy.**

        1.   **The proposed transfer and release violates the government's obligation to safely release detainees.**

The government concedes that under international law and Department of Defense

policy, it must take "necessary measures" to ensure that it does not release prisoners into unsafe

situations. Respondent's Suppl. Mem. in Opp. to Pet.'s Appl. for TRO ("Suppl. Gov't Br.") 9,

ECF No. 101; *see also* TRO Br. 6–9, ECF No. 97-1 (collecting sources); Declaration of Donald

J. Guter ("Guter Decl.") ¶ 7–8. As the government further concedes, determining safety requires

an assessment of "the stability of the area, the resources available to the individual who will be

released, and whether the individual is likely to be attacked upon release." Suppl. Gov't Br. 9–

10. Yet the government's factual submissions come nowhere close to establishing the safety of a

forcible return to Syria. Instead, the evidence establishes that the territory ███████████

██ where the government intends to abandon Petitioner, is neither safe nor stable; that by

forcibly depositing Petitioner ██████████████████ in an area in which he has no

legal right to remain, the government leaves Petitioner exposed to attacks from a range of armies

and armed groups; and that as a male foreign national, Petitioner is at particular risk. In light of

these dangers, the "resources" that the government states it will provide—including the money

**UNDER SEAL**

Petitioner possessed at the time of his capture, water, some rations, and ███████████

█████████████████████████████████████████████████—do not

remotely ensure Petitioner's safety from myriad dangers.

> **a.   The record—including statements by the Departments of Defense, State, and Homeland Security—shows that the area of proposed release is neither safe nor stable.**

Although the government attempts to paint a peaceful picture of ██████ and its

surrounding area by invoking ██████████, *see* Suppl. Gov't Br. 7, the Department of

Defense's declarations about the security situation in this area are directly undermined by

information from multiple government agencies—including the Department of Defense itself.

The credibility of the government's declarants is fatally undermined by the Department

of Defense's own press statements, ████████████████████████

████████████. One declarant, Major General Chad P. Franks, states that "DoD can

attest to the circumstances, including the security situation, in and near ████████," and

that it is the Department of Defense's "███████████████████

████████████████████████." Declaration of

Major General Chad P. Franks ("Franks Decl.") ¶ 6. This declaration is dated June 14, 2018. But

the Department of Defense's own press statements proclaim ██████████

████████████████████████████████

████████████████████████████████

████████████████████:

- ████████████████████████

  Press Release, U.S. Cent. Command,

  (██████████), ("

  CENTCOM Press Release").

**UNDER SEAL**

- ███████████████████████████████████████████████████
  *Id.*

- ███████████████████████████████████████████████████████
  ███████████████████████████████ *Id.*

- ███████████████████████████████████████████████████████
  ████████████████████████████████████████ *Id.*

- ███████████████████████████████████████████████████████
  █████████ *Id.*

- ███████████████████████████████████████████████████████
  ██████████████ *Id.*

- ███████████████████████████████████████████████████████
  ██████████ *Id.*

- ███████████████████████████████████████████████████
  ██████████████ *Id.*

- ███████████████████████████████████████████████████████
  ████████████ *Id.*

- ███████████████████████████████████████████████████████
  ████████████████████████████████████ , Dep't of Def.,
  ████ , ████████████████████████ ("████ DOD Article").

- ███████████████████████████████████████████████████
  █████████ *Id.*

- ███████████████████████████████████████████████████████
  █████████ *Id.*

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

**UNDER SEAL**

 cannot be squared with Major General Franks's contemporaneous declaration stating that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮." Franks Decl. ¶ 6. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ likewise cannot be squared with the attestations of both Major General Franks and Mark E. Mitchell that the area is "'▮▮▮▮▮▮▮ ▮▮▮.'" *Id.*; Declaration of Mark E. Mitchell ("Mitchell Decl.") ¶ 5. Instead, the Department of Defense's press statements show ▮▮▮▮▮▮▮ and its surrounding areas for what they really are: an unstable territory in the midst of an ongoing civil war, where ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮.

As Petitioner has explained, the Department of Defense's position in this case is not only at odds with its own public statements, but also with the position of other government agencies. *See* TRO Br. 12–13. Petitioner previously introduced evidence from both the Department of Homeland Security and the State Department showing that transferring and releasing Petitioner in Syria would not be safe. Although the Department of Defense tries to minimize the significance of both these agencies' determinations that Syria is unsafe, its attempts to do so fail.

As explained in Petitioner's previous filing, the Department of Homeland Security extended the "Temporary Protected Status" designation to Syria through September 30, 2019, after it deemed the country too dangerous for even *Syrian* citizens. *See* TRO Br. 3; Notice of Extension of the Designation of Syria for Temporary Protected Status ("TPS Notice"), 83 Fed. Reg. 9329, 9332 (Mar. 5, 2018). The government tries to explain away this designation by arguing that the Department of Homeland Security's concern is only with President Bashar al-Assad's regime. *See* Suppl. Gov't Br. 13 n.1. But the TPS Notice itself is not limited to areas of

**UNDER SEAL**

Syria under Assad's control; instead, it makes clear that Temporary Protected Status was extended country-wide because "Syria is engulfed in an ongoing civil war marked by brutal violence against civilians, egregious human rights violations and abuses, and a humanitarian disaster on a devastating scale across the country." 83 Fed. Reg. at 9331.

The government also tries to minimize the humanitarian crisis in Syria, arguing that because the Department of Homeland Security does not specifically name ████████ when discussing the humanitarian crisis, its determination "cannot be deemed to undermine the Department's specific assessment regarding Petitioner's safe release." *See* Suppl. Gov't Br. 13 n.1. But again, the Department of Homeland Security specifically refers to "a humanitarian disaster on a devastating scale *across the country*." TPS Notice, 83 Fed. Reg. at 9331 (emphasis added). And it does not limit eligibility for "Temporary Protected Status" to Syrians from government-held or government-besieged territory in the ongoing civil war, nor does it purport to suggest other areas of Syria besides the handful mentioned by name are safe. Thus, while it may be true that "[t]he humanitarian situation is particularly severe in areas besieged by the [Syrian Arab Republic Government]," *id.*, the crisis is not limited to those areas. As the Department of Homeland Security explains, "73% of the Syrian population [is] in need of assistance," including more than "9 million Syrians [who] are in need of emergency food assistance," a situation that "show[s] no sign of improving." *Id.* The Department of Homeland Security's assessment is thus not limited to small pockets of the country: it applies throughout Syria.

Notably, although the government tries to parse and limit the Department of Homeland Security's warning to avoid its clear application to the area where it seeks to transfer and release Petitioner, it does not even try to do the same for the State Department's Travel Advisory. That

**UNDER SEAL**

is for good reason—the State Department's warning is unequivocal: "No part of Syria is safe from violence." U.S. Dep't of State—Bureau of Consular Aff., Syria Travel Advisory (Jan. 10, 2018), https://perma.cc/E5BC-5MLX ("DOS Syria Advisory"). Instead, the government submits a State Department declaration that merely states the obvious: "[t]he Travel Advisory is not a specific assessment of whether the planned release of petitioner is safe or consistent with the obligations of the Department of Defense (DOD)." Declaration of Karin King ¶ 4. While it is true that the State Department's Travel Advisory is not specific to Petitioner, is it not true that the State Department's urgent warning that "no part of Syria is safe" for U.S. citizens and that citizens should "[d]raft a will" before traveling is not relevant to him. DOS Syria Advisory. Tellingly—and glaringly—the State Department's declarant never actually assesses, let alone states, that Petitioner's release in that particular region of Syria *would* be safe. Nor does the declarant assert that the State Department's Travel Advisory does not apply to this specific SDF-held territory. Despite the government's maneuvering, then, this fact remains: before the government took the litigation position it is now taking, the State Department made abundantly clear that Syria is no place for a U.S. citizen.

In the face of the Department of Homeland Security and State Department's assessments that Syria is not safe, the government argues that "[w]ide deference is due to the Department's assessment" because "'it is for the political branches, not the judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments.'" Suppl. Gov't Br. 10 (quoting *Munaf v. Geren*, 553 U.S. 674, 700–01 (2008)). The government is wrong for multiple reasons.

Courts that afford deference in this context do so partly out of the concern that doing otherwise would "undermine the Government's ability to speak with one voice in this area."

**UNDER SEAL**

*Munaf*, 553 U.S. at 702.[1] But on this point, "the Government" is not speaking with one voice. Instead, the Departments of Homeland Security and State have publicly made unequivocal statements about the lack of safety in Syria, and the Department of Defense has publicly announced ███████████████████████████ The Department of Defense cannot now pretend that its recent declarations, made in the context of supporting a litigation position in this Court, are the only government pronouncements entitled to deference. The Department of Homeland Security assessed conditions and determined it was not safe to return even *Syrian* citizens to the country, and the State Department assessed conditions and determined U.S. citizens should not travel there because of the great risk of danger. Plainly, the rationale for affording deference to the executive branch on foreign-policy assessments does not apply when the Department of Defense's assessments differ radically from the established policies of other government agencies and contradict its own public acknowledgments.

The government also argues that the Court should not second-guess the Department of Defense's assessment because it "is based on [the Department of Defense's] expertise in military matters" and because "domestic courts are not equipped to conduct fact-finding" about such issues. Suppl. Gov't Br. 12. But the Department of Defense's factual representations conflict

---

[1] The government cites *Munaf* to support its claim for deference as to the safety of the area surrounding ████████. But the deference described in *Munaf* and *Kiyemba v. Obama*, 561 F.3d 509 (D.C. Cir. 2009), pertains specifically to the executive's determinations regarding the legal and political systems of other countries. As the Supreme Court explained in *Munaf*, "[t]he Judiciary is not suited to second-guess . . . determinations that would require federal courts to pass judgment on foreign justice systems," because it is the "political branches [that] are well situated to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of an ally," and it is the political branches that "possess significant diplomatic tools and leverage" to use to address this problem. 553 U.S. at 702–03. The Court did not suggest that this deference, rooted in principles of comity, applies outside the limited context of assessments of a foreign country's legal and political systems. The military's own self-serving determination about the purported safety of ████████ and the surrounding area, amid Syria's ongoing civil war, does not implicate those foreign policy and diplomatic considerations.

UNDER SEAL

with *its own* ████████████ public statements. As described above, its assessment is based on

the Department of Defense's declarants' statements that ████████ and the surrounding areas

are "████████████" and that "████████████████████████████████

████████████." Mitchell Decl. ¶ 5; Franks Decl. ¶ 6; *see* Suppl. Gov't Br. 1, 9–10. That

assessment cannot be credited in the face of the Department's own evidence showing that

████████████████████. *See* ████████ CENTCOM Press Release; ████████ DOD Article.

Moreover, even if the Court does credit the Department of Defense's declarations in the

face of such significant countervailing evidence, and finds that ████████ and the surrounding

area are currently safe, it does not mean that those areas will *continue* to be safe. As the

government acknowledges, the safety of any proposed release must be judged in light of "the

stability of the area." Suppl. Gov't Br. 9. And as the government has admitted outside of this

litigation, the conflict in Syria is marked by its fluidity and volatility, and violence could erupt at

any time. *See* U.S. Dep't of State—Bureau of Consular Aff., Syria: Safety and Security,

https://perma.cc/PWH9-CNDS (last updated Feb. 20, 2018) ("DOS Syria Information")

(discussing the "violent, volatile conditions in Syria"). In the words of the State Department,

"[a]ttacks from the regime or other groups could happen with little or no warning, no part of

Syria should be considered immune from violence, and the potential exists throughout the

country for unpredictable and hostile acts, including kidnappings, sniper assaults, terrorist

attacks, small arms fire, improvised explosives, artillery shelling, airstrikes, the use of chemical

weapons, large- and small-scale bombings, as well as arbitrary arrest, detention, and torture."

DOS Syria Information. Independent experts agree. This "remains an unpredictable war, in

which areas temporarily enjoying relative security can quickly see conditions deteriorate as

conflict dynamics shift." Declaration of Noah Bonsey ("Bonsey Decl.") ¶ 6. The situation in

UNDER SEAL

northeast Syria is "highly precarious," Declaration of Sara Kayyali ("Kayyali Decl.") ¶ 8, and "even in the SDF-held areas, significant security incidents are relatively common, as seen in a series of attempted killings over the last several months . . . ." Bonsey Decl. ¶ 7. What's more, this uncertainty and risk is compounded by "[q]uestions over the future of the U.S. presence" in Syria. *Id.* If the United States withdraws from the area, it "would remove the security umbrella that currently deters external attack on SDF-held areas," causing "[t]he risk of a major increase in violence in the areas [to] soar accordingly." *Id*. Nothing in the government's submissions contradicts that the place into which it plans to deposit Petitioner is fluid and volatile—a country that, since civil war erupted in 2011, has been one of the deadliest places on the planet.

Ultimately, evidence from the Departments of Defense, Homeland Security, and State shows that ███████ and its surrounding areas are not currently safe, and to release Petitioner there against his will would violate the Department of Defense's obligations under international law and its own policies. And even if this area could somehow be considered safe at this moment due to a (hypothetical) lull in fighting, no American citizens could reasonably expect safety and stability if they were to undertake travel to Syria today. As the D.C. Circuit has admonished in another context implicating national security and foreign affairs, "'[t]here comes a point where . . . Court[s] should not be ignorant as judges of what [they] know as men' and women." *ACLU v. CIA*, 710 F.3d 422, 431 (D.C. Cir. 2013) (quoting *Watts v. Indiana*, 338 U.S. 49, 52 (1949) (opinion of Frankfurter, J.)). Therefore, given that in the midst of an ongoing civil war there is a "risk that even areas in which there is presently no fighting could turn violent again," it would be without "precedent," Guter Decl. ¶ 13, and "unreasonable," *id.* ¶ 14, to transfer and release a U.S. citizen into circumstances such as these. This Court should not sanction such an outcome.

UNDER SEAL

> **b.    As a male foreign national between the ages of 25 and 50, Petitioner would face an increased risk of harm in the area of proposed release.**

Beyond the volatility and instability that subjects everyone in the ███████ area to danger and that that makes it unreasonable to forcibly transfer *any* person there, Petitioner faces an increased risk of harm. As a general matter, "[t]he SDF is especially wary of fighting-age males who lived previously in ISIS-held areas." Bonsey Decl. ¶ 11. Foreign nationals—"i.e. suspected foreign fighters—can be expected to draw particular scrutiny," and "be viewed as a potential security threat." *Id.* Indeed, SDF forces *already* profiled Petitioner as a hostile foreigner, leading to his detention. Return ¶ 61, ECF No. 66-1. Thus, while the government asserts that Petitioner's presence in ████████████████████████ because "███████ ██████████████████████████████████████████████," Suppl. Gov't Br. 8 (citing Franks Decl. ¶ 6), this assessment is undermined by the Department of Defense's own statement that Petitioner was detained by the SDF in the first place due to suspicion that he was a hostile foreigner.

To bolster its claim of safety, the government states that the Department of Defense will return to Petitioner the money he possessed at the time of capture and that it is willing to "███████ ████████████████████████████████████████ ████████████████████████████████████." Suppl. Gov't Br. 1. But the government does not even state definitively that Department of Defense ██████████████████████ ████████████████████████████████████████████████████████ ███████, *id.* at 18.

Last, the Department of Defense maintains that Petitioner was not abused by the SDF, based on its own medical records and declarations. But these sources reflect, at most,

miscommunication. As the declaration from a military medic concedes, Petitioner described a head injury "during detention by the SDF." Declaration of Department of Defense Facility Medic ("Medic Decl.") ¶ 9. This accords with Petitioner's account that, after the medic observed a bruise on the back of his head, Petitioner told the medic he had suffered bruising to his head in SDF custody. Supplemental Declaration of Jonathan Hafetz ("Suppl. Hafetz Decl.") ¶ 4; Declaration of Jonathan Hafetz ("Hafetz Decl.") ¶ 20, ECF No. 97-2. Although the medic now claims that Petitioner did not describe the injury "as intentional or abusive," Medic Decl. ¶ 9, this claim suggests only that the medic did not understand Petitioner's description. Notably, the medic's declaration does not suggest any alternate source for the head injury Petitioner experienced in SDF custody. Moreover, this injury would not be reflected in the Department of Defense's photographs, as "[t]he medical official observed the scar and bruise when he was examining Petitioner's head with his hands, using his fingers to look beneath Petitioner's hair. Neither the scar nor bruise would have been visible in a photograph due to Petitioner's hair." Suppl. Hafetz Decl. ¶ 5. Petitioner is willing to testify to provide further details or clarification regarding this abuse at the hands of the SDF. *Id.* ¶ 7. In any event, the government does not contest that SDF forces previously targeted Petitioner, including by shooting at and detaining him, nor does it contradict that SDF personnel threatened Petitioner with death.

## 2. The planned release violates international law by making it effectively impossible for Petitioner to repatriate.

In addition to violating the prohibition on unsafe release, the government's proposal also violates the rule on release from wartime detention: prisoners should be repatriated, and at the very least the government should not make it harder for individuals to return to their countries of citizenship. The laws of war have long required repatriation of prisoners of war at the end of captivity. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 520–21 (2004) ("Prisoners of war shall be

**UNDER SEAL**

released and repatriated without delay after the cessation of active hostilities." (citing Geneva Convention (III) Relative to the Treatment of Prisoners of War art. 118, Aug. 12, 1949, 6 U.S.T. 3316, T.I.A.S. No. 3364)); Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War art. 75, July 27, 1929, 6 U.S.T. 3516, T.I.A.S. No. 3365 (repatriation should be accomplished with the least possible delay after conclusion of peace); Jordan J. Paust, *Judicial Power to Determine the Status and Rights of Persons Detained Without Trial*, 44 Harv. Int'l L.J. 503, 510–511 (2003) (prisoners of war "can be detained during an armed conflict, but the detaining country must release and repatriate them 'without delay after the cessation of active hostilities,' unless they are being lawfully prosecuted or have been lawfully convicted of crimes and are serving sentences" (citing Geneva Convention (III), *supra*, arts. 85, 99, 118, 119, 129, 6 U.S.T. at 3384, 3392, 3406, 3418)). Accordingly, when both prisoners of war and security internees are transferred, detaining powers must not "increase the difficulty of their repatriation." Geneva Convention (III), *supra*, art. 46; Geneva Convention (IV), *supra*, art. 127 ("When making decisions regarding the transfer of internees, the Detaining Power shall take their interests into account and, in particular, shall not do anything to increase the difficulties of repatriating them or returning them to their own homes."); Guter Decl. ¶ 6.

Yet here, the government proposes to effectively make repatriation impossible. By forcibly removing Petitioner from Iraq to SDF-held territory in Syria, the government is ensuring that Petitioner will be unable to lawfully access consular services and pursue repatriation. In fact, the government proposes to remove Petitioner from a country with multiple U.S. consulates, a recognized government, and functioning commercial airports. From there, the government proposes to strand Petitioner in an area with no recognized government, no U.S. consulate, no access to commercial flights, and no ability to lawfully pursue repatriation.

**UNDER SEAL**

The government compounds these extreme difficulties by refusing to provide Petitioner with any travel documents. There is "no safe and lawful way for a foreign national to leave Syria without either proper identification or the assistance of a foreign government." Kayyali Decl. ¶ 13. If Petitioner wanted to leave—either to see his family or to return to the United States, as is his right—he would be forced to attempt to illegally smuggle himself across the border into Turkey. But such an attempt could prove to be "extraordinarily dangerous," Bonsey Decl. ¶ 12, and border guards "indiscriminately shoot at individuals attempting to illegally cross into Turkey," Kayyali Decl. ¶ 14. If the government releases Petitioner in Syria, it affirmatively consigns him to one of two fates: (1) stay in Syria, a volatile and fragile state, indefinitely, with $4000 and an ad hoc identification card; or (2) risk injury or death by attempting to illegally cross the border. This proposal impermissibly and vastly "increase[s] the difficulties" of repatriation.[2] For the United States to force its own citizen into this dilemma, after holding him for nine months without charge, is unconscionable.

---

[2] The general presumption of repatriation turns on a prisoner's voluntary consent, which is why the government's proposal to forcibly effect a custodial transfer of Petitioner to Saudi Arabia did not constitute an ordinary repatriation. The longstanding practice of both the United States and other powers is not to forcibly repatriate prisoners. *See* Dep't of Defense, Off. of Gen. Counsel, Department of Defense Law of War Manual 9.37.4.2 (June 2015), https://www.defense.gov/Portals/1/Documents/law_war_manual15.pdf ("Law of War Manual") ("The policy of the United States has been not to conduct forcible repatriation of POWs"); *see generally, e.g.*, Dep't of Defense, Conduct of the Persian Gulf Conflict: Final Report to Cong. 587, 102nd Cong., L-3 (1992), *available at* http://www.dtic.mil/dtic/tr/fulltext/u2/a249390.pdf ("By international convention, no [POW] was forcibly repatriated."); R. R. Baxter, Asylum to Prisoners of War, 30 British Y.B. Int'l L. 489, 489–90 (1953) ("In accordance with the Resolution of the United Nations General Assembly of 3 December 1952, the Terms of Reference for the Neutral Nations Repatriation Commission annexed to the Korean Armistice Agreement provided that prisoners who had not 'exercised their right to be repatriated' should be placed in the custody of a Neutral Nations Repatriation Commission (N.N.R.C.), composed of members appointed by Sweden, Switzerland, Poland, Czechoslovakia, and India."). As Petitioner has repeatedly made clear, he would willingly accept return to Saudi Arabia as a free man; he has rejected only his forcible transfer to continued indefinite detention as an enemy combatant, a label the government continues to assert while seeking to deprive Petitioner of the opportunity to disprove it.

UNDER SEAL

**B.** **Petitioner's involuntary release into Syria would violate the Due Process Clause.**

    **1.** **Forcibly returning a U.S. citizen to a war-torn region and effectively trapping him there after nine months of detention shocks the conscience and violates the basic right of all citizens to return to the United States.**

The government's effort to end an American citizen's legal challenge to his nine-month-long military detention by forcibly returning him to the war-torn country he was fleeing, without a passport or access to American consular services, violates the Due Process Clause of the Fifth Amendment. For nine months, the government has asserted its authority to charge Petitioner with a crime, or detain him indefinitely as an enemy combatant, or forcibly render him to the custody of another country. Now that the D.C. Circuit has enjoined Petitioner's involuntary transfer to the custody of third country, the government is unwilling to put Petitioner on trial or defend the legality of his detention. It has instead decided to dump him back in the volatile war zone he was fleeing, fully aware that, to escape, he must both break the law and risk his life.

The crux of the government's argument is that Petitioner voluntarily traveled to Syria to join ISIS—and so gets what he deserves if it returns him there. But if the government wants to punish Petitioner for suspected wrongdoing, it should charge him with a crime and put him on trial, as it has done to other American citizens suspected of joining ISIS. Or, if the government wants to continue to treat Petitioner as an enemy combatant, it should defend that assertion in court. What it cannot do after detaining Petitioner for nine months is to return him to the peril he was fleeing in search of government protection, and strand him there, compelling him to risk his life to obtain government assistance and repatriation. No precedent supports treating an American citizen in this manner, whether because of "scarce resources" or otherwise, and it is no wonder why: it would be unconstitutional.

15

**UNDER SEAL**

As previously explained, the government cannot act in a manner that affirmatively creates or increases a citizen's risk of harm. *See, e.g.*, *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001); *Monfils v. Taylor*, 165 F.3d 511, 517 (7th Cir. 1998); TRO Br. 9–10. This obligation is heightened in two circumstances: first, where "the State has taken a person into custody" and government "officials have 'the luxury . . . of . . . time to make unhurried judgments, upon the chance for repeated reflection." *Butera*, 235 F.3d at 651–52 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998)); and second, where its agents create or increase the danger to an individual not in its custody, especially "where 'actual deliberation is practical,'" *id.* at 652 (quoting *Lewis*, 523 U.S. at 851). If the police cannot forcibly release an individual in a dangerous neighborhood in the United States where he will be exposed to harm, surely the government cannot forcibly transport an American citizen across an international border and release him in a war-torn country, ███████████████████████.

The government has had ample time to consider its options. It has made a deliberate decision to transfer Petitioner back to a country that other government agencies label as extraordinarily dangerous, and release him in an area ██████████████████████████████ and where violence could break out at any time. *See supra* Section I.A.1.a. This decision will necessarily place Petitioner at significant risk ███████████████████████████ ████████████████. This alone is a conscience-shocking way to treat an American citizen.

Even aside from the dangerous and volatile conditions in and near ██████████, the government is fully aware that Petitioner cannot access any American consular services in Syria and that he would need to illegally smuggle himself across an international border, at great peril

16

to his life and safety, to access such services. The government's plan violates the Due Process Clause for this reason as well.

　　As an American citizen, Petitioner has an absolute right to return to the United States after leaving it. *See, e.g.*, *Doe v. Mattis*, 889 F.3d 745, 752 (D.C. Cir. 2018) (citing *Mandoli v. Acheson*, 344 U.S. 133, 139 (1952)); *Newton v. INS*, 736 F.2d 336, 343 (6th Cir. 1984) ("American citizens . . . have the right to return to this country at any time of their liking."). This right does not attach "only once a citizen presents himself at a U.S. port of entry," but also "extend[s] to restrictions that may prevent or impede his ability to a U.S. port of entry." *Mohamed v. Holder*, 995 F. Supp. 2d 520, 536 (E.D. Va. 2014); *see also id.* ("[A] U.S. citizen's right to reenter the United States entails more than simply the right to step over the border after having arrived there."). While courts have upheld security measures that can briefly delay a citizen's return, *see id.* (approving airport screening measures that caused a four to five-day travel delay), no court has approved government action that leaves a citizen with no viable option to return to the United States. *Cf. Fikre v. FBI*, 23 F. Supp. 3d 1268, 1282 (D. Or. 2014) (plaintiff offered "viable means of returning to the United States" because he had "the option of making arrangements to return to the United States through the [U.S.] embassy"). By releasing Petitioner in Syria, the government is forcing him to risk his life to return to the United States. This is an impermissible burden to impose on any American, even if the citizen's own actions originally made it more difficult for him to return to this country. *Cf. Worthy v. United States*, 328 F.2d 386, 394 (5th Cir. 1964) (government cannot force a citizen "to choose between banishment or expatriation on the one hand or crossing the border on the other hand [and] being faced with criminal punishment" for reentry without a valid passport, even though the citizen had voluntarily left the United States without a valid passport).

**UNDER SEAL**

That the government plans to move Petitioner out of a country (Iraq) with a recognized government, multiple operating U.S. consulates, and functioning airports, and strand him in a country (Syria) with none, amplifies the conscience-shocking nature of the government's proposal. The government does not dispute that the only way for Petitioner to access consular services so that he can return to the United States (or to Saudi Arabia, where several members of his family live) would be to illegally smuggle himself out of Syria. The government also does not dispute that Petitioner would necessarily expose himself to certain risk of grave harm, and possible death, if he attempts to leave Syria. Instead, the government argues that, after having imprisoned Petitioner for nine months, it is now free to return him to Syria—even if it means trapping him there—because Petitioner voluntarily traveled there in the past. The government ignores that Petitioner was fleeing the violence in Syria when he was seized and sought the protection of his government, which initially removed him from Syria for his own protection. Hafetz Decl. ¶¶ 3–4; *see* Appellant Br. 26, Doe v. Mattis (D.C. Cir. Feb. 16, 2018), ECF No. 1718454. The government also ignores that it is presently detaining Petitioner in Iraq, where Petitioner could access consular services and a functioning airport. And it ignores that it could simply release Petitioner in the United States. Instead, the government is forcibly moving Petitioner back to a war-zone and releasing him there, knowing full well that Petitioner cannot access a U.S. embassy or consulate without putting his life on the line. This callous and calculated decision shocks the conscience and violates Petitioner's right to return to the United States.[3]

---

[3] Petitioner's claim here is *not* that a U.S. citizen already in Syria or another similar location has a constitutional right to call upon the United States government for protection and safe release elsewhere. But where the government has both taken a citizen into detention and then engaged in long-term detention far beyond the *Hamdi* threshold, its duties are different. *See infra* Section I.B.2.

UNDER SEAL

## 2.    The government may not forcibly transfer and release a U.S. citizen into a foreign country without positive legal authority.

It is now clearer than ever that the executive does not have the unilateral prerogative to dispose of the liberty of an American citizen abroad. In *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5 (1936), the Supreme Court upheld this core constitutional principle and held that the executive cannot forcibly transfer a citizen to another country without affirmative legal authority. *See id.* at 9. And the D.C. Circuit's recent opinion in this case made clear that the *Valentine* principle applies equally to the proposed transfer of a U.S. citizen held abroad even to the custody of foreign countries "with some legitimate sovereign interest in" them, and even where the government alleges he is an enemy combatant subject to indefinite detention by the United States. *See Doe*, 889 F.3d at 755.

The same requirement of positive legal authority applies to the government's proposed post-detention forced return of a U.S. citizen to a foreign country against his will. Critically, the government has already made the determination that it has the authority to detain Petitioner until the end of hostilities. Return at 53; *see Doe*, 889 F.3d at 764. Under *Hamdi*, the due process rights of U.S. citizens—including their rights under *Valentine*—are triggered in habeas "when the determination is made to continue to hold those who have been seized." 542 U.S. at 534. As the D.C. Circuit has held, Petitioner long ago passed out of the period of "temporary detention without process attending 'initial capture.'" *Doe*, 889 F.3d at 764. The decision to transfer a long-term citizen detainee to Syria and release him there, against his will, is far removed from the kind of "battlefield judgment" that would permit the release of a U.S. citizen who had been temporarily detained back into the place where he was found. *See id.* More than nine months after initially detaining Petitioner, removing him from the battlefield, and filing a factual and legal return justifying his indefinite detention, the government has decided to rid itself of

Petitioner because of "scarce Department [of Defense] and military resources." Respondent's Mem. in Opp. to Pet.'s Appl. for TRO ("Gov't Br.") 1, ECF No. 99. But the government cannot rewind the clock and pretend that Petitioner's detention is akin to the "initial captures on the battlefield" that the Supreme excluded from the coverage of the Due Process Clause in *Hamdi*, *see* 542 U.S. at 534, and the requirements it articulated in *Valentine*, *see Doe*, 889 F.3d at 762.

Indeed, the logic of the D.C. Circuit's decision in *Doe* compels this result. The fundamental liberty interest at stake in involuntarily moving a citizen to a foreign country he may not legally or safely leave is no less weighty than that at stake in cases of prolonged detention or involuntary transfer into foreign custody. As in the circumstances of extradition or forced transfer, the release of a citizen into foreign territory without a passport or means of obtaining one is "irrevocable," and further habeas jurisdiction would not be available. *See Doe*, 889 F.3d at 761. Moreover, the potential violation of that fundamental liberty interest is exacerbated where, as here, the non-custodial transfer of a citizen would undermine that citizen's constitutional right to return to the United States. *See Doe*, 889 F.3d at 752 (citing *Mandoli*, 344 U.S. at 139). Given that, there is "no basis for concluding that . . . the Executive need not satisfy the *Hamdi* conditions" for the compelled non-custodial transfer of a U.S. citizen currently in U.S. custody and control into a foreign nation. *Id.* at 762.

Of course, as the D.C. Circuit noted in *Doe*, "it is apparent" from both *Munaf v. Geren*, 553 U.S. 674, and *Wilson v. Girard*, 354 U.S. 524 (1957), "that the Executive need not invariably meet the *Valentine* test to effect a forcible transfer." 889 F.3d at 754. But the rare exception carved out by those cases does not apply here. As the D.C. Circuit explained, the *Munaf*- and *Wilson*-type transfers the government can make without positive legal authority are heavily circumscribed: for the government to make those transfers, the subject citizen must have

**UNDER SEAL**

voluntarily traveled to a foreign country, must have committed crimes there, must be wanted for prosecution by the relevant sovereign, and must actually be held within that sovereign's territory by the United States. *See id.* at 754–56; *see also Munaf*, 553 U.S. at 681; *Wilson*, 354 U.S. at 525–26. As the Court of Appeals explains, "*Munaf* and *Wilson* do not suggest a general prerogative on the part of the Executive to seize any American citizen voluntarily traveling abroad for forcible transfer to any country with some legitimate sovereign interest in her." *Doe*, 889 F.3d at 755. And if that is true of countries with "some legitimate sovereign interest" in a citizen, it is inescapably true of transfers where the government does not claim any foreign sovereign interest at all in a citizen—such as, in Petitioner's case, Syria.

Petitioner's situation does not fit within the narrow *Munaf/Wilson* exception to *Valentine*. The SDF, the controlling military authority in the area where the United States seeks to send Petitioner, has not charged Petitioner with a crime. Indeed, Petitioner is not wanted for prosecution *anywhere*, including in the United States. And he is physically in Iraq, not Syria. To transfer Petitioner to Syria, the government needs positive legal authority.[4]

To be sure, Petitioner in this case does seek the remedy of release. But an involuntary transfer across international borders, even in conjunction with a planned release, is not equivalent to the remedy of release that is the core of the writ of habeas corpus. Notably, the government's proposal marks just the latest of its efforts to shoehorn its planned disposition of Petitioner into the "release" available under habeas. *See, e.g.*, *Doe*, 889 F.3d at 766 ("So transfer,

---

[4] The most obvious type of positive legal authority for this type of non-custodial transfer of an American citizen—*i.e.*, to a place other than to the United States—would be a treaty with allies in an armed conflict that delineates the resettlement or repatriation of individuals detained during hostilities by the various powers. *See, e.g.*, Deborah N. Pearlstein, *How Wartime Detention Ends*, 36 Cardozo L. Rev. 625 (2014). And perhaps, similar to what the Court of Appeals held in *Doe* concerning custodial transfers of citizens, a non-custodial transfer of a citizen to a foreign country might be authorized under the laws of war *after* the government proves the citizen is detainable as an enemy combatant. *See Doe*, 889 F.3d at 758–60.

21

UNDER SEAL

the government says, is thus tantamount to release . . . . The government's position cannot be correct."). But even the government concedes that not *every* type of release is permitted. *See, e.g.*, Suppl. Gov't Br. 9 ("The Manual further states that, if 'operational necessities' and 'logistical constraints' make it difficult to release a detainee at the time the Department determines that release is an appropriate disposition, '[c]ontinued detention in order to facilitate a safe and orderly release may be necessary.'"). And it would be perverse if the government could evade the requirements of *Valentine*, *Hamdi*, and *Doe* by forcibly moving an individual into a foreign country where he will be effectively trapped—with no ability to access consular services or legally leave.

Indeed, accepting the government's position would leave entirely unprotected the "errant tourist, embedded journalist, or local aid worker." *Hamdi*, 542 U.S. at 534. In *Hamdi*, the Supreme Court held that the Constitution could not allow the government to deny such a person the "protections" the Constitution requires to check the "risk of error thought unacceptable" for "irrevocable transfer to another country." *Doe*, 889 F.3d at 763; *see Hamdi*, 542 U.S. at 534. The government may still believe Petitioner is an enemy combatant—but because it refuses to prove it, whatever constitutional rule applies to Petitioner will apply to any other U.S. citizen unlawfully detained in the same situation.[5]

Moreover, "[e]specially in habeas cases like this one, 'history matters.'" *Doe*, 889 F.3d at 756 (quoting *Omar v. McHugh*, 646 F.3d 13, 19 (D.C. Cir. 2011)). In *Doe*, the D.C. Circuit

---

[5] As the Court of Appeals makes clear in *Doe*, that the government continues to allege that Petitioner is an enemy combatant subject to indefinite detention under the AUMF, *see* Gov't Br. 1, has no bearing whatsoever on Petitioner's constitutional rights in this context. The D.C. Circuit (invoking *Hamdi*) stated, "in the case of an American citizen, the government's good-faith determination that he is an enemy combatant is not enough to justify" the government's compelled disposition of the citizen's liberty. *Doe*, 889 F.3d at 763 (citing *Hamdi*, 542 U.S. at 537).

**UNDER SEAL**

observed that there had not been a *single* "instance—in the history of the United States—in which the government has forcibly transferred an American citizen from one foreign country to another." *Id.* And that statement applies to *both* custodial and non-custodial transfers of American citizens. As far as Petitioner is aware, the government has never done what it proposes to do here: forcibly transport an American citizen to another country and release him there against his will absent legal positive authority. "[T]he absence of even a single known example of the unilateral power the Executive claims here is illuminating. . . . There is all the more reason, then, to proceed with considerable caution before recognizing such a power as a unilateral (although apparently never-before-exercised) prerogative of the Executive." *Id.* And while the Department of Defense states that it has released ███ individuals where it plans to send Petitioner, *see* Suppl. Gov't Br. 6, it has not claimed that any of these individuals were U.S. citizens. When the lives and liberty of U.S. citizens are at stake, the Constitution simply requires the government to do more. *See, e.g.*, *Doe*, 889 F.3d at 763.

Finally, while it is true that Petitioner came into U.S. custody in the same area that the government now proposes to release him, that does not render the non-custodial transfer of Petitioner any less of a transfer protected by the *Valentine* rule. As explained above, Petitioner's right to due process in this context ripened as soon as the government classified Petitioner as an enemy combatant and determined that it could and would continue to indefinitely detain him on that basis. *See Doe*, 889 F.3d at 764. As explained in Petitioner's previous filing, *see* TRO Br. 9–10, the government's relationship to (and due-process–based duties toward) an individual fundamentally alters "where the State [takes on] a heightened obligation toward [an] individual." *Butera*, 235 F.3d at 651 (citing *Lewis*, 523 U.S. at 849). Now that Petitioner is in long-term U.S. custody, the due-process rights embedded in the *Valentine* rule and principles governing habeas

23

UNDER SEAL

corpus protect against *any* further disposition of Petitioner, no matter where—unless that

disposition is either voluntary,[6] or is into the United States (where Petitioner has an absolute

right to return and where the Court can order his release),[7] or unless the government proves that

Petitioner is an enemy combatant subject to indefinite detention.[8] *See Doe*, 889 F.3d at 763;

*Valentine*, 299 U.S. at 9 (explaining that the Court's holding rested on "the fundamental

consideration that the Constitution creates no executive prerogative to dispose of the liberty of

the individual"). As in *Doe*, it is true that the constitutional "constraints on the Executive could,

in theory, discourage the Executive from taking custody of a suspected enemy combatant known

to be an American citizen." *Doe*, 889 F.3d at 768. But "[t]hat was equally true, though, of the

Supreme Court's decision in *Hamdi*, which established constraints on the Executive's treatment

of U.S. citizens captured on a foreign battlefield." *Id.* Nevertheless, the D.C. Circuit "adhere[d]

to that decision and appl[ied] it to military transfers, consistent with [Circuit] precedent." *Id.*

(citing *Omar*, 646 F.3d at 24). This Court should do the same here.

## II.   PETITIONER IS LIKELY TO BE IRREPARABLY HARMED IN THE ABSENCE OF AN INJUNCTION.

The evidence here is overwhelming "that irreparable injury is *likely* in the absence of an

injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Los Angeles v.*

*Lyons*, 461 U.S. 95, 103 (1983)). According to the State Department, "no part of Syria should be

considered immune from violence, and the potential exists throughout the country for

---

[6] *See Doe*, 889 F.3d at 764 ("There is, of course, a vast difference between a voluntary transfer and an involuntary one."). For example, Petitioner has repeatedly represented that ██████ ████████████████████████████████████████████████████████████.

[7] As *Doe* explained, "[a] fundamental attribute of United States citizenship is a 'right to . . . return'" to the United States "after leaving." 889 F.3d at 752 (alteration in original) (quoting *Mandoli*, 344 U.S. at 139).

[8] *See Doe*, 889 F.3d at 758–60.

UNDER SEAL

unpredictable and hostile acts, including kidnappings, sniper assaults, terrorist attacks, small

arms fire, improvised explosives, artillery shelling, airstrikes, the use of chemical weapons,

large- and small-scale bombings, as well as arbitrary arrest, detention, and torture." DOS Syria

Information. These factors have "raised the risk of death or serious injury" for U.S. citizens in

Syria, and "the U.S. government is unable to provide emergency services to U.S. citizens in

Syria." DOS Syria Advisory.  In short, "No part of Syria is safe from violence." *Id.*

      Moreover, the specific location the government intends to send Petitioner is ███████



████████████████████████████████████████████████████████. Far

from being "███████████," as both Department of Defense declarants attest, *see* Franks Decl.

¶ 6; Mitchell Decl. ¶ 5, the area near ███████████████████████████████████

████████████████████████████████████████████████

███████████. *See* ██████ CENTCOM Press Release; ██████ DOD Article. This "fragile

security environment," where there are "██████████████████," Bonsey Decl. ¶ 8, is no

place to send a U.S. citizen.

      And more than just sending Petitioner to Syria, by refusing to provide Petitioner with

travel documents, the United States is *stranding* him there. Syria no longer has a U.S. embassy or

consulate through which Petitioner could obtain travel documents, so his only option would be to

try to illegally smuggle himself across the border. But any attempt to illegally cross the border

could prove to be "extraordinarily dangerous." Bonsey Decl. ¶ 12. The terrain near the border is

"littered with landmines," Kayyali Decl. ¶ 16, and Turkish border guards have a practice of

shooting at unauthorized border crossers. *See* Bonsey Decl. ¶ 13; Kayyali Decl. ¶ 14. People

fleeing the violence in Syria have been killed in their attempts to reach safety, *see* Kayyali Decl.

**UNDER SEAL**

¶ 14, and if the government is not enjoined from sending Petitioner to Syria, he may face the same fate.

This harm would be irreparable. By forcibly transferring Petitioner to Syria and stranding him there, the government would be depriving Petitioner of the same liberty interests that were at stake when it sought to forcibly transfer him to Saudi Arabia. Critically, despite ████████ ████████████████████████████████████████████████—the same force that abused him while he was in its custody last September—█████████████████, his "release" there would still be (as it was in the case of transfer) "without any continuing oversight by—or recourse to—the United States." *Doe*, 889 F.3d at 765. "[W]ishing to avoid that irrevocable change in his station, [Petitioner] objects to his proposed" non-custodial transfer and release into Syria, and "[n]o more is required to demonstrate that he would face irreparable injury if he were involuntarily (and irreversibly)" placed there "in violation of his constitutional rights." *Id.* As the D.C. Circuit explained in *Doe*, merely because a particular disposition would end Petitioner's detention in U.S. custody does not negate irreparable injury where the disposition "itself is a harm that cannot be remedied." *Id.* at 766.

## III.    THE BALANCE OF HARMS STRONGLY FAVORS PETITIONER.

Courts must "balance the competing claims of injury [to] consider the effect on each party of the granting or withholding of the requested relief," *Winter*, 555 U.S. at 24 (citation omitted), and determine whether the "balance of equities tips in [Petitioner's] favor," *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012) (quoting *Winter*, 555 U.S. at 20). The grave and imminent risks Petitioner faces if transferred to and released in Syria vastly outweigh any harms cited by the government. *See Doe*, 889 F.3d at 766 (finding balance of harms weighed in favor of Petitioner despite the government's "manifestly weighty" interest in "avoid[ing] undue

interference with its military judgments in connection with ongoing hostilities and with its conduct of foreign relations with a coalition partner in that campaign").

The government says it will face two main "harms" if it cannot send Petitioner to Syria. First, it says it will need to "expend resources to detain an individual that it no longer wishes to detain," and claims that if the Court blocks its attempt to rid itself of Petitioner because it would violate Petitioner's constitutional rights, the government will be left with no "clear alternative." Gov't Br. 10. But that is plainly false. The government has at least five clear options if it no longer wishes to expend resources on detaining Petitioner as an enemy combatant: (1) open the gates and provide Petitioner with safe and voluntary release in Iraq; (2) negotiate with Saudi Arabia to accept Petitioner as a free man; (3) work with Petitioner to identify another safe country; (4) release Petitioner into the United States; or (5) charge him with a crime. Ignoring these options, the government tries to cast Petitioner as unreasonable and recalcitrant for not wanting to be sent to ████████████████ in a country in the midst of a civil war, with no safe way to escape.

Second, the government says that "[j]udicial inquiry or oversight into executive decisions regarding release or transfer of wartime detainees impairs the Executive branch's ability to carry out these essential functions." Gov't Br. 10. But as this Court has found, U.S. citizens have a right "to contest the lawfulness of their . . . transfers at the hands of the Executive," *Doe v. Mattis*, 288 F. Supp. 3d 195, 200 (D.D.C. 2018), and any "harm" caused by judicial oversight here is far outweighed by Petitioner's life and liberty interests at stake. Moreover, it is the government—now in control of Petitioner, and fully able to allow him access to the consular services he would need to risk his life to obtain if he is released in Syria—that is acting unreasonably. Petitioner has repeatedly made clear that he would accept a number of safe release

options, so long as his security and liberty are safeguarded. He is also willing to litigate the

legality of his detention, or to face trial in the United States if charged with a crime. The

government states it wants to release him, and Petitioner shares the government's "desire to end

the detention [he] contests." Gov't Br. 10. But despite essentially conceding that Petitioner poses

no threat, the government has refused to provide an option where Petitioner would be safe and

free, or to provide him the process before continued detention or conviction that the Constitution

requires.

That the balance of equities weighs in favor of Petitioner is clear when compared to the

D.C. Circuit's weighing of the equities when the government attempted to forcibly transfer

Petitioner to Saudi Arabia. There, the interests of the government had greater weight, yet both

this Court and the D.C. Circuit ruled that the balance of the equities tipped in Petitioner's favor.

The government had asserted that at stake was the United States' "credibility with an important

foreign partner," Declaration of ███████████████ ¶ 8, ECF No. 77, and that any delay "could

adversely affect its willingness to engage with the United States on some future detainee

transfers," *id.* But even as the D.C. Circuit recognized the government's interest in "avoid[ing]

undue interference" with "its conduct of foreign relations with a coalition partner" and "its

military judgments in connection with ongoing hostilities," the court held that Petitioner's

interests outweighed the government's, and enjoined the transfer. *Doe*, 889 F.3d at 766–67.

Petitioner's interest here in avoiding grave injury or death is at least as weighty—if not

more so—than Petitioner's interest in avoiding indefinite detention in Saudi Arabia. There is no

comparison between any possible injury to the government if this Court enjoined it from

releasing Petitioner and the absolute, irreparable harm Petitioner would suffer if he were

abandoned in a war-torn country, at significant risk of bodily harm or death, and with no

UNDER SEAL

opportunity to escape—in circumstances the government itself is in a position to remedy right

now. Indeed, the government has no legitimate interest whatsoever in releasing Petitioner into

conditions so perilous. For these reasons, the balance of equities weighs in favor of Petitioner.

## IV.    A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST.

The public interest is served by ensuring that the U.S. government does not transfer and

release a U.S. citizen into harm's way. An American citizen unlawfully detained by the U.S.

government has the absolute right to challenge the detention and to try to secure the right to a

safe release—even in wartime. *See Hamdi*, 542 U.S. at 536. Just as a forcible transfer to the

custody of another country would not have vindicated Petitioner's rights under habeas, *see Doe*,

889 F.3d at 766, neither does his forcible release to a country in which "[n]o part . . . is safe from

violence," DOS Syria Advisory.

## CONCLUSION

For the foregoing reasons, this Court should enjoin the government from transferring

Petitioner to Syria and releasing him there.


Dated:  June 22, 2018                                     Respectfully submitted,

                                                          */s/ Jonathan Hafetz*

Arthur B. Spitzer (D.C. Bar No. 235960)                  Jonathan Hafetz (D.C. Bar No. NY0251)
American Civil Liberties Union                           Anna Diakun
   of the District of Columbia                           Brett Max Kaufman (D.C. Bar No. NY0224)
915 15th Street, NW, 2nd Floor                           Dror Ladin (*pro hac vice*)
Washington, DC 20005                                     Hina Shamsi (D.C. Bar No. MI0071)
Tel: 202-457-0800                                        American Civil Liberties Union Foundation
Fax: 202-457-0805                                        125 Broad Street—18th Floor
aspitzer@acludc.org                                      New York, New York 10004
                                                         Tel: 212-549-2500
                                                         Fax: 212-549-2654
                                                         jhafetz@aclu.org

**UNDER SEAL**

adiakun@aclu.org
bkaufman@aclu.org
dladin@aclu.org
hshamsi@aclu.org

*Counsel for Petitioner*